UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
HACER DINLER, ANN MAURER, and  :
ASHLEY WATERS,                 :
                               :
                 Plaintiffs,   :
                               :        **FIRST AMENDED**
                               :        **COMPLAINT**
          v.                   :
                               :        04 Civ. 07921
The CITY OF NEW YORK and RAYMOND  :
KELLY, Commissioner of the New York City  :
Police Department,             :
                               :
                 Defendants.   :
                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

<u>PRELIMINARY STATEMENT</u>

1.      This is an action to vindicate the civil rights of bystanders near the area of

demonstrations, non-participating observers of demonstrations, and individuals wishing

to participate lawfully in demonstrations in New York City.  During the Republican

National Convention, the New York Police Department deployed a policy and practice of

indiscriminately arresting large groups of people who were peacefully assembled on City

sidewalks and who either were participating in or were in the vicinity of demonstrations.

The Department then detained those arrested for minor offenses for excessive periods of

time and unlawfully fingerprinted them.  Through this lawsuit the plaintiffs seek relief

that will lead the NYPD to discontinue use of these practices at future demonstrations in

New York City.

2.      The Republican National Convention prompted hundreds of thousands of people to participate in lawful demonstrations in New York City between August 26, 2004, and September 2, 2004.   However, during that period the NYPD arrested over 1,800 people, the vast majority of whom were charged with only minor offenses.  On Tuesday, August 31 alone, the NYPD arrested more than 1,100 people, many of whom were not engaging in any unlawful behavior. Because the NYPD deployed mass-arrest tactics—such as mesh nets to indiscriminately trap groups of people on sidewalks without individualized findings of probable cause—the Department ended up arresting many people who were engaged in lawful protest activity or who were not even demonstrators.  The Department then held hundreds of people for more than twenty-four hours, with many of them spending long periods of time in a filthy bus depot converted into an arrest holding facility for the Convention.  Finally, the NYPD systematically fingerprinted those arrested for minor offenses during the Convention.

3.      Shortly before 7:00 p.m. on August 31, 2004, a group of demonstrators carrying signs and playing drums and other instruments left its gathering place at the southern end of Union Square Park and proceeded north on Union Square East.  They were followed by curious observers.  After the police prevented the demonstrators and observers from proceeding north on Union Square East, the group moved east on 16th Street.  Using mesh nets and large numbers of officers, the police then sealed off both ends of the block (at Union Square East and at Irving Place) and refused to allow anyone inside to leave. Many of those trapped between the police lines had been walking lawfully on the sidewalk, and some had not even been following the demonstrators but were simply caught in the crowd when the police sealed the entire block.  Without giving any

opportunity for people to disperse, the police began systematically arresting people on the block, throwing some people to the ground. Those arrested were handcuffed and placed on buses, and many were taken to and held at a filthy bus depot. Even though those arrested on 16th Street were charged with only minor offenses, they were fingerprinted and remained in police custody for long periods of time, some for over two days.

4.     As a result of NYPD policies and procedures, the plaintiffs—a bystander, a non-participating observer, and a lawful demonstrator, each lawfully standing on the sidewalk—were falsely arrested, detained, and fingerprinted. Plaintiff Hacer Dinler, a personal fitness and dance instructor who had no connection to the demonstration and simply happened to be walking on the block, was confined by police as she walked down the 16th Street sidewalk on her way to teach a dance class. After about two hours in confinement, during which time the NYPD ignored her repeated calls for help, Ms. Dinler fainted and experienced convulsions. She was eventually transported by ambulance to St. Vincent's Hospital, where she underwent testing and treatment until the following morning. Plaintiffs Ann Maurer and Ashley Waters were also victims of the NYPD's practice of indiscriminate confinement. Ms. Maurer, a participant in the demonstration, and Ms. Waters, a non-participating observer, were each lawfully standing on the sidewalk on 16th Street when police sealed the entire block. Over the course of the next twenty hours or so, Ms. Maurer and Ms. Waters were unlawfully handcuffed, searched, and fingerprinted before being released.

