```
UNITED STATES DISTRICT COURT              (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
MICHAEL SCHILLER, et al.,             : 04 Civ. 7922 (KMK) (JCF)
                                      :
              Plaintiffs,             :
                                      :
     - against -                      :
                                      :
THE CITY OF NEW YORK, et al.,         :
                                      :
              Defendants.             :
- - - - - - - - - - - - - - - - - - -:
HACER DINLER, et al.,                 : 04 Civ. 7921 (KMK) (JCF)
                                      :
              Plaintiffs,             :
                                      :
     - against -                      :    MEMORANDUM
                                      :    AND  ORDER
THE CITY OF NEW YORK, et al.,         :
                                      :
                                      :
              Defendants.             :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

These cases concern the arrests of persons protesting in connection with the Republican National Convention (the "RNC") in 2004. The plaintiffs have moved to lift the confidentiality designations assigned to certain documents by the defendants pursuant to a protective order (the "Protective Order") previously entered in these and other related actions. The New York Times (the "Times"), which was previously granted permission to intervene, has also moved to remove those designations. In addition, the Times has moved to modify the Protective Order to require any party wishing to designate discovery materials as "Confidential" in the future to demonstrate good cause for doing

1

so.

<u>Background</u>

In February 2005, the plaintiffs served their initial discovery requests on the City. (Letter of Christopher Dunn dated June 2, 2006 ("Dunn 6/2/06 Letter"), attached as Exh. 5 to Declaration of Christopher Dunn dated Nov. 10, 2006 ("Dunn Decl."), at 1). The City produced a number of responsive documents beginning in March 2005. (Dunn Decl., ¶ 2). At a pretrial conference held before the Honorable Kenneth M. Karas on April 21, 2005, the City expressed concern about production of a videotape made at Pier 57 because it depicted arrestees and therefore raised privacy concerns.[1] (Dunn 6/2/06 Letter at 1; Transcript of Conference before the Hon. Kenneth M. Karas dated April 21, 2005, at 8). The plaintiffs agreed that the videotape of Pier 57 should be kept confidential, and the parties agreed to negotiate a protective order. (Dunn 6/2/06 Letter at 1). Since a bevy of additional RNC actions were filed after the instant cases, and because discovery was consolidated, it was agreed that the order would apply to all RNC cases. (Dunn 6/2/06 Letter at 1). While the terms of the order were being negotiated, the City produced more materials responsive to the plaintiffs' discovery requests.

---

[1] Pier 57 is owned by the Hudson River Park Trust (the "HRPT"). During the RNC, individuals were processed and detained there by the New York City Police Department (the "NYPD") following their arrest.

2

(Dunn Decl., ¶ 2).

On October 4, 2005, the Court approved the parties' stipulation concerning confidentiality, entitled "Protective Order #1." The Protective Order deals specifically with the protocol for maintaining the confidentiality of the Pier 57 videotape. The Protective Order also provides that any party may designate other discovery materials as "Confidential" and subject to its terms. (Protective Order #1, ¶ 5). Any material deemed "Confidential" cannot be used "for any purpose other than to prosecute" the RNC cases, and, if filed with the Court, must be filed under seal. (Protective Order #1, ¶¶ 1-3). Finally, the Protective Order states that "[i]n the event that either party disagrees with the designation of particular material as 'Confidential,' such party shall attempt in good faith to resolve the disagreement with the opposing counsel and, if the parties cannot resolve the matter, they may raise it with the Court." (Protective Order #1, ¶ 6).

On November 4, 2005, James Mirro, an attorney for the City, sent an email to all plaintiffs' counsel in the consolidated RNC cases stating:

> Please be advised that, pursuant to paragraph 5 of the Court's October 4, 3005 Protective Order #1, Defendants hereby designate as Confidential all materials (including but not limited to paper documents and videotapes) that they have previously produced in the Schiller case and in the related RNC cases.

(E-mail of James Mirro dated Nov. 4, 2005, attached as Exh. 3 to Dunn Decl.). On November 10, 2005, the plaintiffs wrote to Mr.

Mirro to ask the City to withdraw its blanket confidentiality designation.  (Letter of Christopher Dunn and Palyn Hung dated Nov. 10, 2005, attached as Exh. 4 to Dunn Decl.).   After some negotiation, the City withdrew its confidentiality designations from a limited number of documents.  (Letter of James Mirro dated Jan. 11, 2006, attached as Exh. C to Mirro 7/7/06 Letter).

The plaintiffs again protested the City's blanket confidentiality designations, arguing that "[w]hile the October 2005 protective order does allow the City to designate documents as being confidential, any such designation plainly should be limited to documents the City has reviewed and determined to contain genuinely confidential information."  (Letter of Christopher Dunn dated June 2, 2006, attached as Exh. 5 to Dunn Decl., at 2).  The plaintiffs nonetheless agreed to provide the City with a list of specific materials they believed to have been improperly designated as confidential.  Upon receiving this list, the City agreed to remove the designations from a number of the documents identified by the plaintiffs.  The City also stated that, at the direction of the Court, it would "move for a protective order to maintain the confidentiality" of the remaining materials.  (Letter of Peter G. Farrell dated June 19, 2006, attached as Exh. 7 to Dunn Decl., at 2).

The City made its motion in a letter brief dated July 7, 2006 (the "Protective Order Brief").  The Protective Order Brief and

4

supporting declarations were initially filed under seal. The plaintiffs objected to the sealing of the Protective Order Brief. The Times made a motion to intervene for the purpose of challenging the City's confidentiality designations and also objected to the sealing of the Protective Order Brief. I granted the Times' motion to intervene and found that the Protective Order Brief was a judicial document subject to a presumption of public access. I further ordered the City to file publicly copies of the Protective Order Brief and its accompanying declarations from which excerpts from documents deemed confidential had been redacted. <u>Schiller v. City of New York</u>, No. 04 Civ. 7922, 2006 WL 2788256 (S.D.N.Y. Sept. 27, 2006).

The underlying dispute regarding the City's confidentiality designations has now been fully briefed by the parties and the Times.

<u>Discussion</u>

A. <u>Withdrawal of Confidentiality Designations</u>

1. <u>Legal Standard</u>

Rule 26(c) of the Federal Rules of Civil Procedure permits a district court to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" upon a showing of good cause. It is well established that "'[t]the party seeking a protective order [under Rule 26(c)] has the burden of showing that good cause exists for

issuance of that order.'" Gambale v. Deutsche Bank AG, 377 F.3d 133, 142 (2d Cir. 2004) (quoting In re "Agent Orange" Product Liability Litigation, 821 F.2d 139, 145 (2d Cir. 1987)); see also Condit v. Dunne, 225 F.R.D. 113, 115 (S.D.N.Y. 2004); In Re Application of the Akron Beacon Journal, No. 94 Civ. 1402, 1995 WL 234710, at *10 (S.D.N.Y. April 20, 1995). In the absence of such a protective order, "parties to a law suit may disseminate materials obtained during discovery as they see fit."[2] Jepson, Inc. v. Makita Electric Works, Ltd., 30 F.3d 854, 858 (7th Cir.

