```
UNITED STATES DISTRICT COURT                (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
MICHAEL SCHILLER, et al.,           :  04 Civ. 7922 (KMK) (JCF)
                                    :
              Plaintiffs,           :
                                    :
    - against -                     :
                                    :
THE CITY OF NEW YORK, et al.,       :
                                    :
              Defendants.           :
- - - - - - - - - - - - - - - - - -:
HACER DINLER, et al.,               :  04 Civ. 7921 (KMK) (JCF)
                                    :
              Plaintiffs,           :
                                    :
    - against -                     :       MEMORANDUM
                                    :       AND  ORDER
THE CITY OF NEW YORK, et al.,       :
                                    :
                                    :
              Defendants.           :
- - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

These are two of the many cases that arise from the arrests of demonstrators during the Republican National Convention (the "RNC") in 2004.  At issue here is a document request served upon the defendants on March 29, 2007 ("Request No. 97").  The defendants (hereinafter the "City") objected to production of the requested documents on a number of grounds, including overbreadth, lack of relevance, and the law enforcement privilege.  The plaintiffs then moved to compel the defendants to produce the documents in question.  In an order dated May 18, 2007, I held that Request No. 97 was not overly broad and was reasonably calculated to lead to the discovery of admissible evidence.  Because the issue of the

applicability of the law enforcement privilege had not yet been addressed by the parties, I did not order production of the documents at that time.  That issue has now been fully briefed, and I have reviewed the disputed documents in camera.

For the reasons set forth below, the plaintiffs' motion to compel production of the documents is granted in part and denied in part.  Portions of the documents sought by the plaintiffs are subject to the law enforcement privilege.  However, the privileged material may be redacted in order to provide the plaintiffs with the information necessary to the litigation.  I have provided the defendants with copies of the documents redacted in accordance with the principles discussed below, and they must be produced to the plaintiffs in that form.

Background

    A. NYPD Intelligence Division

Deputy Commissioner David Cohen heads the Intelligence Division of the New York City Police Department (the "NYPD"). Prior to the RNC, the Intelligence Division was responsible for collecting information regarding the nature of planned protest activity in order to assess possible threats to security. (Declaration of David Cohen dated May 2, 2007 ("Cohen 5/2/07 Decl."), ¶¶ 1, 6).  Means used to gather such information included the utilization of confidential informants and the assignment of

undercover officers[1] to monitor the activities and plans of organizations that the NYPD thought were likely to engage in unlawful activity at the RNC.[2]

Commissioner Cohen analyzed the information gathered by his staff and then briefed the RNC Executive Committee on "potential disruptive behavior" at the RNC. (Cohen 5/2/07 Decl., ¶ 9; Letter of Gerald S. Smith dated Feb. 21, 2007 ("Smith 2/21/07 Letter"), attached as Exh. C to Declaration of Palyn Hung dated April 12, 2007 ("Hung 4/12/07 Decl."), at 2-3). Members of the Executive Committee, which included Police Commissioner Raymond Kelly, Chief of Department Joseph Esposito, and other high-ranking NYPD officials, were responsible for formulating the policies challenged by the plaintiffs in these cases. (Cohen 5/2/07 Decl., ¶ 9; Smith 2/21/07 Letter at 2-3, 5). Among these policies are (1) the NYPD's decision to fingerprint all arrestees and (2) the decision not to issue summonses but instead to require that all arrestees be

---

[1] In the interest of brevity, I will generally refer in this opinion only to the use of undercover officers, not to confidential informants. In any event, the distinction is not material to the analysis here.

[2] The City maintains that these undercover officers "were engaged in investigations authorized under specific provisions in the Patrol Guide known as the Handschu Guidelines." (Declaration of David Cohen dated June 6, 2007 ("Cohen 6/6/07 Decl."), ¶ 6 n.4). See Handschu v. Special Services Division, No. 71 Civ. 2203, 2007 WL 1711775, at *1-3 (S.D.N.Y. June 13, 2007) (summarizing history of consent decree governing NYPD investigations of political activity). It is not my role in this litigation to determine whether the investigation undertaken by the Intelligence Division prior to the RNC was permissible under the Handschu Guidelines.

