UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
HACER DINLER; ANN MAURER;                           :
ASHLEY WATERS,                                      :
                Plaintiffs,                      :
                vs.                              :  ECF Case
                                                 :
The CITY OF NEW YORK; RAYMOND W.                    :  04 Civ. 7921 (RCS) (JCF)
KELLY, Commissioner of the New York City            :
Police Department; and INSPECTOR JAMES              :
ESSIG, New York City Police Department;             :
                Defendants.                       :
------------------------------------------------------------x

# PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS PURSUANT TO LCOAL RULE 56.1

**Plaintiff Hacer Dinler**

      1.    In August of 2004, plaintiff Hacer Dinler was 28 years old and working as a dance and fitness instructor in New York City. Prior to August 31, 2004, Ms. Dinler had never been in any kind of protest or demonstration, and she had never been arrested. Declaration of Hacer Dinler (September 26, 2011), ¶ 2.

      2.    On August 31, 2004, Ms. Dinler was working all afternoon at a dance studio, Sal Anthony's Movement Salon, located a few blocks from Union Square. Shortly before 7:00 p.m., Ms. Dinler left that studio and began to walk to another studio to teach a dance class scheduled for 8:00 p.m. *Id.*, ¶ 3.

1

3. On the way to her 8:00 p.m. class, Ms. Dinler walked south on Irving Place toward East 16th Street. At E. 16th Street, Ms. Dinler turned the corner and began walking westward on the north sidewalk toward Union Square Park. As Ms. Dinler was walking toward Union Square, she saw people playing music and dancing on E. 16th Street. *Id.*, ¶ 4.

4. Ms. Dinler stood and watched for a very short amount of time, perhaps five to ten seconds. Then Ms. Dinler continued walking west on E. 16th Street toward Union Square. *Id.*, ¶ 5.

5. As Ms. Dinler neared Union Square, she saw police officers lining up shoulder to shoulder across the roadway and sidewalks up to the building's edge. It appeared to Ms. Dinler that the police officers were going to block people from leaving E. 16th Street. Ms. Dinler hurried to the corner of E. 16th Street and Union Square East in order to try to get out. *Id.*, ¶ 6.

6. Ms. Dinler told the police officers blocking her exit from E. 16th Street that she had no idea what was going on, and she explained that she was simply trying to go to work. Ms. Dinler asked the officers to let her leave. The officers did not allow her to leave. *Id.*, ¶ 7.

7. Ms. Dinler turned around and began walking on the E. 16th Street sidewalk toward Irving Place, in order to try to get out from that end. When Ms. Dinler got near

Irving Place, she saw that it was also blocked by a line of police officers holding netting. *Id.*, ¶ 8.

8. When Ms. Dinler reached the corner of Irving Place and E. 16th Street, she told the officers she was trying going to work. Ms. Dinler explained to these police officers that she did not know what was going on and simply wanted to leave. Ms. Dinler asked the officers if she could leave, but the officers did not let her exit. *Id.*, ¶ 9.

9. Police officers surrounded a portion of the crowd on the northern sidewalk that included Ms. Dinler, and closed in on the group toward the middle of the block. Ms. Dinler asked these police officers why she had been detained. The officers ignored her questions. Ms. Dinler could hear other people in the group talking to police officers. These people were also telling the officers that they were coming or going from work or simply passing through E. 16th Street. *Id.*, ¶ 10.

10. Ms. Dinler was detained in this fashion for about an hour. During this time, police officers began arresting people one-by-one from the group that included Ms. Dinler. *Id.*, ¶ 11.

11. The events were frightening and upsetting to Ms. Dinler. Ms. Dinler knew that she had done nothing wrong. She did not participate in the march. She never heard any order to leave the area, or any instructions on how to do so. She had walked only on the sidewalk and she had never obstructed or intended to obstruct cars or pedestrians. Police officers

3

did not give Ms. Dinler any opportunity to leave. If Ms. Dinler had been given the opportunity to leave, she would have done so. *Id.*, ¶ 12.

12. Defendant James Essig ordered the arrest of everyone on E. 16th Street between Union Square East and Irving Place, including Ms. Dinler. Deposition of James Essig at 732:16-18 (attached as Exhibit B to Declaration of Christopher Dunn (Sept. 30, 2011)).

