UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MICHAEL SCHILLER, FRANCESCA     :
FIORENTINI, ROBERT CURLEY, and    :
NEAL CURLEY,                      :            ECF Case
                Plaintiffs,     :
      vs.                      :
                            :      04 Civ. 7922 (RCS) (JCF)
                            :
The CITY OF NEW YORK; RAYMOND    :
KELLY, Commissioner of the New York City    :
Police Department; TERENCE MONAHAN,    :
Assistant Chief of the Bronx Bureau of the New    :
York City Police Department,              :
                            :
              Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HACER DINLER; ANN MAURER;           :
ASHLEY WATERS,                     :
                Plaintiffs,     :
                            :
                            :      04 Civ. 7921 (RCS) (JCF)
      vs.                      :
                            :
The CITY OF NEW YORK; RAYMOND W.    :
KELLY, Commissioner of the New York City    :
Police Department, and Inspector James Essig,    :
New York City Police Department         :
                            :
             Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Respectfully submitted,

CHRISTOPHER DUNN
TAYLOR PENDERGRASS
DANIEL MULLKOFF
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300

Dated: October 3, 2011
      New York, N.Y.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     Fulton Street (the *Schiller* Plaintiffs) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     East 16th Street (the *Dinler* Plaintiffs) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.     THE PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON
       THEIR FEDERAL AND STATE CLAIMS OF UNLAWFUL ARREST. . . . . . . . . . . 16

     A.    The Plaintiffs Are Entitled to Summary Judgment on Their False Arrest
           Claims Because the Arresting Officer Defendants Have No Knowledge
           of Any Unlawful Action by the Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     B.    No Probable Cause Existed to Arrest the Plaintiffs for Disorderly Conduct
           by Obstructing Pedestrian or Vehicle Traffic. . . . . . . . . . . . . . . . . . . . . . . . . . 17

     C.    No Probable Cause Existed to Arrest the Plaintiffs for Disorderly Conduct
           by Disobeying a Lawful Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     D.    No Probable Cause Existed to Arrest the Plaintiffs for Parading
           Without a Permit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

     E.    The Plaintiffs Are Entitled to Summary Judgment Against Defendants
           Monahan, Essig, and City of New York. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

II.    THE PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR
      STATE CLAIMS OF UNLAWFUL FINGERPRINTING. . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

TABLE OF AUTHORITIES

Cases

*Bradley v. Jusino*, 2009 WL 1181617 (S.D.N.Y. May 4, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Dickerson v. Napolitano*, 604 F.3d 732 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Dwyer v. Guido*, 54 A.D.2d 956 (2d Dep't 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Fidler v. Murphy*, 203 Misc. 51 (N.Y. Sup. Ct. 1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Gow v. Bingham*, 107 N.Y.S. 1011 (N.Y. Sup. Ct. 1907) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hawkins v. Kuhne*, 137 N.Y.S. 1090 (2d Dep't 1912) *aff'd*, 208 N.Y. 555 (1913) . . . . . . . . . . 24

*Jaegly v. Couch*, 439 F.3d 149 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Jenkins v. City of New York*, 478 F.3d 76 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 23

*Marcavage v. City of New York*, 2010 WL 3910355 (S.D.N.Y. Sept. 29, 2010) . . . . . . . . . 15, 16

*Papineau v. Parmley*, 465 F.3d 46 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*People v. Barrett*, 13 Misc. 3d 929 (N.Y. Crim. Ct. 2006) . . . . . . . . . . . . . . . . . . . . 18, 19, 21, 22

*People v. Bezjak*, 11 Misc. 3d 424 (N.Y. Crim. Ct. N.Y. Co. 2006) . . . . . . . . . . . . . . . . . . . 21, 22

*People v. Carcel*, 3 N.Y.2d 327 (N.Y. 1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v. Collins*, 44 Misc. 2d 430 (N.Y. Sup. Ct. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v. Delhall*, 131 A.D.2d 870 (2d Dep't 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*People v. Garvey*, 6 Misc. 2d 266 (N.Y. Mun. Ct. 1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v. Munoz*, 10 Misc. 3d 1052(A) (N.Y. Crim. Ct. N.Y. Co. 2005) . . . . . . . . . . . . . . . 19, 21

*People v. Robertson*, 97 Misc. 2d 1026 (N.Y. Crim. Ct. N.Y. Co. 1979) . . . . . . . . . . . . . . . . . 24

*People v. White*, 56 N.Y.2d 110 (N.Y. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Provost v. City of Newburgh*, 262 F.3d 146 (2d Cir. 2001) . . . . . . . . . . . . . . 16, 17, 18, 19, 21, 22

*United States v. Nelson*, 2011 WL 1327332 (S.D.N.Y. Mar. 31, 2011) . . . . . . . . . . . . . . . . . . . 20

*Wu v. City of New York*, 934 F. Supp. 581 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Statutes and Regulations

N.Y. Crim. Proc. L. § 160.10(1) (McKinney 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

N.Y. Pen. L. § 240.20(5) (McKinney 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

N.Y. Pen. L. § 240.20(6) (McKinney 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

N.Y.C. Code § 10-110 (McKinney 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

38 RCNY § 19-02 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

INTRODUCTION

The 2004 Republican National Convention was an extraordinary event that brought to the streets of New York City hundreds of thousands of protesters wishing to exercise their fundamental First Amendment right to express their views (pro and con) about the federal government and then-President George W. Bush. Before and during the Convention, scores of peaceful marches, rallies, and smaller protests took place.

On August 31, however, a large number of people were arrested, with the two biggest arrest locations being Fulton Street near the World Trade Center site and East 16th Street near Union Square. Each of the seven plaintiffs in these two actions was arrested at one of those two locations, and they all now move for partial summary judgment on their false arrest and fingerprinting claims pursuant to the Court's order establishing an initial round of issues to be addressed on summary judgment in the Convention litigation.

