UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MICHAEL SCHILLER, FRANCESCA : 
FIORENTINI, ROBERT CURLEY, and :
NEAL CURLEY, :                    ECF Cases
                       Plaintiffs, :
                          :
     vs. :
                          :     04 Civ. 7922 (RCS) (JCF)
The CITY OF NEW YORK; RAYMOND :
KELLY, Commissioner of the New York City :
Police Department; TERENCE MONAHAN, :
Assistant Chief of the Bronx Bureau of the New :
York City Police Department, :
                          :
                  Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HACER DINLER, ANN MAURER, :
ASHLEY WATERS, :
                       Plaintiffs, :
     vs. :
                          :     04 Civ. 7921 (RCS) (JCF)
The CITY OF NEW YORK; RAYMOND :
KELLY, Commissioner of the New York City :
Police Department; and Inspector James Essig, :
New York City Police Department :
                          :
                  Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT TO DISMISS ALL OF PLAINTIFFS' CLAIMS
ON THE NO-SUMMONS POLICY AND FINGERPRINTING POLICY**


                         Respectfully submitted,

                         CHRISTOPHER DUNN
                         TAYLOR PENDERGRASS
                         DANIEL MULLKOFF
                         New York Civil Liberties Union Foundation
                         125 Broad Street, 19th Floor
Dated: November 3, 2011         New York, NY  10004
    New York, N.Y.           (212) 607-3300

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I. THE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' CLAIMS THAT THE NO-SUMMONS AND FINGERPRINT POLICIES VIOLATED THE FIRST AMENDMENT. . . . . . . . . . . 13

    A, The City's Claim that the Policies Were Directed at Expression-Neutral Conduct and Not Speech Is Precluded by the Factual Record. . . . . . . . . . . . . 13

    B. The City's Claim that the Policies Are Subject to Intermediate Scrutiny Is Foreclosed by *Tabbaa*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    C. The City Cannot Demonstrate the Convention Policies Were Adopted to Address Compelling Interests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    D. The City Cannot Demonstrate the Convention Policies Were Narrowly Tailored. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

II. THE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' CLAIMS THAT THE FINGERPRINT POLICY VIOLATED STATE LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A. The Fingerprinting Violated Section 160.10. . . . . . . . . . . . . . . . . . . . . . 20

    B. Monetary Damages Are Available for Unauthorized Fingerprinting. . . . . . . . . 21

    C. The City is Not Entitled to Governmental Immunity Under New York State Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

TABLE OF AUTHORITIES

<u>Cases</u>

*Dwyer v. Guido*, 54 A.D.2d 956 (2d Dep't 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Fidler v. Murphy*, 113 N.Y.S.2d 388 (N.Y. Sup. Ct. 1952) . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

*Gow v. Bingham*, 107 N.Y.S. 1011 (N.Y. Sup. Ct. 1907) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Haddock v. City of New York*, 75 N.Y.2d 478 (N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hawkins v. Kuhne*, 137 N.Y.S. 1090 (N.Y. App. Div. 1912), *aff'd*,
    208 N.Y. 55 (N.Y. 1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Housing Works, Inc. v. Safir*, 1998 WL 823614 (S.D.N.Y. Nov. 25, 1998) . . . . . . . . . . . . . . 19

*In the Matter of World Trade Center Bombing Litigation*,
    2011 WL 4387517 (N.Y. Sept. 22, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Latino Officers Association v. City of New York*, 196 F.3d 458 (2d Cir. 1999) . . . . . . . . . . . . 19

*Marcavage v. City of New York*, 2010 WL 3910355 (S.D.N.Y. Sept. 29, 2010) . . . . . . . . 3-4, 13

*Mei v. City of New York*, 2006 WL 2997111 (S.D.N.Y. Oct. 5, 2006) . . . . . . . . . . . . . . . . . . 24

*Mickens v. State of New York*, 25 Misc.3d 191 (N.Y. Ct. Cl. 2009) . . . . . . . . . . . . . . . . . . . . . 24

*Million Youth March v. Safir*, 18 F.Supp.2d 334 (S.D.N.Y. 1998),
    *aff'd on other grounds*, 155 F.3d 124 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*New York Civil Liberties Union v. New York City Transit Authority*,
    675 F.Supp.2d 411 (S.D.N.Y. 2009), *aff'd on same grounds*,
    652 F.3d 247 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*People v. Robertson*, 97 Misc. 2d 1026 (N.Y. Crim. Ct. N.Y. Co. 1979) . . . . . . . . . . . . . . . . 20

*People v. White*, 56 N.Y.2d 110 (N.Y. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Press-Enterprise Co. v. Superior Court of California for County of Riverside*,
    478 U.S. 1 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Schiller v. City of New York*, 2006 WL 2708464 (S.D.N.Y. Sept. 20, 2006) . . . . . . . . . . . . . . . 7

*Sheehy v. Big Flats Community Day, Inc.*, 73 N.Y.2d 629 (N.Y. 1989) . . . . . . . . . . . . . . . 22, 23

*Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15, 16, 19

*United States v. National Treasury Employees Union*, 513 U.S. 454 (1995) . . . . . . . . . . . 15-16

*Zambrana v. New York City Transit Authority*, 14 A.D.3d 23 (N.Y. App. Div. 2004) . . . . . . . 24

Statutes

N.Y. Crim. Proc. L. § 160.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

N.Y. Crim. Proc. L. § 160.50(1)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

N.Y. Crim. Proc. L. § 160.55(1)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

N.Y. Penal L. § 10.10(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Other Authorities

N.Y. Crim. Proc. L. § 160.10 Practice Commentaries (McKinney's 2004). . . . . . . . . . . . . . . 23

PRELIMINARY STATEMENT

The defendants have moved for summary judgment on all claims pertaining to the no-summons and fingerprinting policies in effect during the 2004 Republican National Convention. The Court should deny this motion for the simple reason that it is premised upon a set of facts that is deeply disputed and because the City makes no effort to establish its entitlement to summary judgment on the facts that must be accepted by the Court.

