UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| MICHAEL SCHILLER, FRANCESCA FIORENTINI, ROBERT CURLEY, and NEAL CURLEY, | : : : | |
| Plaintiffs, | : | ECF Case |
| vs. | : : | 04 Civ. 7922 (RCS) (JCF) |
| | : : | |
| The CITY OF NEW YORK; RAYMOND KELLY, Commissioner of the New York City Police Department; TERENCE MONAHAN, Assistant Chief of the Bronx Bureau of the New York City Police Department, | : : : : | |
| | : : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| HACER DINLER, ANN MAURER, ASHLEY WATERS, | : : | |
| Plaintiffs, | : : | |
| vs. | : : : | 04 Civ. 7921 (RCS) (JCF) |
| The CITY OF NEW YORK; RAYMOND KELLY, Commissioner of the New York City Police Department; and Inspector JAMES ESSIG, New York City Police Department | : : : : | |
| | : : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT ON FALSE ARREST CLAIMS FOR PLAINTIFFS
ARRESTED AT CHURCH AND FULTON STREETS AND AT EAST 16th STREET**

Respectfully submitted,

CHRISTOPHER DUNN
TAYLOR PENDERGRASS
DANIEL MULLKOFF
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, NY 10004

Dated: November 3, 2011
New York, N.Y.

TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iv

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS IN OPPOSITION ......................................................... 3

    Fulton Street ................................................................................................... 4

    East 16th Street .............................................................................................. 5

ARGUMENT ........................................................................................................ 6

I.    THE LAW WAS CLEARLY ESTABLISHED IN 2004 THAT NO PERSON
    COULD BE ARRESTED WITHOUT INDIVIDUALIZED PROBABLE CAUSE,
    REGARDLESS OF WHETHER THE PERSON WAS IN OR NEAR A GROUP
    THAT INCLUDED PEOPLE ACTING UNLAWFULLY ......................................... 7

    A.  The Requirement of Individualized Probable Cause for Group Arrests Was
        Established Long Ago by the Supreme Court and Second Circuit .......................... 7

    B.  Nothing in the Cases Cited by the Defendants Changes the Requirement of
        Individualized Probable Cause for Mass Arrests ....................................... 9

II.  THE UNDISPUTED EVIDENCE DEMONSTRATES THAT THE
    DEFENDANTS VIOLATED THE CLEARLY ESTABLISHED RIGHT NOT
    TO BE ARRESTED WITHOUT INDIVIDUALIZED PROBABLE CAUSE ........... 14

    A.  No Reasonable Officer Could Have Believed that Individualized Probable
        Cause Existed to Arrest Every Person on the Fulton Street Sidewalk ................... 15

        Obstructing Traffic ..................................................................................... 16

        Refusal to Comply with Dispersal Order ....................................................... 17

        Parading Without a Permit ........................................................................... 18

        Obstruction of Governmental Administration ................................................. 20

    B.  No Reasonable Officer Could Have Believed that Individualized Probable
        Cause Existed to Arrest Every Person on East 16th Street ................................. 22

        Obstructing Traffic ..................................................................................... 25

        Parading Without a Permit ........................................................................... 26

C.  There Was No "Arguable Probable Cause" to Arrest Plaintiffs ............................27

CONCLUSION ............................................................................................................................28

TABLE OF AUTHORITIES

<u>Cases</u>

*Ackerson v. City of White Plains*, 2010 WL 5158630 (S.D.N.Y. Dec. 16, 2010) ..................14

*Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006).................................................9, 11, 12, 22

*Carr v. District of Columbia,* 587 F.3d 401 (D.C. Cir. 2009) ......................................... passim

*Carr v. District of Columbia*, 599 F.3d 653 (D.C. Cir. 2010) ..................................................11

*City of Indianapolis v. Edmond,* 531 U.S. 32 (2000)................................................................8

*Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977)...........................................................10, 14

*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) ............................................................9

*Hickey v. Seattle*, 2006 WL 3692658 (W.D. Wash. Dec. 13, 2006)...........................10, 14, 26

*In re Kendell R.*, 71 A.D.3d 553 (1st Dep't 2010)...........................................................20, 21

*Jenkins v. City of New York,* 478 F.3d 76 (2d Cir. 2007) ......................................................27

*Lennon v. Miller*, 66 F.3d 416 (2d Cir. 1995)........................................................................20

*Lyons v. City of Seattle*, 214 Fed. App'x 655 (9th Cir. 2006) (memorandum order) ..............13

*Marcavage v. City of New York*, 2010 WL 3910355 (S.D.N.Y. Sept. 29, 2010) ......................6

*Maryland v. Pringle,* 540 U.S. 366 (2003) ..............................................................................8

*Papineau v. Parmley*, 465 F.3d 46 (2d. Cir. 2006) ......................................................... passim

*People v. Case*, 42 N.Y.2d 98 (N.Y. 1977) ....................................................................20, 21

*People v. Ferreira*, 10 Misc. 3d 441 (N.Y. City Crim. Ct. 2005)............................................22

*United States v. Nelson*, 2011 WL 1327332 (S.D.N.Y. Mar. 31, 2011)..................................17

*Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011) ..................................................19, 24

*Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977)..........12, 13

*Williams v. City of Mount Vernon*, 428 F. Supp. 2d 146 (S.D.N.Y. 2006).............................21

*Ybarra v. Illinois*, 444 U.S. 85 (1971) ........................................................................... passim

*Zellner v. Summerlin*, 494 F.3d 344 (2007) ..........................................................................27

Statutes

N.Y. Pen. L. § 195.05 (McKinney 2010) ......................................................................... passim

N.Y. Pen. L. § 240.20(5) (McKinney 2008) .................................................................... passim

N.Y. Pen. L. § 240.20(6) (McKinney 2008) .................................................................... passim

N.Y.C. Code § 10-110 (2010)……................................................................................... pasim

INTRODUCTION

One day after the 2004 Republican National Convention started, the New York City

Police Department made two mass arrests: one of over two hundred people in conjunction with a

peaceful sidewalk march near the World Trade Center site and one of hundreds of people caught

on a block near Union Square after the police had sealed both ends of the block in an effort to

capture some people walking in the street. Despite the undisputed fact that all of the plaintiffs in

these two cases and most of the plaintiffs in other cases – including bystanders, journalists, legal

observers, and demonstrators – had done nothing unlawful, the City nonetheless has moved for

summary judgment on plaintiffs' false-arrest claims, arguing that it had probable cause to arrest

everyone on a theory of group probable cause.

Forty years ago, the United States Supreme Court rejected the notion of group probable

cause when it held that probable cause did not exist to search a person who was in the same

confined area as others suspected of unlawful activity. The Second Circuit recently applied this

principle in denying qualified immunity to police officials who in 1997 had made a mass arrest at

a protest based upon the presence of lawbreakers in the group. For decades it has been clearly

established that no person may be arrested without probable cause to believe that person has

acted unlawfully, regardless of whether the person is in or near a group that includes people

acting unlawfully.

