UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x

MICHAEL SCHILLER, et al.,

                                        Plaintiff,

                -against-

THE CITY OF NEW YORK, et. al,                    04-Civ-7922 (RJS)(JCF)

                                        Defendants.

----------------------------------------------------------------------- x

CONSOLIDATED RNC CASES                           (RJS)(JCF)

----------------------------------------------------------------------- x


**DEFENDANTS' REPLY BRIEF IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT TO DISMISS ALL
OF PLAINTIFFS' CLAIMS BASED ON THE NO-SUMMONS POLICY AND
<u>FINGERPRINTING POLICY</u>**

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
*Attorney for Defendants*
100 Church Street
New York, New York  10007
Tel: (212) 788-8342


*Counsel for Defendants:*   Jeffrey A. Dougherty
                            Peter G. Farrell
                            Fred M. Weiler


Dated: New York, New York
       November 23, 2011

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................... 1

THE UNDISPUTED MATERIAL FACTS.................................... 2

ARGUMENT

I.      THE   RNC   PLAINTIFFS   ABANDONED
        CERTAIN CLAIMS AND DO NOT OPPOSE
        NUMEROUS   ARGUMENTS   RAISED   IN
        DEFENDANTS'   BRIEF REGARDING   THE
        DEFICIENCY   OF   PLAINTIFFS'   CLAIMS
        REGARDING THE POLICIES....................................2

II.     PLAINTIFFS DO NOT DISPUTE MANY OF
        DEFENDANTS'   PROPOSED   MATERIAL
        FACTS. ...................................................................5

        A.      Plaintiffs Do Not Dispute Material Facts
                Regarding   The   Intelligence   Gathered
                Regarding   The   Overarching   Tripartite
                Threat Environment And The Specific
                Threats Facing The City During The RNC
                And Do Not Dispute That Intelligence Was
                Provided To NYPD Decision Makers.............................5

        B.      Commissioner Cohen Is A Fact Witness
                And His Testimony Is Admissible..................................8

III.    PLAINTIFFS' PRIMARY ARGUMENTS FAIL
        BECAUSE THEY ARE NOT BASED UPON THE
        ACCURATE   DEFINITION,   SCOPE   AND
        APPLICATION OF THE POLICIES DURING
        THE RNC..................................................................9

IV.     PLAINTIFFS'   ARGUMENTS   THAT   THE
        POLICIES   ARE   NOT   BASED   ON   THE
        INTELLIGENCE ARE UNSUPPORTED BY THE
        COMPELLING FACTUAL RECORD. ...................................13

        A.      Commissioner Cohen *Did* Play A Critical
                Role In The NYPD's Planning For The
                RNC: He Provided The Intelligence That
                Informed Policy Making...............................................14

B.      Plaintiffs Argument That The Policies Were "Adopted" in April 2004 as a Reiteration of Prior Similar Policies Used at Demonstrations is Irrelevant, Misdirected And Erroneous. .............................................................15

C.      The Intelligence Information Was Not Limited To The End User Reports...............................16

D.      The End User Reports Supported Commissioner Cohen's Threat Assessment And The Individual Threats. .........................................18

E.      Chief Esposito's Testimony Regarding The Rationales For Adopting The Policies Must Be Credited For Purposes Of This Motion. ..................................20

F.      The Threat of "Criminal Activity" Such As Continual Unlawful Acts, Violence, Anarchism or Terrorism Did Inform The Policies. ............................................................22

V.      THE LEGAL ARGUMENTS PRESENTED BY PLAINTIFFS FAIL BECAUSE THEY ADDRESS INAPPLICABLE CONTENT-BASED POLICIES OR POLICIES OF A PROSCRIPTIVE NATURE AND ARE THEREFORE INAPPLICABLE TO "THE POLICIES" AT ISSUE WHICH ARE CONDUCT-BASED................................................................23

A.      Plaintiffs' Reliance On *Tabbaa* To Foreclose Intermediate Scrutiny Is Misplaced. .......................................................24

B.      Plaintiffs' Reliance On Other First Amendment Jurisprudence Is Also Misplaced. .......................................................25

C.      Defendants Are Entitled To Summary Judgment On Plaintiffs' Fourth Amendment Claims. ..........................................................28

D.      The Policies Did Not Violate The Equal Protection Clause. .........................................30

VI.   DEFENDANTS ARE ENTITLED TO SUMMARY
      JUDGMENT   ON   PLAINTIFFS'   STATE   LAW
      CLAIMS REGARDING FINGERPRINTING.........................................31

CONCLUSION............................................................................................................... 33

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Pages**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)...................................................................................................... 21

*Anthony v. City of New York,*
    339 F.3d 129 (2d Cir. 2003).......................................................................................... 16

*Atwater v. City of Lago Vista,*
    532 U.S. 318 (2001)................................................................................................. 28, 29

*Beckman v. United States Postal Serv.,*
    79 F. Supp. 2d 394 (S.D.N.Y. 2000)............................................................................. 21

*Brockman v. Windsor Bd. of Educ.,*
    *99-cv-1220,* 2001 U.S. Dist. LEXIS 23939 (D. Conn. July 23, 2001) ...................................... 4

*Brooklyn Legal Servs. Corp. v. Legal Servs.,*
    462 F.3d 219 (2d Cir. 2006).......................................................................................... 16

*Bryant v. City of N.Y.,*
    99-cv-11237, 2003 U.S. Dist. LEXIS 21642 (S.D.N.Y. Dec. 2, 2003) .................................. 27

*Curley v. Village of Suffern,*
    268 F.3d 65 (2d Cir. 2001)............................................................................................ 27

*Dinler v. City of New York,*
    607 F.3d 923 (2d Cir. 2010)..................................................................................... 19, 22

*Frink Am., Inc. v. Champion Rd. Mach. Ltd.,*
    48 F. Supp.2d 198 (N.D.N.Y. 1999)............................................................................... 3

*Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo,*
    981 F.2d 50 (2d Cir. 1992)............................................................................................ 16

*Holder v. Humanitarian Law Project,*
    130 S. Ct. 2705 (2010).................................................................................................. 18

*Jusick v. City of N.Y.,*
    07-cv-07683 ................................................................................................................... 8

*Kennedy v. City of N.Y.,*
    07-cv-07678. .................................................................................................................. 8

*MacNamara, et al., v. City of N.Y., et al.,*
    05-cv-9216 (RJS) (JCF), November 3, 2011 ........................................................................ 1

*Manders v. City of N.Y.*,
   07-cv-07752 ............................................................................................................ 8

*Monell v. Dep't of Soc. Servs. of City of New York*,
   436 U.S. 658 (1978) .............................................................................................. 16

*National R. Passenger Corp. v. Atchison, T. & S. F. R. Co.*,
   470 U.S. 451 (1985) .............................................................................................. 16

*New York v. Belton*,
   453 U.S. 454 (1981) .............................................................................................. 29

*Osborne v. Fernandez*,
   2009 U.S. Dist. LEXIS 27409 (S.D.N.Y. 2009) ................................................ 16

*Rigby* **v.** *City of N.Y.*,
   07-cv-07751 ............................................................................................................ 8

*Schiller v. City of New York*,
   *04-cv-7921* ,2009 U.S. Dist. LEXIS 15551 (S.D.N.Y. Feb. 27, 2009) ............................ 1, 2, 8

*Schiller v. City of New York, et al.*,
   *Dinler, et al.*, *v. City of N.Y., et al.*, 04-cv-7921 (RJS) (JCF)
   *04-cv-7922* (RJS) (JCF)*, 2006 U.S. Dist. LEXIS 67907
   (S.D.N.Y. Sept. 20, 2006) ........................................................................ 1, 2, 8, 20, 21

*Sheehy v. Big Flats Community Day, Inc.*,
   73 N.Y.2d 629 (N.Y. 1989) ........................................................................ 31, 32

*Speiser v. Randall*,
   357 U.S. 513 (1958) .............................................................................................. 26

*Tabbaa v. Chertoff*,
   509 F.3d 89 (2d Cir. 2007) ........................................................................ 24, 25

*Tufo's Wholesale Dairy, Inc. v. CNA Fin. Corp.*,
   *03-cv-10175*, 2005 U.S. Dist. LEXIS 5453 (S.D.N.Y. April 1, 2005) ...................... 3

*Turner Broad. Sys. v. FCC*,
   512 U.S. 622 (1994) .............................................................................................. 25

*United for Peace and Justice v. City of N.Y.*,
   243 F. Supp. 2d 19 (S.D.N.Y. 2003) ................................................................ 18

*United States v. Nat'l Treasury Emples. Union*,
   513 U.S. 454 (1995) .............................................................................................. 25

*Virginia v. Moore,*
  553 U.S. 164 (2008) .................................................................................. 29

*Western World Ins. Co. v. Stack Oil, Inc.,*
  922 F.2d 118 (2d Cir. 1990) ...................................................................... 21

*Worldcom, Inc. Sec. Litig.,*
  346 F. Supp. 2d 628 (S.D.N.Y. 2004) ......................................................... 3

**Statutes**                                                                    **Pages**

N.Y.C. Admin. Code § 10-110 [c] ..................................................................... 29

N.Y. Crim. Proc. Law §160.10 ......................................................... 3, 5, 31, 32

N.Y. Crim. Proc. Law §160.10(2) ............................................................ 31, 32

N.Y. Crim. Proc. Law §160.50 ...................................................................... 32

N.Y. Crim. Proc. Law §§ 160.55 ................................................................... 32

N.Y. Crim. Proc. Law § 940 ........................................................................ 31

N.Y.C.P.L. §240.20 ...................................................................................... 29

Fed. R. Civ. P. 56 .......................................................................................... 1

Penal Law § 80.05 ....................................................................................... 29

Penal Law § 70.15 ....................................................................................... 29

## DEFENDANTS' REPLY BRIEF REGARDING THE POLICIES

Defendants respectfully submit this memorandum of law to reply to Plaintiffs' briefs submitted in opposition to Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 to dismiss all of Plaintiffs' federal and state law claims regarding the New York City Police Department's (the "NYPD") No Summons Policy and the Fingerprinting Policy (collectively "the Policies") in effect during the 2004 Republican National Convention in New York City (the "RNC" or the "Convention").[1]  Based upon arguments advanced in this reply brief, along with the arguments in Defendants' initial brief dated October 3, 2011 supporting their motion ("Defendants' Brief" or "Defs' Brief") (*Schiller* Docket Entry No. 584), and the undisputed material facts Defendants, are entitled to summary judgment as a matter of law.