5.     The NYPD's policies and practices during the Republican National Convention of arresting lawful demonstrators, non-participating observers and bystanders en masse, of

detaining those arrested for long periods of time in unhealthy conditions, and of routinely

fingerprinting those arrested for only minor offenses violated the First, Fourth, and

Fourteenth Amendments to the United States Constitution as well as provisions of the

New York State Constitution, statutes, and common law.  The plaintiffs seek a finding

that these policies were unlawful; seek a finding that their arrests, detentions, and

fingerprinting were unlawful, and an injunction requiring the return or destruction of their

fingerprints and any other records of the unlawful arrests.  Plaintiffs also seek

compensatory damages and attorneys fees.

## JURISDICTION AND VENUE

6.      This court has subject-matter jurisdiction over the plaintiffs' claims pursuant to

28 U.S.C. §§ 1331, 1343(3-4).

7.      Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to

28 U.S.C. § 1367(a), over any and all state constitutional and state law claims that are so

related to the claims within the original jurisdiction of this court that they form part of the

same case or controversy.

8.      Venue is proper pursuant to 28 U.S.C. § 1391(b) in that plaintiffs' claims arise in

the Southern District of New York.

9.      Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure.

An award of costs and attorneys fees is authorized pursuant to 42 U.S.C. § 1988.

PARTIES

10.    Plaintiff HACER DINLER is a resident of Brooklyn, New York.


11.    Plaintiff ANN MAURER is a resident of Astoria, Queens in New York City.


12.    Plaintiff ASHLEY WATERS is a resident of Cambridge, Massachusetts.


13.    Defendant CITY OF NEW YORK is a municipal corporation within the State of

New York.


14.    Defendant RAYMOND KELLY is the Commissioner of the New York City

Police Department.  He is sued in his official capacity for injunctive relief.


FACTS

15.    The Republican National Convention was held in New York City between August

30, 2004, and September 2, 2004.   In response, numerous organizations and individuals

planned and conducted protest activities—including the single largest demonstration

believed to have taken place at a political convention in the United States.  Despite

repeated statements by NYPD officials, including Police Commissioner Raymond Kelly,

about the threat posed to New York City by "hard-core" and "dangerous" protesters, the

demonstrations proved to be overwhelmingly peaceful.  New York City Mayor Michael

Bloomberg professed to welcome convention participants and peaceful protestors alike,

pledging that the city's security plan would "protect[] the rights of convention-goers and

protestors without unnecessarily getting in the way of New Yorkers as we go about our daily lives."

16.     At Convention-related demonstrations there were nearly 1,800 arrests, many of them mass arrests of people lawfully on public sidewalks or streets, with law-abiding demonstrators and innocent bystanders alike being swept up.  On Friday, August 27, police officers used orange nets to trap and arrest scores of people participating in a bicycle protest that the NYPD had allowed to take place for nearly one and one-half hours before making mass arrests without warning.  Two days later—on Sunday, August 29—the NYPD used nets again to arrest groups of people lawfully standing on sidewalks in Times Square, including legal observers and members of the press.  The use of this type of indiscriminate arrest tactic is wholly unreasonable, as it is virtually certain to result in the arrest of people engaged in lawful activity.

17.     The bulk of the arrests during the Convention took place on Tuesday, August 31, the second day of the Convention.  One of the demonstrations taking place that day was the A31 Street Party, which was described by organizers as a mobile event to assert "the idea that the streets of Manhattan are public domain."  Around 6:00 p.m. the Street Party began to assemble at the southern end of Union Square Park.  The event included two marching bands, consisting of various drums and unamplified horns.  One band wore orange and grey uniforms while other participants were dressed in costume or carried large cardboard cutouts of characters from the Wizard of Oz, creating a carnival-like atmosphere.

18.      Between 6:45 p.m. and 7:00 p.m, participants in the Street Party began to move
out of Union Square, proceeding north on Union Square East.  The group was prevented
from continuing north by a line of NYPD officers that stretched across Union Square
East, so the group started east on 16th Street.

19.      After the group of demonstrators and observers entered the block of 16th Street
between Union Square East and Irving Place, a line of police closed off the Irving Place
end of the block using orange plastic netting.  Roughly simultaneously, a second line of
police with orange netting blocked off the Union Square East end of the block, trapping
well over one hundred people, many of whom were simply observing the demonstration
from the sidewalks or even just passing by.