---

[2] It is somewhat misleading to refer, as courts sometimes do, to a "presumptive right of public access" to pretrial discovery. See, e.g., Mitchell v. Fishbein, 227 F.R.D. 239, 254 (S.D.N.Y. 2005); Loussier v. Universal Music Group, 214 F.R.D. 174, 176-77 (S.D.N.Y. 2003). While materials produced in discovery may be disclosed by the receiving party in the absence of a protective order, the public does not have a right of access to those materials. See, e.g., Securities and Exchange Commission v. TheStreet.com, 273 F.3d 222, 231 n.9 (2d Cir. 2001) (noting that there is no "presumption that discovery materials should be publicly available whenever possible" (quoting Westchester Radiological Association v. Blue Cross/Blue Shield, 138 F.R.D. 33, 36 (S.D.N.Y. 1991))); Oklahoma Hospital Association v. Oklahoma Publishing Co., 748 F.2d 1421, 1424 (10 Cir. 1984) ("While it may be conceded that parties to litigation have a constitutionally protected right to disseminate information obtained by them through the discovery process absent a valid protective order, it does not follow that they can be compelled to disseminate such information."); Levy v. INA Life Insurance Co. of New York, No. 05 Civ. 10310, 2006 WL 3316849, at *1 (S.D.N.Y. Nov. 14, 2006) (noting that "documents exchanged in discovery [are not] matters of public record"); In Re Terrorist Attacks on September 11, 2001, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) (noting that "no public right of access exists with respect to materials produced during the early stages of discovery"). The presumption of public access to judicial documents is inapplicable to "[d]ocuments that play no role in the performance of Article III functions, such as those passed between the parties in discovery." United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995).

1994); see also San Jose Mercury News v. U.S. District Court --
Northern District (San Jose), 187 F.3d 1096, 1103 (9th Cir. 1999);
Public Citizen v. Liggett Group, Inc., 858 F.2d 775, 789 (1st Cir.
1988); Agent Orange, 821 F.2d at 145-46.

The plaintiffs have challenged the City's designation of
certain discovery materials as "Confidential."  Contrary to the
City's assertion, the plaintiffs do not seek to modify the
Protective Order or ask this Court to find that the Protective
Order is unenforceable.  Rather, the plaintiffs have exercised a
right reserved to them under the terms of the Protective Order,
which allows a party that "disagrees with the designation of
particular materials as 'Confidential'" to raise the matter with
the Court if the parties cannot resolve the disagreement.
(Protective Order #1, ¶ 6).

The City contends that the heightened standard set forth by
the Second Circuit in Martindell v. International Telephone and
Telegraph Corp., 594 F.2d 291 (2d Cir. 1979), is applicable here.
That standard requires a party seeking modification of a protective
order to show "improvidence in the grant of [the] order or some
extraordinary circumstance or compelling need" where there has been
reasonable reliance on the order.  Id. at 296; see also AT&T Corp.
v. Sprint Corp., 407 F.3d 560, 562 (2d Cir. 2005); Gambale, 377
F.3d at 142 n.7; TheStreet.com, 273 F.3d at 229.  The City contends
that once a protective order is signed by a court, withdrawal of

confidentiality designations should be subject to Martindell's heightened standard, regardless of the terms of the order. This argument is without merit. Where a protective order permits the parties to designate discovery materials as "Confidential" without a showing of good cause, and one party challenges a designation made by another, the challenging party is not seeking to modify the protective order and therefore does not bear the burden of demonstrating that the confidentiality designations should be lifted.

To support its position, the City relies on Geller v. Branic International Realty Corp., 212 F.3d 734 (2d Cir. 2000), Ionosphere Clubs, Inc. v. American National Bank and Trust Co. of Chicago, 156 B.R. 414 (S.D.N.Y. 1993), and Diversified Group, Inc. v. Daugerdas, 217 F.R.D. 152 (S.D.N.Y. 2003). Geller is clearly inapposite because it involved modification of a protective order, rather than an application of the order's terms. As part of a settlement agreement, the parties had agreed that a specific set of documents -- in that case, the entire case file -- should be sealed. The district court "so ordered" the settlement agreement but did not seal the file. When the defendants learned of this, they wrote to the court asking that the file be sealed. The court refused to do so unless the defendants showed good cause. On appeal, the Second Circuit, citing Martindell, found that after a district court has approved a settlement agreement that includes a sealing order, that

8

order may be modified only upon a showing that is "more substantial than the good cause needed to obtain a sealing order in the first instance." Geller, 212 F.3d at 738. Here, the plaintiffs do not seek to alter the existing Protective Order, only to exercise the challenge provision contained in it.

Ionosphere Clubs also involved modification of a protective order. That order required the sealing of all materials used by a Bankruptcy Examiner in making his report. In considering a motion to unseal those documents, the court applied the Martindell standard, noting that although the protective order stated "that the confidentiality afforded the discovery materials could be 'subsequently revoked, vacated, or modified,' this simple phrase does not mean . . . that all parties contemplated the unsealing of the record." Ionosphere Clubs, 156 B.R. at 434. Rather, the provision merely recognized the fact that a court may, under certain circumstances, modify a protective order after it has been entered. Id. In this case, by contrast, the terms of the Order make it clear that all parties contemplated that "relief from the provisions of the order [could] be sought at any time," Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 126 (2d Cir. 2006). Therefore, such relief does not constitute modification of the Protective Order.

The only case that could plausibly support the City's argument that the Martindell standard should apply here is Diversified

Group.  However, it is not clear from that opinion whether the protective order at issue applied only to specific documents, or whether it permitted the parties to designate any documents they wished as "Confidential."  The court noted that the order had been entered "[u]pon a finding of good cause," and allowed "any party or interested member of the public" to challenge the sealing of documents.  Diversified Group, 217 F.R.D. at 156.  The court also stated, in dicta, that with regard to non-judicial documents, "the Martindell presumption against access would apply" to any such challenge.  Id. at 163.

Nevertheless, Diversified Group does not provide sufficient support for the City's position.  In cases involving protective orders like the one at issue here, courts have generally examined de novo whether the designating party has shown good cause pursuant to Rule 26(c).  See, e.g., Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1122 (3d Cir. 1986) (where protective order covers all documents that producing party deems confidential, "burden of justifying the confidentiality of each and every document . . . remains on [that party]; any other conclusion would turn Rule 26(c) on its head"); Allen v. City of New York, 420 F. Supp. 2d 295, 301 (S.D.N.Y. 2006); Fournier v. McCann Erickson, 242 F. Supp. 2d 318, 342 (S.D.N.Y. 2003) (noting that "heightened 'extraordinary circumstances' burden for unsealing documents [] contemplates the court having already considered each document in the first instance

according to a 'good cause' standard"); <u>Akron Beacon Journal</u>, 1995 WL 234710, at *12 (protective order "improperly shifted the burden" by requiring challenging party to show "particularized need" for material designated as confidential, where designating party had never been required to show good cause).  This approach makes sense, because in cases involving protective orders like the one at issue here, adoption of the City's theory would permit "each party [to] circumvent the 'good cause' standard for protection and, simultaneously, shift the burden to his adversary to unseal a document while benefitting from the more rigorous 'extraordinary circumstances' standard that would apply merely by unilaterally designating any given document as protected."  <u>Fournier</u>, 242 F. Supp. 2d at 342.

Nor do I accept the City's argument that <u>Martindell</u> should apply because the City reasonably relied upon the Protective Order when it produced the materials at issue here.  It is well-established that "protective orders that are on their face temporary or limited may not justify reliance by the parties.  Indeed, in such circumstances reliance may be unreasonable." <u>Gambale</u>, 377 F.3d at 142 n.7 (quoting <u>TheStreet.com</u>, 273 F.3d at 230-31).  In this case, the Protective Order

> not only asked the Court to defer to the parties' judgment on confidentiality but it also allowed for unilateral designation of [a document] as protected material, and it did not list specific documents, or delineate the kinds of documents, contemplated for protection.  Defendants were never required to show good

cause for sealing the various documents.