arraigned before being released.   (Smith 2/21/07 Letter at 5).
According to the defendants, these policies were based on
intelligence information obtained in advance of the RNC and
presented to the RNC Executive Committee by Commissioner Cohen.
(Smith 2/21/07 Letter at 5).

   B. Disputed Documents[3]

   On January 19, 2007, the City identified 600 pages of
intelligence-related documents that had not previously been
disclosed to the plaintiffs in the course of discovery.[4]   The
plaintiffs subsequently determined that those documents "were only
part of Defendants' pre-RNC intelligence gathering."  (Letter of
Palyn Hung dated April 12, 2007 ("Hung 4/12/07 Letter") at 2).
Accordingly, the plaintiffs served Request No. 97, which seeks:

> All documents -- whether in the form of raw reports,
> summaries, or any other form -- containing information
> gathered, collected, or otherwise obtained by the NYPD's
> Intelligence Division between April 1, 2003 and September
> 2, 2004 about individuals, groups, or entities connected
> to demonstrations expected to take place in New York City

---

[3] The factual background of the instant dispute is set out in
greater detail in prior opinions.  See Schiller v. City of New
York, Nos. 04 Civ. 7922, 04 Civ. 7921, 2007 WL 1461378, at *1-2
(May 18, 2007); Schiller v. City of New York, Nos. 04 Civ. 7922, 04
Civ. 7921, 2007 WL 735010, at *1-2 (March 12, 2007).

[4] The City refers to these documents as "end-user reports."
(Cohen 6/6/07 Decl., ¶ 5).  In an order dated May 4, 3007, I found
that the defendants had not demonstrated good cause for designating
the end-user reports "confidential" pursuant to the protective
order that governs in these cases.  See Schiller v. City of New
York, Nos. Nos. 04 Civ. 7922, 04 Civ. 7921, 2007 WL 1299260
(S.D.N.Y. May 4, 2007).  The end-user reports have since been
released to the public.

in conjunction with the Republican National Convention. This request includes but is not limited to DD5s, tape recordings, video recordings, photographs, computer files, e-mails, and web pages.

(Plaintiff's Sixth Request for Documents, attached as Exh. I to Hung 4/12/07 Decl., at 4).  As explained above, I previously determined that this request was not overly broad and was sufficiently likely to lead to the discovery of admissible information.  Schiller, 2007 WL 1461378, at *2-3.

The City has asserted the law enforcement privilege with respect to three categories of documents responsive to Request No. 97.  The first category consists of "field intelligence reports," also known as "DD5s", which are prepared by undercover police officers or their "handlers."[5]  The City contends that these reports are protected by the privilege in their entirety.  The second category includes 84 other documents that the City claims are privileged in their entirety.  The third category consists of 177 documents that the City is willing to produce with certain redactions.  (Cohen 6/6/07 Decl., ¶¶ 6-7).

Discussion

A. Law Enforcement Privilege

The purpose of the law enforcement privilege

---

[5] "Handlers" are the officers "responsible for working with undercovers on a daily basis."  They are "engaged in confidential assignments," and the fact that they are assigned to work with an undercover officers is "known only by NYPD Intelligence Division personnel."  (Cohen 6/6/07 Decl., ¶ 18).

>is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness[es] and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.

In re Department of Investigation of the City of New York, 856 F.2d 481, 484 (2d Cir. 1988). Parties seeking the protection of the privilege "must make a clear and specific evidentiary showing of the nature and extent of the harm that is likely to be encountered if disclosure is permitted, and they may not rely simply on generalized reiterations of the policies underlying the privilege." Kunstler v. City of New York, Nos. 04 Civ. 1145, 04 Civ. 665, 04 Civ. 2611, 2005 WL 2656117, at *1 (S.D.N.Y. Oct. 18, 2005); see also MacWade v. Kelly, 230 F.R.D. 379, 381 (S.D.N.Y. 2005) (party asserting law enforcement privilege "must make a clear showing of harm").