13. Neither defendant James Essig nor any of other member of the New York City Police Department ("NYPD") had any knowledge of the actions of Ms. Dinler at E. 16th Street. *Id.* at 184:9-19; Memo Endorsement by Honorable James C. Francis IV (June 12, 2006) (attached as Exhibit A to Dunn Declaration).

14. After being detained for over an hour, Ms. Dinler became extremely upset. She fainted and lay on the ground going in and out of consciousness. Ms. Dinler was taken by ambulance to the hospital, where she was accompanied by a police officer. Dinler Declaration, ¶ 13.

15. After Ms. Dinler was treated at the hospital, the officer abruptly told her she was no longer under arrest, and left without any further explanation. Ms. Dinler was released from the hospital with no criminal charges. *Id.*, ¶ 14.

**Plaintiff Ashley Waters**

16. In 2004, plaintiff Ashley Waters was a 26-year-old Harvard Law School student. During the summer of 2004, Ms. Waters lived in New York City and split her time

4

between the law firm of Akin Gump Strauss Hauer & Feld LLP (where she is currently employed) and the New York Attorney General's office. Ms. Waters has never participated in a political protest, and prior to August 31, 2004, she had never been arrested. Declaration of Ashley Waters (September 23, 2011), ¶ 2.

17.     On the afternoon of August 31, 2004, Ms. Waters exercised at the New York Sports Club on East 23rd Street and Park Avenue. Ms. Waters left the gym and walked toward Union Square to check the movie schedules at the theatres in the area. *Id.*, ¶ 3.

18.     Ms. Waters got to Union Square around 6:30 p.m. Ms. Waters noticed a crowd at the southern end of Union Square and stopped to listen to a band playing in the park in costumes. *Id.*, ¶ 4.

19.     While Ms. Waters was listening to the band, the band and others began to move east across the park. Ms. Waters was unaware that any type of demonstration or march was planned. *Id.*, ¶ 5.

20.     Ms. Waters stood and watched the band continue to play music as it moved east and out of the park, where Ms. Waters lost sight of them. Ms. Waters then walked in the direction of the band because she was curious to see what they were doing. Ms. Waters did not know whether the band had a permit or needed a permit. *Id.*, ¶ 6.

21. Ms. Waters walked to the northern sidewalk of E. 16th Street, and headed east on the sidewalk toward Irving Place, following behind the band. *Id.* at ¶ 7. After Ms. Waters had walked east about two-thirds of the block, she saw police officers line up and stand shoulder to shoulder, blocking off E. 16th Street and both sidewalks in front of Irving Place. *Id.*, ¶ 8.

22. When Ms. Waters saw the police officers line up across E. 16th Street, she decided to leave. Ms. Waters did not see anyone being allowed to exit at Irving Place. She turned around immediately and began walking back on the northern sidewalk toward Union Square in order to leave from that end. *Id.*, ¶ 9.

23. As Ms. Waters walked toward Union Square she saw another group of police officers forming a shoulder to shoulder line in front of her, trapping her on E. 16th Street. *Id.*, ¶ 10.

24. Police officers surrounded that group that included Ms. Waters, and forced them all into a small space close to a building on the sidewalk. A police officer announced that everyone was under arrest and ordered everyone to sit down. *Id.*, ¶ 11.

25. Ms. Waters was in tears. She did not understand why she would be arrested, as she had done nothing wrong. Ms. Waters did not participate in the march. She had walked only on the sidewalk and she had never obstructed or intended to obstruct cars or pedestrians. Ms. Waters never heard any order to leave the area, or any instructions on how to do so. After she began walking down E. 16th Street, she was never given any opportunity to

leave. If police officers had given her the opportunity to leave E. 16th Street, she would have done so. *Id.*, ¶ 12.

26. Police officers began taking people one-by-one from the group and putting them in handcuffs. Eventually Ms. Waters was handcuffed, put on a bus, and taken to central booking. *Id.*, ¶ 13.

27. Defendant James Essig ordered the arrest of everyone on E. 16th Street between Union Square East and Irving Place, including Ms. Waters. Essig Deposition at 732:16-18.