Starting with their false-arrest claims, the *Schiller* and *Dinler* plaintiffs demonstrate in this memorandum that their arrests were unlawful because no probable cause existed, and on this point their argument is straightforward. Each of the seven plaintiffs -- a woman trying to get to work, another bystander curious about a march, a filmmaker documenting a march, a father-and-son from Philadelphia, and two other protesters -- were engaged in entirely lawful activity. The undisputed evidence shows that the bystanders were simply in the vicinity of a march, that the filmmaker was simply filming the march, and that the protesters were lawfully participating in the demonstrations at the two locations. The undisputed evidence further establishes that all the plaintiffs were on a public sidewalk, none obstructed or tried to obstruct pedestrian traffic, none

1

was given an order or an opportunity to disperse, and none engaged in any activity that required a parade permit. Given these facts and given the court-ordered stipulation that "defendants are deemed to have no personal knowledge of plaintiffs' actions," no individual probable cause existed for the plaintiffs' arrest.

The plaintiffs expect the City will not contest any of this but nonetheless will make the extraordinary claim that it can invoke "group probable cause" to justify all the arrests at the two locations, including of the seven plaintiffs. Such a claim, of course, runs contrary to the essence of probable cause: the requirement that the individual arrested be reasonably suspected of having engaged in unlawful activity. While there may be extremely limited circumstances in which the concept of group probable cause may be valid, the plaintiffs submit that the City cannot come close to justifying the plaintiffs' arrests on this theory. Before delving into group probable cause, however, the plaintiffs will await the City's arguments.

Finally, the plaintiffs' fingerprinting claims are uncomplicated: New York Criminal Procedure Law bars fingerprinting people charged with violations (the only offenses with which the plaintiffs were charged) except in limited, specified circumstances, and it is undisputed that none of the plaintiffs fit into those circumstances. Given this, the plaintiffs are entitled to summary judgment on their fingerprinting claims.

## STATEMENT OF FACTS

The undisputed facts bearing on the plaintiffs' motions are set out in the Rule 56.1 Statements filed in each case, which in turn are based on a declaration from each plaintiff and on deposition testimony from the defendant NYPD officials who ordered the arrests at Fulton Street

and East 16th Street.  Highlighting the undisputed nature of the facts set out in the plaintiffs'

declarations is an order entered by Magistrate Judge Francis during discovery providing that

"defendants are deemed to have no personal knowledge of plaintiffs' actions.  This includes any

member of the NYPD."  Memo Endorsement by Honorable James C. Francis IV (June 20, 2006)

(Exhibit A to Declaration of Christopher Dunn (Oct. 3, 2011)).

As an aid to the Court, the plaintiffs include with their filing a DVD with approximately

one hour of film footage of the events at Fulton Street taken by a videographer who was at that

location with plaintiff Michael Schiller.  *See* "8/31/04 Fulton Street Video by Jon Fine" (attached

as Exhibit A to Declaration of Jon Fine (Sept. 27, 2011)).  Though the plaintiffs do not rely on

this video for their motions, they submit it to the Court because it provides such an informative

and continuous depiction of the events at Fulton Street.

Fulton Street (the <em>Schiller</em> Plaintiffs)

Plaintiff Michael Schiller-  In August 2004

plaintiff Michael Schiller was a 31-year-old resident of

Brooklyn and worked as a professional

cinematographer for film and television.  He had been

hired by Freed Productions, a film production company,

to work on an HBO film about the Convention.

Schiller Plaintiffs' Rule 56.1 Statement ("Schiller 56.1"), ¶¶ 1-2.



*Depiction of Fulton Street Area*

On August 31 Mr. Schiller arrived around 3:30 p.m. at Church and Fulton Streets for an

assignment to film a march scheduled to take place in the vicinity.  Among those accompanying

him was another videographer, Jon Fine.  Once they arrived, Mr. Fine started filming activity at

3

the location, while Mr. Schiller went off separately and started filming other parts of the event. Mr. Schiller did not hear any instructions being given by the police to the march participants or to the media at the beginning of the march.  He had no knowledge of whether a permit was required for the march or whether one had been issued.  *Id.*, ¶¶ 3-5, 13.

As the march started to proceed east along the northern sidewalk of Fulton Street, Mr. Schiller stood on that sidewalk ahead of the march filming it as it came towards him.  Mr. Fine and his assistant filmed from the south sidewalk of Fulton Street.  *Id.*, ¶ 6.

Shortly after the march started, the police stopped it.  By that time, the front of the march had passed Mr. Schiller.  Soon thereafter, the police surrounded him and the marchers with netting. *Id.*, ¶ 7.

Mr. Schiller remained on the sidewalk at all times during the Fulton Street march.  He never blocked or attempted to block the sidewalk, was never informed by any police officer or official that he was blocking the sidewalk, and never heard any order to disperse. He was never given an opportunity to leave, and if he had been, he would have taken it.  *Id.*, ¶¶ 11-13.

Within an hour of being surrounded by the netting, Mr. Schiller was handcuffed and transported by bus to Pier 57. After being held there for many hours, he was transported to another facility, where he was fingerprinted pursuant to the City's "fingerprinting policy" even though he had valid identification and was not wanted for any other crime. *Id.*, ¶¶ 10, 14, 15, 68.

After being held for approximately 28 hours, Mr. Schiller was arraigned and released.  He was charged with parading without a permit in violation of N.Y.C. Code § 10-110, with disorderly conduct under N.Y. Penal Law § 240.20(5) for blocking vehicular and pedestrian

4

traffic, and with disorderly conduct under N.Y. Penal Law § 240.20(6) for failing to comply with a lawful order to disperse. All charges against Mr. Schiller were dismissed. *Id.*, ¶¶ 17-19.

Plaintiffs Robert Curley and Neal Curley- In August 2004 plaintiff Robert Curley was a 50-year-old attorney living in Philadelphia, Pennsylvania. Plaintiff Neal Curley, Robert's son, was a 17-year-old resident of Philadelphia, Pennsylvania, and was entering his senior year of high school (and has since graduated from the University of Chicago). Since Neal was about eight years old, Robert and he had traveled to New York City each year just before the start of the school year to visit the city and often to see a play. As part of this tradition, they came to New York City from Philadelphia in August 2004 to see a play and to participate in an anti-war march they had read about in the *New York Times*. *Id.*, ¶¶ 20-22.