The City seeks to present to this Court a controversy about policies that denied summons and fingerprinted people for "criminal activity" at "RNC-related" events. According to the City, these policies were adopted on the eve of the Convention after months of deliberations and were based upon detailed "intelligence" provided by Deputy Commissioner David Cohen establishing the policies were necessary to address a unique "tripartite" threat of international terrorism, anarchist violence, and widespread civil disorder during the Convention.

In truth -- and plainly for purposes of the City's motion for summary judgment -- everything about this presentation is wrong. First, the policies did not apply to some broad category of "RNC-related events" but instead singled out demonstrations, regardless of whether they took place in the farthest corner of the Bronx or involved only a single person standing on a sidewalk. At the same time, similar unlawful conduct that was not part of a demonstration remained eligible for a summons, even when that unlawful conduct occurred at events where Convention delegates were expected, including at Madison Square Garden.

Second, the no-summons policy had nothing to do with criminal activity. Those charged with felonies and misdemeanors ("crimes" in New York) during the Convention were never

1

eligible to receive summonses from the NYPD, as the department did not issue summonses for such offenses. Rather, the only conduct the no-summons policy applied to was noncriminal violations (such as disorderly conduct and parading without a permit).

Next, the no-summons policy was not adopted shortly before the Convention following months of deliberation about intelligence supplied by Deputy Commissioner Cohen. To the contrary, it was adopted in April 2004 without any deliberation and amounted to nothing more than the reflexive adoption of a policy used for many earlier demonstrations. As for the City's extensive efforts to place Deputy Commissioner Cohen at the center of the no-summons policy, that is foreclosed by one set of dramatic facts not mentioned by the City: Mr. Cohen never participated in any discussions about the no-summons policy, did not play any role in the decision to adopt the policy, and did not even know about the policy until after the Convention had concluded. The no-summons policy had nothing to do with Mr. Cohen or his "intelligence."

Finally, to the extent the "intelligence" can be viewed on summary judgment as having played any role in the adoption of the Convention policies, the City fundamentally mischaracterizes the Web site postings and press accounts contained in the small number of End User Reports that arguably had anything to do with the policies. In fact, not a single entry -- even ignoring that many of them came after the policy was adopted -- establishes or suggests that people planning to participate in demonstrations during the Convention were potential terrorists, were planning acts of violence, were coming with false drivers licenses, were planning on engaging in ongoing unlawful activity, or would seek to thwart prosecution of their summonses. Not surprisingly, although nearly 1,500 people were detained and fingerprinted pursuant to the Convention policies, not one turned out to be a terrorist, to be planning violent acts, to have

fraudulent identification, or to have engaged in further unlawful conduct. Rather, the people

ensnared in this policy, which resulted in lengthy detentions and fingerprinting for noncriminal

violations, were people like the plaintiffs in these two cases: protesters, journalists, legal

observers, and bystanders who posed no threat to the City.

To be clear, the plaintiffs recognize the NYPD had information indicating that New York

City faced threats of substantial disorder or worse during the Convention and further that it used

this information in its planning for the Convention. What is disputed is whether any of that

information was tied to Convention protests, whether any of that information played a role in the

adoption of the policies and whether that information allowed the City to single out people

connected to demonstrations for detention and fingerprinting for noncriminal offenses. Given

these disputes and given the law applicable to the facts appropriately before the Court, the City's

motion is without merit.

## STATEMENT OF FACTS

The plaintiffs dispute virtually every fact asserted by the City with respect to the scope of

the policies at issue here, the circumstances under which the policies were adopted, and the

purported justifications for the policies. *See* Plaintiffs' Response to Defendants' Statement of

Material Undisputed Facts in Support of Their Motion for Summary Judgment on the City's

"No-Summons Policy" and "Fingerprinting Policy" During the 2004 RNC (Nov. 3, 2011). In

addition, the plaintiffs provide a set of independent facts, with appropriate citations to admissible

evidence, that must be taken as true for purposes of the City's motion. *See id*.

On summary judgment, the Court of course must "view the evidence in the light most

favorable to the party opposing summary judgment [and] draw all reasonable inferences in favor

3

of that party." *Marcavage v. City of New York*, 2010 WL 3910355, at \*4 (S.D.N.Y. Sept. 29, 2010) (Sullivan, J.). And under that standard, the facts before the Court dramatically differ from those presented by the City.

NYPD Processing Practices Going Into the Convention

As of August 2004 a person charged with a violation was eligible to receive a summons if he or she had identification and did not have any outstanding warrants. Plaintiffs' Undisputed Facts (hereinafter "PF") 1. Under NYPD policy, a warrant check is run before a person is issued a summons. PF 2. A person issued a summons may be released within a few minutes and at most within one hour. PF 7. People charged with felonies and misdemeanors are not eligible for summonses. PF 65-66.

Prior to the Convention, the NYPD had adopted no-summons policies for "many" events, including the World Economic Forum in January 2002 and anti-war protests in February and March 2003. PF 13. As NYPD Chief of Department Joseph Esposito explained about the policy in place for the Convention, "It is not a new policy invented for the RNC." PF 14.