Without so much as acknowledging the controlling precedent from the Supreme Court

and Second Circuit, the City invokes a case from the D.C. Circuit and an unpublished decision

from the Ninth Circuit for its group probable cause theory. Contrary to the City's

mischaracterization of those cases, they do nothing to dilute the fundamental constitutional

requirement that probable cause must exist for each individual arrested from amongst a group.

Instead, they merely recognize that the requirement of individualized probable cause can be met

1

in certain extraordinary factual circumstances, including where a group is acting as a "cohesive unit" and the police have reason to believe that every person being arrested is in fact part of that unit.

The City's effort to cast the two Convention mass-arrests as this type of situation is foreclosed by the undisputed evidence before the Court. At Fulton Street, the City suggests that its negotiations with a single organizer, combined with announcements made on the scene and with the arresting officer's observations of a large crowd on the sidewalk, somehow create a cohesive unit of lawbreakers that permitted the arrest of everyone on the sidewalk. But nothing about those facts establishes a "cohesive unit" and the undisputed evidence -- including the videos submitted by the City -- makes clear that those on the sidewalk (including mere bystanders, journalists, and legal observers) were in no way acting as a cohesive group. And, consistent with the undisputed fact that all the *Schiller* plaintiffs were acting entirely lawfully, as were practically all other plaintiffs on Fulton Street, the evidence before the Court on summary judgment likewise establishes that no reasonable officer could have concluded that all (or even many) members of the crowd were acting unlawfully.

As for East 16th Street, the City's repeated incantation of the label "16th Street Parade" does nothing to change the undisputed fact that, in response to some people walking in the street near Union Square Park, police officers sealed off both ends of a bustling City block on a summer evening and then arrested hundreds of people trapped inside the block. And the nominal efforts made to tell some people they could leave the block do nothing to change the undisputed fact that many people who had done nothing wrong -- like plaintiff Hacer Dinler, who had just been walking down the block -- were barred from leaving the block and were arrested. Consistent with the undisputed fact that all the *Dinler* plaintiffs and many other plaintiffs

2

arrested at 16th Street were acting entirely lawfully, no reasonable officer could have concluded that all or most of those on the block were acting unlawfully.

## STATEMENT OF FACTS IN OPPOSITION

In opposition to defendants' motion for summary judgment, plaintiffs have responded to defendants' asserted facts, *see* Plaintiffs' Response to Defendants' Rule 56.1 Statements at 16th Street ("16th PR") and Fulton Street ("Ful. PR"), and in the same document have submitted additional undisputed facts in opposition, *see* Plaintiffs' Additional Undisputed Facts in Opposition to Defendants Motion for Summary Judgment at East 16th Street ("16th PF") and Fulton Street ("Ful. PF"). Plaintiffs provide a summary of those facts here.

It is undisputed that defendants have no knowledge of any of the specific acts of the *Dinler* and *Schiller* Plaintiffs, or any of the specific acts of practically any of the other plaintiffs arrested at either location. *See* Ful. PF ¶¶ 9, 34, 54, 72; 16th PF ¶¶ 12, 13, 28, 47, 89. It is also undisputed that the plaintiffs never committed any of the crimes for which they were arrested. *See* Ful. PF ¶¶ 11-13, 27-32, 50-52, 70-71, 81-83, 108-09; 16th PF ¶¶ 11, 25, 44. To establish that there was nevertheless probable cause to arrest the plaintiffs, defendants make sweeping assertions in their Rule 56.1 statements and in their briefs that the plaintiffs were part of a "cohesive unit" acting in concert with a shared criminal intent. Defendants often cite (and misrepresent) the testimony of a few plaintiffs to establish facts that they claim apply equally to hundreds of people. *See, e.g.*, Ful. PR ¶ 113; 16th PR ¶ 24.

Defendants' assertions are flatly contradicted by the testimony of plaintiffs in this case, the testimony of dozens of other plaintiffs, video evidence, and common sense. *See* Ful. PR ¶¶ 20, 73-93, 95-98, 106-07, 110-16, 124-29; 16th PR ¶¶ 20-22, 24, 30-31, 33-34, 38-39, 40, 43, 46-47, 49-50, 57. As shown below, there is no genuine dispute that the hundreds of people

3

arrested by defendants were a diverse and undifferentiated collection of individuals who shared no common knowledge or uniform intent, and plaintiffs' only similarity of experience was being wrongfully arrests by defendants.

Fulton Street:  The incident at Church and Fulton Streets was captured on video, submitted by both plaintiffs and defendants, which clearly shows the event in its entirety. *See, e.g.*, Ful. PF ¶ 97. Around 4 p.m. on August 31, 2004, several hundred people gathered at Church and Fulton Streets. *See* Defendants' Fulton Street Rule 56.1 Statement (hereinafter "Defs. Ful. 56.1") ¶¶ 9, 30. Some of them came to join a publicly advertised march planned by the War Resisters League, some were journalists covering the march (such as plaintiff Michael Schiller), and some had no relation to the march at all. Ful. PF ¶¶ 1-4, 6, 73-76. After talking to a single march organizer, police told people gathered to comply with the law and "have a safe march." Defs.' Ful. 56.1 ¶ 75. These announcements could not be heard by all of the hundreds of people present near Church and Fulton Streets. Ful. PF ¶¶ 5, 89-95. Police directed marchers across Church Street and eastward onto the north sidewalk of Fulton Street. *Id.* ¶ 80.

Just a few minutes after the march began, Defendant Monahan abruptly halted it, and police blocked the sidewalk in front of the marchers. *Id.* ¶¶ 96-01. After warning two people at the front of the march that their banner was blocking the sidewalk and that they could be arrested, Monahan gave a single unamplified warning that people were blocking the sidewalk and must disperse or be arrested. *Id.* ¶¶ 97, 102. Few people among the hundreds gathered heard this single unamplified warning. *Id.* ¶¶ 89-95, 105. Without pausing, Monahan ordered police officers to "form a line," and just a few seconds later, he ordered "arrest teams behind." *Id.* ¶¶ 97-99.

4

Police officials took no steps to distinguish between those who had marched and bystanders on the public sidewalk. Ful. PR ¶¶ 132-35, 145, 149-51. None of the *Schiller* plaintiffs or over one-hundred other plaintiffs heard any order to disperse or had any opportunity to leave prior to arrest. Ful. PF ¶¶ 11, 27-28, 50, 106-07. With the exception of a very few people police permitted to leave, everyone on the Fulton Street sidewalk from the front of the march back to Church Street was placed under arrest. Ful. PR ¶¶ 132-35, 150-51; PF ¶ 65. None of the *Schiller* plaintiffs had committed any unlawful act. *Id.* ¶¶ 11-13, 27-32, 50-52, 70-71; *see also id.* ¶¶ 81-83, 108-09.