## PRELIMINARY STATEMENT

Plaintiffs' opposition briefs argue that Defendants' motion should be denied because there are numerous disputed issues of material fact.  However, the material facts are undisputed and Plaintiffs' attempt to create disputes fails.  Plaintiffs have also abandoned numerous claims and fail to address Defendants' comprehensive arguments which were laid out in Defendants' Brief.  Thus, Plaintiffs are left with a First Amendment claim regarding the Policies (excluding a First Amendment retaliation claim) and a Fourth Amendment claim (that is limited to the MacNamara Brief).  Both of these legal arguments fail as a matter of law on the undisputed facts.  Accordingly, Defendants' motion for summary judgment should be granted.

---

[1] Defendants submit this reply brief in connection with their summary judgment motion in the forty-four ("44") Consolidated RNC Cases identified in **Appendix A**.  This consolidated reply brief responds to: (i) a single opposition brief submitted by the Plaintiffs in *Schiller, et al., v. City of N.Y., et al.,* 04-cv-7922 (RJS) (JCF) and *Dinler, et al., v. City of N.Y., et al.,* 04-cv-7921 (RJS) (JCF), dated November 3, 2011 (the "Schiller Brief"); and (ii) the opposition brief submitted by the Plaintiffs in *MacNamara, et al., v. City of N.Y., et al.,* 05-cv-9216 (RJS) (JCF), also dated November 3, 2011 (the "MacNamara Brief")

## THE UNDISPUTED MATERIAL FACTS

As demonstrated *infra*, there are numerous material facts which Plaintiffs do not dispute. In addition, where Plaintiffs purport to dispute certain facts their disputes are <u>not</u> supported by the record.[2]

## ARGUMENT

**I.   THE RNC PLAINTIFFS ABANDONED CERTAIN CLAIMS AND DO NOT OPPOSE NUMEROUS ARGUMENTS RAISED IN DEFENDANTS' BRIEF REGARDING THE DEFICIENCY OF PLAINTIFFS' CLAIMS REGARDING THE POLICIES.**

As a threshold matter it is important to note that when faced with the arguments presented in Defendants' Brief (which comprehensively addressed the array of claims the RNC Plaintiffs pled regarding the Policies): (i) plaintiffs in 17 RNC Consolidated Cases failed to submit any response whatsoever to Defendants' motion;[3] (ii) the plaintiffs in *Schiller* and *Dinler* affirmatively abandon numerous claims regarding the Policies; and (iii) the Schiller Brief and MacNamara Briefs fail to address arguments presented in Defendants' Brief directed at certain legal theories of liability and therefore Plaintiffs have abandoned these claims.

Specifically, the Schiller Brief explicitly abandons the following five claims: (1) Fourth Amendment claims based upon being denied a summons or being fingerprinted incident

---

[2] For a complete statement of material undisputed facts, Defendants respectfully refer the Court to: (i) Defendants Statement of Material Undisputed Facts In Support Of Their Motion For Summary Judgment On the City's "No Summons Policy" and "Fingerprinting Policy" During the 2004 RNC, dated October 3, 2011 ("Defendants' 56.1 Statement" or "Defs' 56.1"), (*Schiller*, Docket Entry No. 579); (ii) Defendants' Reply 56.1 Statement of Undisputed Material Facts ("Defendants' Reply 56.1 Statement" or "Defs' Reply 56.1"); (iii) Defendants' Response to the additional 56.1 facts proposed by the *Schiller* and *Dinler* Plaintiffs ("Defendants' Responsive Schiller Facts" or "Defs' Responsive Schiller Facts"); and (iv) Defendants' Response to the additional 56.1 facts proposed by the *MacNamara* Plaintiffs proposed facts submitted herewith ("Defendants' Responsive MacNamara Facts" or "Defs' Responsive MacNamara Facts"). For the Court's convenience, Defendants have consolidated (ii) – (iv) into Defs' Reply 56.1, separated by headings.

[3] *See* Appendix A.

to arrest; (2) First Amendment retaliation claims based upon the Policies; (3) claims that the Policies violated the Equal Protection Clause of the Fourteenth Amendment; (4) Section 1983 claims based upon a violation of N.Y.C.P.L. § 160.10; and (5) all claims against the individual defendants related to the Policies.  Schiller Brief at p. 12, n. 4.

The MacNamara Brief fails to address the arguments in Defendants' Brief that (i) Defendants are entitled to summary judgment on Plaintiffs' First Amendment retaliation claims based on the Policies (Defs' Brief at pp. 34-39); (ii) Defendants are entitled to summary judgment on Plaintiffs' state and federal claims regarding an alleged violation of N.Y.C.P.L. § 160.10 (Defs' Brief at pp. 46-54); and (iii) Commissioner Kelly, Chief Esposito, Mayor Bloomberg, retired Chiefs Patrick Devlin and John Colgan are personally liable.  Defs' Brief at p. 59.  Both the Schiller and MacNamara Briefs fail to address Defendants' argument that a substantive due process claim based on the Policies fails as a matter of law.  Based on authority in this district and other district courts within the Second Circuit these claims are deemed abandoned, and therefore, Defendants should be granted summary judgment on these claims. *See Tufo's Wholesale Dairy, Inc. v. CNA Fin. Corp.*, 03-cv-10175, 2005 U.S. Dist. LEXIS 5453, *10 (S.D.N.Y. April 1, 2005) (granting defendants summary judgment on unfair settlement practices claim where plaintiff did not address defendants' arguments and thereby was deemed to have "abandoned this cause of action"); *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 687 (S.D.N.Y. 2004) (in a class action litigation alleging violations of Securities Act of 1933 based upon 20 distinct, alleged omissions from registration statements, where lead plaintiff did not address defendants' arguments in support of summary judgment on 8 of those omissions summary judgment was granted with respect to them); *Frink Am., Inc. v. Champion Rd. Mach. Ltd.*, 48 F. Supp.2d 198, 209 (N.D.N.Y. 1999) (claims not addressed in plaintiff's brief in

opposition to defendant's motion for summary judgment are deemed to have been abandoned by plaintiff).

Both the Schiller Brief and MacNamara Briefs fail to address Defendants' argument that they are entitled to qualified immunity. Defendants' Brief at p. 56-59. Therefore, in addition to the fact that all Plaintiffs have abandoned their claims against all individual defendants, all individual defendants would also be entitled to qualified immunity because of Plaintiffs' failure to oppose this argument. *See Brockman v. Windsor Bd. of Educ.*, 99-cv-1220, 2001 U.S. Dist. LEXIS 23939, *10 (D. Conn. July 23, 2001) (granting summary judgment to individual defendant on qualified immunity basis where plaintiff's opposition brief did not address qualified immunity argument).

In addition to failing to address arguments regarding certain claims in their entirety, both the Schiller Brief and the MacNamara Brief fail to address key components of arguments presented in Defendants' Brief. For example, both the Schiller and MacNamara Briefs fail to address Defendants' arguments that the decisions made by Chief of Department Joseph Esposito and Commissioner Raymond Kelly in adopting the Policies based upon Commissioner Cohen's tripartite threat analysis are entitled to significant deference. (Defs' Brief at pp. 30-31). Both briefs also fail to address Defendants' arguments regarding (i) a complete absence of any evidence of animus against First Amendment activity or impermissible motivations for adopting the Policies; and (ii) the significance of the hundreds of thousands of demonstrators who expressed their First Amendment rights during the RNC and who were not subject to arrest or the Policies. (Defs' Brief at pp. 33-34). The MacNamara Brief also fails to address Defendants' arguments regarding Plaintiffs' inability to establish the elements of a *prima*

*facie* Equal Protection claim (the Schiller Brief explicitly disavowed that claim).  Accordingly, these arguments are unopposed and should be accepted by the Court.

After stripping away all of the abandoned claims, Plaintiffs are left with the following: (i) a First Amendment challenge to the constitutionality of the Policies (excluding any retaliation claim) against defendant City of New York; (ii) a claim limited to the *MacNamara* Plaintiffs that the Policies violated the Fourth Amendment against defendant City; and (iii) state law claims regarding a purported violation of N.Y.C.P.L. § 160.10 against defendant City.  In assessing these remaining claims, the Court must accept that the NYPD decision makers are afforded significant deference in their decisions to adopt the Policies because of Plaintiffs' failure to address that issue.  It is against this backdrop that we review the material undisputed facts.

## II.    PLAINTIFFS DO NOT DISPUTE MANY OF DEFENDANTS' PROPOSED MATERIAL FACTS.

Plaintiffs' opening argument in opposition asks the Court to deny Defendants' motion "for the simple reason that it is premised upon a set of facts that is deeply disputed by and because the City makes no effort to establish its entitlement to summary judgment on the facts that must be accepted by the Court."  Schiller Brief at p. 1.  Simply put, plaintiffs are wrong.

### A.    Plaintiffs Do Not Dispute Material Facts Regarding The Intelligence Gathered Regarding The Overarching Tripartite Threat Environment And The Specific Threats Facing The City During The RNC And Do Not Dispute That Intelligence Was Provided To NYPD Decision Makers.