20.      Without any audible order to disperse, the two lines of police then proceeded to
move toward each other, compressing the demonstrators, observers, and passers-by into
one large crowd.  After a few moments, the police split the crowd into separate groups
and forced each group onto either the north or south sidewalk of the block.  Police
officers were unresponsive to questions about the reason for the detention.

21.      Shortly after forcing the groups onto the sidewalks, police began roughly to
remove individuals from the crowd and to throw them to the ground before arresting
them.  They appeared to be targeting protestors wearing masks or costumes, as well as
the musicians, many of whose instruments were thrown to the ground and damaged.

22.    Following this series of targeted arrests, the police continued to surround the groups on the sidewalk and refused to release them.  At approximately 7:15 p.m. police announced that everyone would be arrested and began systematically to arrest the remaining individuals.  Each arrestee was placed in plastic flexcuffs and led onto a waiting city bus on Irving Place.

23.    The arrestees were transported by city bus to Pier 57, a block-long, three-story former bus depot on the Hudson River at 11th Avenue and 15th Street used by the City to hold demonstrators arrested during the Convention.  Some arrestees were taken into Pier 57, where they remained for long periods of time in unhealthy conditions.  Others were transported directly to 100 Centre Street.  Upon information and belief all those arrested were fingerprinted, regardless of the offense with which they were charged.

24.    Eventually, those arrested on 16th Street were released, with some of them having spent over two days in police custody.

25.    The mass arrest of people at demonstrations substantially chills the exercise of First Amendment rights.  When the police arrest large numbers of people engaged in lawful activity at or near demonstrations, those arrested are far less likely to be comfortable engaging in future protest activity.  Moreover, when such arrests take place at highly publicized events such as the Republican National Convention, the public at large is given the message that participation in protest activity is likely to lead to arrest.

8

PLAINTIFF HACER DINLER

26.     Plaintiff Hacer Dinler is a twenty-eight year-old, Turkish-born resident of Brooklyn, New York.  She works as a dance and fitness instructor and conducts private sessions with clients throughout New York City and in Scarsdale, New York.

27.     One of the dance studios at which Ms. Dinler holds sessions is Sal Anthony's Movement Salon, located at 190 3rd Avenue at 17th Street.  On August 31 she worked at Sal Anthony's from approximately 1:00 to 7:00 p.m.  She left the studio and began to walk downtown to teach a dance class scheduled for 8:00 p.m. in a studio called Lila, on Bowery near Houston Street.

28.     Ms. Dinler's route took her toward Union Square via 16th Street.  While walking on the north sidewalk of 16th Street from Irving Place toward Union Square East, she saw one of the marching bands playing music in the street and many people watching the band and chanting.

29.     Ms. Dinler then noticed a large number of police officers blocking the Union Square East end of 16th Street.  Frightened by the police and the large crowd of people, she froze for a moment, then turned back toward Irving Place.  At this point she saw that her exit had been blocked by the other line of police, who had closed off Irving Place with orange netting.  Ms. Dinler told some of the police officers that she was on her way to teach a dance class and that she needed to get by, but they would not let her leave the area.

30.     When the police on both ends of the block began to close in, Ms. Dinler, along with about 60 or 70 other people, was forced against a building on the north side of 16th Street.   Police surrounded the group in a semi-circle.  Ms. Dinler asked why she had been detained, but the officers were unresponsive.

31.     Ms. Dinler watched as members of the band who had been marching in the street were pulled out of the crowd and arrested.  Many were thrown violently to the ground by the police.  Ms. Dinler saw blood on people's faces and was very concerned both for the musicians and for her own well-being.  She hoped that once the marchers had been arrested, the police would let the rest of the people go.  Instead, the police began to arrest everyone on the block, putting them in plastic handcuffs (known as flexcuffs) and taking them to city buses that were parked on Irving Place.

32.     Ms. Dinler was held on the sidewalk by the police for approximately two hours, while other people on the block were individually arrested and taken to the buses.  She requested to use a bathroom, but was refused.  After approximately two hours, the police began to arrest the people around Ms. Dinler.