Fournier, 242 F. Supp. 2d at 341.  Reliance upon the protection of such an order when producing discovery materials or witnesses for deposition is unreasonable.[3]  See Lugosch, 435 F.3d at 126 (stating that it is "difficult to see" how party could reasonably rely on confidentiality order stating that it "shall not prevent anyone from applying to the Court for relief therefrom"); Allen, 420 F. Supp. 2d at 300-01 (reliance unreasonable where protective order permitted plaintiffs to challenge defendants' confidentiality designations, and where such challenge triggered obligation on the part of defendants to show good cause); Akron Beacon Journal, 1995 WL 234710, at *15 (production of documents not made in reliance on protective order where order preserved right of parties to challenge confidentiality designations); cf. Liggett Group, 858 F.2d at 790 (protective order "extending broad protection to all documents . . . without a showing of good cause for confidentiality as to any individual documents" was "by nature overinclusive and [], therefore, peculiarly subject to later modification").

Accordingly, the City bears the burden of demonstrating good

---

[3] It should be noted that a number of the disputed documents were produced before the Protective Order was even entered.  The City contends that, with respect to those documents, it relied upon either an expectation that a protective order would be entered or upon an agreement among the parties with respect to the terms of the order.  However, because there can be no reasonable reliance upon the kind of protective order at issue here, there can also be no reasonable reliance upon an expectation that such an order would be entered in the future.

cause for designating each of the documents at issue as "Confidential."[4]

2. <u>Good Cause</u>

"Ordinarily, good cause [for a protective order] exists 'when a party shows that disclosure will result in a clearly defined, specific and serious injury.'" <u>In Re Terrorist Attacks</u>, 454 F. Supp. 2d at 222 (citing <u>Shingara v. Skiles</u>, 420 F.3d 301, 306 (3d Cir. 2005)). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test. Moreover, the harm must be significant, not a mere trifle." <u>Cipollone</u>, 785 F.2d at 1121 (internal citations omitted); <u>see also</u> <u>Allen</u>, 420 F. Supp. 2d at 302 (finding that "generalized and unsupported claims of harm that might result from disclosure" do not constitute good cause).

The City asserts that many of the materials at issue here are subject to various privileges, most notably the law enforcement

---

[4] The City contends that the plaintiffs "have no legitimate interest in the use or dissemination of discovery materials" and have "articulated no prejudice to them [] that would result from maintaining the status quo," and that the Court should therefore find good cause for maintaining the confidentiality of the disputed documents. (Mirro 7/7/06 Letter at 4). Because the City bears the burden of demonstrating good cause, these claims are without merit.

Equally unavailing is the City's argument that even if there is not good cause for maintaining the confidentiality of these documents, the Court should nonetheless refuse to permit the plaintiffs to use the documents for any purpose other than the prosecution of RNC-related lawsuits. (Mirro 12/8/06 Letter at 12). To grant that request would be to enter a protective order without the showing of good cause that is required under Rule 26(c).

13

privilege and the deliberative process privilege.  However, the
City has waived any claim of privilege with respect to material
previously disclosed to the plaintiffs.  "If a party voluntarily
discloses a privileged document, it waives the privilege for that
document and cannot later seek to keep the document confidential."
United States v. Gangi, 1 F. Supp. 2d 256, 263 (S.D.N.Y. 1998); see
also In re Omnicon Group, Inc. Securities Litigation, 233 F.R.D.
400, 413 (S.D.N.Y. 2006); Large v. Our Lady of Mercy Medical
Center, No. 94 Civ. 5986, 1998 WL 65995, at *4 (S.D.N.Y. Feb. 17,
1998) (privilege must be asserted at time of production).  The City
appears to concede that it has waived these privileges, but
contends that "there is very considerable information in [the
disputed] documents over which [the] defendants could have asserted
various privilege"[5] and that the information remains "sensitive and

---

[5] The City claims that the defendants "elected to assert
relatively limited formal privilege claims . . . to facilitate
discovery and limit motion practice based upon their reliance on
the Protective Order." (Mirro 12/8/06 Letter at 10).  As explained
above, such reliance was unreasonable, and in any case, voluntary
disclosure to an adversary constitutes waiver even where the party
to whom production is made is subject to a confidentiality
agreement.  See Westinghouse Electric Corp. v. Republic of the
Philippines, 951 F.2d 1414, 1426-27 (3d Cir. 1991) (rejecting
argument that party did not waive privilege when it disclosed
documents to Department of Justice ("DOJ") because DOJ had agreed
to keep documents confidential); Bowne of New York City, Inc. v.
AmBase Corp., 150 F.R.D. 465, 480 (S.D.N.Y. 1998) (finding that
"even if the disclosing party requires, as a condition of
disclosure, that the recipient maintain the materials in
confidence, this agreement does not prevent the disclosure from
constituting a waiver of the privilege").  Moreover, the Protective
Order does not include a non-waiver agreement which might have
allowed the parties to preserve claims of privilege while

confidential." (Mirro 12/8/06 Letter at 10). However, as is explained in more detail below, even if there had been no waiver, the City has failed to demonstrate that the documents in question would be privileged.

The City also argues that the Court should find good cause for the continued confidentiality of the disputed documents because New York's Code of Professional Responsibility prohibits the plaintiffs' counsel, the New York Civil Liberties Union ("NYCLU"), from engaging in pretrial publicity. Specifically, the City claims that release of the documents at issue here would violate Disciplinary Rule 7-107, which prohibits any extrajudicial statement "that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding." The problem with the City's argument is that removing these documents from the scope of the Protective Order does not necessarily mean that they will be released to the public. The NYCLU must first determine whether disclosure of the documents would be consistent with its ethical obligations. Of course, the City might be able to establish good cause for a protective order by demonstrating that public disclosure would be substantially likely to prejudice the trial of these or other RNC-related cases. However, the City has

_____

exchanging documents.

made no attempt to show that any such prejudice would result from disclosure of the documents.

Finally, the City claims that a number of the disputed documents "contain information that is sufficiently unreliable -- or subject to misinterpretation -- that it should not be disseminated beyond this litigation." (Mirro 7/7/06 Letter at 10). These assertions are, for the most part, entirely conclusory. The City has not explained what makes the documents unreliable, aside from the fact that they may contain incomplete information. The mere fact that a given document does not provide the reader with a full picture does not make it unreliable. Additionally, the City gives the general public very little credit when it contends that readers will be unable to grasp that the information contained in these documents might be incomplete or inaccurate.

Furthermore, the City has not demonstrated that any confusion that results will be so serious and damaging to the defendants as to justify a protective order. As the City itself points out, when a party expresses concern that materials may be misleading, "'[a] court may consider whether the nature of the materials is such that there is a fair opportunity for the subject to respond.'" (Mirro 7/7/06 Letter at 10 (quoting Amodeo, 71 F.3d at 1051)). The defendants can remedy any confusion that results from disclosure of these documents by providing public clarification regarding the information contained in them.

16

In another case involving mass arrests at political demonstrations, a court has noted "the patent inadequacy of the type of formulaic incantations of harm" put forward by the City in support of its assertion of various privileges. Kunstler v. City of New York, Nos. 04 Civ. 1145, 04 Civ. 665, 04 Civ. 2611, 2006 WL 1084375, at *2 (S.D.N.Y. April 24, 2006); see also Haus v. City of New York, No. 03 Civ. 4915, 2004 WL 3019762, at *3-4 (S.D.N.Y. Dec. 29, 2004) ("This formulaic assertion, taken almost word-for-word from innumerable other such agency submissions, plainly fails to offer a persuasive basis for believing that production under the governing confidentiality order would pose any harm to the public interest."). Unfortunately, almost all of the City's claims regarding the harm that will occur if the documents at issue here are released to the public are similarly inadequate. Nevertheless, I will address each of these claims in turn.