The privilege is a qualified one. See Kunstler, 2005 WL 2656117, at *1; MacWade, 230 F.R.D. at 381. When determining whether to order disclosure, courts should "'balance the public interest in nondisclosure against the need of the particular litigant for access to the privileged information.'" Kunstler v. City of New York, 439 F. Supp. 2d 327, 328 (S.D.N.Y. 2006) (quoting Friedman v. Bache Halsey Stuart Shields, Inc., 738 F.2d 1336, 1341 (D.C. Cir. 1984)); see also Kitevski v. City of New York, No. 04 Civ. 7402, 2006 WL 680527, at *3 (S.D.N.Y. March 16, 2006); Borchers v. Commercial Union Assurance Co., 874 F. Supp. 78, 80 (S.D.N.Y. 1995). "However, the party asserting the privilege must 'make a

6

threshold showing that the privilege attaches' before the court is required to balance the parties' interests." <u>City of New York v. Beretta</u>, 222 F.R.D. 51, 66 (E.D.N.Y. 2004) (quoting <u>United States v. United States Currency in the Sum of Twenty One Thousand Nine Hundred Dollars</u>, No. 98 CV 6168, 1999 WL 993721, at *3 (E.D.N.Y. Sept. 21, 1999)).

    B. <u>Applicability of the Privilege</u>

        1. <u>Field Intelligence Reports</u>

The field intelligence reports are daily reports that describe an undercover officer's observations.[6] Each "contain[s] extremely detailed information about a particular activity including the geographic location, the premises, the time of meetings, numbers of persons present often identifying them by name, relationships between undercovers and confidential informants and other contacts they may have, as well as methods of communication and the means by which information is gathered." (Cohen 6/6/07 Decl., ¶ 22). In a declaration filed in support of the City's assertion of privilege, Commissioner Cohen divides the information contained in the reports into seven categories: (1) case number, (2) date of report, (3) date of opening of investigation, (4) unit reporting, (5) person reporting, (6) date, time, and location information, and (7) "description of activities, including name of organization(s), name

---

    [6] Some of these reports are written by the officers' handlers, others by the officers themselves.

and/or description of individual(s), meeting attended, topics discussed, conversations engaged in or overheard, things observed." (Cohen 6/6/07 Decl., ¶¶ 16, 18). Commissioner Cohen claims that these documents are protected by the privilege in their entirety because disclosure of "any portion of the information contained in" the reports would permit identification of the undercover officer involved, would reveal the "size and capabilities of the NYPD undercover program," and would disclose the "methods used by the NYPD in an undercover investigation." (Cohen 6/6/07 Decl., ¶ 17).

In their reply brief, the plaintiffs indicate that they do not seek "information about confidential sources and techniques, which indisputably are covered by the law-enforcement privilege and which are irrelevant to the issues before this Court." (Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion to Compel the Production of Documents ("Pl. Reply") at 6). With respect to the field reports, the plaintiffs therefore "seek none of the information in categories 1-6 and from category 7 do not need 'description of activities,' 'name and/or description of individuals,' or 'meeting attended.'" (Pl. Reply at 7). They seek only "information the [Intelligence D]ivision gathered about Convention-related protest activity (including any NYPD assessments of that information)."[7] (Pl. Reply at 6). They argue that this

---

[7] The City contends that the plaintiffs' use of the phrase "Convention-related protest activity" in their reply narrows the scope of Request No. 97. The City claims that "[i]n response to

information is highly relevant, since it is "the very information the City claims justified its actions." (Pl. Reply at 8 n.3).

The issue, therefore, is whether it is feasible to redact the field intelligence reports so as to permit the plaintiffs to review them without revealing the identities of undercover officers or disclosing confidential NYPD tactics and strategies. After reviewing the documents, I have determined that it is.[8] Where a

---

[the plaintiffs'] original request, defendants identified 'all documents' 'containing information' 'about individuals, groups, or entities connected to demonstrations' [during the RNC] -- not just documents discussing 'convention related protest activity.'" (Letter of Peter G. Farrell dated June 15, 2007 at 2). Accordingly, the City initially declined to produce for in camera review many of the documents responsive to the plaintiffs' original request. I ordered the City to produce for in camera inspection all of the documents it initially identified as being responsive to Request No. 97. Upon review, it is apparent that some of the information contained in those documents tends to reveal law enforcement strategies and the identities of undercover officers. Most of this information is also irrelevant because it relates to activities unrelated to planned protests at the RNC. As explained below, this information may be redacted from the documents before they are produced to the plaintiffs.