28. Neither defendant James Essig nor any of other member of the NYPD had any knowledge of the actions of Ms. Waters at E. 16th Street. *Id.* at 184:9-19; Memo Endorsement by Honorable James C. Francis IV (June 12, 2006).

29. During her arrest processing, Ms. Waters was fingerprinted by a police officer. *Id.*, ¶ 14.

30. No officer ever expressed any doubts about Ms. Waters's identity. Ms. Waters was carrying a valid and accurate government-issued identification, although no police officer ever asked to examine it. At the time of her arrest, Ms. Waters was not being sought by law enforcement officials for the commission of any other offense, nor would the officers have had any reason to suspect that she was. *Id.*, ¶ 15.

31. Ms. Waters was kept in a holding cell until the evening of September 1, 2004, when she was taken from the cell and was arraigned. *Id.*, ¶ 16.

32. Ms. Waters was charged with disorderly conduct for obstructing vehicular traffic in violation of N.Y. Penal Law § 240.20(5), disorderly conduct for refusing to obey a lawful order to disperse in violation of N.Y. Penal Law § 250.20(6), and parading without a permit in violation of N.Y.C. Code § 10-110. *Id.*, ¶ 17.

33. Ms. Waters was released from custody around 6 p.m., approximately 23 hours after she was first detained on E. 16th Street. *Id.*, ¶ 18.

34. All charges against Ms. Waters were dismissed pursuant to an adjournment in contemplation of dismissal. *Id.*, ¶ 19.

**Plaintiff Ann Maurer**

35. In August 2004, plaintiff Ann Maurer was 24 years old and living in Jersey City, New Jersey. Declaration of Ann Maurer (September 26, 2011), ¶ 2.

36. On August 31, Ms. Maurer left work around 5:30 p.m. and met her friends at Union Square Park. *Id.*

37. After arriving at Union Square, Ms. Maurer and her friends watched a band that was playing in the park. When the band started marching out of Union Square while playing music, she decided to follow them. *Id.*, ¶ 3.

38. Ms. Maurer did not know whether or not the band needed a permit, or whether they had one. Ms. Maurer understood that no permit was required to march on the sidewalk, and she wanted to follow the law and had no intention of getting arrested. Ms. Maurer and her friends agreed in advance to stay on the sidewalk. *Id.*, ¶ 4.

39. After the marchers began to proceed northbound along Union Square East, Ms. Maurer followed behind them, staying on the sidewalk. At E. 16th Street, the marchers turned east onto E. 16th Street, walking toward Irving Place. Ms. Maurer wanted to follow the marchers, so she crossed the street lawfully and began walking east on the northern sidewalk of E. 16th Street. *Id.*, ¶ 5.

40. As Ms. Maurer neared the intersection of E. 16th Street and Irving Place, she encountered a line of police officers that extended across E. 16th Street and the sidewalks up to building edge on both sides. The officers were holding orange netting. *Id.*, ¶ 6.

41. When Ms. Maurer saw the line of police officers at Irving Place, she wanted to leave. She came within ten to fifteen feet of the line of police officers at Irving Place, and did not see the police officers letting anyone exit the area or her them give orders or instructions of any kind. *Id.*

9

42. Ms. Maurer turned around and began walking back westward on the E. 16th Street sidewalk toward Union Square in order to leave from the other side. As Ms. Maurer walked back on the sidewalk toward Union Square, she could see that police officers had also blocked off E. 16th Street and the sidewalks at that end as well. Ms. Maurer was trapped on the E. 16th Street sidewalk by the lines of police officers on either side. *Id.*, ¶ 7.

43. Police officers closed in and surrounded everyone standing on the north sidewalk of E. 16th Street, including Ms. Maurer. Ms. Maurer heard an officer state over a megaphone that everyone trapped on the block was under arrest. *Id.*, ¶ 8.

44. Ms. Maurer did not understand why she was being arrested, as she had done nothing wrong. Ms. Maurer had walked only on the sidewalk and she had never obstructed or intended to obstruct cars or pedestrians. Ms. Maurer never heard any order to leave the area, or any instructions on how to do so. After she began walking on the E. 16th Street sidewalk, she was never given any opportunity to leave. If police officers had given her the opportunity to leave, she would have done so. *Id.*, ¶ 9.