On August 31, Robert and Neal Curley arrived in New York City. After doing some shopping and purchasing tickets for a play to be performed near Union Square, they planned to participate in the march until it got to Union Square, where they then would attend the play and have dinner. *Id.*, ¶ 23.

At approximately 3:00 p.m., they arrived near the intersection of Church and Fulton Streets where they saw a large crowd and a number of police officers. The crowd eventually began to move, crossing Church Street in the crosswalk and proceeding east along the north sidewalk of Fulton Street. Police officers were present and seemed to be directing the group. Neither Robert nor Neal knew whether a permit was required for the march. *Id.*, ¶¶ 24, 31, 32.

Robert and Neal crossed Church Street in the crosswalk and proceeded east along the north sidewalk of Fulton Street. After they had walked approximately 20 feet, the group they were walking with stopped. Robert and Neal did not know why the march had stopped. At that

point, police officers surrounded everyone on the sidewalk, and Robert and Neal subsequently heard that everyone would be arrested. *Id.*, ¶¶ 25-26.

Other than when they crossed Church Street in the crosswalk, both Robert and Neal were on the sidewalk at all times. Neither Robert nor Neal ever blocked or attempted to block the sidewalk, and neither was informed by any police officer or official that he was blocking the sidewalk. Neither heard any order to disperse. Neither was given any opportunity to leave, and if they had been, both Robert and Neal would have taken it. *Id.*, ¶¶ 27-32.

Robert and Neal were handcuffed and transported by bus to Pier 57. After being held there, they were transported to another facility, where both were fingerprinted pursuant to the City's "fingerprinting policy" even though both had valid identification and were not wanted for any other crime. *Id.*, ¶¶ 35-39, 68.

They were eventually arraigned and released—Robert after being held for approximately 16 hours, Neal for approximately 14. Both were charged with parading without a permit in violation of N.Y.C. Code § 10-110, with disorderly conduct under New York Penal Law § 240.20(5) for blocking vehicular and pedestrian traffic, and with disorderly conduct under New York Penal Law § 240.20(6) for failing to comply with a lawful order to disperse. All charges against Robert and Neal Curley were dismissed. *Id.*, ¶¶ 40-43.

Plaintiff Francesca Fiorentini- In August 2004 Francesca Fiorentini was a 21-year-old resident of Manhattan and was enrolled at New York University. On August 31 Ms. Fiorentini went to the intersection of Church and Fulton Streets to photograph and possibly participate in a demonstration organized by the War Resister's League. She intended to participate only if she felt that she could without facing the threat of being arrested. *Id.*, ¶¶ 44-45.

6

When Ms. Fiorentini arrived at the intersection of Church and Fulton Streets at approximately 3:30 p.m., she saw several hundred people as well as a large number of police officers. At some point, the crowd started to cross Church Street in the crosswalk and walk east on the north sidewalk of Fulton Street. Ms. Fiorentini had no knowledge of whether a permit was required for the march or whether one had been issued. *Id.*, ¶¶ 46, 47, 52.

Because the police appeared to be allowing the march to proceed without problem, Ms. Fiorentini believed she could participate in the march without the risk of arrest. She therefore followed along with the crowd, crossing in the crosswalk and then walking east on the Fulton Street sidewalk. Shortly after Ms. Fiorentini began walking along the Fulton Street sidewalk, the march stopped. She did not know why it stopped. Police officers then surrounded everyone on the sidewalk, and Ms. Fiorentini heard that everyone would be arrested. *Id.*, ¶¶ 47-49.

Other than when she crossed Church Street in the crosswalk, Ms. Fiorentini was on the sidewalk at all times. At no time did she block or attempt to block the sidewalk, nor was she informed by any police officer or official that she was blocking the sidewalk. At no time did she hear an order to disperse. She was not given any opportunity to leave, and if she had been, she would have taken it. *Id.*, ¶¶ 50-52.

Ms. Fiorentini was subsequently handcuffed and transported by bus to Pier 57. After being held there, she was transported to another facility, where she was fingerprinted pursuant to the City's "fingerprinting policy" even though she had valid identification and was not wanted for any other crime. *Id.*, ¶¶ 55-57, 68.

After being held for approximately 35 hours, Ms. Fiorentini was released with a desk appearance ticket. She was charged with parading without a permit in violation of N.Y.C. Code

§ 10-110, with disorderly conduct under New York Penal Law § 240.20(5) for blocking vehicular and pedestrian traffic, and with disorderly conduct under New York Penal Law § 240.20(6) for failing to comply with a lawful order to disperse. All charges against Ms. Fiorentini were dismissed. *Id.*, ¶¶ 58-60.

Defendant Terrence Monahan- In August 2004 defendant Terrence Monahan was a deputy chief in the New York City Police Department and served as the Executive Officer of the Bronx Borough Command. During the RNC, Deputy Chief Monahan was the commanding officer of the mobile field forces. Among his unit's responsibilities was the policing of demonstrations. *Id.*, ¶¶ 61-62.

On August 31 Deputy Chief Monahan arrived at the intersection of Church and Fulton Streets, where he observed between 500 and 1,000 people gathered. At some time after the march started, he made his way to the front and stopped the front of the march. Shortly thereafter, he ordered that everyone on the north sidewalk of Fulton Street back to the corner of Church Street was to be arrested. Deputy Chief Monahan was responsible for the detention and arrest of everyone in that area, including Mr. Schiller, Robert and Neal Curley, and Ms. Fiorentini. Two hundred and twenty-seven people were arrested at the Fulton Street location on August 31, 2004, and all charges against the 227 arrestees were dismissed. *Id.* at ¶¶ 8, 33, 53, 63-66. At the time of their arrest, neither Deputy Chief Monahan nor any other member of the NYPD had any knowledge of the actions of Mr. Schiller, Robert and Neal Curley, or Ms. Fiorentini at the Fulton Street march. *Id.*, ¶¶ 9, 34, 54.