The Convention No-Summons and Fingerprinting Policies

There is no dispute that the NYPD adopted a no-summons policy for the Convention and that everyone subjected to the policy was fingerprinted. Defendants' Undisputed Facts (hereinafter "DF") 151, 153. The City, however, asserts the no-summons policy applied to a broad range of "RNC-related events" and was not targeted at demonstrations. This is disputed and wrong.

The no-summons policy of course applied to demonstrations that took place during the Convention. Consistent with this, everyone arrested at the Fulton and Church Street and at the

4

East 16th Street protests, including the plaintiffs in these two cases, was denied a summons and instead transported to Pier 57 for processing.  PF 82, 106.  No exceptions were made to the policy.  PF 72.

The policy applied City-wide to all five boroughs.  PF 17.  It also applied to a single individual standing on a City sidewalk with a sign.  For instance, on August 31, 2004, Georgianna Page was standing alone on a public sidewalk in front of a Hummer dealership near the intersection of 55th Street and 11th Avenue in Manhattan seeking to protest against gas-guzzling Hummer vehicles she believed were connected to the war in Iraq.  She was charged with disorderly conduct for allegedly blocking pedestrian traffic.  She was not issued a summons but instead was handcuffed and transported to Pier 57 for processing pursuant to the no-summons policy.  PF 18.

Beyond this, however, the City contends the policy applied to a broad range of "RNC-related events," DF 165-71, and thus was not limited to demonstrations.  Though Chief Esposito claimed this in his deposition,[1] the facts establish otherwise.  Most significantly, between July 28 and September 3, 2004, the NYPD operated a special unit "to address illegal activity and to improve quality-of-life conditions most particularly in the vicinity of Madison Square Garden, Times Square Area, and other areas where the RNC Delegates would visit including hotel zones, restaurants, theaters, and shopping areas."  PF 19.  That unit issued 1,826 summonses, including 339 Criminal Court summonses, with summonses being issued for a range of offenses.  Forty-eight summonses were issued for disorderly conduct, PF 20, the same offense the plaintiffs in

---

[1]The policy was never reduced to writing and was only conveyed to members of the NYPD orally.  PF 22.

these two cases were charged with, PF 90, 95, 100, 105, 112, 116, and the same offense that everyone arrested at the Fulton and East 16th Street locations was charged with.

Moreover, the policy was not directed at criminal activity in any way. Under New York law, felonies and misdemeanors are the offenses that constitute "crimes." *See* N.Y. Penal L. § 10.10(6). People charged with felonies and misdemeanors are not eligible for summonses under NYPD policy. PF 65-66. Thus, the unlawful conduct the no-summons policy covered was non-criminal "violations," such as disorderly conduct and parading without a permit. More specifically, it covered violations allegedly committed by people associated with protests – and only people associated with protests.

When the policies were adopted, NYPD Commissioner Raymond Kelly and Chief Esposito knew they would result in people being held in custody longer than if the policy were not in place. PF 26. Going into the Convention, the NYPD expected that the vast majority of participants in Convention protests would be peaceful. DF 9.

Timing of Adoption of the Policy

In his deposition Chief Esposito asserted the no-summons policy was adopted following months of deliberation on the eve of the Convention (which started on August 31, 2004). *See* DF 157-60. However, a Department memorandum dated May 5, 2004, reporting on an April 27, 2004 meeting stated, "No summonses will be issued." PF 23. The NYPD official who authored that memo testified that he attended a meeting in late March or April 2004 at which Chief Esposito announced the Department would use a no-summons policy for the Convention. PF 23. For purposes of the City's motion, the no-summons policy was adopted no later than April 27, 2004, over five months before the Convention began.

6

The Basis for the Adoption of the Convention No-Summons Policy

Highlighting the work of David Cohen, the NYPD Deputy Commissioner for Intelligence, the City claims the NYPD adopted the no-summons policy to address concerns about international terrorism, anarchist violence, widespread civil disorder designed to shut down the City, people with fraudulent or no identification, the threat of people engaging in ongoing unlawful conduct following release with a summons, and the prospect that people would not return for court appearances if only issued summonses.  For purposes of summary judgment, however, the facts are very different.

First, the person who made the decision to adopt the no-summons policy was Commissioner Raymond Kelly.  DF 156.  The City, however, has adduced no testimony from him (nor can it, as he has been precluded from testifying in this case because the City objected to his being deposed[2]).  The Court therefore has no evidence before it from the decisonmaker.

Second, there are no documents memorializing the reasons for the policy.  PF 28.

Third, though the City portrays Deputy Commissioner Cohen as having played a central role in the no-summons policy and though Mr. Cohen regularly met with the so-called RNC Executive Committee that included Commissioner Kelly and Chief Esposito, DF 43, Mr. Cohen did not participate in any discussions about the policy, did not participate in the decision to adopt the policy, and did not even know about the policy until after the Convention was over.   PF 25.  This removes Deputy Commissioner Cohen from the discussion of the reasons for the no-summons policy being adopted.

That leaves Chief Esposito as the sole source of information about the reasons for the

_____

[2]*Schiller v. City of New York*, 2006 WL 2708464 (S.D.N.Y. Sept. 20, 2006).

7

policies, and it is on his testimony the City relies. Setting aside the hurdle that Chief Esposito was not the decisionmaker, there is every reason to disregard, at least for summary judgment, his testimony. He places the key decision meeting on the eve of the Convention, DF 158-60, which is four months after the actual decision date and renders irrelevant his recollection of an August 2004 meeting. He also placed Deputy Commissioner Cohen at the pivotal meeting, PF 34, a notable error that further undermines the credibility of his memory. Most importantly, he candidly testified that he did not even remember being in the meeting, that he had no memory of the details of the meeting, and that there were no documents or people he could consult that would help him remember the details of the meeting. PF 28, 30-32, 36, 42 (quoting testimony).[3]

Given all this, on summary judgment the Court is left with no credible evidence that Commissioner Kelly decided to adopt the no-summons policy for the reasons asserted by the City. To the contrary, the evidence available to the Court and construed most favorably to the plaintiffs establishes that the no-summons policy was adopted in April 2004 without deliberation and as nothing more than a reiteration of the same policy that had been adopted (for reasons wholly absent from the record) for many prior demonstrations.