East 16th Street: On August 31, 2004, Union Square Park and the surrounding streets were filled with hundreds, if not thousands, of New Yorkers conducting their routine daily business—coming home from work, going to movie theaters, visiting restaurants, sitting in the park, heading to the subway—on a warm summer evening. *See* 16th PF ¶ 62. Union Square Park was bustling as usual, and also reflected the highly charged atmosphere that existed in New York City during the RNC. *Id.* ¶ 62. Shortly before 7 p.m., a few people in costumes carrying puppets set off from the park onto Union Square East sidewalks and roadway, followed later by boisterous marching bands. *Id.* ¶¶ 60-61. The costumed dancers, puppets, marching bands, applause, and lively atmosphere attracted the immediate attention and curiosity of hundreds near Union Square Park at the time, like plaintiffs Ashley Waters and Ann Maurer. *Id.* ¶¶ 20, 37, 62.

When Defendant Essig learned that individuals had left Union Square Park and walked onto the Union Square East roadway, he decided to arrest them all. *Id.* ¶¶ 56, 68, 74. Essig never actually saw these people enter the roadway, and those individuals were never isolated from the hundreds of others walking along and observing from the public sidewalks. *Id.* ¶¶ 74-75. The entire crowd was directed by police down East 16th Street, which itself was already

crowded with people who were living, working or dining in the area, or who were simply passing through on their way to somewhere else, like plaintiff Hacer Dinler. *Id.* ¶¶ 3-5, 66.

Police officers directed the crowd down East 16th Street to Irving Place, where they seized everyone on the block between two lines of police officers at either end. *Id.* ¶¶ 65, 70, 73-75. In addition to seizing some of the people defendants sought to arrest, the group seized by defendants included numerous spectators and bystanders, as well as journalists and legal observers. *Id.* ¶ 74. Essig sent two officers through the group to tell people that if they were not "part of the demonstration," they could leave. *Id.* ¶ 78. These two officers gave these unamplified instructions on the noisy block, crowded with hundreds of people, for a few minutes. *Id.* ¶ 81. Essig did not talk to these officers again about their efforts, and he did not tell officers at either end of East 16th Street that they should allow people to exit. *Id.* ¶¶ 82-83. Plaintiffs never heard any officer tell them they should or could exit East 16th Street, or provide any information on how to do so. *Id.* ¶ 85. When plaintiffs approached the lines of officers closing in on them and tried to exit, officers refused to let them leave, and officers testified that they did not allow anyone to exit. *Id.* ¶¶ 83, 87. Essig ordered the arrest of everyone seized on East 16th Street. *Id.* ¶¶ 56, 68, 88. Hundreds of these individuals, including all the *Dinler* plaintiffs, had never committed a single unlawful act. *Id.* ¶¶ 11, 25, 44.

## ARGUMENT

The defendants have moved for summary judgment on all of the plaintiffs' false arrests claims in the Convention cases. As this Court noted in an earlier Convention case, summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Marcavage v. City of New York*, 2010 WL 3910355, at *4

(S.D.N.Y. Sept. 29, 2010) (citations omitted).  And in adjudicating a summary judgment motion, the Court must "view the evidence in the light most favorable to the party opposing summary judgment [and] draw all reasonable inferences in favor of that party." *Id.*

Ultimately, the City's motions as they apply to the *Schiller* and *Dinler* cases turn on whether defendants Chief Terrence Monahan, who ordered the arrests at Fulton Street, and Deputy Inspector James Essig, who ordered the arrests at East 16th Street, are entitled to qualified immunity.  Typically, the qualified immunity analysis immunity entails a two-step inquiry (1) whether the defendants' action were unlawful and (2) if so, whether the asserted right was "clearly established" at the time of the action.  Given the space constraints under which the plaintiffs are operating, they proceed directly to the second (and dispositive) issue, namely whether the defendants violated rights that were clearly established as of August 2004.

I.  THE LAW WAS CLEARLY ESTABLISHED IN 2004 THAT NO PERSON COULD BE ARRESTED WITHOUT INDIVIDUALIZED PROBABLE CAUSE, REGARDLESS OF WHETHER THE PERSON WAS IN OR NEAR A GROUP THAT INCLUDED PEOPLE ACTING UNLAWFULLY.

In support of their motions for summary judgment, defendants argue "where it reasonably appears to the police that a large group is engaging in unlawful conduct, the police have probable cause to arrest the entire group." *See* Defendants' Memorandum to Dismiss False Arrest Claims at Fulton Street ("D. Ful. Mem.") at 9; and 16th Street ("D. 16th Mem.") at 11.  This position is foreclosed by Supreme Court and Second Circuit law that the City does not acknowledge and is based on the City's mischaracterization of cases outside the Second Circuit.

A.  The Requirement of Individualized Probable Cause for Group Arrests Was Established Long Ago by the Supreme Court and Second Circuit.

In 1971 the Supreme Court ended any argument that a warrantless arrest of an individual among a group alleged to be committing unlawful conduct could be supported by anything other

than individualized probable cause particular to that person.  In *Ybarra v. Illinois*, the Court

rejected the claim that police could detain and search a person about whom they had no

individualized suspicion because he was in a bar for which they had a search warrant based on

suspicion of drug dealing.  As the Court explained, "a person's mere propinquity to others

independently suspected of criminal activity does not, without more, give rise to probable

cause," and that the Fourth Amendment  "cannot be undercut or avoided by simply pointing to

the fact that coincidentally there exists probable cause to search or seize another . . . ."  444 U.S.

85, 91 (1971).  Instead, a warrantless arrest "must be supported by probable cause particularized

to that person."  *Id.; see also Maryland v. Pringle,* 540 U.S. 366, 371 (2003) ("belief of guilt

must be particularized with respect to the person to be searched or seized"); *City of Indianapolis

v. Edmond,* 531 U.S. 32, 37 (2000).  For the last 40 years, clearly established constitutional law

has required individualized probable cause to justify any warrantless arrest.

     In *Papineau v. Parmley*, 465 F.3d 46 (2d. Cir. 2006), the Second Circuit recognized the

principle of *Ybarra* in rejecting a qualified immunity claim asserted by officers who ordered a

mass-arrest of protesters under facts analogous to these cases.  In *Papineau* a group of peaceful

protestors briefly entered the roadway to distribute literature, and then left and returned to nearby

private property joining other protestors who had been congregating lawfully for weeks as part of

an ongoing protest.  *Id*. at 52.  Shortly thereafter, police issued a dispersal order, then

immediately charged onto the private property and arrested many of the demonstrators.  *Id*. at

53-54.  The individual officers sought qualified immunity, arguing their actions were justified

because some of the protestors in the group had earlier violated the law -- including the

disorderly statute relied upon by the City here -- by entering the road.  *Id*. at 58-59.

The Second Circuit rejected the officers' qualified immunity claims.  Even assuming that the protestors who entered the roadway had violated the law, the Court noted there was a serious question regarding whether the officers could have believed that they were justified in taking action against this undifferentiated group when "none of the troopers could identify any person [on the private property] as having been on the road." *Id.* at 60.  The Second Circuit held that as of 1997, officers could not have "reasonably thought that indiscriminate mass arrests without probable cause were lawful." *Id.*

Citing *Ybarra,* the D.C. Circuit in 2006 rejected officers' claims to qualified immunity for the mass arrest of protesters in a park because the officers did not have individualized suspicion of those they arrested. *See Barham v. Ramsey,* 434 F.3d 565, 572-77 (D.C. Cir. 2006). And in 2008 the Tenth Circuit cited and quoted the Second Circuit's ruling in *Papineau* in noting "that Fogarty was a participant in an antiwar protest where some individuals may have broken the law is not enough to justify his arrest." *Fogarty v. Gallegos,* 523 F.3d 1147, 1158 (10th Cir. 2008).