Plaintiffs admit key material facts in their briefs that support Defendants' motion.  For example, the MacNamara Brief recognizes the momentous "concern law enforcement must have [had] about the threats that exist in New York City post-9/11" and "surrounding the RNC."  MacNamara Brief at p. 1.  Furthermore, Plaintiffs also either admit, or <u>do not and cannot dispute</u>

the existence of the following specific threats and concerns identified by Commissioner Cohen: (1) the City and the RNC were targets for terrorist acts; (2) threats were posed by individuals with violent criminal histories; (3) there was a threat of possible anarchist violence during the RNC; (4) there was a threat of destruction of property and attacking businesses during the RNC; (5) a spectrum of unlawful activity was possible; (6) there was a threat of continuous unlawful conduct; (7) threats suggested individuals and groups were intent on shutting down New York City and shutting down the RNC; (8) there was a concern that individuals engaging in unlawful acts during the RNC would utilize false identification or not carry identification; (9) it was easy to obtain false identification; (10) the RNC was a National Special Security Event; and (11) individuals from out of state or those utilizing false identification may attempt to elude criminal prosecution if issued summonses. *See* Defs' Reply 56.1 at ¶¶ 63-66, 81, 83, 85, 86, 96-97, 99-101, 104-110, 112-122, 131-146. [4]

Additionally, Plaintiffs either do not or cannot dispute certain critical facts regarding Commissioner Cohen's overarching tripartite threat assessment, or that he was aware of the extremist tactics used to overwhelm law enforcement at prior large-scale events like the Battle of Seattle, or that it take only takes a small number of extremist elements to trigger spiraling disorder.[5] Defs' Reply 56.1 at ¶¶ 21-39, 46-55. Plaintiffs also do not dispute that Chief

---

[4] Defendants note that Plaintiffs, in response to Defendants' 56.1 Statement, cite to additional facts they proffer as supposedly indicating the intelligence regarding the tripartite threat environment or the specific threats did not inform the decision to adopt the Policies, but that argument in no way places these facts in dispute.   *See* Defs' Responsive Schiller Facts at ¶¶13-15, 19-20, 23, 25, 27, 28-71; *see also* Defs' Reply 56.1 at ¶¶ 149-226; Section IV. *infra* (demonstrating an inability to create dispute regarding scope of the Policies and intelligence that informed their adoption; dismantling Plaintiffs' arguments regarding timing of adopting of the Policies; and establishing lack of relevance of Chief Esposito's inability to recall immaterial minor details regarding planning meetings).

[5] Plaintiffs' attempt to take these facts out of the analysis by arguing they are "expert" opinions is discussed in Section II, B *infra*.

Esposito himself possessed independent knowledge of the disorder that had occurred in Seattle and other cities.  Defs' 56.1 at ¶ 40.

Plaintiffs do not dispute the critical fact which weaves all of this information together, which is that Commissioner Cohen conveyed the intelligence information and threat assessment to Chief Esposito and Commissioner Kelly and the reason he did so was to facilitate their planning for the policing of the Convention.  *See* Schiller Brief at p. 3; Defs' Reply 56.1 at ¶¶ 50, 101, 52-55; Schiller Facts at ¶ 38.[6]  Indeed, the Schiller Brief concedes that Commissioner Cohen "met with" "Commissioner Kelly and Chief Esposito" "regularly" (Schiller Brief at p. 7) and that "plaintiffs recognize the NYPD had information indicating that New York City faced threats of substantial disorder or worse during the Convention and further that it used this information in its planning for the Convention."  Schiller Brief at p. 3(emphasis added); *see also* Defs' Reply 56.1 at ¶¶ 149-150, 152-153, 156-157 (not disputing that the NYPD held planning meetings and the Policies were adopted as a result of discussions held and decisions made during those meetings).  The practical implication of these undisputed facts is significant for purposes of Defendants' motion for summary judgment because it establishes the decision makers were aware of an array of potential threats when the Policies were put into place.[7]

---

[6] "Schiller Facts" refers to additional facts asserted by the Schiller/Dinler Plaintiffs at the end of their 56.1 Counterstatement.

[7] As for facts that Plaintiffs claim are disputed, as Defendants demonstrate in their Reply 56.1 Statement and subsequently in this Brief, Plaintiffs are unable to create a genuine dispute because (i) they cite no admissible evidence from the record to contradict Defendants' asserted facts and therefore cannot create a dispute; (ii) they seek to dispute facts by citing irrelevant and misplaced evidence or by making legal arguments; or (iii) they attempt to create a factual dispute by citing bits and pieces of deposition testimony from the vast record in this litigation, which when read in a proper context either illustrates that there is no genuine dispute or in some cases actually bolsters the facts as Defendants have presented them.

## B. Commissioner Cohen Is A Fact Witness And His Testimony Is Admissible.

Unable to dispute the litany of threats set out by Commissioner Cohen, Plaintiffs seek to dispute Commissioner Cohen's threat assessment by arguing that these facts are "expert opinion" and cannot be considered by this Court because Commissioner Cohen has not been designated as an expert in this litigation. *See, e.g.*, Defs' Reply 56.1 at ¶ 19. First, this argument is belied by the Plaintiffs' admissions through their counsel, Christopher Dunn (attorney for the *Schiller* and *Dinler* plaintiffs). Indeed, Mr. Dunn affirmatively stated that he recognized that Commissioner Cohen was a fact witness possessing information that "may bear on the no-summons policy, including information about what was conveyed to the RNC Executive Committee (information that might include facts and assessments conveyed) . . . We agree that this **information is non-expert**". Dougherty Decl. as Ex. J) (emphasis added).

Plaintiffs' efforts to cast Commissioner Cohen's testimony as "expert" is also contradicted by Plaintiffs' prior pleadings. Indeed, Commissioner Cohen is a <u>fact witness</u> and a <u>named defendant</u> in at least four Consolidated RNC Cases.[8] Moreover, other Plaintiffs amended their complaints to add claims against Commissioner Cohen where they alleged Cohen "distorted intelligence data that culminated in the formulation and adoption of the no-summons and blanket fingerprinting policies" or he "grossly misinformed the RNC Executive Committee of the security threat posed by the people and groups who were planning to protest during the RNC." *Schiller v. City of New York*, 04-cv-7921, 2009 U.S. Dist. LEXIS 15551, *19-20 (S.D.N.Y. Feb. 27, 2009).[9] Now, in response to Defendants' Brief, Plaintiffs admit these threats were genuine

---

[8] Cohen is an active defendant in *Jusick v. City of N.Y.*, 07-cv-07683**;** *Manders v. City of N.Y.*, 07-cv-07752; *Rigby* v. *City of N.Y.,* 07-cv-07751; and *Kennedy v. City of N.Y.*, 07-cv-07678.

[9] Plaintiffs subsequently withdrew their motions to amend as against Cohen in response to Defendants' appeal to the Second Circuit on the issue of whether Cohen was entitled to qualified immunity. *MacNamara* Docket Entry No. 388.

but instead claim Cohen's assessment should be rejected because it is offered as expert opinion. The notion that <u>the facts</u> regarding the threats that Commissioner Cohen conveyed to policy makers can be disregarded because Commissioner Cohen can be regarded as an <u>expert</u> in his field is absurd.[10] Therefore, Plaintiffs' attempts fail and these facts must be deemed undisputed. *See* Defs' Reply 56.1 at ¶¶ 19, 34, 38, 47, 49, 50, 51, 58, 60-63, 80.

### III. PLAINTIFFS' PRIMARY ARGUMENTS FAIL BECAUSE THEY ARE NOT BASED UPON THE ACCURATE DEFINITION, SCOPE AND APPLICATION OF THE POLICIES DURING THE RNC.

In addition to having failed to successfully dispute the material facts as presented by Defendants, the thrust of the arguments in Plaintiffs' briefs is based on a demonstrably false and misleading characterization of the Policies. In essence, Plaintiffs suggest that the Policies were somehow directed at speech or, in other words, sought to proscribe, inhibit or punish free expression during the Convention. Plaintiffs' assertion, however, is unsupported by any evidence in the record. First and foremost, Plaintiffs actually mischaracterize the way that Defendants and Chief Esposito defined the Policies. Plaintiffs inaccurately suggest that "the City contends that the policy applied to <u>a broad range</u> of RNC-related events" and then cite Defendants' 56.1 Statement to support that assertion. Schiller Brief at p. 5 (citing Defs' 56.1 at ¶¶ 165-71) (emphasis added). Plaintiffs' entire argument challenging the "scope" of the Policies can be dismantled because neither Defendants' Brief nor the record as set forth in Defendants' 56.1 Statement remotely suggests that the Policies were directed at some nebulously defined or "broad range" of unlawful activities or events.

Instead, the record establishes that the Policies were specifically and narrowly directed at the types of illegal conduct anticipated by the intelligence provided. Defs' Reply 56.1

---

[10] Plaintiffs have obviously abandoned their argument that this information was "manipulated" or "distorted" and Defendants should be granted summary judgment on any remaining claims based on that theory of liability. *See* authority cited in Section I *supra*.

at ¶¶ 32-135, 165-226.  Moreover, the NYPD decision makers believed that the Policies served their interests in preserving order and public safety by addressing the threats identified.  *See* Defs' Brief at pp. 21-30, 31-34.  The fact that the threats encompassed, and the Policies addressed, unlawful conduct that was likely to occur at RNC demonstrations does not magically transform the Policies into ones directed at First Amendment activity; the Policies were designed to address security and safety issues likely to arise during the RNC, not demonstrations *per se*. As long as conduct was lawful, demonstrations were permitted to continue unabated, and only <u>unlawful conduct</u> triggered the Policies.