33.     At this point Ms. Dinler became extremely upset and began to cry.  Her heart was beating rapidly and she felt panicked.  After about five minutes, Ms. Dinler fainted.  For the next several minutes she lay on the ground, going in and out of consciousness, her body shaking, convulsing, and contracting without her control.

34.    Eventually, an ambulance arrived and transported Ms. Dinler to Saint Vincent's Hospital.  While en route to the hospital, she was given two injections in an effort to relax her muscles.  As a result of the injections, Ms. Dinler received bruises on her arms that lasted for approximately two weeks.  She still experiences pain at the site of the injections.

35.    Ms. Dinler arrived at Saint Vincent's at approximately 9:30 p.m.  She spent approximately two hours in the emergency room, where the doctors had difficulty controlling her convulsions.  She was told she had a very high temperature.  She also felt very confused and groggy, as a result of the injections she had been given.  At some point, a police officer came to the hospital and spoke to Ms. Dinler, telling her that she would not be charged with a crime.

36.    After the officer left, Ms. Dinler had another convulsion and was given another injection.  The hospital also administered a CAT scan and blood tests.

37.    Ms. Dinler was finally released at 4:00 a.m. the morning of September 1.  She was told to return to Saint Vincent's the following Friday for a follow-up visit.  Because she has no health insurance, Ms. Dinler decided she could not afford to return for this visit.

38.    After leaving the hospital, Ms. Dinler finally arrived at her home at approximately 5:00 a.m.  She spent the entire day in bed, recovering from her ordeal.  As a result, she was unable to travel that day to Scarsdale, New York, where she had scheduled a full day

of private sessions. Ms. Dinler was also unable to attend scheduled sessions the following day, and only was able to return to work on the evening of September 2.

39.    In addition to the bruises and pain she still suffers from the injections, Ms. Dinler has experienced severe emotional distress as a result of her ordeal. She feels nervous and fearful around police officers. She remains upset about what happened, and the experience has adversely affected her work. Ms. Dinler also received a $2,500 hospital bill, which she has had to worry about trying to pay, since she does not have health insurance.

<u>PLAINTIFF ANN MAURER</u>

40.    Plaintiff Ann Maurer is a twenty-five year-old resident of Astoria, Queens. Ms. Maurer has lived in Astoria since May 2004, when she moved from New Orleans, Louisiana. She is currently the assistant to the legal director of the American Civil Liberties Union in New York. Ms. Maurer has participated in approximately ten protests in her life. While living in New Orleans, she once served as a volunteer marshal during an anti-war protest and helped to negotiate a march route with the local police.

41.    On August 31 Ms. Maurer left work at 5:00 p.m. She had three friends in town from New Orleans, and she met them at Union Square at 5:30. Her friends had read flyers about events taking place at Union Square that evening and wanted to see what was going on.

42.     Ms. Maurer and her friends watched the musical groups that were playing in Union Square.  After being handed a flyer by a demonstrator, they decided to join the group.  One of Ms. Maurer's friends had a flight the next day, so they had no intention of getting arrested.  In fact, Ms. Maurer and her friends planned to return home after the demonstration and spend a quiet Thursday evening at her apartment.  They were confident that they would not be arrested if they stayed on the sidewalk and did not block the street.  Accordingly, as the group began to proceed northbound along Union Square East, she and her friends crossed the street and walked on the far sidewalk.  They then proceed north to 16th Street, which they crossed in the crosswalk.  At that point Ms. Stauber and her friends encountered a line of police officers blocking the northbound sidewalk (as well as all of Union Square East).  They therefore turned east on 16th Street, carefully remaining on the sidewalk as the group of demonstrators also proceeded east on 16th Street.

43.     As they neared the intersection of 16th Street and Irving Place, Ms. Maurer saw the line of police officers blocking the street.  By this point, the police had also blocked off the Union Square East end of the block in a similar fashion.  Ms. Maurer was standing within ten to fifteen feet of the police line at Irving Place and did not hear any order to disperse or any other communication from the police.

44.     After the police began to close in on either side of the block, Ms. Maurer and her friends were gradually pushed into a group surrounded by police officers on the north sidewalk on 16th Street.