a. Videotapes

The plaintiffs seek to remove the City's confidentiality designation from 27 videotapes. The videotapes were made on August 31, 2004, and contain footage from two locations: the intersection of Church Street and Fulton Street in lower Manhattan, and 16th Street between Union Square East and Irving Place. (Mirro 7/7/06 Letter at 11). "The videos were taken by NYPD officers shortly before, during and after the arrests of several hundred individuals at those two locations." (Mirro 7/7/06 Letter at 11).

The City contends that the videotapes should remain confidential because they show individuals being arrested, and therefore "contain information that many of the individuals depicted . . . would regard as highly personal and private in nature." (Mirro 7/7/06 Letter at 11).  This argument lacks merit because the demonstrations and arrests depicted on the videotapes took place in public, where they could have been witnessed by any passerby and taped by anyone with a video camera.[6]

The City also contends that dissemination of the tapes would reveal the NYPD's "tactic of monitoring large crowds" such as those that gathered to protest during the RNC.  It will not come as a surprise to anyone in New York City that the NYPD videotapes large crowds of protesters, given the amount of publicity generated in recent years by this very practice.[7]  Nor does the City explain how revealing to the public the NYPD's practice of monitoring protests would impair law enforcement.  Accordingly, the City has not demonstrated good cause for maintaining the confidentiality of the videotapes.

---

[6] The City points out that the videotapes depict individuals who are not parties to these lawsuits and have not executed waivers that would allow release of arrest records sealed pursuant to New York Criminal Procedure Law § 160.50. However, a visual recording of a mass demonstration in which numerous persons are taken into custody does not qualify as an "arrest record."

[7] It should also be noted that the City did not redact the discussion of this tactic from the publicly filed copy of the Protective Order Brief.

b. <u>RNC Executive Summary</u>

The City contends that a document identified as the RNC Executive Summary is subject to the law enforcement privilege and the deliberative process privilege.[8]  Both privileges are subject to waiver.  <u>Kitevski v. City of New York</u>, No. 04 Civ. 7402, 2006 WL 680527, at *4 (S.D.N.Y. March 16, 2006) (law enforcement privilege); <u>National Council of La Raza v. Department of Justice</u>, 339 F. Supp. 2d 572, 585 (S.D.N.Y. 2004) (deliberative process privilege).  Even if these privileges had not been waived, however, the City has failed to demonstrate that they would apply to this document.

> The purpose of the law enforcement privilege
>
> is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness[es] and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.

<u>In Re Department of Investigation of the City of New York</u>, 856 F.2d 481, 484 (2d Cir. 1988).  In order to sustain the privilege, a party "must make a clear and specific evidentiary showing of the nature and extent of the harm that is likely to be encountered if disclosure is permitted, and they may not rely simply on

---

[8] The City's privilege log shows that the City has already redacted large portions of the document that are protected by the law enforcement privilege.  (RNC Defendants' Privilege Log, attached as Exh. 1 to Dunn Decl., at 8).  The City has not redacted any part of the document based on the deliberative process privilege.  (RNC Defendants' Privilege Log at 8).

generalized reiterations of the policies underlying the privilege."
Kunstler v. City of New York, Nos. 04 Civ. 1145, 04 Civ. 665, 04
Civ. 2611, 2005 WL 2656117, at *1 (S.D.N.Y. Oct. 18, 2005); see
also MacWade v. Kelly, 230 F.R.D. 379, 381 (S.D.N.Y. 2005) (stating
that party asserting law enforcement privilege "must make a clear
showing of harm").

The City notes that the "Overview" section at the beginning of
the document discusses the potential for terrorist activity during
the RNC, special training provided to police officers, and an NYPD
intelligence program.  (Mirro 7/7/06 Letter at 12).  However, the
"Overview" says very little of substance about these matters.[9]  The
City states that "the remainder of the document discusses these and
other law enforcement issues in greater detail" (Mirro 7/7/06
Letter at 12), but the balance of the redacted version in fact
consists only of lists of events associated with the RNC,
descriptions of planned protests, charts showing the membership of
various NYPD committees, heavily redacted spreadsheets showing
items purchased in preparation for the RNC, and a calendar showing
when and where security barriers would be set up.

The City has not provided sufficient support for its
conclusory assertion that public disclosure of this document would

---

[9] A copy of this document, with the City's redactions, was
submitted in camera for my review.  It is disclosure of the
redacted version that is at issue, as the plaintiffs do not contest
the designation of the redacted portions as confidential.

"undermine the NYPD's planning for future unique and uncommon large-scale events and demonstrations." (Mirro 7/7/06 Letter at 12). See Haus, 2004 WL 3019762, at *4 (rejecting similar claims by NYPD with respect to document describing number of officers of various ranks stationed at specific locations during anti-war protest). The City does not explain how this information would be useful to persons planning to protest or disrupt future events. Accordingly, the City has not demonstrated that this document is subject to the law enforcement privilege.

The City also contends that dissemination of this document would reveal to the public "the inner workings of the NYPD in preparing for high profile national security events." (Mirro 7/7/06 Letter at 12). Without a concrete showing of harm that would result from public disclosure, the mere fact that the defendants wish to shield from public view the NYPD's preparations for the RNC does not justify a protective order. If a party could obtain a protective order based merely on an assertion that it would prefer to keep a document from public view, Rule 26(c)'s "good cause" requirement would be meaningless.

Next, the City contends that the document falls within the scope of the deliberative process privilege, and that "[p]ublic disclosure of this document would chill the candor of executives within the NYPD." (Mirro 7/7/06 Letter at 12).

> The rationale behind [the deliberative process] privilege is "the obvious realization that officials will not

> communicate candidly amongst themselves if each remark is
> a potential item of discovery and front page news, and
> its object is to enhance the quality of agency decisions,
> by protecting open and frank discussion among those who
> make them within the Government."

Tigue v. United States Department of Justice, 312 F.3d 70, 76 (2d

Cir. 2002) (quoting Department of the Interior v. Klamath Water

Users Protective Association, 532 U.S. 1, 8-9 (2001). "In order

for a document to be protected by the privilege, it must be: (1) an

inter-agency or intra-agency document; (2) predecisional; and (3)

deliberative." Id. The privilege is a qualified one, requiring

courts to balance the agency's interest in non-disclosure against

"the public interest in opening for scrutiny the government's

decision-making process." Resolution Trust Corp. v. Diamond, 137

F.R.D. 634, 642 (S.D.N.Y. 1991) (quoting In Re Franklin National

Bank Securities Litigation, 478 F. Supp. 577, 582 (E.D.N.Y. 1979)).

The City contends that the RNC Executive Summary is

predecisional because "it is a draft document that predates final

policy decisions concerning the policing of the RNC," and that it

is deliberative because "it reflects internal discussions among top

NYPD executives, recommendations and proposals for policing the

RNC." (Mirro 7/7/06 Letter at 12). A document is predecisional

when it forms "an essential link in a specified consultative

process." National Congress for Puerto Rican Rights v. City of New

York, 194 F.R.D. 88, 92-93 (S.D.N.Y. 2000) (quoting Providence

Journal Co. v. United States Department of the Army, 981 F.2d 552,

559 (1st Cir. 1992)); see also Tigue, 312 F.3d at 80 (noting that privilege "does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment") (quoting Grand Central Partnership v. Cuomo, 166 F.3d 473, 482 (2d Cir. 1999)). Accordingly, the mere fact that a document "predates" a decision does not mean that it is predecisional. The City has not shown that the RNC Executive Summary is predecisional because it has not identified any "specific agency decision to which the document correlates," nor established "that its author prepared the document for the purpose of assisting the agency official charged with making the agency decision." National Congress for Puerto Rican Rights, 194 F.R.D. at 93 (quoting Providence Journal Co., 981 F.2d at 557). The document seems to outline decisions that had been made previously. The fact that the NYPD may have subsequently reviewed and reconsidered those decisions does not render the document predecisional. See A. Michael's Piano v. Federal Trade Commission, 18 F.3d 138, 147 (2d Cir. 1994) (document not predecisional if it is a "postdecisional memoranda setting forth the reasons for an agency decision already made") (quoting Renegotiation Board v. Grumman Aircraft Engineering Corp., 421 U.S. 168, 184 (1975)); Resolution Trust Corp., 137 F.R.D. at 641.