[8] Redaction of privileged information is an appropriate means to address legitimate law enforcement concerns if it may be accomplished without destroying the sense of the information left unredacted. See, e.g., Vodak v. City of Chicago, No. 03 C 2463, 2004 WL 2032147, at *5 (N.D. Ill. Sept. 9, 2004)(permitting redaction of "names of all undercover intelligence officers as well as any identifying information" contained in disputed documents). In this case, redaction of all information not related to the plans of an organization or individual with respect to the RNC does not, as Commissioner Cohen asserts, "result[] in pages of meaningless snippets of text and punctuation." (Cohen 6/6/07 Decl., ¶ 22). The plaintiffs do not need to know when, where, and from whom the defendants learned a particular piece of information regarding planned protest activities during the RNC. In severely redacted form, these documents still provide the plaintiffs with the information they seek without revealing privileged or irrelevant

field intelligence report contains no mention of the RNC, or specifically states that there was no mention of the RNC at a given meeting or protest, the document need not be produced to the plaintiffs at all.[9]  The majority of the information contained in the remaining reports bears no relation to the RNC or falls within the categories that the plaintiffs have indicated they do not seek, and may therefore be redacted.  Information regarding the plans of a particular organization or individual with respect to the RNC can, in most instances, be retained without jeopardizing the confidentiality of NYPD sources or methods of investigation.

It is difficult to imagine how someone could determine the identity of an undercover officer simply from the fact that he or she was present at a meeting or protest attended by dozens, if not

---

data.

[9] The following pages contain no mention of the RNC, state that no information regarding the RNC was obtained at a given event, or contain only a brief passing reference to RNC-related matters (for example, making posters or flyers for protests). Therefore, they need not be produced to the plaintiffs: 161-62, 497, 499-502, 504-05, 516, 519-20, 522, 524, 526-28, 530-31, 536, 541, 552, 570, 588, 592-602, 608, 612, 615, 618-19, 622-23, 625, 627, 629, 633, 636, 642-43, 649, 656, 666, 682, 685-89, 694-98, 708-09, 713-15, 718-19, 727-28, 731-32, 737-40, 745, 748, 751-53, 762-63, 766, 773, 785-87, 801-05, 819-23, 825-30, 834, 837, 839, 840-47, 850-55, 857-63, 865, 868-69, 872-75, 877-83, 886-89, 893-95, 898-99, 901, 918-19, 942-50, 958-63, 965-1032, 1049-1050, 1087-1107, 1111-20, 1203, 1123-24, 1127, 1131-37, 1140, 1142-43, 1149, 1151, 1161, 1171-73, 1176-1182, 1184, 1188-91, 1197-99, 1201-02, 1205-06, 1208-11, 1213, 1217, 1219-20, 1221-22, 1224-26, 1229, 1232-34, 1238, 1241, 1243-45, 1249-53, 1259-63, 1269, 1285, 1287, 1300, 1306, 1309, 1311, 1315.

hundreds, of people.  Since the City may redact dates, locations, numbers of persons present, and other details regarding each meeting, it will be difficult in most cases to determine what meeting is being discussed.  Even where it is possible to do so, it is implausible that, as the City asserts, "[w]ith data from other sources and documents, a person may determine the identity of the undercover . . . ." (Cohen 6/6/07 Decl., ¶ 18).  The City does not explain with any specificity how extrinsic information would allow someone to determine which participant at any given meeting was an undercover officer.  Given the extensive redactions being permitted here, that possibility is indeed remote.  To the extent that any such possibility exists, it can be adequately addressed with an "attorneys'-eyes-only" designation.