45. Police officers began pulling people out of the group one-by-one and arresting them. Eventually Ms. Maurer was handcuffed and arrested, put on a bus, and taken to central booking. *Id.*, ¶ 10.

46.     Defendant James Essig ordered the arrest of everyone on E. 16th Street between Union Square East and Irving Place, including Ms. Maurer. Essig Deposition at 732:16-18.

47.     Neither defendant James Essig nor any of other member of the NYPD had any knowledge of the actions of Ms. Maurer at E. 16th Street. *Id.* at 184:9-19; Memo Endorsement by Honorable James C. Francis IV (June 12, 2006).

48.     Ms. Maurer had a valid New Jersey driver's license, which was taken from her by a police officer during the booking process. Ms. Maurer was fingerprinted. Maurer Declaration, ¶ 11.

49.     No police officer ever expressed any doubts about Ms. Maurer's identity. At the time of the arrest, Ms. Maurer was not being sought by law enforcement officials for the commission of any other offense, nor would the officers have had any reason to suspect that she was. *Id.*, ¶ 12.

50.     Ms. Maurer was released with a desk appearance ticket around 2 p.m. on September 1, 2004, nearly 20 hours after she was originally detained by police officers on E. 16th Street. *Id.*, ¶ 13.

51.     Ms. Maurer was charged with disorderly conduct for obstructing vehicular traffic in violation of N.Y. Penal Law § 240.20(5), disorderly conduct for refusing to obey a

11

lawful order to disperse in violation of N.Y. Penal Law § 250.20(6), and parading without a permit in violation of N.Y.C. Code § 10-110. *Id.*, ¶ 14.

52. All charges against Ms. Maurer were dismissed pursuant to an adjournment in contemplation of dismissal. *Id.*, ¶ 15.

**Defendant James Essig**

53. As of August 31, 2004, defendant James Essig was the commanding officer of the 41st Precinct of the NYPD. Essig Deposition at 17:8-21.

54. During the Republican National Convention, Inspector Essig supervised the NYPD's mobile field force in the area east of Fifth Avenue, and South of 34th Street. *Id.* at 78:22-79:4. Inspector Essig's unit was involved in mass arrests at several locations during the Convention, including the arrests at E. 16th Street. *Id.* at 85:11-86:10.

55. On August 31, 2004, Inspector Essig arrived in the Union Square and saw many people in the park but no unlawful activity. *Id.* at 99:17-24.

56. Inspector Essig became aware that a group of people had left the park and started marching. He decided to arrest them. *Id.* at 731:4-732:18.

57. In order to make these arrests, Inspector Essig left the park and caught up to the front of the group about halfway between Union Square East and Irving Place on E. 16th Street. *Id.* at 103:5-11. Inspector Essig then passed the front of the march and proceeded on to

Irving Place, where police officers formed a line across E. 16th Street at the intersection of Irving Place. *Id.* at 105:11-20. After the line of police officers was established to the west preventing anyone from exiting E. 16th Street near Union Square East, Inspector Essig ordered the arrests of everyone detained on E. 16th Street between the two police lines. *Id.* at 295:8-25.

**Other**

58. In March 2004, the NYPD issued legal guidelines for the Convention that explained, "Generally, no permit is required for groups of demonstrators to walk or march along the sidewalk." Legal Guidelines for the Republican National Convention (Mar. 24, 2004) (relevant excerpt attached as Exhibit D to Declaration of Christopher Dunn (Sept. 30, 2011)).

59. Everyone arrested at the Republican National Convention was fingerprinted pursuant to a policy adopted by the City of New York not to issue summons to anyone arrested at a Convention-related event. Deposition of Joseph Esposito at 200:10-15 (attached as Exhibit C to Declaration of Christopher Dunn (Sept. 30, 2011)).

Respectfully submitted,

*/s/ Christopher Dunn*
CHRISTOPHER DUNN (CD-3991)
TAYLOR PENDERGRASS (TP-3608)
DANIEL MULLKOFF
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, N.Y. 10004
(212) 607-3300

Dated: October 3, 2011          Counsel for the Plaintiffs
       New York, N.Y.