East 16th Street (the *Dinler* Plaintiffs)

Plaintiff Hacer Dinler- In August 2004 Hacer
Dinler was 28 years old and working as a dance and
fitness instructor in New York City. She had never
been in any kind of protest or demonstration and had
never been arrested. Dinler Plaintiffs' 56.1 Statement
("Dinler 56.1"), ¶ 1.



*Depiction of Union Square Area*

Shortly before 7:00 pm, on August 31, Ms. Dinler
left a dance studio a few blocks east of Union Square Park where she had been working all afternoon
and began to walk toward another studio, on Bowery near Houston Street, to teach a dance class
scheduled for 8:00 p.m. On her way to the second studio, Ms. Dinler walked south on Irving Place
and turned right on East 16th Street. As she walked westward on the north sidewalk toward Union
Square East, she saw a band and people dancing in the street. She paused very briefly to observe
them and then continued on her way to work. *Id.*, ¶¶ 2-4.

As Ms. Dinler neared Union Square, however, she saw police officers forming a line
across E. 16th Street and the sidewalks up to the building's edge on both sides. She hurried to
exit the area and asked the officers to allow her to leave, explaining that she had no idea what
was going on and was simply trying to go to work. The officers did not let her leave. *Id.*, ¶¶ 5-6.

Ms. Dinler then turned around and began walking back eastward on the E. 16th Street
sidewalk in order to leave from Irving Place. When Ms. Dinler got near, however, she saw that
Irving Place was also blocked with officers, who were holding netting. She again asked the
officers to allow her to leave, explaining that she did not know what was going on and was

9

simply going to work. Again, the officers did not let her leave. *Id.*, ¶¶ 7-8.

Police officers surrounded a portion of the crowd on the northern sidewalk that included Ms. Dinler and closed in on the group toward the middle of the block. Ms. Dinler was detained in this fashion for about an hour, during which time police officers began arresting people one-by-one from the group. *Id.*, ¶¶ 9-10.

Ms. Dinler was frightened and upset. She knew that she had done nothing wrong. She did not participate in the march. She never heard any order to leave the area or any instructions on how to do so. She had walked only on the sidewalk and she had never obstructed or intended to obstruct cars or pedestrians. Police officers did not give her any opportunity to leave. If Ms. Dinler had been given any such opportunity, she would have taken it. *Id.*, ¶ 11.

By the end of an hour of detention, Ms. Dinler had become became extremely upset. She fainted and was on the ground going in and out of consciousness. She was then taken by ambulance to the hospital, accompanied by a police officer. After Ms. Dinler was treated at the hospital, the officer abruptly told her she was no longer under arrest and left without any further explanation. Ms. Dinler was released from the hospital with no criminal charges. *Id.*, ¶¶ 14-15.

Plaintiff Ashley Waters- In August 2004 Ms. Waters was a 26-year-old Harvard Law School student. During the summer of 2004 she lived in New York City and split her time between the law firm of Akin Gump Strauss Hauer & Feld LLP (where she is currently employed) and the New York Attorney General's office. Ms. Waters has never participated in a political protest, and until August 31, 2004, she had never been arrested. *Id.*, ¶ 16.

On the afternoon of August 31, Ms. Waters exercised at the New York Sports Club on East 23rd Street and Park Avenue. She then left the gym and walked toward Union Square to

check the movie schedules at the theatres nearby. *Id.*, ¶ 17.

Ms. Waters got to Union Square around 6:30 p.m. and noticed a small crowd at the southern end of Union Square and stopped to listen to a band playing in the park. As Ms. Waters watched, the band and others began east across Union Square Park, out of the park, and north on Union Square East, where Ms. Waters lost sight of them. Ms. Waters was unaware that any type of demonstration or march was planned. She was curious and wanted to observe the band, so she walked out of Union Square Park and eastward on the northern sidewalk of E. 16th St. heading toward Irving Place, following the band and the marchers. *Id.*, ¶¶ 18-21.

After Ms. Waters had walked east about two-thirds the length of the block, she saw that there was a line of police officers standing across E. 16th at Irving Place. When she saw the officers lining up, she decided to leave. She did not see anyone being allowed to exit at Irving Place, however, so she turned around and began walking back on the sidewalk of E. 16th Street toward Union Square East in order to leave from that end. As Ms. Waters walked toward Union Square East, she saw that another line of police officers was also blocking E. 16th Street in that direction, trapping her on E. 16th. *Id.*, ¶¶ 21-23.

Police officers eventually surrounded the trapped group that included Ms. Waters and forced everyone into a small space close to a building on the sidewalk. An officer announced that everyone was under arrest and ordered everyone to sit down. *Id.*, ¶ 24.

Ms. Waters was in tears. She did not understand why she would be arrested, as she had done nothing wrong. She never heard any order to leave the area or any instructions on how to do so. She had walked only on the sidewalk, and she had never obstructed or intended to obstruct cars or pedestrians. She was never given any opportunity to leave. If she had been, she would

11

have taken it. *Id.*, ¶ 25.

Police officers began taking people one-by-one from the group and putting them in handcuffs. Eventually, Ms. Waters was pulled from the group, handcuffed, put on a bus, and taken to central booking. She was later fingerprinted pursuant to the City's "fingerprinting policy" even though she had valid identification and was not wanted for any other crime. *Id.*, ¶¶ 26, 29, 30, 59.

Ms. Waters was kept in a holding cell until the evening of September 1, 2004, when she was taken from the cell and arraigned. She was charged with disorderly conduct for obstructing vehicular traffic in violation of N.Y. Penal Law § 240.20(5), disorderly conduct for refusing to obey a lawful order to disperse in violation of N.Y. Penal Law § 240.20(6), and parading without a permit in violation of N.Y.C. Code § 10-110. She was released from custody around 6 p.m., approximately 23 hours after she was first detained on E. 16th Street. All charges against Ms. Waters were dismissed. *Id.*, ¶¶ 31-34.