Considerations That Could Not Have Been Justifications for the No-Summons Policy

Though there is nothing before the Court about the reasons why Commissioner Kelly adopted the no-summons policy, there is evidence precluding certain justifications offered by the City. For starters, there is the City's repeated claim that the threat of "anarchist violence" was a

---

[3]The plaintiffs recognize that on this and other points Chief Esposito offers different testimony. For purposes of summary judgment, however, there plainly is a dispute about his recollection on these points, and the plaintiffs, as the nonmovants, are entitled to have the Court construe the facts in their favor.

central justification for the policy.  DF 80-95.  In fact, Chief Esposito disavowed having had

concerns about criminal activity tied to anarchists.  PF 62.

In a related vein, Chief Esposito testified that the no-summons policy had nothing to do

with people being charged with committing terrorist acts or other felonies or even being charged

with misdemeanors because no one charged with such acts would have been eligible for a

summons.  PF 65-66.  Similarly, the no-summons policy had nothing to do with people who

would not have identification, as they too would have been ineligible for summonses.  PF 64.

Finally, Chief Esposito testified that the designation of the Convention as a national security

event had nothing to do with the policy, PF 60, which is no surprise since he knew nothing about

the criteria by which an event was so designated, PF 61.

The "Intelligence"

Finally, there is the "intelligence."  Beyond the fact that the Court should not even

consider this information given the absence of any credible evidence it played a role in the

decision to adopt the policy, the City fundamentally mischaracterizes that information.

At the outset, it is worth noting that the "intelligence" consisted of information collected

by the NYPD Intelligence Division from "open source material" such as Web sites and press

reports.  DF 24 n.4.  As Chief Eposito acknowledged about information on Web sites, "[s]ome of

it is very accurate and some of it is very inaccurate."  PF 45.

As for that information, it was placed into the so-called "End User Reports."  DF 41-42,

PF 43-44.  Those reports consist of approximately 600 pages of entries, but Chief Esposito

identified entries in only 57 of those pages as bearing on the no-summons policy.  PF 46.  And

of those pages, only 35 of them are in reports dated from before April 27, 2004, the date by

which the no-summons policy was adopted. PF 48. As Chief Esposito testified, new information contained in End User Reports dated after the meeting where the policy was adopted could not have been considered as part of the decision. PF 47.

Without any recognition that it is at most the entries in these 35 pages of End User Reports that could have played a role in the no-summons policy, the City proposes findings about the "intelligence" that simply have no support in the 35 pages, or even the 57 pages. To take one particularly important example, the City claims the intelligence established that many people -- including possibly terrorists or others bent on committing violent acts -- would be coming to Convention demonstrations with fraudulent identification and offers expert testimony about the ready availability of fraudulent drivers licenses. DF 124-145, 223 (referring to intelligence indicating "prevalence" of fraudulent identification). In the face of this threat, the City contends, it needed the no-summons policy so that it could fingerprint everyone as a possible way of catching terrorists or other criminals.

Nothing in the "intelligence," however, supports this concern. Chief Esposito identified a total of ten End User Report entries he claimed supported the City's concern about false identification. PF 50. Not one of those entries mentions false drivers licenses. PF 50. In fact, the only arguable mentions of false identification were (1) an entry in a report dated July 22, 2004 -- months after the decision had been made -- stating that "activists are exploring the possibility of creating false business cards that can be used in an attempt to gain access to otherwise off-limits areas in an attempt to disrupt the RNC"; (2) a related entry purportedly summarizing this entry (and illustrating how information gets distorted) stating, "Activists to create false credentials to gain access to businesses located within restricted areas during RNC";

10

and (3) an entry that reports that a person arrested and subsequently found to have bomb-making instructions at his home "possessed various forms of fictitious identification, including a NYC press pass." PF 51.

That is the sum total of the intelligence about fraudulent identification. Not only does it fail to provide any basis for believing that the City faced a serious threat of people coming to New York with false identification, it provides no evidence about the only relevant factual issue: Did the City have reason to believe that people planning to participate in demonstrations -- and only those people -- would bring fraudulent identification? And consistent with the absence of any information suggesting any such actual threat, not a single person held pursuant to the no-summons policy was found to have fraudulent identification. PF 75.

Similarly inaccurate is the City's claim the intelligence established a widespread threat of known terrorists or of others known to have violent criminal histories coming to the Convention. DF 67-68, 82-94. The End User Reports identify exactly three such persons. *See* Bates Documents 102589 (Daniel Andreas); 102617 (Lisa Fithian); 102618 (Jaggi Singh). And nothing in those reports suggests that any of the three intended to participate in demonstrations, much less engage in summons-eligible offenses in conjunction with those demonstrations.

More broadly, there is nothing in the 57 pages worth of End User Report entries that establishes anything about unlawful conduct of people participating only in Convention demonstrations posing the concerns asserted by the City, including violence, shutting down the City, engaging in unlawful conduct following the issuance of a summons, or thwarting subsequent prosecutions. Whatever might be said about what the Web site postings and press accounts from months before the Convention suggested about general threats of public disorder

11

during the Convention, none of that information singles out demonstrations.