B. <u>Nothing in the Cases Cited by the Defendants Changes the Requirement of Individualized Probable Cause for Mass Arrests.</u>

The City does not even mention *Ybarra* and *Papineau.*  Rather, it seeks to invoke a decision from the D.C. Circuit and an unpublished one from the Ninth Circuit.  Neither supports the City's position and neither does anything to change the requirement of individualized probable cause for mass arrests.

The defendants rely primarily on *Carr v. District of Columbia,* 587 F.3d 401 (D.C. Cir. 2009).  There, the D.C. Circuit considered a record, with all inferences drawn in favor of police, that established that a "cohesive unit" of individuals marched without a permit through the streets, destroying property, lighting fires, tossing bricks through windows, and smashing police

car windshields. *Id.* at 402-05. An undercover police officer accompanying the group testified that he witnessed every member of "the mob act[ing] uniformly in celebrating the destructive acts of individual protestors." *Id.* at 406. Unlike the facts in this case, the group was later isolated in an alley where no others were present and arrested. Though police had no knowledge of the specific acts of any particular individual, they asserted there was probable cause to arrest everyone in the group for parading without a permit and for violating a rioting statute that criminalized any person's mere "assemblage" with others engaged in riotous acts. *Id.* at 405-06.

As an initial matter, the D.C. Circuit affirmed that the officer's testimony <u>was insufficient</u> to establish individualized probable cause to arrest everyone in the group for parading without a permit. *Id.* at 410. Under the parading statute, the police had to "reasonably believe that all of the protestors knew no permit was granted." *Id.* at 411. Because police did not inform protestors there was no permit and had "no direct evidence upon which to conclude that everyone arrested had the requisite intent," police could not establish individualized probable cause to arrest for parading without a permit in the absence of some information specific to an individual arrestee. *Id.*; *cf. Dellums v. Powell*, 566 F.2d 167, 181 n.30 (D.C. Cir. 1977) (dispersal order was required before arrest because, *inter alia*, police could not infer intent for every person arrested); *Hickey v. Seattle*, 2006 WL 3692658, at *6-10 (W.D. Wash. Dec. 13, 2006) (finding individualized probable cause lacking because, *inter alia*, police who made mass arrest failed to make individualized assessments necessary to determine whether individuals present in prohibited area had culpable mental state).

With regard to the rioting charge, the D.C. Circuit reversed summary judgment in favor of plaintiffs, finding that police might be able to meet their burden to show individualized probable cause based on the alleged threat of violence and the unusual facts that (1) the rioting

statute criminalized proximity to riotous acts; (2) the officer's testimony that he actually

observed every member of the group assembling together and cheering in the presence of riotous

acts, and; (3) there was "no affirmative evidence . . . of individuals not associated with the

protest being present in the alley" at the time of arrest. *Carr*, 587 F.3d at 405-10.  Under these

unique facts with all inferences in favor of the police, the court found they might be able to show

the group had acted as a "cohesive unit" and that "all members of the crowd violated the law."

The court made clear it was not relaxing the requirement of individualized probable cause, but

rather holding this burden could potentially be "satisfied if the officers have grounds to believe

all arrested persons were part of a unit observed violating the law." *Id*. at 407.  The court noted

the analysis would be different if police "should have known (or did know) that non-marchers

entered the alley" before arrests were made. *Id*. at 406.  The D.C. Circuit reemphasized this

point when denying a petition for rehearing, noting that "if police arrested an undifferentiated

group of marches and bystanders with no effort to the separate the two, that would be equivalent

to what we held unconstitutional in *Barham v. Ramsey*." *Carr v. District of Columbia*, 599 F.3d

653, 653 n.1 (D.C. Cir. 2010).

  The D.C. Circuit's citation to *Barham v. Ramsey* is particularly noteworthy, given what

that case reveals about the limits of *Carr* and the long established law about mass arrests of

protesters. *Barham* arose from the 2002 arrest of hundreds of individuals at a public park. *See*

434 F.3d 565, 569 (D.C. Cir. 2006).  Police alleged that some of the individuals congregating in

a public park were the same as those who had committed unlawful acts elsewhere earlier in the

day. *Id*.  Police subsequently arrested everyone in the park without any dispersal order even

though a "diverse flow of human traffic entered and exited the park" prior to the arrests. *Id*.  The

district court denied qualified immunity and the D.C. Circuit affirmed, holding that the

11

"undisputed evidence reveals that [police] arrested an undifferentiated mass of people on the basis of crimes committed by a handful of individuals who were never identified." *Id.* at 568. Because police could not show "particular probable cause to arrest each of the 386 persons caught in the police sweep," the arrests violated plaintiffs' "firmly established" rights and the court denied qualified immunity. *Id.* at 568. The court noted "large-scale demonstration scenarios do[] not suspend—or even qualify—the normal operation of the Fourth Amendment's probable cause requirements." *Id.* at 575.

The *Barham* court made clear that this holding was consistent with its earlier ruling in *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977). Defendants assert that *Cullinane* "clearly permitted police to effectuate *en mass* [sic] arrests without the unrealistic requirements of singling out each unlawful individual." *See* D. 16th Mem. at 33; Ful. Mem. at 32. The language selectively excerpted by defendants did not, however, concern the constitutional minima required *to arrest*, but rather the constitutional standards under which police may use crowd-control measures to order a "violent mob" *to disperse*. *See Barham*, 434 F.3d at 575 (citing *Cullinane*). As clearly explained in *Cullinane* and amplified in *Barham*, while police may "deal with the crowd as a unit" without any need to "single out individuals" when they are "order[ing] violent or obstructive demonstrators to disperse," police cannot make arrests on anything less than individualized probable cause. *Id.* (citing *Cullinane*). *Barham* was clear, however, that police cannot "deal with the crowd as a unit unless [they] first issue[] an order to disperse and then provide[] a reasonable opportunity to comply." *Id.* at 576. An individuals' mere physical presence after that time, however, would then be sufficient to establish probable cause without knowing anything more about the specific acts of any person. *Id.*

Reaching even further afield, defendants' claim that an unpublished Ninth Circuit case substantiates the "validity of group arrests." *See* D. Ful. Mem. at 18; D. 16th Mem. at 21.  In *Lyons v. City of Seattle*, police issued "loud, clear, repeated dispersal orders" to protestors throwing rocks and firing bottle rockets at police, and gave ample time to comply with those orders.  214 Fed.App'x 655, 657 (9th Cir. 2006) (memorandum order).  Defendants cite *Lyons* without even mentioning these facts, eliding the fundamental predicate that established individualized probable cause to arrest in that case.  Defendants misleadingly excerpt the phrase "fair probability" to further the radical proposition that an arrest is constitutionally permissible as long as there is merely a "fair probability that plaintiffs were part of the unlawful group," *see* D. Ful. Mem. at 9; D. 16th Mem. at 11.  *Lyons* held no such thing, of course.  The court's actual finding was that "there was a 'fair probability' that the plaintiffs . . . had heard dispersal orders with which they could have complied."  *Id.* at 657.