In an attempt to color their contention that the Policies "singl[ed]out demonstrations" (Schiller Brief at p. 1) and were "targeted at and implemented solely against individuals engaged in political protest during the RNC" (MacNamara Brief at p. 1), Plaintiffs cite to the fact that: (i) the Policies "applied" in all five boroughs, including the "farthest corner of the Bronx" (ii) were applied in an isolated case of a single individual standing on the sidewalk; and (iii) that the NYPD's Quality of Life ("QOL") Team issued summonses in the geographical vicinity of Madison Square Garden or other locations where RNC delegates congregated during the Convention.  Schiller Brief at 1, 2, 4-5; MacNamara Brief at 1-5.  These facts are immaterial and are presented in a misleading manner.  *See* Defendants' Responsive Schiller Facts at ¶¶ 13-15, 19-20, 23, 25, 27, 28-71.

First, whether the Policies applied city-wide is immaterial to their constitutionality because as Chief Esposito explained the Policies were adopted and implemented

based on the intelligence information and would apply wherever that type of unlawful conduct occurred.[11]  Defs' Responsive Schiller Facts at ¶ 17;  Defs' Reply 56.1 at ¶¶ 46-135, 173-226.

Second, the evidence Plaintiffs highlight regarding an isolated case about a single individual being subject to the Policies who was arrested for disorderly conduct while blocking the sidewalk outside a Hummer Dealership during the RNC does not undermine the rationales. Defs' Responsive Schiller Facts at ¶ 18.  Indeed, disorderly conduct directed at shutting down businesses or disrupting the City was the type of unlawful conduct identified by the intelligence for which the Policies were implemented to address.  The fact that the Policies were applied to a single individual engaged in such conduct does not cast doubt on the reasons the Policies were adopted.

Third, Plaintiffs' arguments regarding the enforcement efforts of the Quality of Life Team are also irrelevant and immaterial to the legal question before this Court.  Plaintiffs attempt to suggest some insidious discrimination against RNC demonstrators or the RNC arrestees subject to the Policies by drawing a comparison to facts regarding the QOL Team's issuance of summonses for a range of minor offenses including disorderly conduct.  Schiller Brief at p. 1-2, 5-6; MacNamara Brief at p. 2-5, 7-8, 15-16.  The fact that QOL summonses were issued, even in proximity to Madison Square Garden, has nothing to do with whether the Policies were constitutional under the First, Fourth or Fourteenth Amendments.  That is because, as Chief Esposito explained, the enforcement efforts of the QOL Team were not focused on addressing the type of illegal conduct that was considered to be "directly related to the RNC."  Defs'

---

[11]  Chief Esposito explained that the "RNC-related [illegal] conduct" that subjects someone to the Policies was based on the intelligence information, which was focused on the individuals coming to the RNC to engage in unlawful acts and was not geared at for example "a fellow who is, or a gal who is drinking a beer at Yankee Stadium."  Defs' Responsive Schiller Facts at ¶ 17; Defs' Reply 56.1 at ¶¶ 165-172.

Responsive Schiller Facts at ¶ 19.  Moreover, the "vast majority" of the people committing these offenses were "vendors" and "peddlers" who would have been in their respective locations without regard to the Convention being in town.  Defs' Responsive Schiller Facts at ¶ 19. Furthermore, many of these vendors worked at the same locations for many years and were known to the QOL Team issuing them summonses.  *Id.*  This presents a dramatic contrast to the serious threats posed by the individuals who were believed to have descended upon New York City and the Convention for the sole purpose of committing unlawful acts in an effort to disrupt the business of the City and the RNC.  Defs' Reply 56.1 at ¶¶ 96-97, 101-120.  Chief Esposito further explained that the reason the Policies did not apply to QOL offenses was based on "fairness" because the intelligence the NYPD obtained did <u>not</u> suggest these individuals posed the threats the Policies were directed to address. *Id.*[12]  Therefore, Plaintiffs' "evidence" actually bolsters the argument in Defendants' Brief that the Policies were narrowly tailored, were directed at the threats identified by the intelligence and did not unnecessarily burden speech or expression.  Defendants' Brief at p. 31-34.

> An additional flaw in Plaintiffs' reliance on the QOL evidence, which is cited in order to create the inference that those not engaged in political expression were treated differently, is that this evidence is <u>devoid</u> of one critical detail – whether or not the people issued summonses by the QOL Team were exercising their First Amendment rights when they received the purported benefit of a summons and were not fingerprinted.  Indeed, Plaintiffs can <u>never</u> establish this necessary fact because the evidence they proffer -- charts and statistics -- does not

---

[12] The arguments in the MacNamara Brief that Chiefs McManus and Colgan could not explain in their depositions, which occurred years after the RNC, the distinction between the application of the Policies to RNC-Related unlawful acts at the exclusion of QOL offenses is irrelevant. MacNamara Brief at pp. 4-5.  Neither McManus nor Colgan were the policy makers or the primary consumers of the intelligence information that bore upon the adoption of the Policies. Responsive MacNamara Facts at ¶¶ 13-20; Defs' Reply 56.1 at ¶¶ 43-45, 50-51, 149-160.

indicate the individual circumstances under which the QOL summonses were issued.  *See* Declaration of Christopher Dunn, Exs. E-F.  Therefore, Plaintiffs' reliance on that information is flawed and any inference of selective treatment must be rejected.  It is also noteworthy that the only purported relevance this type of comparative evidence could have is within the confines of Fourteenth Amendment equal protection jurisprudence, a claim which is specifically abandoned in the Schiller Brief (Schiller Brief at p. 12, n. 4) and not comprehensively addressed in the MacNamara Brief.  Nevertheless, Plaintiffs seek to conflate a proper legal analysis under the First Amendment by interposing this information without citing a case or offering any explanation as to its relevance to the "strict scrutiny" standard they suggest as an appropriate framework.  *See also*, Section V, *infra* (discussing First Amendment standards).

## IV.   PLAINTIFFS' ARGUMENTS THAT THE POLICIES ARE NOT BASED ON THE INTELLIGENCE ARE UNSUPPORTED BY THE COMPELLING FACTUAL RECORD.

Plaintiffs' next argument in opposition is that although it is undisputed that vast amounts of intelligence was gathered and provided to Chief Esposito and Commissioner Kelly, the intelligence had nothing to do with their adoption of the Policies.  Plaintiffs instead argue that the Policies were adopted "without deliberation" as a simple "reiteration" of similar policies adopted for prior events.  *See generally* Schiller Brief at pp. 8-12, 16-18, MacNamara Brief at pp. 2-3.

In support of this theory, Plaintiffs point to the following: (i) that Commissioner Cohen did not participate in the decision to adopt the Policies and was unaware of their existence until after the RNC; (ii) the Policies were "adopted" in April 2004 as a reiteration of past no summons policies used at prior demonstrations and not on the eve of the RNC as explained by Chief Esposito; (iii) that the intelligence which informed the adoption of the Policies should be limited to the End User Reports; (iv) the End User Reports do not support Commissioner

Cohen's threat assessment; (v) that Chief Esposito's deposition testimony regarding the reasons the Policies were adopted should be disregarded; and (vi) that the threats of summons ineligible "crimes" did not inform the adoption of the Policies.  Schiller Brief at pp. 1-12 MacNamara Brief at pp. 1-3.  None of these arguments or purportedly material facts defeat summary judgment because they are unsupported by both logic and the record or are otherwise immaterial to the issues on this motion.

### A.   Commissioner Cohen *Did* Play A Critical Role In The NYPD's Planning For The RNC: He Provided The Intelligence That Informed Policy Making.

Plaintiffs' suggestion that neither Commissioner Cohen nor the intelligence he gathered played any role whatsoever in the adoption of the Policies flies in the face of both the undisputed record and logic.  Rather than citing evidence which supports this contention, Plaintiffs point to the fact that Commissioner Cohen did not participate in discussions with Chief Esposito and Commissioner Kelly about the adoption of the Policies and was also unaware that they were implemented until after the Convention.

First, Plaintiffs' reliance on Commissioner Cohen's testimony in no way disputes Chief Esposito's undisputed testimony that he based the Policies on, *inter alia*, information provided by Commissioner Cohen.  Second, the fact that Commissioner Cohen testified that he does not recall being involved in a discussion about the Policies or was aware of their implementation is irrelevant considering his clearly defined role within the NYPD's Intelligence Division and the very specific role he played with respect to planning for the RNC.  Defs' Reply 56.1 at ¶ 21-22.  Indeed, Commissioner Cohen was not tasked with making policy decisions; instead his role was to serve as a conduit of information regarding threats to public safety facing the City and the Convention – critically all undisputed facts.  Defs' Reply 56.1 at ¶¶ 21-24. Commissioner Cohen's background is intelligence and not "policing."  He worked at the CIA for

35 years before joining the NYPD.  Defs' Reply 56.1 at ¶¶ 22.  What this meant during the RNC was that Commissioner Cohen provided the information and Chief Esposito and Commissioner Kelly decided what to do with that information.  Defs' Reply 56.1 at ¶¶ 149-160, 165-173. Accordingly, it is not surprising that Commissioner Cohen, whose responsibilities centered on intelligence gathering, does not recall know the Policies were implemented or recall discussions about them.

**B.    Plaintiffs Argument That The Policies Were "Adopted" in April 2004 as a Reiteration of Prior Similar Policies Used at Demonstrations is Irrelevant, Misdirected And Erroneous.**

Plaintiffs' arguments that the decision to "adopt" the Policies was made in April 2004, "without deliberation" as a reiteration of no summons policies that had been utilized in the past is unsupported by evidence in the record.  *See generally,* Schiller Brief at pp. 1-2, 8-10, MacNamara Brief at p. 2-3.  First, Plaintiffs' argument is based on a false premise that "no summons policies" are always used at demonstrations in New York City.  To the contrary, Chief Esposito testified that he could only recall a few demonstrations at which a no summons policy was decided on prior to the event.  Defendants' Responsive Schiller Facts at ¶¶ 10, 13-15, 29. He further explained that a no summons policy would <u>always</u> be based on intelligence information and that when intelligence regarding an event or demonstration does not support the adoption of such a policy it is not implemented.  *Id.*  Moreover, in recent years and since the 9/11 terrorist attacks, there have been dozens – if not hundreds – of demonstrations in New York City every year, and there is no evidence in the record that a no summons policy was used at any of those events.