13

45.    The police began arresting individual protestors who had been wearing masks and costumes and those who had been playing music. Ms. Maurer then heard an officer state over a megaphone that everyone on the block was under arrest. At approximately 7:15 p.m., Ms. Maurer and her friends were restrained with flexcuffs and put onto city buses that were parked on Irving Place. Ms. Maurer and her female friend were put onto a bus of about 50 women, while her two male friends were taken to an all-male bus. Ms. Maurer's bag was searched before she was allowed onto the bus.

46.    The bus was then driven to Pier 57 by a police officer who did not appear to be an experienced bus driver. On the way to Pier 57, the bus struck several vehicles, two of which were parked. Many of the women on the bus were complaining that the flexcuffs around their arms were too tight and were causing pain. After arriving at Pier 57, no one was allowed off of the bus, and Ms. Maurer and the others sat there for about an hour. No one was allowed to use restrooms during this time. One woman on the bus became ill and started vomiting and was only released from her flexcuffs and assisted by police officers after repeated calls by other arrestees.

47.    The bus was then driven to 100 Centre Street, where again it sat parked for approximately one hour before anyone was let out. The bus pulled into a gated enclosure, where everyone was let out and put into two lines. They then walked single file into a courtyard at 100 Centre Street, where they were assigned in groups of four to an arresting officer and photographed. Ms. Maurer's bag was confiscated, her flexcuffs were removed, and she was given an extensive pat down search before entering the building.

48.    For the rest of the night, Ms. Maurer was moved through a series of holding cells. Between the first and second cells she filled out paperwork with her arresting officer, and provided photo identification. Around 7:00 a.m., when she was moved between the third and fourth cells, Ms. Maurer was fingerprinted. At no point during the fingerprinting procedure did anyone ask Ms. Maurer for her identification. Ms. Maurer was not being sought by law enforcement officials for the commission of some other offense, nor would the officers who fingerprinted her have any reason to suspect that she was. Ms. Maurer was moved to four different holding cells throughout the night.

49.    Ms. Maurer was finally released at approximately 3:30 p.m. on the afternoon of September 1, about 20 hours after the police had first placed her in flexcuffs. At her release, she was charged with disorderly conduct and given a Desk Appearance Ticket. After being released, she had to wait in line for another two hours at One Police Plaza to retrieve her bag.

<u>PLAINTIFF ASHLEY WATERS</u>

50.    Plaintiff Ashley Waters is a twenty-six year-old Harvard Law School student residing in Cambridge, Massachusetts. Ms. Waters also received her undergraduate degree from Harvard University. Following graduation, she worked at the investment banking firm of Peter J. Solomon for a year, then did volunteer work and traveled overseas before starting law school in the fall of 2002. In the summer after her first year of law school, Ms. Waters worked for the San Francisco District Attorney's office and often interacted with San Francisco police officers, whom she greatly respected. During

15

the summer of 2004, Ms. Waters lived in New York and split her time between the law firm of Akin, Gump, Strauss, Hauer & Feld and the New York Attorney General's office. During the week of August 31, Ms. Waters was staying with her boyfriend, who resides permanently on 21st Street and First Avenue, before returning to Cambridge to begin her third year of law school. She has never participated in a political protest and, prior to the events of August 31, had never been arrested.

51.    On the afternoon of August 31, Ms. Waters exercised at the New York Sports Club on East 23rd Street and Park Avenue and left the facility at approximately 6:20 p.m. Before heading home and while still carrying her gym bag, she walked toward Union Square, with the intention of checking the movie schedules at theaters in the area.

52.    At about 6:45 p.m. she noticed the crowd at the southern end of Union Square and stopped to listen to a band of musicians that was playing there. Various groups of people milled about the area listening to the music, some apparently protestors and others simply interested observers or bystanders. Ms. Waters was unaware that a protest had been scheduled at that time and place until she came upon it.

53.    After Ms. Waters had been listening to the band for about ten or fifteen minutes, the band and other demonstrators began to move. They marched north on Union Square East then, after encountering a line of police officers, headed east toward Irving Place on 16th Street. Many people followed the band across Union Square East onto 16th Street. Ms. Waters--who had no intention of protesting, joining the musicians, or getting

arrested--and a few other curious observers followed the group at a distance, crossing onto the north sidewalk of 16th Street.