Nor is the document deliberative. The redacted version of the document submitted in camera does not contain suggestions,

opinions, or recommendations that "reflect the personal opinions of the writer rather than the policy of the agency." Ingles v. City of New York, No. 01 Civ. 8279, 2004 WL 2274653, at *1 (S.D.N.Y. Oct. 8, 2004) (quoting Grand Central Partnership, 166 F.3d at 482). Indeed, the document does not appear to contain anything that could be characterized as an opinion and does not evaluate various options or recommend particular courses of action.

Finally, much of the document consists of purely factual material that is not protected by the privilege. See Grand Central Partnership, 166 F.2d at 482; National Congress for Puerto Rican Rights, 194 F.R.D. at 93; Resolution Trust Corp., 137 F.R.D. at 640-41. Accordingly, even if the deliberative process privilege had not been waived, this document would not be subject to the privilege.

There is no reason to believe that public disclosure of the RNC Executive Summary would chill the candor of NYPD officials or interfere with important law enforcement interests. The defendants have not shown good cause for maintaining the confidentiality of this document, and it shall not remain subject to the Protective Order.

### c. Pier 57 Environmental Reports

There are three environmental reports regarding Pier 57 at issue here, each prepared by a different environmental consulting firm. The first two were commissioned by the HRPT in April and May

2004, and the third was commissioned by the New York City Law Department in October 2004.    (Mirro 7/7/06 Letter at 12-13; Declaration of Curt Beck, attached as Exh. K to Mirro 7/7/06 Letter, ¶ 3).   The City contends that the first two reports are subject to the deliberative process privilege and that the third is shielded by the work product doctrine.   The City also contends that disclosure of the reports would pose a security risk and threaten plans to develop Pier 57 commercially.

The City argues that the April 2004 and May 2004 reports are protected by the deliberative process privilege because they gave the HRPT "information to be considered [in deciding] whether to conduct work -- and what work to conduct -- on the Pier."   (Mirro 7/7/06 Letter at 13).   As explained above, factual information is not covered by the privilege.   The recommendations contained in the reports are likewise outside of the scope of the privilege.   The deliberative process privilege "does not operate indiscriminately to shield all decision-making by public officials."   Grossman v. Schwartz, 125 F.R.D. 376, 381 (S.D.N.Y. 1989).   In arguing that the deliberative process privilege applies to these documents, among others, the City asks the Court to accept that virtually all decisions made by the NYPD and the HRPT regarding the RNC were matters of important public policy.   See Soto v. City of Concord, 162 F.R.D. 603, 612 (N.D. Cal. 1995) ("The deliberative process privilege should be invoked only in the context of communications

25

designed to directly contribute to the formulation of important public policy."). This is plainly not the case. Instead, the Court must determine in each case whether the decision at issue was a "routine operating decision" rather than a "policy oriented judgment" to which the privilege would apply. See E.B. v. New York City Board of Education, 233 F.R.D. 289, 293 (E.D.N.Y. 2005). Decisions regarding work to be done at Pier 57 are routine operating decisions. Cf. Mitchell, 227 F.R.D. at 250-51 (finding that decision whether or not to recertify an attorney to state panel of appointed counsel is not a matter of important public policy); Haus, 2004 WL 3019762, at *3 (finding that adequacy of personnel and equipment at specific locations during protest and other "similar logistical issues" are not matters of policy). Accordingly, the April 2004 and May 2004 reports do not fall within the scope of the deliberative process privilege.

The City claims that the October 2004 report is attorney work product because it was "prepared in anticipation of the RNC litigation." (Mirro 7/7/06 Letter at 13). However, the City has waived all claims of work product immunity with respect to this document by producing it to their adversaries in the very litigation for which it was created. See In Re Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir. 1993) ("Once a party allows an adversary to share the otherwise privileged thought processes of counsel, the need for the privilege disappears.").

The City next argues that all of the disputed reports contain schematic diagrams, photos, and structural information about Pier 57 that "could be of considerable interest to those seeking to threaten the security of the building itself or its future occupants." (Mirro 7/7/06 Letter at 13).  The HRPT claims that it "has been made aware that certain of its properties have . . . been designated as potential terrorist targets" by the NYPD, although Pier 57 itself has not been so identified.  (Declaration of Laura Blackman, attached as Exh. J to Mirro 7/7/06 Letter ("Blackman Decl."), ¶ 6).  As noted above, a party seeking a protective order under Rule 26(c) must "show an adequate reason, by a 'particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements.'"  Akron Beacon Journal, 1995 WL 234710, at *10 (quoting Cipollone, 785 F.2d at 1121).  The fact that other HRPT properties have been designated as potential terrorist targets, combined with a vague assertion that terrorists might be interested in schematic diagrams and other information related to Pier 57, is plainly insufficient to meet this burden.

Finally, although the HRPT has already entered into a development agreement with the Wyckoff Group, the HRPT contends that the "ongoing sensitive negotiations for optimum development of Pier 57 . . . could be seriously undermined, if not imperiled, if documents or information concerning Pier 57 were to be leaked or otherwise disseminated to the public."  (Blackman Decl., ¶¶ 7-8).

27

Again, this kind of conclusory statement, without further factual support, is insufficient to demonstrate good cause for a protective order.  Moreover, it is difficult to understand what commercial harm could result from dissemination of these reports, unless the HRPT plans to withhold material information from potential development partners or buyers.

Accordingly, the City has not shown good cause for maintaining the confidentiality of the Pier 57 environmental reports, and they shall no longer be subject to the Protective Order.

                    d.  NYPD/HRPT Memorandum of Understanding and
                        Correspondence

The plaintiffs object to the confidentiality designations assigned by the City to various letters exchanged by the NYPD and the HRPT, an indemnification agreement, and a "partially executed" Memorandum of Understanding ("MOU") between the NYPD and the HRPT, along with a cover letter showing that a copy of the MOU was provided to a member of the New York City Council on October 1, 2004.  (Mirro 7/7/06 Letter at 14, 19; Blackman Decl., ¶¶ 11, 12).  The City claims that these documents meet the requirements of the deliberative process privilege.  They do not, and the City has not demonstrated that any serious injury will result from dissemination of these materials.

The City contends that the MOU is predecisional "because it pre-dates final decisions about the full scope of work to be done on the Pier before arrestees were housed there," and that the

remaining documents are predecisional because they pre-date final decisions about whether, and on what terms, the HRPT would permit the NYPD to use Pier 57 during the RNC.  (Mirro 7/7/06 Letter at 14, 20).  The City claims that the MOU is deliberative "because it contains some information about some of the work that was contemplated for the Pier," and that the remaining documents are deliberative because they contain "proposals, recommendations, and related information." (Mirro 7/7/06 Letter at 14, 20).

As noted above, the fact that a document was created before a decision was made does not make it predecisional for the purpose of the privilege, and a vague assertion that a document contains "recommendations and related information" does not make it deliberative.  The deliberative process privilege applies only to "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency," Ingles, 2004 WL 2274653, at *1 (quoting Grand Central Partnership, 166 F.3d at 482), and which were "prepared in order to assist an agency decisionmaker in arriving at his or her decision." Resolution Trust Corp., 137 F.R.D. at 640 (citing Renegotiation Board, 421 U.S. at 184).