The plaintiffs have indicated that they do not seek the names of individuals mentioned in the field intelligence reports.  However, they do seek the names of organizations.  Commissioner Cohen asserts that disclosure of the "groups or organizations about whom information is being obtained" would reveal the Intelligence Division's "methodologies." (Cohen 6/6/07 Decl., ¶ 14).  Of course, "[l]aw enforcement has a legitimate interest in maintaining the confidentiality of the targets of its investigations," but that interest does not necessarily justify denying disclosure altogether.  Vodak, 2004 WL 2032147, at *5.  Disclosing which organizations were monitored closely by the NYPD may reveal something about the NYPD's

strategies, but the plaintiffs have a substantial need for that information.  Without the names of the organizations whose plans are being described, the plaintiffs cannot know whether, for example, fifteen organizations or only one organization planned to commit mass civil disobedience in New York City during the RNC.  The distinction is highly relevant to the City's defense.

Commissioner Cohen does not claim that any of the organizations mentioned in the field intelligence reports are the subject of a continuing investigation.  While it is true that "an investigation need not be ongoing for the law enforcement privilege to apply," National Congress for Puerto Rican Rights v. City of New York, 194 F.R.D. 88, 95 (S.D.N.Y. 2000), the City does not explain how disclosure of the fact that an organization was investigated in connection with the RNC would hinder law enforcement efforts in the future.  Commissioner Cohen does assert that the NYPD may in the future need to monitor some of the same organizations.  (Cohen 6/6/07 Decl., ¶ 29).  However, the very limited information being produced to the plaintiffs reveals nothing about police investigatory tactics beyond that fact that undercover officers or informants attended meetings of, and protests organized by, various activist organizations.  This is hardly a revelation.  "The use of undercover police officers to collect information about a group or organization engaged in First Amendment conduct is not a novel technique requiring protection from disclosure by the law

enforcement privilege." <u>Vodak</u>, 2004 WL 2032147, at *6.

Moreover, the disclosure of the end-user reports has already revealed that the NYPD monitored the plans of most of these organizations, and the plaintiffs point out that some of the end-user reports make it clear that NYPD undercover officers or informants attended activist meetings and reported back to the Intelligence Division. (Pl. Reply at 8). Presumably, then, most, if not all, of the organizations mentioned in these documents have already been alerted to the fact that they were being monitored and that undercover officers or informants may have attended their meetings prior to the RNC.[10]

Because the plaintiffs' need for the names of organizations mentioned in the field intelligence reports outweighs "the public interest in nondisclosure," <u>Kunstler</u>, 439 F. Supp. 2d 328, the names of organizations may not be redacted where they appear in the context of discussions regarding RNC-related protest activity. Concerns that disclosure will "reveal to the public where [the Intelligence Division] has been focusing its investigative efforts," thereby compromising "its ability to conduct future investigations," can be further allayed by limiting disclosure to plaintiffs'

---

[10] The names of many of the same groups also appear, unredacted, in the documents that the City has indicated it is willing to produce to the plaintiffs (for example, Bates Nos. 1453-57, 1473-87, 1546-1612).

counsel.[11]  <u>Vodak</u>, 2004 WL 2032147, at *8.

I have provided the City with redacted copies of the remaining field intelligence reports.  In those copies, I have redacted all information that does not relate to the plans of any particular organization or individual with respect to the RNC.[12]  I have also redacted a limited amount of information related to plans for the RNC where it is evident that disclosure of that information could lead to the identification of an undercover officer.  With those redactions, the City must produce the field intelligence reports to the plaintiffs.

2. <u>Other Documents</u>

As explained above, there are two other categories of documents at issue: 84 documents that the City contends are privileged in their entirety and 177 documents that the City has agreed to produce with certain limited redactions.  Commissioner Cohen's declaration

---

[11] In addition, one further restriction is appropriate in light of the number of counsel involved in this litigation.  Only one set of documents shall be produced and it shall be securely maintained at the offices of the New York Civil Liberties Union (the "NYCLU"), plaintiffs' counsel in these two cases.  Other counsel appearing for the plaintiffs in the related cases may review the documents at the NYCLU offices but may not remove them or copy them except as necessary to submit them to the Court as sealed exhibits.

[12] One individual encountered by the NYPD repeatedly advocated destruction of property and violence against police officers. Although these comments were not always made in connection with the RNC, I have not redacted them because the documents make it clear that he planned to attend the RNC, and therefore his predilection for violence is plainly relevant.  I have redacted his name, but have assigned him a pseudonym ("John Doe") to make it clear that the same individual is being referred to throughout.