Plaintiff Ann Maurer- In August 2004 Ms. Maurer was 25 years old and living in Jersey City, New Jersey. On August 31, 2004, she left work at 5:30 p.m. and met her friends at Union Square, where they watched a band that was playing in the southern end of Union Square Park. When the band started marching out of Union Square Park and north on Union Square East, Ms. Maurer decided to follow behind and see what they were doing. *Id.*, ¶¶ 35-37.

Ms. Maurer understood that no permit was required to march on the sidewalk and she had no intention of breaking the law, so she stayed on the sidewalk when following the marchers. After the marchers turned east on E. 16th Street, Ms. Maurer crossed the street lawfully and began walking east on the northern sidewalk. *Id.*, ¶¶ 38-39.

12

As Ms. Maurer neared the intersection of E. 16th Street and Irving Place, she encountered a line of police officers that extended across E. 16th Street and the sidewalks. When she saw the police officers, she wanted to leave the area and turned around and began walking back west toward Union Square to exit from that end. As Ms. Maurer walked on the sidewalk back toward Union Square East, she could see a line of police officers had blocked off that end as well and that she was trapped. *Id.*, ¶¶ 40-42.

Police officers closed in and surrounded everyone standing on the north sidewalk of E. 16th Street, including Ms. Maurer. Ms. Maurer heard an officer state over a megaphone that everyone trapped on the block was under arrest. *Id.*, ¶ 43.

Ms. Maurer did not understand why she was being arrested, as she had done nothing wrong. She had walked only on the sidewalk, and she had never obstructed or intended to obstruct cars or pedestrians. She never heard any order to leave the area or any instructions on how to do so. After she began walking on the E. 16th Street sidewalk, she was never given any opportunity to leave. If she had been, she would have taken it. *Id.*, ¶ 44.

The police began pulling people out of the group one-by-one and arresting them. Eventually Ms. Maurer was handcuffed, put on a bus, and taken to central booking. She was subsequently fingerprinted pursuant to the City's "fingerprinting policy" even though she had valid identification and was not wanted for any other crime. *Id.*, ¶¶ 45, 48, 49, 59.

Ms. Maurer was released with a desk appearance ticket around 2 p.m. on September 1, 2004, nearly 20 hours after she was originally detained on E. 16th Street. She was charged with disorderly conduct for obstructing vehicular traffic in violation of N.Y. Penal Law § 240.20(5), disorderly conduct for refusing to obey a lawful order to disperse in violation of N.Y. Penal Law §

240.20(6), and parading without a permit in violation of N.Y.C. Code § 10-110.  All charges against Ms. Maurer were  dismissed.  *Id.*, ¶¶ 50-52.

Defendant James Essig- As of August 2004, defendant NYPD Deputy Inspector James Essig was the commanding officer of the 41st Precinct of the New York Police Department. During the Convention, Deputy Inspector Essig was charged with supervising the operations of a "mobile field force" in the area east of Fifth Avenue, and South of 34th Street.  His unit was responsible for making mass arrests at several locations, including the arrests at East 16th Street. *Id.*, ¶¶ 53-54.

On August 31, Deputy Inspector Essig arrived at Union Square and saw many people in the park but no unlawful activity.  At one point Deputy Inspector Essig became aware that a group of people had left the park and started marching. He decided to arrest them. *Id.*, ¶¶ 55-56.

To make these arrests, Deputy Inspector Essig left the park and proceeded east on E. 16th Street, past the front of the march.  Police officers formed lines across E. 16th Street at both the Irving Place and Union Square East intersections, preventing anyone from exiting on either end. Deputy Inspector Essig  ordered, and was responsible for, the detention and arrest of everyone on E. 16th Street between the two police lines, including Ms. Dinler, Ms. Waters, and Ms. Maurer. *Id.*, ¶¶ 12, 27, 46, 57. At the time of their arrest, neither Deputy Inspector Essig nor any other NYPD officer had any personal knowledge regarding the actions of the Ms. Dinler, Ms. Waters, or Ms. Maurer. *Id.*, ¶¶ 13, 28, 47.

14

ARGUMENT

Pursuant to the Court's order of June 20, 2011, the plaintiffs in the *Schiller* and *Dinler* cases move for partial summary judgment against defendants Terrence Monahan, James Essig, and the City of New York on two issues: their claims of unlawful arrest without probable cause under federal and state law and their claims of unlawful fingerprinting under state law.[1]

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Marcavage v. City of New York*, 2010 WL 3910355, at *4 (S.D.N.Y. Sept. 29, 2010) (Sullivan, J.) (citing Fed. R. Civ. P. 56(c)(2) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). The moving party bears the burden of proving that there is no genuine issue of material fact, and the court must resolve any ambiguity in favor of the nonmoving party. *Id.* (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004)). Under these standards, the plaintiffs respectfully submit they are entitled to summary judgment on their federal and state claims of false arrest and on their state claims of unlawful fingerprinting.

---

[1]The plaintiffs do not move for summary judgment on their constitutional challenge to the no-summons policy or on their ancillary constitutional challenge to the fingerprinting practice as part of the no-summons policy, nor do they move now on their First Amendment challenge to the arrests. This memorandum therefore addresses none of those issues. For the convenience of the Court, the plaintiffs file a single memorandum on both motions but respectfully reserve the right to file a reply memorandum in each case should the City's opposition make that appropriate.

15

I. THE PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR FEDERAL
AND STATE CLAIMS OF UNLAWFUL ARREST.

All plaintiffs allege they were arrested in violation of their rights under the Fourth

Amendment to the United States Constitution (pursuant to 42 U.S.C. § 1983), New York common

law, and the New York Constitution. *See Schiller v. City of New York*, Second Amended

Complaint ¶¶ 122-24 (Aug. 31, 2007); *Dinler v. City of New York*, Third Amended Complaint ¶¶

71-73 (Aug. 31, 2007).