Finally, the City had no information to suggest any of the plaintiffs posed any threat to the City, PF 86, 91, 96, 101, 108, 109, 113, or had any information suggesting that either the Fulton Street or East 16th Street events presented any of the dangers the City claims underlay the Convention policies, PF 83-85, 107.

Impact of the No-Summons and Fingerprinting Policies

Approximately 1,480 people were arrested during Convention demonstrations and charged only with violations, PF 73; no exceptions were made to the no-summons policy, PF 72. Everyone arrested at the Fulton Street and East 16th Street mass-arrest locations, including the plaintiffs, was denied a summons and was fingerprinted pursuant to the policies.  PF 82, 106. As a result of the policies, the plaintiffs were held for between 14 and 35 hours PF 87, 92, 97, 102, 110, 114.

ARGUMENT

The City has moved for summary judgment on the plaintiffs' claims that the no-summons and fingerprinting policies the City adopted for the Convention violated the First Amendment and that the fingerprinting policy further violated state law.[4]  As this Court noted in an earlier Convention case, summary judgment "should be rendered if the pleadings, the discovery and

---

[4]The City also contends there is no general constitutional right to a summons or to be fingerprinted, see Defendants' Brief at 5-9; that the Convention policies were not retaliatory, see id. at 34-39; that the plaintiffs have not established a violation of the Equal Protection Clause of the Fourteenth Amendment, see id. at 39-46; that a violation of the state's Criminal Procedure Law does not create a cause of action under 42 U.S.C. § 1983, see id. at 47-48; and that Commissioner Kelly, Chief Esposito, Mayor Bloomberg, Patrick Devlin, and John Colgan are not personally liable, see id. at 54-56, 59.  Because the NYCLU does not assert any of these claims in the Schiller and Dinler cases, it does not respond to these arguments.

12

disclosure materials on file show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." *Marcavage v. City of New York*, 2010 WL

3910355, at *4 (S.D.N.Y. Sept. 29, 2010) (Sullivan, J.) (citations omitted). As the Court further

noted, "The moving party bears the burden of proving that there is no genuine issue of material

fact," and the Court is "to view the evidence in the light most favorable to the party opposing

summary judgment, to draw all reasonable inferences in favor of that party, and to eschew

credibility determinations." *Id.* (internal quotations and citations to Supreme Court and Second

Circuit cases omitted).

## I. THE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' CLAIMS THAT THE NO-SUMMONS AND FINGERPRINT POLICIES VIOLATED THE FIRST AMENDMENT.

The City asserts the defendants are entitled to summary judgment on plaintiffs' First

Amendment challenge to the no-summons and related fingerprinting policies because the policies

were directed at conduct, not speech, and because they were appropriately tailored to sufficient

government interests. *See* Defendants' Memorandum of Law in Support of their Motion for

Summary Judgment to Dismiss All of Plaintiffs' Claims Based on the No-Summons Policy and

Fingerprinting Policy at 9-39 (Oct. 3, 2011). In making this argument, the City relies on a set of

facts that cannot be accepted for purposes of summary judgment and disregards the law that

applies to the facts that are before the Court.

### A, The City's Claim that the Policies Were Directed at Expression-Neutral Conduct and Not Speech Is Precluded by the Factual Record.

The City opens its First Amendment analysis with the assertion that the no-summons and

related fingerprinting policies do not even trigger First Amendment scrutiny because, according

13

to the City, the policies "were directed at unlawful <u>conduct</u> and not speech or association." *See* Defendants' Brief at 9 (emphasis in original); *see generally id.* at 9-13 (without citation to any facts).

The City's argument fails for the simple reason that the policies at issue in fact singled out demonstrations for the denial of summonses and for fingerprinting. As noted above, the no-summons policy applied to demonstrations anywhere in New York City, even if they occurred far away from the site of the Convention and even if they involved a single protester standing on a City sidewalk. Meanwhile, people engaged in similar unlawful conduct right at locations where Convention delegates were expected (including Madison Square Garden) were routinely issued summonses so long as that unlawful conduct was not connected to a protest. *See supra* at 4-5 (discussing scope of no-summons policy). As a result of this, people associated with protest were detained for long periods of time and automatically fingerprinted while people who committed similar offenses not associated with protests were not.

Because the Convention policies singled out for detention and fingerprinting those associated with demonstrations, they plainly implicate the First Amendment. As the Second Circuit recently explained in a case challenging on First Amendment grounds a policy of detaining and fingerprinting people crossing the international border because they had attended a religious conference:

> Government action can constitute a direct and substantial interference with associational rights even if there is no prior restraint and no clear chilling of future expressive activity. For example, when government action substantially penalizes members of a group for exercising their First Amendment rights, that penalty in itself can constitute a substantial burden, even if the government did not prevent the group from associating and regardless of any future chilling effect. . . .
> <u>Here, plaintiffs suffered a significant penalty, or disability, solely by virtue of associating at the RIS Conference: they were detained for a lengthy period of</u>

14

time, interrogated, fingerprinted, and photographed when others, who had not
attended the conference, did not have to endure these measures.

*Tabbaa v. Chertoff*, 509 F.3d 89, 101-02 (2d Cir. 2007); *accord NAACP v. Claiborne Hardware*

*Co.*, 458 U.S. 886, 925 (1982) ("To impose liability for presence at weekly meetings of the

NAACP would -- ironically -- not even constitute 'guilt by association,' since there is no

evidence that the association possessed unlawful aims. Rather, liability could only be imposed on

a 'guilt *for* association' theory. Neither is permissible under the First Amendment").