In sum, as of 2004 the law was clearly established that probable cause was required to arrest each individual within any group, and there was no exception for "group arrests."  *See Ybarra, Papineau.*  In a few cases, courts have found that an individual's mere physical presence can be sufficient to establish individualized probable cause without police having any other information specific to that individual arrestee.  This includes cases where individuals remained in defiance of valid dispersal orders after being given an opportunity to comply, *e.g. Cullinane* and *Lyons*, and an extraordinary case where a court was unwilling to affirm summary judgment against police when they claimed to have witnessed every member of a "cohesive unit" of active rioters violating the law and police were able to isolate that "cohesive unit" prior to arrest, *see Carr*.

When police confront an undifferentiated group that includes only some people that are suspected of breaking the law, however, *see Papineau, Barham,* a warrantless arrest of any (or all) individuals within that group is unconstitutional unless police have information about the specific unlawful acts and, independently, the mental state of each individual to be arrested, *see Carr* (parading without a permit), *Hickey,* and *Dellums*.[1]

## II.   THE UNDISPUTED EVIDENCE DEMONSTRATES THAT THE DEFENDANTS VIOLATED THE CLEARLY ESTABLISHED RIGHT NOT TO BE ARRESTED WITHOUT INDIVIDUALIZED PROBABLE CAUSE.

Turning to the two specific mass-arrest locations at issue in the City's summary judgment motion, it is undisputed that the plaintiffs in both these cases (as well as in many of the other Convention cases) had done nothing unlawful and further that no member of the NYPD had any knowledge of their individual actions (other than that the plaintiffs were on the Fulton Street sidewalk or in the block of East 16th Street). *See* Ful. PF ¶¶ 9, 34, 54, 72; 16th St. PF ¶¶ 13, 28, 47, 89.   Nonetheless, the City contends that a reasonable officer would have had probable cause to arrest everyone at those two locations.

How the defendants assert they can meet their burden under *Ybarra, Papineau,* and even *Carr* is difficult to discern from their briefs, to no small extent because their argument is based upon the fundamentally flawed premise that "where it reasonably appears to the police that a large group is engaging in unlawful conduct, the police have probable cause to arrest the whole

---

[1]Nor can defendants prevail based on their assertion in a footnote that they are immune from liability under New York law.  As defendants acknowledge, state qualified immunity does not apply "where the officials' actions are undertaken . . . without a reasonable basis," and municipalities are not immune for officers' actions that were "inconsistent with acceptable police practices."  D. Ful. Mem. at 34 n.16; D. 16th Mem. at 30 n.20; *see also Ackerson v. City of White Plains,* 2010 WL 5158630, at *4 (S.D.N.Y. Dec. 16, 2010) (argument that municipality was immune "is of no avail if the officers acted without probable cause").  As plaintiffs make clear, defendants clearly lacked probable cause, and no reasonable officer could have thought there was probable cause. Therefore, state-law immunity does not apply.

14

group." D. Ful. Mem. at 9; 16th Mem. at 11. Reduced to their essential elements, however, defendants' arguments rest on the assertion that what happened at Fulton Street and East 16th Street is what happened in *Carr,* and that the hundreds of individuals they arrested are comparable to a "cohesive unit" of rioters observed by police acting uniformly with a common criminal purpose.

The initial hurdle this argument encounters is that, unlike the rioting charges at issue in *Carr*, none of the violations invoked by the defendants make it unlawful to be in the vicinity of other unlawful conduct. Specifically, nothing in N.Y.C. Code Section 10-110 (2010) (parading without a permit), N.Y. Penal Law Section 240.20(5) (2008) (obstructing traffic), Section 240.20(6) (2008) (failure to obey an order to disperse), or Section 195.05 (2010) (obstructing government administration) ("OGA") comes close to proscribing "assemblage" with others engaged in violent acts. This notion of unlawful assemblage was central to *Carr* (and is analogous to group trespass cases) and its absence from this case substantially undermines the City's argument from the outset.

Beyond that, the undisputed facts specific to Fulton Street and East 16th Street establish that no reasonable officer could have concluded that all of the hundreds of people arrested at those locations were acting unlawfully, under the theory of a "cohesive unit" or any other theory. Because the two locations present slightly different situations for purposes of the City's group probable cause theory, the plaintiffs address each separately.

A. No Reasonable Officer Could Have Believed that Individualized Probable Cause Existed to Arrest Every Person on the Fulton Street Sidewalk.

The City contends that the diverse crowd of hundreds of people in the vicinity of the intersection of Church and Fulton Streets was a "cohesive unit" because police negotiated with a single organizer, made announcements to the crowd, and observed a large crowd block

15

pedestrian and vehicular traffic. *See* D. Ful. Mem. at 18. Setting aside disputes about the particulars of some of these assertions, the City never explains how this combination of facts can in any way establish that the marchers, journalists, legal observers, and passersby on the Fulton Street sidewalk were acting as a cohesive unit. The City points to nothing in the cases it cites to suggest that this type of combination of factors creates a cohesive unit for probable cause purposes, and what happened on Fulton Street cannot remotely be compared to the situation described in *Carr*. *See* Ful. PR ¶¶ 133-34. Were there any question about this, even a casual review of the video submitted by the City, as well as the video submitted by the plaintiffs, makes clear that the assemblage of people at Fulton Street was far from a cohesive unit. *See, e.g.*, Ful. PF ¶ 97 (citing videos); ¶ 69 (Fine Video).

Beyond this, the undisputed facts before the Court – highlighted by the videos – demonstrate how no reasonable officer could have concluded that everyone on the Fulton Street sidewalk was acting unlawfully as alleged by the City, particularly in light of the *mens rea* elements of the offenses and in light of the undisputed fact that the police expressly consented to the march (not that police consent was required). In the brief filed with their motions for partial summary judgment, the plaintiffs addressed the substantive elements of most of these offenses, *Schiller-Dinler* Memorandum of Law in Support of Plaintiffs' Motions for Partial Summary Judgment at 17-22 (Oct. 3, 2011), and they respectfully refer to that analysis as a point of reference. In this brief, they supplement that analysis to respond to arguments made by the City.