Second, the evidence Plaintiffs seek to rely upon to establish when the Policies were "adopted" – an internal memoranda <u>not</u> authored by the final decision makers with authority to "adopt" the Policies – is not evidence of a final decision.  Schiller Facts at ¶ 23; Defs' Reply 56.1

at ¶ 156.  Rather, Chief Esposito testified that the decisions regarding the Policies were an "evolving process."  Defs' Reply 56.1 at ¶¶ 154-55.  From the moment any suggestion was made to adopt the Policies, that suggestion was subject to revision by Commissioner Kelly and Chief Esposito throughout the entire time period between the planning for the RNC and the "implementation" of the Policies (when the first RNC arrestee was denied a summons).  Defs.' Reply 56.1, ¶ ¶ 149-160. Moreover, as a matter of law, the Court should look to the date of implementation, not the date of "adoption."  That is because the operative period for determining whether a constitutional violation occurred in a Section 1983 litigation is <u>not</u> when a policy or decision was made but when it was implemented.[13]  Here, the Policies were not implemented until the RNC began – in late August of 2004.  Defs' 56.1 at ¶¶ 157-160.  Thus, any consideration of when the decision was first adopted is not material.   In any event, as demonstrated below, Plaintiffs' alleged April 2004 date does not matter because as of that time there was ample support for the Policies.

## C.  The Intelligence Information Was Not Limited To The End User Reports.

Plaintiffs seek to limit the record regarding the rationales and information that informed the adoption of the Policies by suggesting that the End User Reports are the single

---

[13] *See National R. Passenger Corp. v. Atchison, T. & S. F. R. Co.*, 470 U.S. 451, 466 (1985) ("Policies . . .are inherently subject to revision and repeal."); *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 61 (2d Cir. 1992) (constitutional challenges are generally not ripe until a policy is formally adopted and implemented).  In the First Amendment context, a controversy is ripe when a plaintiff suffers a "threatened or actual injury."  *Osborne v. Fernandez*, 2009 U.S. Dist. LEXIS 27409, (S.D.N.Y. 2009) (citing *Brooklyn Legal Servs. Corp. v. Legal Servs.*, 462 F.3d 219, 226 (2d Cir. 2006)).  Even then, Plaintiffs lack standing to challenge a policy that is discretionary and subject to continual revision prior to implementation based on a variety of circumstances.  Indeed, under Section 1983, a defendant can only be held liable if "the action that is alleged to be unconstitutional <u>implements or executes</u> a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Anthony v. City of New York,* 339 F.3d 129, 138-139 (2d Cir. 2003) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978)) (emphasis added).

source of information the Court should consider in determining whether Defendants' asserted justifications for the Policies supported the threat assessment presented by Commissioner Cohen. *See* Schiller Brief at pp. 2, 9-12; MacNamara Brief at pp. 2.

First, no interpretation of the record (even one construing facts in Plaintiffs favor) supports the fact or even a reasonable inference that the body of intelligence presented to Commissioner Kelly and Chief Esposito was limited to the 600 pages of End User Reports. Indeed, the record is replete with testimony from Chief Esposito and Commissioner Cohen alike that during the <u>approximately 18 months</u> dedicated to planning for the RNC, there were <u>numerous</u> meetings and briefings specifically addressing the threat assessment the City faced during the RNC. Indeed, these meetings began in early 2003 and increased in frequency as the RNC approached. Defs' Reply 56.1 at ¶¶ 1, 13, 21-24, 149-159; Schiller Facts at ¶ 38.

Second, both Commissioner Cohen and Chief Esposito had personal knowledge of the type of spiraling disorder that had plagued other cities that hosted large events and demonstrations like the chaos that shut down the WTO during the 1999 Battle of Seattle and disrupted the Free Trade of the Americas Meeting in Miami. <u>so</u> <u>both</u> Commissioner Cohen and Chief Esposito were aware of the threats revealed there. Defs' Reply 56.1 at ¶¶ 29, 32-40. Finally, Plaintiffs ignore the fact that the types of threats discussed through that process were set out in a presentation by Commissioner Cohen to ranking members of the NYPD before the RNC began (and therefore before the Policies were implemented). Defs' Reply 56.1 at ¶¶ 52-55. Thus, it is undisputed that there were multiple buckets of information that supported the Policies prior to and after April 2004, and right up through the RNC. Accordingly, Plaintiffs' argument must be rejected.

### D.   The End User Reports Supported Commissioner Cohen's Threat Assessment And The Individual Threats.

Plaintiffs further argue that Defendants mischaracterize the End User Reports because "not a single entry" establishes that individuals planning on participating in demonstrations during the RNC was a terrorist, was planning violent acts, would utilize a fraudulent driver's license, would engage in continual unlawful acts, or would seek to thwart criminal prosecution.  Schiller Brief at p. 2, 9-12; MacNamara Brief at p. 2.  This argument fails for at least three reasons.

First, Plaintiffs try to view each piece of evidence in isolation, ignoring the overall environment in which the Policies were adopted and second-guessing the decisions made against that backdrop.  Such Monday-morning quarterbacking should be rejected.  An after–the-fact interpretation of any particular End User Report is both irrelevant and improper.    That is because controlling authority mandates that the government's conclusions about the analysis of threats to public safety must be credited.  *See Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, at 2728 (2010) (when the government is seeking to "prevent imminent harms" in the context of security interests, it "is not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusions."); *see also* Defendants' Brief at p. 30-31.  Here, that means that Chief Esposito's testimony regarding his interpretation of the End User Reports coupled with the threat environment communicated by the Intelligence Department must be credited.[14]  *See United for Peace and Justice v. City of N.Y.*, 243 F. Supp. 2d 19, 26-28

---

[14]  In fact, Chief Esposito specifically explained how the End User Reports impacted the decisions he made to adopt the Policies:

> A. Chris, I think what you're trying to do is to show that one particular document said everything, made us believe everything you just said.  That's not the truth.  It's everything put <u>together</u>.  <u>A lot of these documents don't stand alone.  It's part of the bigger picture. So this perhaps coupled with intel division saying, Hey, they're going to come here and shut down</u>.  What tactic are they going to use?  <u>They are going to resist the GOP by</u>

(S.D.N.Y. 2003) (court gave "great weight" to Chief Esposito's judgment in context of making policing decisions based on safety risks posed by a large scale demonstration and "will not second guess or substitute its judgment for that of the NYPD.").

Second, various RNC Plaintiff themselves admit that the End User Reports "support the conclusion that there were plans for 'widespread' civil disobedience, or that 'plans' for any civil disobedience that were detected through internet searches were 'heavily' publicized."[15]

Third, the Second Circuit has reviewed the End User Reports and found "that the public faced a substantial threat" of disruption and violence during the RNC.   *Dinler v. City of New York (In re City of New York),* 607 F.3d 923, 946 (2d Cir. 2010) (Second Circuit holding that the confidential Field Intelligence Reports reinforced the City's assertion of threats set out in the End User Reports, and finding Plaintiffs thus had no need for the confidential Field Reports).[16]

---

continually doing A, B, C and D. So this may not stand by itself, but this in my mind with other information they have given me equals continuous unlawful activity and shutting down the RNC.
Q. I understand that and I accept it.
A. Do you understand it?
Q. I think I do
A. Do you accept it?
Q. I do.

Defs' Reply 56.1 at ¶ 82. (emphasis added); *see also* Defs' Reply 56.1 at ¶¶ 20, 101, Defs' Responsive Schiller Facts at ¶¶ 46, 62 (identifying specific End-User Reports that informed the decision to adopt the Policies and supported the threat assessment).

[15] *See* Rule 56.1 Counterstatement filed by RNC Plaintiffs in 12 Consolidated RNC Cases and docketed in *Rigby v. City of N.Y.*, 07-cv-7751, Docket Entry No. 82 at ¶ 5, p. 10.
[16] While not relevant to the issue of what the NYPD expected might happen, and by way of example only, Defendants note that, contrary to Plaintiffs' asserted fact, ███████████████████████████████████████████████████████████████████████████████████████████████████████████. *See* Defs' Responsive Schiller Facts at ¶ 74.

**E.  Chief Esposito's Testimony Regarding The Rationales For Adopting The Policies Must Be Credited For Purposes Of This Motion.**

In a transparent, last-ditch effort to remove the compelling evidence in the record establishing that the intelligence of a pervasive tripartite threat informed the decision to adopt the Policies, Plaintiffs argue that the evidence from Chief Esposito's <u>nine day</u> deposition should be essentially disregarded in its entirety because (a) he was not a final policy maker for purposes of making the decision to adopt or implement the Policies; and (b) his credibility is at issue because he was unable to recall certain details of planning meetings in 2003 and 2004 which occurred 2-3 years before his 2006 depositions and 7-8 years before his 2011 depositions.  Schiller Brief at pp. 7-8.  Both of these arguments fail.

First, the fact that Commissioner Kelly is the "final policy maker" and that he ultimately approved a decision does not change the fact that Chief Esposito was present for every step throughout the decision-making process, had personal knowledge of the reasons for its adoption, and was a "principal consumer" of the intelligence that informed the decision to adopt the Policies.  Defs' Schiller Responsive Facts at ¶ 38.   Indeed, Magistrate Judge Francis recognized these exact facts in entering a protective order barring Commissioner Kelly's deposition in this litigation.  *Schiller v. City of New York*, 04-cv-7922, 2006 U.S. Dist. LEXIS 67907, *6-8 (S.D.N.Y. Sept. 20, 2006) (holding that while Commissioner Kelly was "the ultimate decision maker with respect to the policing strategies utilized at the RNC" because "the record indicates that the policies … [including the] decision not to issue summonses … were formulated in consultation with, and on the basis of recommendations made by, the other police officials [including] Chief Esposito [who was] was able to describe the considerations that went into that decision.").   Accordingly, Chief Esposito's testimony regarding the rationales for adopting the Policies is relevant and must be considered.