54.    Ms. Waters walked toward Irving Place on the sidewalk of the northern side of 16th Street.  As she neared Irving Place, she noticed that the street had become crowded with people, both on the sidewalk and in the street.

55.    When she had almost reached Irving Place, Ms. Waters realized that the entire block had been barricaded by a line of police officers standing shoulder-to-shoulder across the street.  Upon realizing the passage had been blocked, Ms. Waters turned around and attempted to walk back in the direction of Union Square.  At this point, the crowded street and sidewalk became hectic and chaotic.  Ms. Waters crossed to the south sidewalk in an effort to avoid the crowd, while the band she had been observing remained on the street.

56.    At this point, Ms. Waters noticed that another line of police officers had moved onto 16th Street from the Union Square side of the block.  These officers formed a moving barricade, forcing people into a small space up against a building on the southern sidewalk, near Irving Place.  With their batons out, the officers formed a semi-circle and held Ms. Waters and the others against the building.  Ms. Waters estimates that approximately 50 people were compressed into the semi-circle.

57.    Ms. Waters expected the police to tell the crowd to disperse, but the police made no communication to the group.  Instead, police officers began arresting certain

individuals. Ms. Waters witnessed some members of the band wearing orange and grey being roughly pulled from the group, thrown to the ground, and arrested. At this point, Ms. Waters began crying. The police officers surrounding the group and standing two feet in front of her noticed her distress but did not attempt to reassure her or calm her.

58.    Soon after, a commanding officer appeared to give an order to another officer regarding the group being held against the building. This other officer then told the group that they were all under arrest, and everyone sat down on the sidewalk. At this point it was approximately 7:15 p.m.

59.    The police began to arrest people one-by-one, putting each person in flexcuffs and taking them to the city buses parked on Irving Place. Ms. Waters' bag was searched, but nothing of interest was found. At this time, two buses were filled, one with men and one with women. Ms. Waters was placed on the same bus as was Ms. Maurer, whom she had not met before.

60.    After being placed in flexcuffs and put on the bus, she was driven to Pier 57, where she sat for approximately one hour in the bus. Many of the women were screaming at the bus driver or crying because their flexcuffs were hurting them. Without ever being taken out of the bus at Pier 57, Ms. Waters and her fellow arrestees were next driven to 100 Centre Street, where they waited for about an hour before being let off the bus. Ms. Waters was on the bus until approximately 11:00 in the evening.

61.    While on the bus for over three hours, Ms. Waters and the others were given no food or water, had no access to bathrooms, and those with medical complaints were not given timely treatment. One person on the bus was vomiting, and another was in need of medical attention to relieve the pain her flexcuffs were causing her. It was only after persistent pleading from the other women on the bus that these two arrestees received medical attention. After the first couple of hours in flexcuffs, with her hands secured behind her back, Ms. Waters began to suffer from a great deal of pain and discomfort in her arms and shoulders.

62.    After being taken off the bus, police forced the group into a double-file line to await processing. Ms. Waters waited in this line for approximately one hour before finally being processed. The flexcuffs were then cut off. Ms. Waters' bag was confiscated by the police, and she was not given a property receipt. Overwhelmed and surprised by the events of the previous few hours, Ms. Waters was again in tears, as were some of her fellow arrestees.

63.    During processing, Ms. Waters was fingerprinted by a police officer. Her identification was in her bag, which the police had already confiscated. However, at no point during the fingerprinting procedure did anyone ask Ms. Waters for identification. Ms. Waters was not being sought by law enforcement officials for the commission of any other offense, nor would the officers who fingerprinted her have any reason to suspect that she was.

64.     Ms. Waters was put into a holding cell with about twenty other people around midnight. She was then moved for no apparent reason to numerous different cells throughout the night until 8:00 a.m. Most of the cells were crowded, and Ms. Waters eventually lay down on the floor to try to sleep.