As an initial matter, it is worth reiterating that the deliberative process privilege "does not operate indiscriminately to shield all decision-making by public officials." Grossman, 125

29

F.R.D. at 381.   The City asks the Court to accept that decisions regarding whether and under what conditions the HRPT would allow the NYPD to use Pier 57 are important matters of public policy. Even assuming that they are, the City has not demonstrated that the MOU, the indemnification agreement, or the correspondence at issue here were prepared in order to assist a decisionmaker in determining whether to adopt a particular policy, or that they reflect the personal opinions of anyone within the NYPD or the HRPT.

Accordingly, there is no reason to believe that disclosure of these documents would inhibit "open and frank discussion," <u>Tigue</u>, 312 F.3d at 76, within the NYPD or the HRPT, and the City has not shown good cause for maintaining their confidentiality.

e. <u>Police Students Guide: Maintaining Public Order</u>

This document is an NYPD training manual dated July 2004.   In part, the manual describes laws applicable to the conduct of demonstrators and appropriate responses to various situations that might arise during demonstrations.   According to the City, this document is subject to the law enforcement privilege.   However, the City does not explain, and it is not clear from the document itself,[10] how release of the manual would "undermine the NYPD's ability to police incidents of civil disorder [and] civil

---

[10] At the Court's request, the City submitted a copy of this document for <u>in camera</u> review.

disobedience . . . among other things."  (Mirro 7/7/06 Letter at 15).

The City seems to contend that release of two passages that explain how to respond to particular kinds of attacks would render the police more vulnerable to such attacks and "potentially jeopardize the safety of Department personnel" (Declaration of John McManus ("McManus Decl."), attached as Exh. I to Mirro 7/7/06 Letter), ¶ 12), but gives no reason why that would be the case. The City also notes that the manual "details vulnerable locations for civil disobedience." (Mirro 7/7/06 Letter at 14).  The passage to which the City refers is all of seven lines long, and merely lists broad categories of "problem locations."  The City has given the Court no reason whatsoever to believe that public disclosure of this document would make it more difficult for the police to maintain order at the kinds of locations listed.

Accordingly, the City has not met its burden of showing good cause for the confidentiality of this document.

### f. Pier 57 Officer Exposure Reports

The next documents at issue are reports of medical complaints made by police officers in September and October 2004, entitled "Occupational Health Nursing Unit Exposure Reports."  The City contends that the documents contain personal and private information, such as names and tax identification numbers.  The plaintiffs and the Times do not dispute the fact that public access

to this information would constitute an invasion of privacy, and they agree that the names of officers should be redacted from any documents disclosed by the plaintiffs.  Before disclosing any of these documents, the plaintiffs must also redact other identifying information, such as tax identification numbers, Social Security numbers, dates of birth, telephone numbers, and addresses.  See, e.g., Kelly v. City of New York, No. 01 Civ. 8906, 2003 WL 548400, at *6 (S.D.N.Y. 2003).  However, the City's contention that the documents are unreliable hearsay and "likely to contain misinformation" is insufficient to justify confidentiality, particularly once identifying information is redacted.

### g. NYPD Legal Guidelines for the RNC

The New York Civil Liberties Union (the "NYCLU"), which is counsel for the plaintiffs in these actions, obtained a document entitled "NYPD Legal Guidelines for the RNC" independent of the discovery process.  (Dunn 11/10/06 Letter at 7; Dunn Decl., ¶ 14).  The plaintiffs have submitted a facsimile of the cover of the document, which shows that it was faxed to the NYCLU on August 24, 2004, approximately six weeks before these cases were filed.  (NYPD Legal Guidelines for the RNC Cover Sheet, attached as Exh. 10 to Dunn Decl.).  The City concedes that the Protective Order does not limit the plaintiffs' use of documents obtained outside of the discovery process.  (Mirro 12/8/06 Letter at 9 n.6).  Cf. Seattle Times Co. v. Rhinehart, 467 U.S. 20, 34 (1984) (noting that

protective order does not violate First Amendment if it permits dissemination of "the identical information covered by the protective order as long as the information is gained through means independent of the court's processes"). Accordingly, the defendants' confidentiality designation does not prevent the plaintiffs from disclosing this document, which was obtained by the plaintiffs independent of discovery.

### h. Lesson Plan on Double-Cuffing

This document describes how and when to use plastic double-cuffs (also known as "flexcuffs"). Once again, the City asserts that disclosure of this document would impair law enforcement interests, primarily because it describes the qualities that make double-cuffs different from traditional handcuffs. I have examined this document in camera and find that the allegedly sensitive information to which the City refers would be obvious to anyone with a modicum of common sense. Accordingly, the City has not demonstrated good cause for maintaining the confidentiality of this document.

### i. Lesson Cover Sheet: Cuffing

This document explains briefly the proper procedures for handcuffing and transporting persons who are under arrest. The City contends that its release would jeopardize the safety of law enforcement officers. It is conceivable, of course, that knowledge of the steps a police officer has been advised to follow when

handcuffing or transporting a detainee could make it easier for the detainee to escape or harm the officer. However, the document includes minimal detail. Furthermore, much of the information it contains will be familiar to anyone who has ever been searched when going through security at an airport. Finally, the document is not marked as "Confidential," and the City has given the Court no reason to believe that the NYPD takes care to maintain its confidentiality. Accordingly, the City has not shown good cause for keeping this document confidential.

### j. Internal Affairs Bureau Complaints

     This document describes complaints made to the NYPD Internal Affairs Bureau (IAB) during the RNC.[11] Identifying information regarding civilian complainants has been redacted. The City has also redacted a "transmittal memo to the Law Department" and information regarding open Civilian Complaint Review Board investigations. (RNC Defendants' Privilege Log at 10). According to the City, this document is subject to both the deliberative process privilege and the law enforcement privilege.

     The City's argument that the document is subject to the deliberative process privilege is utterly meritless. Aside from describing complaints made by civilians regarding police officers' conduct, the document contains purely factual information regarding

---

[11] At the Court's request, the City submitted a copy of this document for in camera review.

actions taken by the NYPD to deal with the complaints.  There is no evidence whatsoever that dissemination of this document would chill the candor of officials within the NYPD.

The City's argument that the document is subject to the law enforcement privilege also fails.  The City contends that "[d]isclosure of this document would undercut the IAB's ability to conduct effective internal investigations." (Mirro 7/7/06 Letter at 17).  This contention is entirely conclusory, as is the supporting affidavit's contention that "[t]o effectively investigate police misconduct, IAB's methods must not be disclosed." (McManus Decl., ¶ 17).

Finally, the City notes that the document reveals the identities of individual officers about whom complaints were made during the RNC.  The City contends that because the document does not reveal whether the complaints were substantiated, release of the document would invade the privacy of non-defendant officers. (Mirro 7/7/06 Letter at 17).  This concern can be addressed by redaction of identifying information, such as names, tax identification numbers, and badge numbers.  Accordingly, the plaintiffs shall redact that information from the document before disclosing the document.

                      k.  <u>NYPD Interoffice Memoranda</u>

In the course of discovery, the City produced approximately 700 pages of NYPD interoffice memoranda to the plaintiffs.  The

City asserts that all of these memoranda are subject to the law enforcement and deliberative process privileges.  According to the City, the documents include

> communications and discussions of NYPD's policing tactics and techniques, legal issues concerning these policing tactics and techniques, law enforcement and counter-terrorism equipment and methods, budgeting requests relating to those resources, building schematics release of which raises security concerns, and other sensitive law enforcement information not intended to be disclosed to the public.