says very little about these documents.  The City itself notes in
its brief that a claim of law enforcement privilege must be
supported by an explanation of "why the specified documents fall
within the scope of the privilege." (Defendants' Memorandum of Law
in Opposition to Plaintiffs' Motion to Compel Document Discovery
("Def. Memo.") at 5).  However, Commissioner Cohen's declaration
does not explain why the documents in the first category are
privileged, nor does it explain why it is necessary to redact
information from documents in the second category.[13]  As a result,
although the documents have been submitted in camera, the  Court can
only guess why the City believes that they are subject to the
privilege.  It is plainly apparent from my review of the documents
that the privilege applies to at least some of the information
contained in them.  See Galvin v. Hoblock, No. 00 Civ. 6058, 2003
WL 22208370, at *6 (S.D.N.Y. Sept. 24, 2003) (noting that although
defendants failed to "demonstrate with specificity the harm likely
to flow from disclosure," in camera review revealed that documents
were subject to the privilege).  However, where it is not clear from
the nature of the withheld or redacted information whether the
privilege is applicable, the documents must be produced because the
City has failed to make the required "clear showing of harm."

---

[13] These documents are mentioned several times (Cohen 6/6/07
Decl., ¶¶ 6-7, 20, 30), but Commissioner Cohen does not explain how
they implicate the privilege, as he does with the field
intelligence reports.  (Cohen 6/6/07 Decl., ¶¶ 15-19, 22-24).

15

MacWade, 230 F.R.D. at 381.

Many of the documents in the second category, which the City seeks to withhold altogether, contain no information related to planned protest activity at the RNC, and therefore need not be produced to the plaintiffs.[14]  A number of other documents in this group describe in detail the NYPD's plans and strategies for its pre-RNC intelligence-gathering operation, as well as lessons learned from political demonstrations in other cities.  These documents are protected by the privilege because their disclosure would likely reveal confidential law enforcement tactics.[15]  A few documents in the second category do contain information regarding RNC-related protest plans and therefore must be produced, but certain privileged information may be redacted from them according to the principles set forth above.[16]   I have provided copies of those documents to

_____

[14] These are Bates Nos. 411-15, 1324, 1328-55, 1364, 1371-73, 1375-78, 1394, 1398, 1403-17, and 1422.  Many of these pages consist of photographs of unidentified demonstrations, individuals, and buildings.

[15] These are Bates Nos. 387-88, 390-91, 393, 400, 1321-22, 1326-27, 1363, 1366-70, 1379-81, 1383-84, 1387, 1390-93, 1418, and 1430-46.  Most of these documents do not contain information obtained by the NYPD about individual activists or organizations but rather describe the NYPD's plans for its pre-RNC intelligence-gathering operation.  They therefore also fall outside the scope of the plaintiffs' request.

[16] I have not generally redacted individuals' names from these documents, as I did with the field intelligence reports, because most of these documents do not describe interactions with individuals or their statements or actions at meetings and protests.  Disclosure of the names contained in the field intelligence reports would make it easier to determine the

the defendants with redactions.[17]

The third category consists of documents that the City is willing to produce to the plaintiffs with certain redactions.  Much of the redacted information is privileged.  For example, the City has redacted the names and e-mail addresses of informants, NYPD officers involved in specific investigations, and members of other law enforcement agencies, as well as identifying information regarding undercover officers.  Some information, including Social Security numbers, addresses, and dates of birth, appears to have been redacted to protect individuals' privacy.  Other information, such as strategies that may be used by the police to counter common tactics used by demonstrators, is plainly covered by the law

---

identities of undercover officers or informants.  By contrast, individuals are, for the most part, not mentioned in this second category of documents in connection with any undercover investigation.  Rather, these documents simply indicate that the NYPD considered certain individuals to be of interest in the months leading up to the RNC.  Disclosure of their names does not appear to pose a risk of revealing confidential methods or sources. Indeed, the third category of documents, which the City has represented that it is willing to produce, contains numerous unredacted names.  The City has not explained the distinction between the names contained in this third category of documents, which it will produce voluntarily, and the names contained in the second category of documents, which it claims are subject to the privilege.