The standards governing false arrest claims under the Fourth Amendment are well-

established and straightforward. Whether the Fourth Amendment has been violated turns on

whether probable caused existed for the arrest. *See Provost v. City of Newburgh*, 262 F.3d 146,

156-57 (2d Cir. 2001) (analyzing Fourth Amendment false arrest claim for alleged violation of

New York disorderly conduct statute); *Marcavage*, 2010 WL 3910355, *4 (same). "Probable

cause exists when an officer has knowledge or reasonably trustworthy information of facts and

circumstances that are sufficient to warrant a person of reasonable caution in the belief that the

person to be arrested has committed or is committing a crime.'" *Provost*, 262 F.3d at 157

(internal quotations and citation omitted). Where no probable cause exists under this standard, the

plaintiff has established a Fourth Amendment violation. *See id.* at 156-60 (affirming Fourth

Amendment violation where probable cause did not exist under disorderly conduct statute).

As for false arrest under New York common law and the New York Constitution, the

substantive standards are the same as those under the Fourth Amendment. *See Jenkins v. City of

New York*, 478 F.3d 76, 84 & n.3 (2d Cir. 2007). With respect to both federal and state claims,

where, as here, "an arrest is not made pursuant to a judicial warrant, the defendant bears the

burden of proving probable cause as an affirmative defense." *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010).

Plaintiffs assert that, under the undisputed facts before the Court, no probable cause existed for their arrests and therefore that the defendants violated their federal and state rights when they arrested them. *See Provost*, 262 F.3d at 156-60.

A. The Plaintiffs Are Entitled to Summary Judgment on Their False Arrest Claims Because the Arresting Officer Defendants Have No Knowledge of Any Unlawful Action by the Plaintiffs.

As an initial matter, the plaintiffs are entitled to summary judgment on their false arrest claims for the simple reason that the defendant arresting officers -- Terrence Monahan at Fulton Street and James Essig at E. 16th Street -- have no knowledge of the actions of any of the plaintiffs. *See Schiller 56.1 ¶¶ 9, 34, 54; Dinler 56.1 ¶¶ 13, 28, 47.* Given this, they cannot meet the affirmative burden they bear -- since the arrests were made without a warrant -- of establishing probable cause for the arrests. *See Dickerson*, 604 F.3d at 751. This alone is a sufficient basis to enter summary judgment on the false-arrest claims against defendants Monahan and Essig, and against the City of New York. *See infra* at 22-23 (discussing municipal liability for false arrest claims under state law).

In addition to the defendants having no knowledge of the plaintiffs' individual actions, the undisputed evidence before the Court affirmatively establishes the lack of probable cause to arrest any of the plaintiffs. The plaintiffs now turn to each violation with which they were charged.

B. No Probable Cause Existed to Arrest the Plaintiffs for Disorderly Conduct by Obstructing Pedestrian or Vehicle Traffic.

The plaintiffs were charged with disorderly conduct under New York Penal Law §

17

240.20(5) for blocking vehicular and pedestrian traffic.[2]  Schiller 56.1, ¶¶ 18, 42, 59; Dinler 56.1, ¶¶ 32, 51.

For each section of the disorderly conduct statute, including subsection 5, probable cause requires a showing the person acted "with intent to cause a public inconvenience, annoyance or alarm, or recklessly creating a risk thereof." *See, e.g., Provost,* 262 F.3d 146, 157-58 (2d Cir. 2001) (upholding jury verdict for disorderly-conduct false arrest claim where evidence showed lack of requisite intent).

Moreover, an arrest under subsection 5 of the disorderly conduct statute also requires a showing that a person with the requisite intent "obstructs vehicular or pedestrian traffic."  N.Y. Pen. L. 240.20(5) (McKinney 2011); *People v. Delhall,* 131 A.D.2d 870, 871 (2d Dep't 1987) (finding no probable cause where lack of evidence that pedestrians were obstructed by defendant). As the Second Circuit recently explained in *Papineau v. Parmley*, "New York courts have interpreted this statute to permit punishment only where the conduct at issue does more than merely inconvenience pedestrian or vehicular traffic." 465 F.3d 46, 59 (2d Cir. 2006) (citing cases); *see also People v. Barrett,* 13 Misc. 3d 929, 944 (N.Y. Crim. Ct. 2006) (stating person "must create a serious interference with vehicular or pedestrian traffic" to violate statute).  Indeed, as the Second Circuit recognized in *Papineau*, the New York Court of Appeals has held that no violation exists where protesters occupy an entire sidewalk, thereby forcing pedestrians out into

---

[2] Plaintiff Dinler was arrested but released from a hospital without being formally charged with anything.  Dinler 56.1 ¶ 15.  For the reasons discussed below, there would not have been any probable cause for arresting her for violating section 240.20(5) or for any other violation.

the street. *See* 465 F.3d at 59 (citing *People v. Nixon*, 248 N.Y. 182, 185, 187 (1928)).

Here, it is undisputed that none of the plaintiffs obstructed or attempted to obstruct pedestrian or vehicular traffic, much less that they did so with the intent to create public inconvenience, annoyance, or alarm or recklessly create the risk of such. Schiller 56.1, ¶¶ 12, 29, 30, 51; Dinler 56.1 ¶¶ 11, 25, 44. For this reason, no probable cause existed to arrest any of the plaintiffs for violating section 240.20(5). *See Provost*, 262 F.3d at 156-60 (upholding Fourth Amendment violation for disorderly conduct arrest for lack of requisite intent); *Barrett*, 821 N.Y.S.2d at 431 (dismissing charge for alleged violation of section 240.20(5) for lack of evidence of requisite intent and for lack of showing any serious interference with traffic); *People v. Munoz*, 10 Misc. 3d 1052(A), at *4 (N.Y. Crim. Ct. N.Y. Co. 2005) (dismissing disorderly conduct charge because, due lack of factual allegations, "[t]here is no conceivable way of knowing if this particular defendant actually . . . interfered with pedestrian and/or vehicular traffic").

### C. No Probable Cause Existed to Arrest the Plaintiffs for Disorderly Conduct by Disobeying a Lawful Order.

The plaintiffs also were charged with disorderly conduct under New York Penal Law section 240.20(6) for allegedly disobeying a lawful order to disperse. Schiller 56.1, ¶¶ 18, 42, 59; Dinler 56.1, ¶¶ 32, 51.