This is precisely the situation here. The City's policy singled out people for detention and

fingerprinting because of their association with First Amendment activity. As the Second Circuit

held in *Tabbaa*, this plainly triggers First Amendment scrutiny.

> B. The City's Claim that the Policies Are Subject to Intermediate Scrutiny
> Is Foreclosed by *Tabbaa*.

The City next argues that, even if their policies implicated First Amendment interests, the

policies "should be examined under the intermediate scrutiny test." *See* Defendants' Brief at 13.

This argument is foreclosed by *Tabbaa*. As noted above, the Second Circuit there dealt with a

policy similar to the one before this Court in that it singled out for detention and fingerprinting

people associated with First Amendment activity. And even though that case dealt with the

international border, where government authority is greatest, the Second Circuit held that the

policy was subject to strict scrutiny under which the government must demonstrate that the

challenged policy was prompted by a compelling government interest and that the policy is

narrowly tailored to that interest. *See Tabbaa*, 509 F.3d at 102 (citing and quoting *Roberts v.*

*United States Jaycees*, 468 U.S. 622, 623 (1984)); *cf. United States v. National Treasury*

*Employees Union*, 513 U.S. 454, 475 (1995) (in striking down on First Amendment grounds ban

15

on government employees receiving honoraria for expressive activities, noting that "[t]he fact that [the statute] singles out expression for special regulation heightens the Government's burden of justification"). As the Second Circuit's reliance on *Roberts* suggests, this is the well-established test for policies that directly burden First Amendment rights. *See, e.g., Press-Enterprise Co. v. Superior Court of California for County of Riverside*, 478 U.S. 1, 13-14 (1986), *discussed and quoted in New York Civil Liberties Union v. New York City Transit Authority*, 675 F.Supp.2d 411, 437-38 (S.D.N.Y. 2009) (noting and applying test in striking down policy that burdened First Amendment right of access to Transit Authority hearings), *aff'd on same grounds*, 652 F.3d 247, 264-65 (2d Cir. 2011). Indeed, in *Tabbaa* the Court of Appeals noted that "[c]ourts have regularly applied this test to associational claims." 509 F.3d at 102 (citations omitted).

### C. The City Cannot Demonstrate the Convention Policies Were Adopted to Address Compelling Interests.

Under First Amendment strict scrutiny, the initial step is for the government to demonstrate that the challenged action was taken for a reasons or reasons that qualifying as compelling. As the Supreme Court noted in *National Treasury Employees Union*, the government "must do more than simply posit the existence of the disease sought to be cured . . . [but] must demonstrate that the recited harms are real." 513 U.S. at 475 (internal quotation and citation omitted). Without acknowledging this burden, the City devotes a substantial portion of its brief to the factual claim that concerns unique to the Convention about a "tripartite threat of terrorism, anarchist violence, and widespread civil disobedience," along with concerns about false identification were behind the policies. *See* Defendants' Brief at 14-21. In doing so, the

16

City highlights the views of Deputy Commissioner Cohen. *See id.* at 15-17, 19 n.14.[5]

The plaintiffs do not dispute that many of the interests claimed by the City would be substantial if they in fact had played a role in the policies and were real. But the City's position on summary judgment is foreclosed by two fundamental factual disputes: (1) whether the concerns claimed by the City in fact played any role in Commissioner Kelly's decision to adopt the policies; and (2) whether the concerns it claims had any basis in fact.

As discussed above, in the absence of any testimony from Commissioner Kelly, who made the decision to adopt the policies; in the absence of any memoranda setting out the reasons for the policies; in light of the fact that Deputy Commissioner Cohen played no role in the decision to adopt the policies or in any deliberations about the policies; and in light of Chief Esposito's testimony about his inability to remember anything about the meeting where the decision to adopt the policies was made, *see supra* at 7-8, the City has simply failed to provide the Court with any evidence about the actual reason for the policies. Indeed, the Court must assume that the policies were adopted without deliberation and that their adoption was nothing more than the unthinking reiteration of policies deployed for many prior demonstrations. *See supra* at 4, 6-8.

Moreover, the evidence construed most favorably to the plaintiffs fails to establish that the threats posited by the City were "real" for purposes of the City's demonstration-only policies, in that nothing in the "intelligence" provided any support for the assertion that people planning to

---

[5]The City's extensive reliance on the opinions of Deputy Commissioner Cohen in its brief and Rule 56.1 Statement is improper. The City never designated him as an expert, and the plaintiffs had no opportunity to depose him about his opinions. The plaintiffs will move separately to strike all expert opinions by Mr. Cohen from this case.

participate in Convention demonstrations presented any of the threats asserted by the City (including being potential terrorists, planning violent acts, carrying fraudulent identification, or planning to engage in ongoing unlawful activity if issued a summons). *See supra* at 9-12.

Nothing in the record before this Court, construed in favor of the plaintiffs, allows the City to meet its burden of showing that the Convention policies were in fact justified by compelling interests.

D. The City Cannot Demonstrate the Convention Policies Were Narrowly Tailored.

Finally, even if the City could demonstrate that Commissioner Kelly adopted the Convention policies for the reasons it has asserted and even if it could establish that the threats it posited were real, the City would still bear the burden of demonstrating its policies were narrowly tailored to the compelling interests that motivated the policies. More specifically, it would have to demonstrate the intelligence established that it would be appropriate to single out demonstrations during the Convention for the no-summons and fingerprinting policies.

The City argues its policies were narrowly tailored because they "were not simply directed at demonstrations and instead were directed at "all illegal activity directly related to the RNC." Defendants' Brief at 32. Because the policy in fact singled out demonstrations, this argument is simply irrelevant.