Obstructing Traffic: To make a warrantless arrest under Penal Law section 240.20(5), defendants must have seen every person on Fulton Street intentionally or recklessly causing a public inconvenience, annoyance or alarm through a "serious interference" with vehicular and pedestrian traffic. *See Papineau*, 465 F.3d at 59. The testimony and the video evidence shows,

however, that there were no grounds to conclude that each and every person walking down the

Fulton Street sidewalk intended to obstruct traffic. Ful. PR ¶¶ 111-12, 115-16.  It is equally clear

that none of them caused any "serious interference" with vehicular or pedestrian traffic.  The

undisputed evidence is that neither the *Schiller* plaintiffs nor over one-hundred other plaintiffs

ever obstructed or intended to obstruct traffic, Ful. PF ¶¶ 12, 29-30, 51, 81-82, and that the

*Schiller* plaintiffs and many others remained on the sidewalk except to cross Church Street with

the traffic light or under police direction, *id.*, ¶¶ 13, 31-32, 52, 70, 77, 80.  Testimony and video

evidence undisputedly show that pedestrians were able to walk both ways on the Fulton Street

sidewalk .  *Id.* ¶¶ 85-86.

Even if there had been any unlawful obstruction committed by particular individuals,

however, defendants would still have to show they reasonably believed *everyone* on Fulton

Street committed that crime.  Unlike the officer in *Carr*, Monahan does not claim to have

personally observed all individuals in the group actually obstructing traffic.  Ful. PR ¶¶ 102, 111-

12, 115-16, 133-34; Ful. PF ¶¶ 9, 34, 54, 72.  The video of the Fulton Street arrests leaves no

genuine dispute that not everyone near Church and Fulton Streets was obstructing traffic, *see*

Ful. PF ¶¶ 85-86, and no reasonable officer could have concluded otherwise, let alone inferred

that every person present had "the intent to cause public inconvenience, annoyance or alarm, or

recklessly creat[ed] a risk thereof." Sec. 240.20(5).   Just as the Second Circuit held in *Papineau*

that officers were not entitled to qualified immunity for false arrest under section 240.20(5), *see*

465 F.3d at 59-60, the defendants are not entitled to it here.

Refusal to Comply with Dispersal Order: To establish probable cause to believe

plaintiffs have violated Sec. 240.20(6), defendants would have to believe that everyone on Fulton

Street (1) congregated with other persons in a public place; (2) was given a lawful order of the

17

police to disperse; (3) refused to comply with that order; and (4) acted 'with intent to cause public inconvenience, annoyance or alarm' or with recklessness to the 'risk thereof.'" *See United States v. Nelson*, 2011 WL 1327332, at \*3 (S.D.N.Y. Mar. 31, 2011). Defendants' assertion that they gave a valid dispersal order and time to comply is foreclosed by the undisputed evidence.[2]

Not only does the evidence makes clear that no reasonable officer could have believed a single unamplified dispersal could have possibly reached the entire crowd from the front back to Church Street, *see* Ful. PF ¶¶ 97-105, it is undisputable that plaintiffs were not given an opportunity to comply with any dispersal order and did not "refuse" to disperse. *Id.* ¶¶ 11, 27-28, 50, 108-09. Monahan only gave the dispersal order *after* the few marchers who could have heard the order were physically blocked by police from dispersing. *Id.* ¶¶ 97-101. Monahan waited virtually no time at all—less than one second—between giving the dispersal order and instructing police officers to "form a line." *Id.* ¶ 98. Finally, besides lacking any reason to believe that each and every plaintiff refused to comply with a dispersal order, defendants cannot point to any information known to them at the time from which they could infer that each and every person on the Fulton Street sidewalk did so with "the intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof." Defendants do not even address the intent requirement in their brief, let alone provide evidence any reasonable officer could have believed there was probable cause.

Parading Without a Permit: To establish probable cause under section 10-110, an officer must reasonably believe that a permit is required, and that the person to be arrested is aware of the lack of a permit and knowingly participated despite that knowledge. *See* Plaintiffs' SJ Mem. at 17-19.  As an initial matter, no permit is required for a sidewalk march. *See* Ful. PR ¶ 17; Ful.

---

[2] The plaintiffs also dispute that defendants could lawfully order dispersal, as the plaintiffs were engaged in protected First Amendment activity, but will address that issue in later briefing.

PF ¶ 67. Beyond that, it is undisputed that the police gave their consent and allowed the Fulton

Street march to proceed without a pre-obtained permit *See* Ful. PR ¶ 19; Ful. PF ¶¶ 78-80, 93.

Having done so, no reasonable officer could believe that probable cause existed to arrest

everyone for parading without a permit unless the consent had been clearly revoked and

everyone had been given an opportunity to cease the march.  As the Seventh Circuit recently

explained in rejecting qualified immunity for officers who did exactly what the defendants did at

Fulton Street:

> No precedent would be necessary, moreover, to establish that the Fourth
> Amendment does not permit the police to say to a person go ahead and march and
> then, five minutes later, having revoked the permission for the march without
> notice to anyone, arrest the person for having marched without police permission.
> This would be an "indefensible sort of entrapment by the State – convicting a
> citizen for exercising a privilege the State told him was available to him."

*Vodak v. City of Chicago*, 639 F.3d 738, 746-47 (7th Cir. 2011) (Posner, J.) (quoting *Cox v.*

*Louisiana*, 379 U.S. 536, 571-73 (1965)).

   Here, no notice was given to anyone the police were revoking their express consent to

march and, as noted above, no opportunity was afforded to people to disperse after Chief

Monahan gave his unamplified order at the front of the march.[3]  No reasonable officer could have

---

[3] Further, no officer could have concluded that everyone on Fulton Street knew that the parade
lacked a permit, or that they needed a permit to walk on the sidewalk, given the undisputed facts
that police gave consent for the march, accommodated and guided it, and given the long history
of the NYPD permitting sidewalk marches without any permit.  *See* Ful. PR ¶ 19; Ful. PF ¶¶ 67,
78-80, 93.  Although defendants point to announcements they made advising marchers that there
was no permit, *see* D. Mem. Ful. at 18, 22, that does not negate their consent for the march, and
there is no genuine dispute that not everyone in the crowd heard these warnings, Ful. PF ¶¶ 5, 13,
52, 89-91, 93-95.  Finally, defendants could not have reasonably concluded that each person on
the public Fulton Street sidewalk was "participating" in the march.  The sidewalk was open and
foreseeably included bystanders completely unaffiliated with the march.  Ful. PR ¶¶ 106, 145; PF
¶¶ 1-4, 6, 73-76.

believed that there was probable cause to arrest everyone on Fulton Street for parading without a permit.

Obstruction of Governmental Administration:  Finally, in a stratagem that reflects the City's own recognition of the lack of merit to its position, the defendants argue that there was probable cause to arrest the *Schiller* plaintiffs for Obstruction of Governmental Administration ("OGA") under section 195.05 of the Penal Law.  None of the plaintiffs was ever charged with OGA, and this is the first time defendants have invoked OGA as a basis for the arrests at Fulton Street.  The uncontroverted evidence demonstrates that no reasonable officer could have concluded there was probable cause to believe everyone at Fulton Street had engaged in OGA.