Second, Plaintiffs argument that Chief Esposito's inability to recall minor details provides a separate basis to discredit or discount his testimony fails because the details that Chief Esposito was unable to recall (*i.e.,* the location and dates of meetings or who attended them) are irrelevant and immaterial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."); *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) ("The existence of disputed facts that are immaterial to the issues at hand is no impediment to summary judgment."); *Beckman v. United States Postal Serv.*, 79 F. Supp. 2d 394, at 398 (S.D.N.Y. 2000) (granting defendants motion for summary judgment and rejecting plaintiffs argument to defeat summary judgment by pointing to disputed facts that were deemed immaterial).  Here, Chief Esposito's inability to recall picayune details about planning meetings many years after they occurred cannot create a dispute sufficient to deny Defendants' motion or create a question of fact regarding his credibility.  That is because Chief Esposito's recollections about the relevant information – <u>why the Policies were adopted and the scope of the intelligence that informed that decision making process</u> – has always been unwavering.  Defs' Reply 56.1 ¶¶ 21-135, 146-226; *see also Schiller v. City of New York*, 04-cv-7922, 2006 U.S. Dist. LEXIS 67907, *6-8 (S.D.N.Y. Sept. 20, 2006) (rejecting Plaintiffs argument that Chief Esposito's "recollection of [RNC planning] meetings [was] too vague" as a basis to compel Commissioner Kelly's deposition because Chief Esposito "was able to describe the considerations that went into th[e] decision" to adopt the no summons policy).  Indeed, Plaintiffs were allowed to depose Chief Esposito for nine days over a nearly 5 year period, resulting in 1987 pages of deposition

testimony during which Chief Esposito's testimony regarding the reasons the Policies were adopted was steadfast.[17]

### F.  The Threat of "Criminal Activity" Such As Continual Unlawful Acts, Violence, Anarchism or Terrorism Did Inform The Policies.

Plaintiffs seek to attack the rationales provided by Chief Esposito for the Policies by citing to out of context testimony from Chief Esposito's nine day deposition.  Specifically, Plaintiffs argue that because Chief Esposito indicated that felonies and misdemeanors are not summons eligible offenses, it is impossible for threats involving offenses of that level to have any bearing upon the decision to adopt the Policies.  Schiller Brief at p. 6, 8-9.  Plaintiffs' argument fails, however, because the fact that certain acts may be "crimes" under the penal law and not subject to a summons does not undermine Chief Esposito's asserted rationales.  Chief Esposito repeatedly explained throughout the nine days he was deposed by Plaintiffs that threats involving felonies and misdemeanors do not occur in a vacuum.  The threats facing the City during the RNC also encompassed a very real potential for spiraling disorder and violence to rapidly unfold during demonstrations triggered by initial acts of civil disobedience and summonsable offenses.  Defs' Reply 56.1 at ¶¶ 38-40, 151, 187.  Chief Esposito also explained that he personally understood the gravity of such a risk and this same concern was communicated to NYPD policy makers by Commissioner Cohen who provided his own analysis of the disorder and chaos that plagued other cities like Seattle, Quebec, Genoa, Cancun, San Francisco and Miami.  *See* Defs' Responsive Schiller Facts at ¶¶ 62.  Therefore, the fact that

---

[17] The Second Circuit recognized that it was "with the help of Commissioner Cohen's analysis and briefing regarding the threats outlined in the End User Reports [that] the NYPD's RNC Executive Committee--consisting of Police Commissioner Raymond Kelly … formed a policing strategy [of] not to issue summonses but to arrest all RNC-related disorderly protestors [and] that all arrestees be fingerprinted to verify the identity of those in custody."  *Dinler*, 607 F.3d 923 at 930 (2d Cir. 2010).

Chief Esposito may have testified that certain criminal acts did not qualify for summonses is not material.

**V.    THE LEGAL ARGUMENTS PRESENTED BY PLAINTIFFS FAIL BECAUSE THEY ADDRESS INAPPLICABLE CONTENT-BASED POLICIES OR POLICIES OF A PROSCRIPTIVE NATURE AND ARE THEREFORE INAPPLICABLE TO "THE POLICIES" AT ISSUE WHICH ARE CONDUCT-BASED.**

    The legal arguments in Plaintiffs' Briefs can be disregarded because they do not apply to the facts of this case and are premised upon a definition of the Policies that is demonstrably false and belied by the undisputed factual record in this litigation.  *See generally*, Schiller Brief at pp. 13-19; MacNamara Brief at pp. 5-15.  Plaintiffs argue that the Policies were content based and should be subject to strict scrutiny under the First Amendment because they singled out for detention and fingerprinting those associated with demonstrations while people who committed similar offenses not associated with demonstrations were not similarly treated. As discussed in detail, *supra*, Plaintiffs' view of the Policies is unsupported by the factual record because the Policies were <u>only</u> triggered if someone committed unlawful conduct of the type that fell within the purview of the tripartite threat assessment.  Nothing in the record suggests that the Policies had anything to do with the content of speech, the singular fact of participating in RNC demonstrations, or that the unlawful conduct that subjected someone to the Policies was based upon any reason other than the intelligence information.  Defs' Reply 56.1 at ¶¶ 166, 170-171, 173.  Plaintiffs' presentation of the Policies is also flawed because it is premised upon a comparison of RNC arrestees to individuals issued summonses by the QOL Team who Plaintiffs imply were not engaged or believed to be engaged in First Amendment activity.  However, as demonstrated previously any evidence supporting such an inference is lacking.

    Finally, Plaintiffs do not even address Defendants' arguments that the threshold burden must be "direct and substantial" or that any burden imposed by the Policies was

incidental considering the fact that there is no evidence in the record that the Policies interfered with the nearly 800,000 demonstrators who exercised their First Amendment rights during the RNC without arrest or being subject to the Policies.  *See* Defendants' Brief at pp. 12-13. Accordingly, Defendants' arguments should be accepted by the Court, i.e., intermediate scrutiny applies.

### A.   Plaintiffs' Reliance On *Tabbaa* To Foreclose Intermediate Scrutiny Is Misplaced.

Plaintiffs erroneously rely on *Tabbaa v. Chertoff,* 509 F.3d 89, 102 (2d Cir. 2007) to argue strict scrutiny under the First Amendment should be the applicable standard here.  In *Tabbaa*, the Second Circuit found that the threshold burden on free association rights was satisfied because "plaintiffs suffered a significant penalty, or disability, <u>solely by virtue of associating</u> at the [Reviving the Islamic Spirit] Conference: they were detained for a lengthy period of time, interrogated, fingerprinted, and photographed when others, who had not attended the conference, did not have to endure these measures."  *Tabbaa*, 509 F.3d at 102.

On the threshold issue as to whether the Policies posed the necessary burden triggering heightened First Amendment review, *Tabbaa* is inapplicable and distinguishable.  That is because in *Tabbaa* the plaintiffs were detained and fingerprinted when crossing the U.S./Canada border <u>because of</u> their association at a conference which intelligence information suggested had insidious ties to international terrorism.  *See id.* at 92-94.  Unlike the *Tabbaa* plaintiffs, RNC arrestees were not subject to fingerprinting and detention because of the simple fact that they attended RNC demonstrations or because there was intelligence suggesting RNC demonstrations may turn disorderly and spiral out of control.  Instead, they were subject to custodial arrest and fingerprinting <u>because</u> they committed unlawful conduct and because that unlawful conduct was of the type forewarned by the intelligence information.  This is a dramatic contrast to an

individual who when passively crossing an international border is stopped, interrogated, fingerprinted and photographed because of the singular fact that they attended a religious conference. Accordingly, Plaintiffs' argument that the Policies did trigger a sufficient burden on First Amendment rights necessary to trigger strict scrutiny or that *Tabbaa* forecloses intermediate scrutiny must be rejected.

### B. Plaintiffs' Reliance On Other First Amendment Jurisprudence Is Also Misplaced.

Plaintiffs argue that the Policies violate the First Amendment by citing legal authority indicating that various statutes, laws, or governmental edicts that somehow proscribe speech or effectively limit speech, expression or association facially violate the First Amendment, violate the First Amendment as applied, or do not past muster under strict scrutiny. *See* Schiller Brief at pp. 16-19; MacNamara Brief at pp. 5-9. By way of example, the Schiller Brief cites *United States v. Nat'l Treasury Emples. Union*, 513 U.S. 454 (1995), in support of the argument that the Policies should be subject to strict scrutiny and that Defendants cannot demonstrate that the Policies addressed compelling governmental interests. Schiller Brief at pp. 16-17. This case however is distinguishable and inapplicable. In *Nat'l Treasury Emples. Union*, the Supreme Court held that a statute banning federal employees from accepting compensation for making speeches or writing articles violated the First Amendment as-applied to those employees because the benefits the statute provided to the government, that the ban was necessary to protect the efficiency of the public service, were speculative and not a reasonable response to the actual or serious harms. *See Nat'l Treasury Emples. Union*, 513 U.S. at 473-477. This case and others cited by Plaintiffs are inapplicable because they address "direct regulation[s] of communication." *Id.* (quoting *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664

(1994).  As discussed herein and in Defendants' Brief, the Policies did not contain any similar or arguably comparable proscriptive component.[18]

Similarly, the cases Plaintiffs rely upon in support of their argument that the Policies were not narrowly tailored do not apply because they address scenarios in which strict scrutiny or a heighted First Amendment review applies to laws or regulations involving prior restraints on speech or direct regulations of expression.  In addition, Plaintiffs do not address whether the Policies satisfy the second prong of the intermediate scrutiny standard, requiring that the governmental interests advanced by the Policies does not burden more speech than necessary. *See* Defendants' Brief at pp. 31-34.  Plaintiffs failure to address this argument warrants summary judgment.