65.     Ms. Waters remained in a holding cell until 5:00 p.m. on the evening of September 1, when she was taken from the cell to be arraigned. Outside the courtroom, she was told by her assigned public defender that she had been charged with two counts of disorderly conduct and one count of marching without a permit. Ms. Waters appeared before the judge and agreed to an Adjournment Contemplation of Dismissal agreement. Ms. Waters was able to leave the courtroom by 6:00 p.m.

66.     After being released, Ms. Waters attempted to retrieve her bag, which had been confiscated by the police. An officer told her she would need photo identification and a property receipt to get her bag back. However, she had not been given a receipt, and her identification was in the confiscated bag. Eventually, after expressing her extreme distress over the entire situation, and indicating that she was without any money, identification, or the keys to her apartment, an officer helped her locate her bag. Ms. Waters was finally able to leave around 7:00 p.m.

67.     Throughout the entire ordeal, Ms. Waters' emotional distress was significant. Having spent the previous summer working closely with police officers in San Francisco, as an intern for the District Attorney's office there, she had a great deal of respect for police officers and the work they do. As a result of the mass-arrest tactics she witnessed

on 16th Street and her treatment while in custody, Ms. Waters' faith in the law enforcement system has been shaken. She is still interviewing for positions after law school with the District Attorney's office, but is now doing so with a more critical eye because of her traumatic experience.

68.    Additionally, Ms. Waters has experienced personal distress because she believed she had not done anything wrong and should not have been arrested. Ms. Waters had stood on the sidewalk, only observing the events that were going on around her, never saying a word to a police officer or even participating in the protest activities. She was never told to leave the area or warned that she could be arrested. Indeed, since the police had blocked off both ends of 16th Street, she was arrested and detained without being given any opportunity to leave the area at all.

69.    The Plaintiffs filed Notices of Claim on November 23, 2004.

## JURY DEMAND

70.    The plaintiffs demand a jury trial on each and every one of their claims.

## CAUSES OF ACTION

71.    The defendants' arrest of the plaintiffs violated their rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

72.    The defendants' arrest of the plaintiffs violated their rights under Article I, Sections 8 and 12 of the New York State Constitution.

73.    The defendants' arrest of the plaintiffs violated their rights under the common law of New York.

74.    The defendants' detention of the plaintiffs violated the plaintiffs' rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

75.    The defendants' detention of the plaintiffs violated the plaintiffs' rights under Article I, Sections 6, 8 and 12 of the New York State Constitution.

76.    The defendants' detention of the plaintiffs violated the plaintiffs' rights under the common law of New York.

77.    The defendants' fingerprinting of the plaintiffs violated the plaintiffs' rights under section 160.10 of New York Criminal Procedure Law and the common law of New York.

WHEREFORE, the plaintiffs request that this court:

(1)    Assume jurisdiction over this matter;

(2)    As a predicate to the other relief sought, find that the defendants' arrest of the plaintiffs violated their rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution; 42 U.S.C. § 1983; Article I, Sections 8 and 12 of the New York State Constitution; and the common law of New York;

(3)    As a predicate to the other relief sought, find that the defendants' detention of the plaintiffs violated the plaintiffs' rights under the First, Fourth and Fourteenth Amendments; 42 U.S.C. § 1983; Article I, Sections 6, 8 and 12 of the New York State Constitution; and the common law of New York;

(4)    As a predicate to the other relief sought, find that the defendants' fingerprinting of the plaintiffs violated plaintiffs' rights under section 160.10 of the New York Criminal Procedure Law and the common law of New York;

(5)    Issue an injunction requiring defendants to return to the plaintiffs, or where necessary to expunge, all fingerprints taken in conjunction with their arrests along with all other information or records about their arrest;

(6)    Award compensatory damages to each of the plaintiffs;

(7)    Award the plaintiffs attorneys' fees and costs; and

(8)    Grant any other relief the court deems appropriate.


Respectfully submitted,

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION, by


MATTHEW POPOWSKY
CHRISTINA SHAY
JESSE DEVINE
CHRISTOPHER DUNN (CD-3991)
PALYN HUNG (PH 8007)
New York Civil Liberties Union Foundation
125 Broad Street, 17th Floor
New York, N.Y. 10004
(212) 344-3005

Counsel for the Plaintiffs

Dated: February 17, 2005
       New York, N.Y.