(Mirro 7/7/06 Letter at 18).  The City simply describes the documents, making no attempt to demonstrate that their release to the public would interfere with future NYPD investigations or other law enforcement activity.  The City offers only a single concrete suggestion of harm, stating that release of one particular memorandum "might well cause . . . [a confidential source] not to share similar information with the NYPD in the future," a claim that is unsupported by the accompanying declaration from an NYPD official.  (Mirro 12/8/06 Letter at 18; McManus Decl., ¶ 18).  The confidentiality of these documents cannot be justified on the basis of an assertion by a City attorney that release of one of them "might" make it harder for the NYPD to obtain information from an allegedly confidential source.

The City also fails to show that the memoranda are subject to the deliberative process privilege, alleging only that the memoranda are predecisional "because they pre-date the RNC," and deliberative "because they address issues and provide information

that informed subsequent NYPD policy decisions." (Mirro 7/7/06 Letter at 18). Once again, the City fails to identify any particular decision or decisions to which these documents relate and fails to recognize that a document that simply provides information that assists a decisionmaker does not fall within the privilege. Vague assertions of the kind offered here do not suffice to demonstrate that disclosure would chill the candor of NYPD officials.

The declaration submitted in support of the City's motion articulates a final, and perhaps more candid, reason that the defendants wish to maintain the confidentiality of the memoranda. It states that they "contain unguarded assessments and critiques by senior NYPD personnel that would cause embarrassment and mislead the public if [] publicized." (McManus Decl., ¶ 18). However, the mere fact that documents were not intended for public view when they were created does not justify a protective order. Nor, again, does the fact that the NYPD would prefer to continue to keep these documents from the public. "[B]ecause release of information not intended by the writer to be for public consumption will almost always have some tendency to embarrass, an applicant for a protective order whose chief concern is embarrassment must demonstrate that the embarrassment will be particularly serious." Cipollone, 785 F.2d at 1121. The City has not shown that any serious harm will result from disclosure of these documents.

37

Maintaining their continued confidentiality is therefore unwarranted.

l. <u>Chart of RNC Permit Applications</u>

In June 2004, the NYPD created a chart "for the purpose of evaluating the various permit applications submitted to the City for approval in anticipation of the RNC." (Mirro 7/7/06 Letter at 19). According to the City, the chart is subject to the deliberative process privilege because it contains comments from NYPD personnel regarding the applications. To support this assertion, the City simply states that the document was created before the NYPD made its final decisions with respect to the applications, and that it "contains the personal views and considerations that led to those final decisions." (Mirro 7/7/06 Letter at 19). The declaration offered in support of the City's motion states only that the comments "reveal non-final information about the permit-approval process." (McManus Decl., ¶ 19).

The City has not demonstrated that disclosure of the comments contained in this document would chill the candor of NYPD personnel. The heightened scrutiny under which the NYPD operated in the months before the RNC does not transform a routine decision such as whether or not to grant a permit into a matter of important public policy. Furthermore, the City has not provided sufficient information about the nature of the comments to show that they are of the sort that, if revealed to the public, would inhibit NYPD

officials from freely expressing their opinions. Finally, any
purely factual information contained in the chart could be
disclosed in any event. See Hopkins v. U.S. Department of Housing
and Urban Development, 929 F.2d 81, 85 (2d Cir. 1991) (citing
Environmental Protection Agency v. Mink, 410 U.S. 73, 92 (1973)).
Therefore, the City has not shown good cause for maintaining the
confidentiality of this document.

> m. RNC Arrest Worksheet and Arrest-to-Arraignment
>    Time Charts

The RNC Arrest Worksheet and Arrest-to-Arraignment Time Charts
are "incomplete, non-final compendium[s] of RNC arrest statistics"
created by the NYPD and the New York City Law Department for use in
RNC-related litigation. (Mirro 7/7/06 Letter at 19-20). The City
contends that they are attorney work product or are subject to the
attorney-client privilege. Even assuming that they are, the City
has waived these privileges. The City also contends that the
documents are subject to the deliberative process privilege. Even
if that privilege had not been waived, the City's assertion is
utterly meritless. Compilations of arrest statistics are precisely
the sort of purely factual material that is exempt from the
privilege, and contrary to the City's repeated assertions in its
brief, the fact that a document "contains information that led to
a final decision" does not bring it within the scope of the
privilege, much less demonstrate that disclosure would chill the
candor of NYPD officials.

39

o.   "Legal Matters" Presentation

A document identified as the "Legal Matters" Presentation was created "by the NYPD Legal Bureau for the purpose of training high-ranking NYPD personnel." (Mirro 7/7/06 Letter at 20). The City contends that it is subject to the attorney-client privilege; however, the City has already waived that privilege by producing the document to the plaintiffs in the course of discovery.

The City also contends that "[p]ublic disclosure of this document would undermine the NYPD's ability to police future demonstrations effectively because it would provide those who wish to engage in disorderly conduct with information about how the NYPD will seek to counteract that conduct." (Mirro 7/7/06 Letter at 20). Having reviewed the document in camera, I find that there is no merit to this claim. The document merely gives an overview of First Amendment doctrine, notes which sections of the New York Penal Code are applicable to various types of protest activities, and explains when arrests are appropriate. Most, if not all, of this information is readily available from other sources, and there is no reason whatsoever to believe that release of this document would jeopardize law enforcement interests. Accordingly, I find that the City has not shown good cause for the confidentiality of this document.

p. Charts of RNC Events and Police Operations

The City seeks to maintain the confidentiality of various

charts: (1) a chart of scheduled RNC events; (2) a chart of unscheduled RNC events; and (3) a chart of "Manhattan South Operations." Having reviewed the documents in camera, I find that they consist of brief descriptions of various demonstrations and RNC-related events, along with estimated numbers of participants and notes on actions taken by the police in response. According to the City, dissemination of these documents would "undermine the NYPD's ability to police future demonstrations effectively." (Mirro 7/7/06 Letter at 21). This assertion is entirely conclusory, and the supporting affidavit provides no factual support for the City's claims. The City has given the Court no reason to believe that public dissemination of this document would interfere with future law enforcement efforts. Accordingly, the document need no longer be kept confidential.

q. Deposition Testimony

The plaintiffs have objected to the confidentiality designations assigned to portions of the transcripts of the depositions of (1) Captain Patrick Cortright (April 26, 2006); (2) Chief Thomas Graham (April 4, 2006); and (3) Chief John Colgan (April 25, 2006).

The City asserts that various portions of the transcripts are subject to the deliberative process privilege. The City claims that the testimony "deals with pre-decisional and deliberative conversations and actions leading to final policy decisions

41

regarding the RNC." (Mirro 7/7/06 Letter at 22). As explained above, such vague assertions, unaccompanied by any specific information about the policy decisions involved, do not suffice to show that the deliberative process privilege applies. The City has not shown that dissemination of these transcripts would "have a chilling effect on the free flow of information within the NYPD in the future." (Mirro 7/7/06 Letter at 22).

The City also alleges that the deliberative process privilege applies to portions of Chief Graham's deposition that deal with "internal conversations concerning critiques and analyses of NYPD operations." (Mirro 7/7/06 Letter at 22). The City argues that because "candor is an essential element to the NYPD's ability to evaluate its own operations," those portions should remain confidential. (Mirro 7/7/06 Letter at 22). Once again, this claim is so vague that it is impossible for the Court to conclude that public disclosure of the conversations in question would chill the candor of NYPD officials.

It is possible that the City is attempting to assert the so-called "self-critical analysis" privilege with respect to the designated portions of Chief Graham's testimony. The availability of this privilege is "an open question in this Circuit," Tortorici v. Goord, 216 F.R.D. 256, 258 (S.D.N.Y. 2003), and in any case, like the City's other claims of privilege, this claim has been waived. Moreover, "[t]o uphold such a privilege, the proponent

must demonstrate that the information [that he seeks to withhold] is of the type whose flow would be curtailed" if the information were released. Haus v. City of New York, No. 03 Civ. 4915, 2005 WL 1705291, at *4 (S.D.N.Y. July 21, 2005). Here, the City has "utterly fail[ed] to demonstrate any likelihood that if the document segments . . . were [released], police officials in the future would be any less forthcoming or candid." Id.