[17] Several of the documents contained in this category are identical to, or contain essentially the same information as, documents that the City has indicated it is willing to produce to the plaintiffs in redacted form.  For example, 1323 contains essentially the same information as 1459.  Pages 1357-1362 in the second category are identical to 1463-68 and 1802-07 in the third category.

enforcement privilege.  These redactions are therefore permissible.

In some instances, however, the City has made redactions that are not clearly supported by the policies behind the law enforcement privilege.  For example, the documents contain numerous e-mails from activist list-serves, which were then forwarded to various NYPD officers.  The City has redacted the names and e-mail addresses of those officers, but has also redacted their comments regarding the forwarded e-mails.  The City has also redacted handwritten comments on various documents.  Internal NYPD e-mails and officers' notes are not automatically subject to the privilege; as with any other type of information, the City must demonstrate that their disclosure would interfere with a law enforcement investigation.  The City has made no attempt to do so.  Accordingly, those comments may not be redacted where they contain additional relevant information or indicate what information in the document or e-mail the NYPD considered important.

Similarly, information is not privileged simply because it was obtained as a result of an undercover investigation.  The City appears to have redacted certain information on the theory that all information obtained from an undercover officer is protected by the privilege. However, as explained above, information is privileged only when its disclosure would interfere with legitimate law enforcement interests.  The mere fact that information was obtained through an undercover investigation does not render it privileged.

Rather, the City must make a clear and specific showing that its disclosure would jeopardize that investigation or future investigations.  See Vodak, 2004 WL 2032147, at *7 (rejecting suggestion that law enforcement privilege "creates a blanket exemption from disclosure for all materials gathered in a law enforcement investigation without an analysis of the specific types of information gathered in each case and a specific showing of harm from disclosure").  For example, the City might show that the information was only available to a very limited number of persons, one of whom was an undercover officer, and that disclosure of the information would therefore reveal the identity of the undercover. The City has made no such showing here.  These redactions must therefore be removed.

With respect to a number of other redactions, it is simply impossible to determine the City's reasoning from Commissioner Cohen's affidavit or from the documents themselves.  I cannot determine, for instance, why the City has redacted the names of individuals who reside in New York City, but not the names of individuals who reside outside of New York City.  Such redactions must be removed because the City has not adequately supported its assertion of the privilege.[18]  I have provided the City with copies

---

[18] I have altered redactions on the following pages: 1449-50, 1456, 1459, 1462, 1468, 1473, 1489-97, 1501-02, 1522, 1541-45, 1623, 1626, 1637, 1642-43,  1663, 1667, 1675, 1676, 1678-79, 1684-87, 1696, 1699, 1706, 1725-26,  1800-01, 1808, 1811, 1815, 1819, 1823-24, 1829, 1831, 1832-33, 1836, 1838,  1846, 1848-49, 1852,

of the documents in the third category with revised redactions, and

---

1855, 1859, 1861, 1864-65, 1867, 1871, 1876, 1881, 1885, 1886, 1891, 1893, 1896, 1899, 1901, 1906, 1908, 1913, 1915, 1917, 1964, 1972-73, 1985.

of the documents in the third category with revised redactions, and
they must be produced to the plaintiffs in that form.

Conclusion

For the reasons set forth above, the plaintiffs' motion is
granted in part and denied in part. The City must produce the
disputed documents to the plaintiffs with redactions as set forth
above. The documents shall be subject to an attorneys'-eyes-only
designation as well as to the further restrictions on dissemination
set forth above.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
        August 6, 2007

Copies mailed this date:

Christopher Dunn, Esq.
Palyn Hung, Esq.
New York Civil Liberties Union
125 Broad Street, 17th Floor
New York, New York 10004

---

1855, 1859, 1861, 1864-65, 1867, 1871, 1876, 1881, 1885, 1886,
1891, 1893, 1896, 1899, 1901, 1906, 1908, 1913, 1915, 1917, 1964,
1972-73, 1985.

Peter G. Farrell, Esq.
Special Assistant Corporation Counsel
Terri Feinstein Sasanow, Esq.
Assistant Corporation Counsel
City of New York Law Department
100 Church Street
New York, NY 10007