As noted above, all disorderly conduct charges require a showing of specific intent. In addition, alleged violations of subsection 6 require a showing that the person "congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse." N.Y. Pen. L. § 240.20(6). Courts have recognized that probable cause exists to arrest under this subsection only where a person receives a lawful order to disperse, has an opportunity

19

to disperse, and refuses to disperse. *See United States v. Nelson*, 2011 WL 1327332, at *3 (S.D.N.Y. Mar. 31, 2011) (finding that to justify arrest under section 240.20(6) "the Government must establish that there was probable cause" that, *inter alia*, the individual "was given a lawful order of the police to disperse" and "refused to comply with that order") (citing *People v. Cohen*, 6 Misc. 3d 1019(A), at *2 (N.Y. Crim. Ct. N.Y. Co. 2005)); *People v. Garvey*, 6 Misc. 2d 266, 271 (N.Y. Mun. Ct. 1948) (ordering acquittal where insufficient evidence to show, *inter alia*, that dispersal order was heard by defendant under predecessor statute to section 240.20(6)); *Bradley v. Jusino*, 2009 WL 1181617, at *6-7 (S.D.N.Y. May 4, 2009) (finding no probable cause as a matter of law where protester did not have opportunity to disperse); *People v. Collins*, 44 Misc. 2d 430, 431 (N.Y. Sup. Ct. 1964) (reversing conviction under predecessor statute because defendants did not refuse to comply with order to "move on").

Setting aside whether either defendant Monahan or Essig gave a lawful order to disperse, it is undisputed that no plaintiff heard any order to disperse or was given any opportunity to disperse. Schiller 56.1 ¶¶ 11, 27, 28, 50; Dinler 56.1 ¶¶ 11, 25, 44.[3] Consequently, no probable

---

[3] In addition, it is undisputed that neither Dinler nor Waters "congregated" with anyone else -- a necessary element of a section 240.20(6) violation -- they were simply trapped on E. 16th Street by police officers who provided them no opportunity to leave. Dinler 56.1, ¶¶ 3-11, 17-25. Likewise, Schiller did not congregate with others, but was merely present at the Fulton Street march in his capacity as a journalist. Schiller 56.1, ¶¶ 1-4, 6. *See People v. Carcel*, 3 N.Y.2d 327, 332 (N.Y. 1957) (reversing conviction under predecessor statute to section 240.20(6) because defendants were not "congregating with others").

cause existed to believe any plaintiff had disobeyed a lawful order to disperse and did so with the

intent to create public inconvenience, annoyance, or alarm or of recklessly creating the risk of

such. *See, e.g., Provost*, 262 F.3d at 156-60 (upholding verdict of Fourth Amendment violation

for disorderly conduct arrest for lack of requisite intent); *People v. Bezjak*, 11 Misc. 3d at 426,

436-37 (noting that court had previously dismissed disorderly conduct charge because police

warning did not constitute dispersal order); *Munoz*, 10 Misc. 3d 1052(A) at *4 (dismissing charge

because, due lack of factual allegations, "[t]here is no conceivable way of knowing if this

particular defendant actually . . . refused any order to disperse").

    D. <u>No Probable Cause Existed to Arrest the Plaintiffs for Parading Without a Permit</u>.

    Finally, the plaintiffs were charged with parading without a permit in violation of N.Y.C.

Administrative Code § 10-110.  Schiller 56.1, ¶¶ 18, 42, 59; Dinler 56.1, ¶¶ 32, 51.

    Under section 10-110, a permit is required for parades, processions or races that take place

on a "public street or roadway." 38 RCNY § 19-02 (2004) (providing that permit requirement

applies to processions "upon any public street or roadway").  As the NYPD itself expressly noted

in legal guidelines it issued shortly before the Convention, marches taking place on public

sidewalks do not require permits under section 10-110:  "Generally, no permit is required for

groups of demonstrators to walk or march along the sidewalk." Legal Guidelines for the

Republican National Convention (Mar. 24, 2004) (relevant excerpt attached as Exhibit C to

Declaration of Christopher Dunn (Oct. 3, 2011)).  As for those processions subject to section 10-

110, to violate the section a person must be aware of the lack of a required permit and knowingly

participate in the event notwithstanding that knowledge. *See Bezjak*, 11 Misc. 3d at 434-36; *see

also Barrett*, 13 Misc. 3d at 941-43 (stating intent constitutionally required under section 10-110).

It is undisputed that every plaintiff was walking only on a sidewalk and never walked in a street. Schiller 56.1, ¶¶ 13, 31, 32, 52; Dinler 56.1, ¶¶ 11, 25, 44. Given this, none of the plaintiffs were even subject to the permit requirement.[4] Moreover, none had any knowledge of whether a permit was required. *Id.* Thus, no probable cause could have existed to believe they had violated the statute. *See, e.g., Bezjak,* 11 Misc.3d at 434-36 (dismissing parading without a permit charges because knowledge element could not be inferred for defendants who were not present for announcement at start of march); *Barrett,* 13 Misc. 3d at 941-43 (dismissing parading without a permit charges because, *inter alia,* plaintiffs had no knowledge regarding permit).

### E. The Plaintiffs Are Entitled to Summary Judgment Against Defendants Monahan, Essig, and City of New York.

Defendants Monahan and Essig ordered the arrest of everyone at, respectively, Fulton Street and E. 16th Street, including the plaintiffs. Schiller 56.1, ¶¶, 8, 33, 53; Dinler 56.1, ¶¶ 12, 27, 46. Because no probable cause existed for the arrest of any of the plaintiffs, the plaintiffs are entitled to summary judgment against these two defendants in their individual capacities for violations of their rights under the Fourth Amendment and under state law. *See, e.g., Provost,* 262 F.3d at 156-60 (upholding verdict holding police officer liable for false arrest without probable cause in violation of Fourth Amendment).