Conversely, the City makes no effort to argue that a policy of singling out demonstrations for custodial arrest and fingerprinting while issuing summonses for similar unlawful conduct at other Convention-related events that were not demonstrations was narrowly tailored to the intelligence. *See* Defendants' Brief at 31-34. Nor could it, given the evidence that the City faced public-safety threats across the board that were in no way specific to demonstrations.

18

To take just one example the City undoubtedly finds particularly important, it contends that "information indicated that terrorists could initially be 'involved with lesser offenses' including summons eligible offenses." Defendants' Brief at 22. The problem with this claim, of course, is that this type of information could not justify a policy of singling out demonstrations for the no-summons policy while issuing summons for similar lesser offenses at locations, like Madison Square Garden, where Convention delegates were expected. If the City had a *bona fide* concern about terrorists engaging in summons-eligible activity, it should have stopped issuing all summons or at least all summonses for any activity remotely connected to the Convention. But the policy of singling out demonstrations makes no sense and certainly cannot be said to be narrowly tailored. *See, e.g., Latino Officers Association v. City of New York*, 196 F.3d 458, 466-67 (2d Cir. 1999) (in far more deferential context of restrictions on government employee speech, holding that decision to bar advocacy group from wearing NYPD uniforms in public parades not narrowly tailored to interest in controlling use of uniform when department allowed other groups to wear uniform in parades); *Housing Works, Inc. v. Safir*, 1998 WL 823614, *6-7 (S.D.N.Y. Nov. 25, 1998) (holding that policy of barring expressive activity on steps of City Hall to protect against threat of terrorism not narrowly tailored because City had allowed other large events to take place at same location); *Million Youth March v. Safir*, 18 F.Supp.2d 334, 345-47 (S.D.N.Y. 1998) (holding that NYPD ban on protest not narrowly tailored because evidence showed department had allowed similar large events to take place), *aff'd on other grounds*, 155 F.3d 124 (2d Cir. 1998); *contrast Tabbaa*, 509 F.3d at 103 (finding policy narrowly tailored because intelligence indicated terrorists might attend specific conference and only those who attended conference were subject to policy).

## II. THE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' CLAIMS THAT THE FINGERPRINT POLICY VIOLATED STATE LAW.

The City also moves for summary judgment on the plaintiffs' claims that the fingerprinting violated state law, contending (1) the policy did not violate section 160.10 of the Criminal Procedure Law ("CPL"), (2) damages are not available for violations of section 160.10; and (3) the City is immune to damage liability for violations of the statute. At the outset, it is worth noting that the Court need not even address this issue now if it denies the City's motion for summary judgment on the First Amendment claims, as the fingerprinting policy is encompassed in the plaintiffs' First Amendment claim.

### A. The Fingerprinting Violated Section 160.10.

With respect to the contention the fingerprinting did not violate section 160.10, the City first argues that nothing in the section expressly "prohibits" fingerprinting people charged only with violations about whom there is no suspicion as to their identity. *See* Defendants' Brief at 53. This may be literally true, but by expressly limiting the circumstances in which those charged with violations can be fingerprinted the statute plainly bars fingerprinting in any other circumstances, as New York courts have recognized. *See People v. White*, 56 N.Y.2d 110, 112 n.1 (N.Y. 1982) (citing section 160.10 and explaining that downgrading of marijuana possession to a violation means that "one charged under this section is not to be fingerprinted"); *Dwyer v. Guido*, 54 A.D.2d 956, 956 (2d Dep't 1976) (noting that a violation is "an offense for which [a defendant] could not be fingerprinted"); *People v. Robertson*, 97 Misc. 2d 1026, 1032 (N.Y. Crim. Ct. N.Y. Co. 1979) ("assuming the defendant was originally arrested for disorderly conduct (a violation), the police would not be authorized to fingerprint and photograph the defendant"). And the City's position is completely undercut by its own actions: shortly after the

20

NYCLU wrote to Commissioner Kelly in October 2004 about the unlawful fingerprinting of people charged with violations during the Convention, the City expunged all the fingerprints and changed its fingerprinting practices.  PF 80-81.

The City next contends that the information available to it about people coming to New York during the Convention with fraudulent identification or no identification means that its fingerprinting complied with the restrictions of section 160.10.  *See* Defendants' Brief at 53. Beyond being undermined by the City's destruction of the fingerprints, this contention encounters a host of problems: (1) the intelligence contained no information suggesting that people participating in Convention demonstrations would bring fraudulent identification, PF 50-51; (2) the City had no information that people at either the Fulton Street or East 16th Street sites would have fraudulent identification, PF 84, 107; and (3) it is undisputed that each of the plaintiffs in these two cases had valid identification and did not fall into the narrow exceptions of section 160.10, PF 89, 94, 99, 104, 117-18.   The City cites no authority for the remarkable proposition that it has the authority to disregard state law as it did, and none exists.

### B. Monetary Damages Are Available for Unauthorized Fingerprinting.

The City also contends monetary damages are not available for unlawful fingerprinting in violation of section 160.10.  *See* Defendants' Brief at 48-52.  In doing so, it fails to acknowledge that New York courts long ago authorized such damages.  In *Fidler v. Murphy*, the court upheld a jury award to six plaintiffs who were fingerprinted following their arrest for the misdemeanor of resisting an officer.  113 N.Y.S.2d 388 (N.Y. Sup. Ct. 1952).  The court found that the section of the Code of Criminal Procedure (CCP) -- the predecessor statute to the CPL – governing fingerprinting did not authorize printing for this misdemeanor and concluded that fingerprinting

"in a case not provided for by law would constitute a cause of action for assault." *Id*. at 390. *See also Hawkins v. Kuhne*, 137 N.Y.S. 1090, 1091-93 (N.Y. App. Div. 1912) (affirming liability of police captain who ordered unlawful fingerprinting of arrestee charged with misdemeanor), *aff'd* 208 N.Y. 555 (N.Y. 1913); *Gow v. Bingham*, 107 N.Y.S. 1011, 1017-1018 (N.Y. Sup. Ct. 1907) (observing that police officers who unlawfully fingerprint arrestees in contravention of "express and certain" statutory language are "liable to a civil action for damages").