To violate section 195.05, a person must "intentionally obstruct[], impair[] or pervert[] the administration of law or other governmental function or prevent[] or attempt[] to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act."  N.Y. Pen. L. § 195.05; *Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995).  As the Second Circuit has explained, "New York courts have further held that the official function being performed must be one that was authorized by law." *Id.* (citation omitted).  In addition, for "interference" to fall within the statute's scope, it must be, "in part at least, physical in nature." *People v. Case*, 42 N.Y.2d 98, 102 (N.Y. 1977).  Without this physical element, refusal to comply with a police order is not sufficient to constitute OGA. *See, e.g. In re Kendell R.*, 71 A.D.3d 553, 554 (1st Dep't 2010).

Defendants argue that plaintiffs committed OGA by refusing to comply with four "orders" given by police at Fulton Street:  walk no more than two abreast, obey traffic lights, not block pedestrian or vehicular traffic, and to disperse. *See* Def. Ful. Mem. at 26.  Defendants' argument fails for a host of reasons.  Defendants present no evidence that every person arrested

20

on Fulton Street heard, or could reasonably have been expected to hear, any of the "orders." In fact, it is undisputed that many plaintiffs did not hear any police instructions before or during the march. Ful. PF ¶¶ 5, 13, 52, 67, 89-91, 93-95. Defendants likewise provide no evidence to establish that any officer witnessed every member of the group physically resist any of these "orders." *Case*, 42 N.Y.2d at 102; *Kendell R.*, 71 A.D.3d at 554. Nor do defendants suggest how any officer could reasonably have known that every person on the Fulton Street sidewalk had the requisite intent to obstruct a governmental function. For those reasons, no reasonable officer could have thought there was probable cause under Sec. 195.05.

The lack of probable cause for OGA becomes even more clear when one examines the particular "orders" plaintiffs allegedly violated. As discussed above, there was no probable cause to arrest the plaintiffs for blocking the sidewalk or for refusing to disperse. Defendants do not explain how there could possibly have been probable cause for OGA based on orders to not block traffic and to disperse when there was no probable cause to arrest for blocking traffic or refusing to disperse.

Defendants' argument based on an "order" to obey traffic lights fares no better. The videos show that police directed people across Church Street, both with and against the light. Ful. PF ¶ 80. It is also undisputed that none of the *Schiller* plaintiffs ever crossed against the traffic light. *Id.*, ¶ 70. Even assuming that police gave an order that was heard by every person arrested, it is undisputed that the police lacked information that every one of them refused to comply, and did so with the intention of obstructing governmental function.

Defendants' assertion that there was probable cause to make an OGA arrest for violating an "order" to "walk no more than two abreast" fails as well. This admonition was far from a "lawful order" as required under section 195.05, and there is no legal obligation to walk no more

21

than two abreast. *See, e.g., Williams v. City of Mount Vernon*, 428 F. Supp. 2d 146, 156-57

(S.D.N.Y. 2006) (denying qualified immunity on OGA false arrest claim because "ignoring an

officer's request for identification is not a crime" under New York law so police were not

"engaging in lawful conduct"); *People v. Ferreira*, 10 Misc. 3d 441, 442-43 (N.Y. City Crim. Ct.

2005) (dismissing OGA charge for refusal to comply with order not to leave because defendant

had no obligation to remain and answer officer's questions). Even if some of the people on

Fulton Street were more than two abreast at any point, the videotape makes clear that not

*everyone* was walking more than two abreast. Ful. PF ¶¶ 85-86. Moreover, it is undisputed that

none of the *Schiller* plaintiffs knowingly walked more than two abreast with anyone during the

march. Ful. PF ¶ 71. Defendants' eleventh-hour attempt to excavate probable cause through

OGA is unavailing.[4] No reasonable officer could have believe there was probable cause to arrest

the *Schiller* plaintiffs, and every person on the sidewalk, for OGA.

> B. <u>No Reasonable Officer Could Have Believed that Individualized Probable Cause
> Existed to Arrest Every Person on East 16th Street.</u>

For the East 16th Street mass arrest location, the City likewise contends that everyone

arrested was part of a cohesive unit such that Deputy Inspector Essig could conclude that

probable cause existed to arrest the hundreds of people on the block. D. 16th Mem. at 21.

Specifically, the defendants repeatedly assert and imply that the individuals near Union Square

Park on August 31, 2004, were all "participants" in "plans" for an "unpermitted 16th Street

Parade." *See* 16th PR ¶¶ 6, 12, 14, 24, 57; *cf. Barham*, 434 F.3d at 575 (noting officer's repeated

"insistence on referring generically to all the individuals who were arrested as 'demonstrators'").

---

[4] Defendants string-cite a number of cases, all of which are distinguishable, but do not explain
how any of them is arguably analogous to this case.

The City further suggests that everyone on the block could be arrested because there were "coordinated marching bands and participants chanting in unison." D. 16th Mem. at 21.

It is undisputed, however, that all of the *Dinler* plaintiffs and many of the plaintiffs in the other cases were in no way involved with the bands walking in the street. 16th PR ¶¶ 2-5, 17-21, 36-39, 62, 66, 74, 88. More importantly, the City never explains how two bands plus individuals "chanting in unison" in the middle of a crowded New York City block on a summer evening can translate into everyone on that block being a cohesive unit for purposes of probable cause. The City cites no cases to support this proposition and, again, this is plainly distinguishable from *Carr*, which involved a readily identifiable and discrete group of people engaged in riotous conduct.

As discussed below, the undisputed testimony of plaintiffs and the video evidence establishes there is no genuine dispute that the hundreds of various persons arrested on East 16th Street were not part of any "cohesive unit" acting in concert with a common criminal intent. When people holding puppets, and later on a marching band, left a crowded and lively Union Square Park on a summer evening during the highly-charged political atmosphere of the RNC, it predictably attracted the attention and interest of hundreds of people near a downtown public park, *see* 16th PF ¶ 62, none of whom had any common criminal purpose. This included dozens who, like Plaintiff Waters, had absolutely no idea what was going on but curiously observed from the sidewalks. *Id.* ¶¶ 17-22, 62. No reasonable officer could have concluded that there was any unifying intent, let alone any identifiable spatial cohesion, to this amorphous undifferentiated group of hundreds of people who happened to be in and around Union Square Park at the time.

Not only was there never any "cohesive unit," but the undisputed evidence establishes that no reasonable officer could have concluded that the only people caught between the two

23

police lines were those suspected of having unlawfully marched in the street from the park. Whichever individuals Essig believed (but did not see) had violated the law near Union Square Park, those individuals were hardly isolated in an "alley" where no "non-marchers entered" prior to their arrest. *See Carr*, 587 F.3d at 406. Rather, they were directed by police into an open city block, akin to the public park in *Barham* or the private property in *Papineau*, where they intermingled freely with passersby, spectators, and others. *See* 16th PF ¶¶ 65, 66, 74.