Finally, the MacNamara Brief conflates the standards of First Amendment jurisprudence which apply to their claims.  MacNamara Brief at pp. 5-9.  Despite the distinct arguments in Defendants' Brief (which were framed in response to Plaintiffs' pleadings and contention interrogatory responses) that the Policies neither violated the First Amendment generally nor separately served a distinct basis for a First Amendment retaliation claim, the MacNamara Brief fails to address these arguments individually.  Moreover, the MacNamara Brief fails to address Defendants' argument that the Policies did not pose the necessary "direct and substantial" burden triggering heightened review, fails to argue that intermediate scrutiny is

---

[18] The MacNamara Brief relies upon correspondingly inapplicable authority such as *Speiser v. Randall*, 357 U.S. 513 (1958), where the Supreme Court held that a lower court decision denying veterans tax exemptions on the basis of their refusal to execute an oath affirming they did not advocate the overthrow of the government violated the First Amendment because, *inter alia*, there was no compelling interest to justify suppression of protected speech.  MacNamara Brief at pp. 5-6.  For the reasons articulated above, *Speiser* also has no bearing on the constitutionality of the Policies, which unlike the regulation at issue in *Speiser*, neither compelled speech nor suppressed it.

inapplicable and otherwise fails to posture any clear or coherent framework in which their claims surrounding the Policies should be reviewed by this Court.

Indeed, the MacNamara Brief cites Judge McKenna's decision in *Bryant v. City of N.Y.*, 99-cv-11237, 2003 U.S. Dist. LEXIS 21642, at *39-41 (S.D.N.Y. Dec. 2, 2003) as bearing upon their First Amendment claim.  MacNamara Brief at pp. 6-7.  First and foremost it must be noted that *Bryant* is a case in which the court <u>dismissed</u> plaintiffs' First Amendment claim on summary judgment.  *See Bryant*, 2003 U.S. Dist. LEXIS 21642, at *43 (granting defendants' summary judgment on First Amendment claim alleging an improper motivation behind the decision to deny demonstrator arrestees desk appearance tickets and rejecting plaintiffs' argument challenging the sufficiency of the NYPD's reasons as a pretext for an insidious motive to suppress speech).

Plaintiffs' argument also fails to account for the fact that in *Bryant* the district court applied the First Amendment retaliation standard delineated by the Second Circuit in *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) as applying to a claim that being denied a Desk Appearance Ticket (a particular variety of arrest processing) violated the First Amendment.  *See Bryant*, 2003 U.S. Dist. LEXIS 21642, at *39-41.  In so doing, Plaintiffs' argument fails to consider that under that standard, in order to establish a *prima facie* case of First Amendment retaliation, they must establish a genuine issue of material fact regarding an allegedly improper motive.  Tellingly, Plaintiffs do not point to any evidence in the record of an improper motive or suggesting the Policies were motivated or substantially caused by an exercise of First Amendment activity.  Accordingly, *Bryant* does not support Plaintiffs' theories.

27

C.   **Defendants Are Entitled To Summary Judgment On Plaintiffs' Fourth Amendment Claims.**

The Defendants are entitled to summary judgment on all claims under the <u>Fourth Amendment</u> arising from claims in the MacNamara Brief regarding the Policies.[19]  Plaintiffs arguments in opposition fail because they neither raise any material disputes of fact applicable to the Fourth Amendment's objective reasonableness framework nor effectively discredit the legal authorities Defendants cite which unequivocally establish there is no constitutional right to a summons and that it is not unconstitutional to fingerprint incident to arrest.

The thrust of Plaintiffs' argument in support of their allegations that the Policies violated the Fourth Amendment appears to be that denial of summonses during the circumstances presented to law enforcement during the RNC was unreasonable.[20]  In support of this argument, the MacNamara Brief presents an inaccurate reading of *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001), and inaccurately suggests it stands for the principle that the Supreme Court "declined to adopt a blanket rule that one cannot be arrested for an offense that does not carry jail time."  MacNamara Brief at p. 11.  This argument fails for two reasons.  First, Plaintiffs' citation to *Atwater* in no way supports the inference they ask this Court to make.[21]

---

[19]  The Schiller Brief abandons this claim.

[20]  Plaintiffs also appear to conflate applicable Fourth Amendment jurisprudence with equal protection standards by suggesting the Policies must serve "legitimate governmental interests" or that a comparison to individuals issued summonses who were "not engaged in expressive activity" is somehow relevant in determining Fourth Amendment reasonableness.  MacNamara Brief at p. 11.  Because Plaintiffs' argument is premised on a misplaced understanding of applicable law under the <u>Fourth Amendment</u>, Defendants do not respond to it and it should be rejected.

[21]  In proper context Plaintiff's citation to *Atwater* actually suggests that Fourth Amendment jurisprudence should seek to establish readily administrable rules within which police officers can work (such as the rule that there is no constitutional right to a summons):

But we have traditionally recognized that a responsible Fourth Amendment balance is not well served by standards requiring sensitive, case-by-case determinations of government need, lest every discretionary judgment in the field be converted into an occasion for constitutional review. Often enough, the Fourth Amendment has to be applied on the spur (and in the heat) of the

Indeed, *Atwater* and its progeny clearly establish that custodial arrests for minor offenses are constitutionally reasonable under the Fourth Amendment where the police officers effecting those arrests have probable cause to believe a crime was committed in their presence. *See* Defendants' Brief at pp. 5-8. Second, even assuming *Atwater* can be interpreted as Plaintiffs suggest (which it cannot), it in no way advances Plaintiffs argument because unlike the Texas mother in *Atwater*, the RNC Plaintiffs were arrested for offenses that carry jail terms.[22]

Plaintiffs also fail to substantively address *Virginia v. Moore*, 553 U.S. 164 (2008), or explain how this controlling Supreme Court precedent (establishing that even where a state law mandates issuing a summons a custodial arrest is reasonable under the Fourth Amendment) does not preclude their Fourth Amendment claim. *Id*. at 173-76; *see also* Defendants' Brief at p. 5-6.

Finally, to the extent that Plaintiffs assert that the Policies are a basis for an excessive detention claim (Schiller Brief at p 6; MacNamara Brief at pp. 13-14)., that claim must

---

moment, and the object in implementing its command of reasonableness is to draw standards sufficiently clear and simple to be applied with a fair prospect of surviving judicial second-guessing months and years after an arrest or search is made. Courts attempting to strike a reasonable Fourth Amendment balance thus credit the government's side with an essential interest in readily administrable rules.

*Atwater v. City of Lago Vista*, 532 U.S. 318, 347 (2001); *see also New York v. Belton*, 453 U.S. 454, 458 (1981) (Fourth Amendment rules "ought to be expressed in terms that are readily applicable by the police in the context of the law enforcement activities in which they are necessarily engaged" and not "qualified by all sorts of ifs, ands, and buts").

[22] Participation "in any procession, parade or race, for which a permit has not been issued when required by this section" is punishable by a fine of up to $ 25 or up to 10 days in jail or both (Administrative Code § 10-110 [c]). Disorderly Conduct, N.Y.C.P.L. § 240.20 is a violation, and violations are punishable by a fine of up to $250 (*See* P.L. § 80.05) or up to 15 days in jail (*See* P.L. § 70.15).

be rejected because the Policies are constitutional.  Accordingly, the Court should not consider these facts or arguments.[23]

### D.   The Policies Did Not Violate The Equal Protection Clause.

In the event the Court does not deem Plaintiffs' Fourteenth Amendment Equal Protection claims abandoned (which they have been), Plaintiffs' arguments in the MacNamara Brief suggesting the Policies violated the Equal Protection clause must be rejected.  MacNamara Brief at pp. 15-16.[24]  First and foremost, the inherent weakness of Plaintiffs' equal protection argument is demonstrated by the fact that they fail to commit to whether the Policies should be subject to "some heightened strict scrutiny" or alternatively whether a "rational scrutiny analysis" (i.e. rational basis review) should apply.  *See id.*  Notwithstanding the fact that after seven years of litigating their claims Plaintiffs cannot affirmatively proffer an appropriate framework under which their claims violate the Fourteenth Amendment, Plaintiffs otherwise fail to substantively respond to Defendants' arguments.  Indeed, as discussed in Section I, *supra*, Plaintiffs fail to address Defendants' argument that the 14th Amendment claim coalesces with the First Amendment claim and should be dismissed; fail to offer evidence that they were "similarly situated" to a proper comparative group; and fail to point to any evidence in the record establishing Defendants acted with an impermissible motivation.  Accordingly, Defendants should be granted summary judgment on the Fourteenth Amendment Equal Protection claim.

---

[23] Any facts and arguments regarding the length of Plaintiffs' detentions unrelated to the Policies, are clearly outside the scope of the Court's order for this round of summary judgment briefing.  (Schiller, Docket Entry No. 552).  In any event, the Court can also easily dismiss these claims because excessive detention or "delay for delays" sake is contingent on malice.  And as discussed *supra* and in Defendants' Brief on pages 34-39, the record is devoid of any evidence of malice.

[24] As discussed in Section I infra, the *Schiller/Dinler* Plaintiffs expressly disavowed making this claim and the MacNamara Brief fails to address the argument that Plaintiffs cannot meet its *prima facie* elements.

## VI. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' STATE LAW CLAIMS REGARDING FINGERPRINTING.

Defendants refer the Court to their Memorandum of Law in Opposition to Plaintiffs' Motions for Partial Summary Judgment on Their False Arrest Claims at Church and Fulton Streets and State-Law Fingerprinting Claims (*Schiller*, Docket Entry 597, pp. 21-27) for defendants' arguments about why the early New York cases of *Gow v. Bingham*, *Hawkins v. Kuhne*, and *Fidler v. Murphy* are outmoded, and why those cases do not support the Plaintiffs' claim that an alleged violation of CPL § 160.10 creates a private cause of action for money damages under New York state law.  Here, defendants will focus on Plaintiffs' argument that recognizing such a private right of action would be consistent with the three-pronged test set forth by the New York Court of Appeals in *Sheehy v. Big Flats Community Day, Inc*., 73 N.Y.2d 629 (1989).