Next, the City claims that portions of these deposition transcripts fall within the scope of the law enforcement privilege because the testimony "deals with police tactics . . . including information regarding how the NYPD responds tactically to certain scenarios, how NYPD officers are trained for such scenarios, intelligence the NYPD may have gathered during and in anticipation of the RNC, and NYPD intelligence gathering methods." (Mirro 7/7/06 Letter at 22). The City asserts that disclosure of this information would provide "a roadmap to those who would, in the future, seek to engage in [public] disorder" (Mirro 7/7/06 Letter at 22), but does not explain how disclosure would interfere with the efforts of the police to keep order during future demonstrations and large-scale public events. Once again, the Court cannot accept the City's conclusory assertions absent any factual support for them. The declaration of Assistant Chief John McManus, offered in support of the City's claim, is not based upon personal knowledge. Rather, the statements contained therein are

offered "upon information and belief."   (McManus Decl., ¶ 27).
More importantly, the declaration merely repeats, word for word,
the general assertions contained in the City's brief.   These are
precisely the sort of "formulaic incantations of harm," <u>Kunstler</u>,
2006 WL 1084375 at *2, that the City has put forward in other
litigation, and they do not support a finding of good cause in this
case.   As stated above, the City's desire to shield from public
view the NYPD's preparations for the RNC, without more, does not
justify a protective order.

      The City also claims that dissemination of certain portions of
these deposition transcripts would constitute an invasion of
privacy, "cause embarrassment to the individuals involved," or "be
subject to misinterpretation and would lead to confusion." (Mirro
7/7/06 Letter at 23).   The plaintiffs have agreed to redact
portions of the transcripts that contain references to the
deponent's family and employment history. (Dunn 11/10/06 Letter at
15).   However, other portions of the transcripts remain disputed.

      The City seeks to maintain as confidential portions of
testimony dealing with prior depositions of Chief Graham and Chief
Colgan.   There is no reason to believe that release of that
information would invade the deponents' privacy or cause them
embarrassment, and those portions of the transcripts need not
remain confidential.   The City also seeks to maintain the
confidentiality of a portion of Chief Graham's testimony in which

he refers to a communication with his attorney.  Although that communication may have been privileged, the privilege has been waived by its disclosure to the plaintiffs' counsel.

The City also seeks to maintain the confidentiality of various portion of Chief Colgan's testimony because they would "cause public confusion" if released.  As discussed above, the possibility of "public confusion" does not constitute good cause for a protective order.

Finally, the City seeks to maintain the confidentiality of a statement by Chief Colgan regarding the age of another Police Chief, who is now retired.  The City has given the Court no basis to believe that the person in question made any attempt to keep his age a secret.  Accordingly, there is no reason to maintain the confidentiality of that portion of Chief Colgan's testimony.

The City has not shown good cause for the confidentiality of these deposition transcripts.  Aside from the redactions to which the plaintiffs have agreed, the documents are not subject to the Protective Order.

B. Modification of the Protective Order

In addition to requesting that the City's confidentiality designations be removed from the specific documents at issue here, the Times asks that the Protective Order be modified by requiring the parties "to make a particularized showing of good cause for designating as confidential any transcripts of any depositions, and

any discovery produced, subsequent to the Court's order on the instant motion." (Letter of David McCraw dated Nov. 9, 2006, at 10).

As noted above, there is a strong presumption against modification of a protective order to permit public access to discovery materials when those materials have been produced in reliance upon the protective order.  In this case, the Times asks only that in the future, parties be required to demonstrate to this Court that there is good cause for designating a document or deposition as "Confidential" before doing so.  The proposed modification would apply only to materials produced, or depositions taken, subsequent to this order, and therefore the <u>Martindell</u> standard does not apply to the Times' request.  Modification is appropriate, under the terms of the Protective Order itself, if the Times demonstrates good cause.  (Protective Order #1, ¶ 9).

The Times has not done so.  It asserts that there is a "public interest" in discovery produced in the RNC litigation.  Such a vague assertion is an insufficient basis for requiring the parties to justify each confidentiality designation at the time of production.[12]  Umbrella protective orders like the one at issue here

_____

[12] The Times relies on two cases denying protective orders in light of the public interest in discovery in cases involving public officials.  One case cited by the Times expressly relies on a now-obsolete version of Rule 5(d) of the Federal Rules of Civil Procedure, which required that all discovery documents be filed with the court.  <u>Hawley v. Hall</u>, 131 F.R.D. 578, 581-83 (D. Nev. 1990).  The Second Circuit has since noted that to the extent prior

are "a useful method of dealing with large-scale discovery,"
Cipollone, 785 F.2d at 1123, and are routinely entered.   See
Uniroyal Chemical Co. Inc. v. Syngenta Crop Protection, 224 F.R.D.
53, 57 (D. Conn. 2004); DeCarlo v. Archie Comic Publications, Inc.,
No. 00 Civ. 2344, 2000 WL 781863, at *1 (S.D.N.Y. June 20, 2000).
"Because in any large-scale litigation the movant will likely have
far more documents that it wants to designate as confidential than
the respondent will object to being so designated, the umbrella
order approach is less time-consuming and burdensome to the parties
and the court than the document-by-document method."[13]   Cipollone,
785 F.2d at 1122 n.18.

_____Finally, the City also requests "leave to modify the
Protective Order" or "leave to negotiate a new Confidentiality

---

cases relied on Rule 5(d) to find a presumption of public access to
discovery materials, those cases are no longer good law, because
Rule 5(d) no longer permits the filing of discovery materials with
the court unless they are used in the proceeding or the court
orders that they be filed.   TheStreet.com, 273 F.3d at 233 n.11.
The other case cited by the Times, Flaherty v. Seroussi, 209 F.R.D.
295 (N.D.N.Y. 2001), also relies on the former version of Rule
5(d).   That case was decided before TheStreet.com, and the court
noted the "possibility that recent amendments to Rule 5(d) . . .
may significantly undermine the argument that the rules favor free
public access to discovery materials."   Id. at 298 n.7.

[13] Of course, whenever an umbrella protective order is issued
"there is a danger[] that counsel will err on the side of caution
by designating confidential any potentially sensitive document."
Cipollone, 785 F.2d at 1122 n.17; see also DeCarlo, 2000 WL 781863,
at *1 (noting possibility of abuse of privilege afforded by such an
order).   Indeed, the City did just that when it designated all
previously-produced discovery in all RNC-related cases as
"Confidential" under the Protective Order.

Order and Stipulation." (Mirro 7/7/06 Letter at 23; McManus Decl., ¶ 28). It does not appear that the City is requesting modification of the existing Protective Order. The City may certainly negotiate a new stipulated confidentiality order with the plaintiffs, but the parties will remain bound by the current Protective Order until a new one is entered by the Court.

Conclusion

For the reasons stated above, the City's motion to maintain the confidentiality of the disputed documents is denied. Before releasing any of the documents, however, the plaintiffs shall redact them as discussed above. The Times' motion to modify the Protective Order is also denied.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       January 19, 2007

Copies mailed this date:

Christopher T. Dunn, Esq.
New York Civil Liberties Union
125 Broad Street, 17th Floor
New York, New York  10004

James Mirro, Esq.
Special Assistant Corporation Counsel
Assistant Corporation Counsel
100 Church Street
New York, NY 10007

David McCraw, Esq.
The New York Times Company
229 West 43rd Street
New York, NY 10036