---

[4] Indeed, three of the plaintiffs were not participants in a march at all: Dinler was simply walking across E. 16th Street, Waters was simply observing the E. 16th Street march from a sidewalk, and Schiller was acting as a journalist. Dinler 56.1, ¶¶ 1-4, 17-21; Schiller 56.1, ¶¶ 1-4, 6. Thus, they could not have been subject to the permit requirement.

The plaintiffs also are entitled to summary judgment against New York City for the arrests ordered by defendants Monahan and Essig in violation of state law. They ordered those arrests while acting as employees of the City, *see* Schiller 56.1, ¶ 65; Dinler 56.1, ¶ 57, and the City is liable under a theory of *respondeat superior* for violations of state law, *see Jenkins,* 478 F.3d at 95 n.21 (noting New York law that makes New York City liable for false arrests by police officers); *Wu v. City of New York*, 934 F. Supp. 581, 591–92 (S.D.N.Y. 1996) ("Although *respondeat superior* claims are barred against municipalities for § 1983 violations under *Monell*, such claims are available for violations of state law.").

## II. THE PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR STATE CLAIMS OF UNLAWFUL FINGERPRINTING.

Six of the seven plaintiffs in these two cases were fingerprinted, and they seek damages for being fingerprinted. Beyond the fact they would be entitled to damages for the fingerprinting as a result of the underlying arrests being unlawful, *see, e g., Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (noting that those subject to false arrest are entitled to damages for all harms arising from detention pursuant to arrest), the plaintiffs also allege that by fingerprinting them the City violated their rights under section 160.10 of New York Criminal Procedure Law and under New York common law. *See* Dinler Plaintiffs' Third Amended Complaint, ¶ 77; Schiller Plaintiffs' Second Amended Complaint, ¶ 128.

New York Criminal Procedure Law section 160.10 prescribes the circumstances in which the police can take fingerprints. Under the statute, fingerprints must be taken for felonies, misdemeanors under the Penal Law, and for one loitering offense. *See* N.Y. Crim. Proc. L. § 160.10(1) (McKinney 2011). For violations, however, the statute authorizes fingerprinting only in

limited and specified circumstances:

> [A] police officer who makes an arrest for any offense, either with or
> without a warrant, may take or cause to be taken the fingerprints of the
> arrested person if such police officer:
>> (a) Is unable to ascertain such person's identity; or
>> (b) Reasonably suspects that the identification given by such person
>> is not accurate; or
>> (c) Reasonably suspects that such person is being sought by law
>> enforcement officials for the commission of some other offense.

*Id.* § 160.10(2). Thus, fingerprinting is not authorized for violations unless one of the

circumstances listed in section 160.10(2) applies. *See People v. White*, 56 N.Y.2d 110, 112 n.1

(N.Y. 1982) (citing section 160.10 and explaining that downgrading of marijuana possession to a

violation means that "one charged under this section is not to be fingerprinted"); *Dwyer v. Guido*,

54 A.D.2d 956, 956 (2d Dep't 1976) (noting that a violation is "an offense for which [a

defendant] could not be fingerprinted"); *People v. Robertson*, 97 Misc. 2d 1026, 1032 (N.Y. Crim.

Ct. N.Y. Co. 1979) ("assuming the defendant was originally arrested for disorderly conduct (a

violation), the police would not be authorized to fingerprint and photograph the defendant").

New York courts have long recognized liability for unauthorized fingerprinting. In *Fidler*

*v. Murphy*, a jury awarded damages to a truck driver who was fingerprinted and photographed

after being arrested for the misdemeanor of resisting an officer. 203 Misc. 51, 53 (N.Y. Sup. Ct.

1952). The court upheld the jury award, holding that, under the statute in operation at the time,

fingerprinting was not authorized for that type of misdemeanor, so the police conduct constituted

assault. *Id.* at 52-53; *see also Hawkins v. Kuhne*, 137 N.Y.S. 1090, 1091-93 (2d Dep't 1912)

(affirming liability of police official who ordered unlawful fingerprinting), *aff'd*, 208 N.Y. 555

(1913); *Gow v. Bingham*, 107 N.Y.S. 1011, 1017-18 (N.Y. Sup. Ct. 1907) (noting that police

24

officers can be held liable for unlawful fingerprinting).  Accordingly, the police may be held liable when they fingerprint people outside the authorization in section 160.10.

Here, the plaintiffs (except Ms. Dinler) were fingerprinted after their arrests.  Schiller 56.1 ¶¶ 15, 36, 38, 56; Dinler 56.1, ¶¶ 29, 48.  The acts the plaintiffs were charged with -- disorderly conduct and parading without a permit -- were all violations.  Consequently, none of the plaintiffs could have been lawfully fingerprinted unless the conditions of section 160.10(2) were satisfied. The uncontroverted evidence, however, is that each of the six plaintiffs who was fingerprinted: 1) had a valid driver's license that accurately identified her and that she showed to at least one police officer; 2) was never told anything to suggest that her identification was not accurate; and 3) was not sought by law enforcement officials for the commission of any offense and knew of no reason why anyone would reasonably suspect that she was sought for such.  Schiller 56.1, ¶¶ 16, 37, 39, 57; Dinler 56.1, ¶¶ 30, 49.

Thus, the evidence demonstrates that the police unlawfully fingerprinted the plaintiffs. Moreover, it is undisputed that the fingerprinting was done pursuant to a policy adopted by the City that affected everyone arrested at a Convention-related event. Dinler 56.1 ¶ 59.  The plaintiffs are entitled to summary judgment against the City on their fingerprinting claims.

CONCLUSION

For all the foregoing reasons, the plaintiffs request that the Court grant their motions for partial summary judgment on their federal and state claims for unlawful arrests and on their state claims for unlawful fingerprinting.

Respectfully submitted,

CHRISTOPHER DUNN (CD-3991)
TAYLOR PENDERGRASS (TP-3608)
DANIEL MULLKOFF
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, NY  10004
(212) 607-3300

Counsel for Plaintiffs

Dated: October 3, 2011
       New York, N.Y.