It is true, of course, that *Fidler*, *Hawkins*, and *Gow* all came before modern doctrine about "implied" causes of action, but their holdings are entirely consonant with the three-prong analysis articulated by the New York Court of Appeals in *Sheehy v. Big Flats Community Day, Inc.*: "(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme." 73 N.Y.2d 629, 633 (N.Y. 1989).

First, because section 160.10(2) limits fingerprinting to narrow circumstances, arrestees who are not in those circumstances -- like the plaintiffs -- plainly constitute "the class for whose particular benefit the statute was enacted." *Id*. And the broader structure of Article 160 of the Criminal Procedure Law, which requires that fingerprints be returned or destroyed when a prosecution ends favorably or only in conviction for a violation, *see* N.Y. Crim. Proc. L. §§ 160.50(1)(a), 160.55(1)(a), further supports the finding that plaintiffs are members of the class for whose benefit section 160.10(2) was enacted.

Citing the legislative history of section 940 of the CCP, the City argues that section 160.10 was enacted for the benefit of law enforcement authorities. *See* Defendants' Brief at 49.

22

But subdivision 2 is a modern provision that "has no roots in the former Code of Criminal Procedure and was not incorporated in the first two drafts of the CPL distributed by the Revision Commission for public comment." N.Y. Crim. Proc. L. § 160.10 Practice Commentaries (McKinney's 2004). Whatever animated the Legislature in 1928 cannot reasonably represent the Legislature's intent in passing subdivision 2 of section 160.10 over four decades later.

Recognition of a private cause of action for violations of CPL § 160.10(2) also promotes the legislative purpose of the statute, as required by the second prong of the *Sheehy* test. Both a plain reading of section 160.10(2) as well as a holistic approach to Article 160 establish that the Legislature intended section 160.10(2) to preserve limitations on fingerprinting for individuals arrested for violations. Recognizing a cause of action for injuries arising from the violation of these limitations would further this legislative purpose. On the other hand, failure to recognize this cause of action would erode the protection of these limitations to the point of non-existence.

Finally, a private cause of action for violations of section 160.10(2) is consistent with the legislative scheme, meeting the third prong of the *Sheehy* test. In evaluating consistency with the legislative scheme, the New York courts consider whether the Legislature has already "made express provision for civil remedy, albeit a narrower remedy than the plaintiff might wish." *Sheehy*, 73 N.Y.2d at 636. The City argues that a remedy already exists under sections 160.50 and 160.55. But those sections are not remedies for violations of section 160.10; rather, they provide for the return or destruction of fingerprints for arrestees who ultimately prevail at their criminal proceeding or are convicted only of a violation. Those provisions, however, provide no remedy for the assault of unauthorized fingerprinting in violation of section 160.10. Since the Legislature has not articulated an alternative civil remedy for this injury, the earlier decisions

23

recognizing the availability of money damages for unlawful fingerprinting are entirely consistent
with the legislative scheme.

C. The City is Not Entitled to Governmental Immunity Under New York State Law.

The City asserts it is entitled to governmental immunity on the grounds that it is shielded
from liability for adopting policies that are "reasonable in light of alternative choices," including
decisions involving the allocation of limited resources.  Defendants' Brief at 54-56.  The New
York courts, however, consistently have held that a government entity is not shielded from
liability where it "violated constitutional or statutory rights of which reasonable persons would
be aware." *Mickens v. State of New York*, 25 Misc.3d 191, 201 (N.Y. Ct. Cl. 2009); *see also*
*Haddock v. City of New York*, 75 N.Y.2d 478, 486 (N.Y. 1990) (rejecting municipal immunity
because City had failed to comply with its own personnel procedures).  Here, the fingerprinting
violated section 160.10.  By contrast, none of the cases the City cites involved decisions by
government entities that violate a state statutory right; rather, each illustrates a situation where
government entities legitimately balanced competing policy preferences.  *See, e.g.*, *Mei v. City of*
*New York*, 2006 WL 2997111, at *40-41 (S.D.N.Y. 2006) (immunity where City adopted policy
of filling a reservoir until it spilled over into a river to maximize City's water supply); *In the*
*Matter of World Trade Center Bombing Litigation*, 2011 WL 4387517, at *46-47 (N.Y. Sept. 22,
2011) (immunity where Port Authority exercised discretion as to where to concentrate security on
the basis of studies identifying World Trade Center vulnerabilities); *Zambrana v. New York City*
*Transit Authority*, 14 A.D.3d 23 (N.Y. App. Div. 2004) (immunity where Transit Authority
policy of keeping subway doors unlocked during transit reasonably balanced passengers' ease of
exit and danger of injury).

24

CONCLUSION

For all the foregoing reasons, the plaintiffs urge the Court to deny the defendants' motion for summary judgment on the no-summons and fingerprinting policies.

Respectfully submitted,

CHRISTOPHER DUNN
TAYLOR PENDERGRASS
DANIEL MULLKOFF
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300

On the brief: Scarlet Kim

Counsel for the Plaintiffs

Dated: November 3, 2011
       New York, N.Y.

nyclusumm-printsjopp