Defendants assert they could nevertheless reasonably conclude the individuals on East 16th Street were the same as those who committed unlawful acts near Union Square Park because "non-law breakers" exited the police barricades on East 16th Street of their own accord prior to the arrests. *See* D. 16th Mem. at 22-23. The undisputed evidence, however, based on testimony by police officers and protesters, establishes that that police officers refused to let most people exit. 16th PF ¶¶ 8, 71, 73, 83, 87. Indeed, as Judge Posner observed in a recent Seventh Circuit decision rejecting the type of argument made by the City here, the City's position defies commonsense: "Nothing is more common than for mass arrests in riots or demonstrations to net a sizable percentage of innocents. Persons knowingly involved in a disturbance are quicker to size up the situation and flee when the police close in on them; innocents often freeze in puzzlement, becoming sitting ducks easily swept up in the police charge." *Vodak,* 639 F.3d at 750.

Essig admitted it was possible that "non-law breakers" might be caught in the undifferentiated group seized between the two police lines, *see* 16th PF ¶ 75, and the fact that he undertook "additional measures to mitigate against the possibility of arresting non-law breakers," *see* Def. 16th St. Mem. at 22, implicitly acknowledges what any reasonable officer would have known was an absolute certainty. Those "additional measures," however, consisted of nothing

more than having two officers give unamplified instructions on a noisy city block for a few minutes. *See* 16th PF ¶¶ 78-81. Further, Essig gave no instructions to the officers in the police lines that they should allow people to exit. *Id.* ¶¶ 78-80.

These "additional measures" were foreseeably ineffectual at "differentiating" the seized group. The undisputed evidence shows that dozens of plaintiffs, including the *Dinler* plaintiffs, never heard any officer give any information or order that they should exit East 16th Street or face arrest. *See* 16th PF ¶¶ 11, 25, 44, 85. Many plaintiffs were understandably reluctant to attempt to exit with intimidating police lines closing in on them, and plaintiffs who did try to exit, like Plaintiff Dinler, were ignored or refused. *Id.* ¶¶ 8, 73, 86-87. Whatever individuals were alleged to have violated the law near Union Square Park, no reasonable officer could have believed that the hundreds of individuals seized later on an open and crowded city block consisted of only the same individuals.

In addition to claiming that everyone on the block was part of a cohesive unit, the City claims that Deputy Inspector Essig could have reasonably concluded that all of the hundreds of people had obstructed vehicular or pedestrian traffic in violation of Penal Law section 240.20(5) or had paraded without a permit in violation of Administrative Code section 10-110. D. Mem. 16th 11-17. Given that each of the *Dinler* plaintiffs, and almost all of the other plaintiffs, had not engaged in any unlawful conduct, the undisputed evidence before the Court forecloses the City's arguments.

Obstructing Traffic: Even assuming some individuals committed unlawful obstruction near Union Square, defendants would still have to show that they could have reasonably believed that everyone arrested on East 16th Street (1) seriously interfered with traffic and (2) had the requisite intent. No officer could reasonably believe he or she personally witnessed every

member of a group of hundreds—surrounded by spectators and bystanders on an open city street—all obstruct traffic, let alone infer the requisite intent for each of them. Indeed, there is no such evidence here. *See* 16th PR ¶¶ 38-39, 55, 57.

Defendants also assert that plaintiffs were aware of others committing obstruction and, citing *Carr*, that "by virtue of not disassociating themselves from the group . . . became participants in the group." D. 16th Mem. at 23. This argument has no legal merit. Nothing in section 240.20(5) even possibly makes unlawful proximity to others who are obstructing traffic, unlike the rioting statute in *Carr* which prohibited an individual from assembling with other people who were committing obvious acts of violence in their very presence. The argument is also factually baseless. Defendants cite to the depositions of *three* other non-*Dinler* plaintiffs, none of which establish the proposition that "plaintiffs were plainly aware of . . . obstruction" generally, nor with regard to the *Dinler* plaintiffs specifically. D. 16th St. 56.1 ¶ 60; D. 16th Mem. at 23; 16th PR ¶¶ 28, 30, 38, 60. Furthermore, numerous plaintiffs who wanted to "disassociate" themselves by exiting East 16th Street were consistently prevented from doing so by police. *See* 16th PF ¶ 73. For all these reasons, as in *Papineau* no reasonable officer could have believed there was probable cause to arrest everyone seized on East 16th Street for obstructing traffic.

Parading Without a Permit: Similarly, no reasonable officer could have believed everyone arrested on East 16th Street had paraded without a permit in violation of section 10-110. As a threshold matter, unlike *Carr*, there is no evidence to establish that Essig or any other NYPD officer actually observed every member in the group engaged in the act of parading. Instead, defendants assert that "numerous plaintiffs . . . admit they knew there was no permit," and try to impute this testimony to hundreds of plaintiffs. Defendants' assertion is false with

26

regard to the *Dinler* Plaintiffs, *see* 16th PR ¶ 14, and moreover, these assertions are irrelevant to the Fourth Amendment inquiry. *See Hickey,* 2006 WL 369658 at *8 (finding plaintiffs' later deposition testimony that they knowingly entered a prohibited area irrelevant because "[t]he focus of the probable cause inquiry is what the *officers* knew or believed at the time of arrest") (emphasis in original) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The question is whether defendants could have reasonably concluded *at the time of arrest* that everyone on East 16th Street had "participated" in a parade, and with the knowledge that a permit was required and had not been obtained.

Plainly, no reasonable officer could have believed that everyone arrested had violated section 10-110. As discussed above, probable cause was completely lacking because, as a matter of law, no permit is required for a sidewalk march. Moreover, it is undisputed that numerous people, including all of the *Dinler* plaintiffs, walked only on the sidewalks, *see* 16th PF ¶ 65, and whether or not any officer could believe that people in the roadway were violating section 10-110, no officer could have believed everyone trapped on the block—including those on the sidewalks—were guilty of that offense.

### C. There Was No "Arguable Probable Cause" to Arrest Plaintiffs

Defendants also argue that the arresting officers are entitled to qualified immunity based on the existence of "arguable probable cause." Def. Ful. St. Mem. at 33; 16th St. Mem. at 34. Whether arguable probable cause existed "entails an inquiry into the facts known to the officer at the time of arrest." *See Zellner v. Summerlin*, 494 F.3d 344, 370 (2007). Based on this fact-intensive inquiry, at the summary judgment stage defendants must show that based on undisputed facts officers of reasonable competence could disagree on whether the probable cause test was met. *Id.* at 372; *see also Jenkins v. City of New York,* 478 F.3d 76, 87-88 (2007) ("'Arguable' probable cause should not be misunderstood to mean 'almost' probable cause.").

27

Defendants cannot make this showing.  For the reasons discussed above, the undisputed facts show that there was no probable cause to make the arrests at Fulton Street and at East 16th Street and that no objectively reasonable officer could have believed otherwise.

CONCLUSION

For all the foregoing reasons, the *Schiller* and *Dinler* plaintiffs urge the Court to deny the defendants' motion for summary judgment on the false-arrest claims.

Respectfully submitted,

TAYLOR PENDERGRASS (TP-3608)
CHRISTOPHER DUNN (CD-3991)
 DANIEL MULLKOFF
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, N.Y.  10004
(212) 607-3300

On the brief:  Scarlet Kim

Dated: November 3, 2011          Counsel for the Plaintiffs
       New York, N.Y.

28