Addressing the first prong of the *Sheehy* test, Plaintiffs argue that by virtue of the enactment of subdivision 2 of CPL § 160.10, they are now suddenly within the class of persons for whose benefit CPL § 160.10's predecessor was enacted.  (Schiller Opposing Brief, pp. 22-23).  They reason that because the Legislature was silent on its reasons for adding § 160.10(2) to New York's Code of the Criminal Procedure, "[w]hatever animated the Legislature in 1928 cannot reasonably represent the Legislature's intent in passing subdivision 2 of section 160.10 four decades later." (*Id*., p. 23).  But merely because the Legislature was silent on its reasons for the enactment of CPL § 160.10 does not vitiate its original intention in enacting Code of Criminal Procedure § 940 in 1928 to benefit law enforcement authorities.  Indeed, without knowing the Legislature's intent in enacting CPL § 160.10(2), how can plaintiffs even argue that "[w]hatever animated the Legislature in 1928 cannot reasonably represent the Legislature's intent in passing subdivision 2 of section 160.10 four decades later"? Plaintiffs do not suddenly

31

become a class of persons benefitted by CPL § 160.10 merely because subdivision 2 was added – with no explanation – to the Code of Criminal Procedure in 1970.  If the Legislature in 1970 wanted fingerprinted arrestees to be in the class of persons benefitted by the statute it would have said so.   Indeed, the New York Legislature has amended § 160.10 four times since its codification in 1970 and has never seen fit to create a private cause of action for violation of § 160.10.

As for the second prong of the *Sheehy* test, Plaintiffs argue that recognizing a private cause of action for violation of CPL § 160.10(2) would further the legislative purpose of "preserv[ing] limitations on fingerprinting for individuals arrested for violations." (*Schiller* Opposing Brief, p. 23).   But, the only stated legislative purpose of CPL § 160.10 is for the benefit of the police and thus Plaintiffs cannot show that, even using a "holistic approach" to Article 160, the Legislature  intended to create a right to privacy or a right to be free from assault for any arrestee who could be fingerprinted under CPL § 160.10. Again, Plaintiffs presume a legislative intent that simply does not exist.

Finally, addressing the third prong of the *Sheehy* test, Plaintiffs complain that the existing remedies for a violation of CPL § 160.10 – CPL §§ 160.50 and 160.55 – are inadequate. (Plaintiffs' Opposing Brief, p. 23). Plaintiffs argue that these are not remedies for unlawful fingerprinting at the time it occurs, but rather procedures that depend on the later outcome of a criminal proceeding. Nonetheless, with these Article 160 provisions, the Legislature has already "made express provision for civil remedy, *albeit a narrower remedy than plaintiffs might wish."* *Sheehy,* 73 N.Y.2d at 636. (emphasis added).

In sum, there is no private cause of action under New York state law for violation of CPL § 160.10, nor should this Court create one.  For these reasons, and for the reasons set

forth in defendants' Memorandum of Law in Opposition to Plaintiffs' Motions for Partial Summary Judgment on Their False Arrest Claims at Church and Fulton Streets and State-Law Fingerprinting Claims, dated November 3, 2011, this Court should grant defendants' motion for summary judgment on Plaintiffs' state-law fingerprinting claim, and deny Plaintiffs' summary judgment motion.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court grant Defendants' motion for summary judgment dismissing Plaintiffs' claims regarding the Policies, and award Defendants costs, fees and such other and further relief as the Court deems just and proper.

Dated:  New York, New York
          November 23, 2011

Respectfully submitted,

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
*Attorney for Defendants*

By:          _____/s/_____
                Jeffrey A. Dougherty
                Peter G. Farrell
                Fred Weiler
                Special Federal Litigation Division
                100 Church Street, Room 3-143
                New York, New York 10007
                Tel:     212-788-8342
                Fax:    212-788-776
                jdougher@law.nyc.gov

## Appendix A To Reply Brief

## Reply Submitted in 44 RNC Consolidated Cases

Defendants submit this reply brief in connection with their summary judgment motion in the following forty-four ("44") Consolidated RNC Cases: *Abdell v. City of New York,* 05-cv-8453; *Adams v. City of New York* 05-cv-9484; *Araneda v. City of New York* 05-cv-9738; *Bastidas v. City of New York* 05-cv-7670; *Bell v. City of New York*, 05-cv-3705; *Biddle v. City of New York* 05-cv-1570; *Botbol v. City of New York* 05-cv-1572; *Bunim v. City of New York* 05-cv-1562; *Coburn v. City of New York* 05-cv-7623; *Cohen v. City of New York* 05-cv-6780, *Concepcion v. City of New York* 05-cv-8501; *Crotty v. City of New York,* 05-cv-7577; *Dinler v. City of New York* 04-cv-7921; *Drescher v. City of New York* 05-cv-7541; *Dudek v. City of New York* 04-cv-10178; *Eastwood v. City of New York* 05-cv-9483; *Epstein v. City of New York* 05-cv-1563; *Galitzer v. City of New York* 05-cv-7669; *Garbini v. City of New York* 05-cv-1565; *Greenwald v. City of New York* 05-cv-1566; *Grosso v. City of New York* 05-cv-5080; *Jusick v. City of New York* 07-cv-7683; *Kennedy v. City of New York* 07-cv-7678; *Lalier v. City of New York* 05-cv-7580; *Lee v. City of New York* 05-cv-5528; *Macnamara v. City of New York* 04-cv-9216; *Manders v. City of New York* 07-cv-7752; *Meehan v. City of New York* 05-cv-5268; *Moran v. City of New York* 05-cv-1571; *Pagoda v. City of New York* 05-cv-7546; *Phillips v. City of New York* 05-cv-7624; *Pickett v. City of New York* 05-cv-1567; *Portera v. City of New York* 05-cv-9985; *Rigby v. City of New York* 07-cv-7751; *Ryan v. City of New York* 05-cv-1564; *Schiller v. City of New York* 04-cv-7922*; Sikelianos v. City of New York* 05-cv-7673*; Sloan v. City of New York* 05-cv-7668; *Starin v. City of New York* 05-cv-5152; *Stark v. City of New York* 05-cv-7579; *Tikkun v. City of New York* 05-cv-9901; *Tremayne v. City of New York* 05-cv-1568; *Winkleman v. City of New York* 05-cv-2910; and *Xu v. City of New York* 05-cv-7672.  Defendants note they did not identify either, *Bell,* or *Starin* in their Notice of Motion (*Schiller* Docket Entry No. 578) or identify them in their moving brief because based on their pleadings and contention interrogatory responses it did not appear they were making these claims.  However, the *Bell* and *Starin* plaintiffs have opposed Defendants' motion.  *See Bell* Docket Entry No. 129.  To the extent the Court construes the pleadings in these cases or in *any other* Consolidated RNC Cases to state any of the claims addressed herein, Defendants submit that *any* decision by this Court should be equally applicable in all RNC cases.

## RNC Consolidated Cases Which Joined Schiller Brief & MacNamara Brief

Plaintiffs in the following twenty-four ("24") Consolidated RNC Cases sought to adopt the arguments posed in the Schiller and MacNamara Briefs by incorporating them by reference: *Bastidas v. City of New York,* 05-cv-7670*; Bell  v. City of New York*, 05-cv-3705; *Botbol v. City of New York* 05-cv-1572; *Coburn v. City of New York,* 05-cv-7623*; ; Cohen v. City of New York,* 05-cv-6780; *Concepcion v. City of New York,* 05-cv-8501*; Crotty v. City of New York* 05-cv-7577; *Drescher v. City of New York*, 05-cv-7541*;Dudek v. City of New York,* 04-cv-10178; *Galitzer v. City of New York,* 05-cv-7669*; Grosso v. City of New York,* 05-cv-5080; *Jusick v. City of New York* 07-cv-7683*; Lee v. City of New York,* 05-cv-5528*;  Manders v. City of New York,* 07-cv-7752*; Moran v. City of New York* 05-cv-1571; *Phillips v. City of New York,* 05-cv-7624*;

*Rigby v. City of New York*, 07-cv-7751*; Sikelianos v. City of New York*, 05-cv-7673*; Sloan v. City of New York*, 05-cv-7668*; Starin  v. City of New York*, 05-cv-5152*; Stark v. City of New York* 05-cv-7579*;  Tikkun v. City of New York*, 05-cv-9901*; Winkleman v. City of New York*, 05-cv-2910*; Xu v. City of New York*, 05-cv-7672*.

## RNC Consolidated Cases Which Did Not Oppose Defendants' Brief Or Join In Opposition Briefs

Defendants' motion for summary judgment regarding the Policies was completely unopposed in the following <u>seventeen ("17") Consolidated RNC Cases</u>: *Abdell* v. *City of New York* 05-cv-8453*; Adams v. City of New York 05-cv-9484; Araneda v. City of New York* 05-cv-9738; *Biddle v. City of New York* 05-cv-1570; *Bunim v. City of New York* 05-cv-1562; *Eastwood v. City of New York* 05-cv-9483; *Epstein v. City of New York 05-cv-1563; Garbini v. City of New York* 05-cv-1565*; Greenwald v. City of New York* 05-cv-1566; *Kennedy v. City of New York* 07-cv-7678; *Lalier v. City of New York* 05-cv-7580; *Meehan v. City of New York* 05-cv-5268; *Pagoda v. City of New York* 05-cv-7546; *Pickett v. City of New York* 05-cv-1567*; Portera v. City of New York* 05-cv-9985; *Ryan v. City of New York* 05-cv-1564*;* and *Tremayne v. City of New York*  05-cv-1568.