1    C5V0RNCA(correctedx2)          Argument

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------x
     DINLER, et al,
4
                    Plaintiff,
5
                v.                           04 CV 7921
6
     CITY OF NEW YORK, et al,
7
                    Defendant.
8
     ------------------------------x
9                                            New York, N.Y.
                                             May 31, 2012
10                                           3:30 p.m.

11   Before:

12                   HON. RICHARD J. SULLIVAN,

13                                           District Judge

14                          APPEARANCES
     For Plaintiff:
15
     CHRISTOPHER T. DUNN
16   NEW YORK CIVIL LIBERTIES UNION

17   MICHAEL L. SPIEGEL

18   JONATHAN C. MOORE
     BELDOCK LEVINE & HOFFMAN LLC
19   JEFFREY ADAM ROTHMAN

20   For Defendant:

21   PETER GERARD FARRELL
          NEW YORK CITY OFFICE OF THE CORPORATION COUNSEL
22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

1          (Case called, in open court)

2          THE COURT:  All right.  My preference would be to have

3    everybody have a seat if we can, so try to find a seat.  Great,

4    thanks.

5          All right.  We are here on the parties' motions for

6    summary judgment, which is a mountain of material.  And I

7    was tempted to just stack it to see how high it went, but I

8    didn't have the insurance for it, so.  And then there's hours

9    of video footage.  I have been through it all.  It's a lot of

10   material, even though this is an abbreviated motion, really,

11   for summary judgment on issues that the parties believed would

12   sort of help get the ball rolling and were sort of the clearest

13   examples as to why summary judgment was appropriate.

14         So I have looked at those materials, I have received

15   correspondence from the parties as to how we're going to divide

16   up the argument today.  Got my chess clock, you each get an

17   hour.  And I'm going to stick to it, just because I think we

18   could go all night, otherwise.  So I am going to hold you to

19   it, so be strict.  If you are dividing up arguments, make sure

20   that you stick by your deadlines, because otherwise you are

21   taking from others.

22         So, remind me of how we're gonna do this.

23         MR. DUNN:  Your Honor, I'm going to start, and then

24   Mr. Spiegel is going to go, and then Mr. Moore.

25         THE COURT:  Okay.  And do you have time?

```
1                MR. DUNN:  We're going to take about 40 minutes of our

2    time now on the cross-motions on the false arrest claims.  And

3    we'll reserve 20 minutes for response on those motions, as well

4    as the no summons policy.

5                THE COURT:  All right, so 40 now, and then 20 as

6    rebuttal?

7                MR. DUNN:  Yes.

8                THE COURT:  For the City?

9                MR. FARRELL:  We are going to address our -- we moved

10   at the same time on the two arrest locations, so we'll address

11   our motions, as well as proposed plaintiffs' motions on Church

12   and Fulton and 16th Street, and we will then go directly into

13   our motion on the no summons and fingerprint policy.  And my

14   intent is to reserve either 5 or 10 minutes of that time so

15   that we will have a final rebuttal.

16               THE COURT:  All right.  And I think that's fair, since

17   they're the only ones moving, there's not cross-motions for the

18   ones you are reserving on.

19               Okay.  All right, I have got the court security

20   officers here since we have a number of people standing.  I

21   want to make sure that's all right.  I have additional chairs

22   in the jury room that we can use.  Should we take a minute to

23   do that?

24               THE MARSHAL:  Yeah.

25               THE COURT:  Thank you.  If I had known it was going to
```

1   be this many folks, I might have arranged for a larger

2   courtroom.

3          Thanks.

4          (Pause)

5          MR. FARRELL:  While waiting for that, I just wanted to

6   ask the Court to make sure that you received our letter

7   regarding the Bernini case out of the Eight Circuit that we

8   sent in after the summary judgment motions were fully

9   submitted.  That case was just decided in the beginning of

10  2012.

11         THE COURT:  I'm all over it.   I'm all over it.

12  Nothing happens in the Eighth Circuit, that I don't know.

13         Okay, are we ready?

14         All right.  So, Mr. Dunn, you are going to lead off?

15         MR. DUNN:  I am.

16         Good afternoon, your Honor.  This is moment that has

17  been a long time in coming.  But the passage of time has done

18  nothing to diminish the importance of the issues before you

19  today.  With over 1800 arrests at the Republican National

20  Convention of 2004, that stands as the largest number of

21  arrests in American presidential convention history.

22         We are here, today, to talk about the two largest mass

23  arrests in 2004 that involved nearly 600 people at Fulton and

24  East 16th Street.  And those arrests, your Honor, sent a very

25  loud and destructive message.  And that message was, if you

1    were a protestor, if you were a legal observer, if you were a

2    journalist covering a protest, if you were a member of the

3    public watching a protest from a public sidewalk, or you were

4    just a bystander in the vicinity of the protest, you could be

5    summarily swept up by the police, arrested, handcuffed,

6    fingerprinted, in some instances held for days, having done

7    nothing wrong.

8            And we are here, today, to ask you to send an equally

9    powerful message that when police officials act unreasonably

10    and they violate the Constitution, they will be held

11    accountable in federal court and, hopefully, that this message

12    will be heard loudly and clearly by protestors in the future,

13    and by police commanders in the future.

14            THE COURT:  All right, on tapes, I heard some

15    protestors saying:  I don't need a permit, the only permit I

16    need is the Constitution.

17            Do you agree with that?

18            MR. DUNN:  In many instances, I absolutely agree with

19    that --

20            THE COURT:  Do you agree with that at Fulton Street?

21            MR. DUNN:  Absolutely.  New York City, you do not need

22    a permit to march on the sidewalk, but you do not need to reach

23    that.  Because we win, regardless of whether or not a permit

24    was required, because a permit was granted.  But I will --

25            THE COURT:  And with respect to East 16th Street, are

1    you suggesting everybody was on the sidewalk?

2              MR. DUNN:  No, your Honor.

3              THE COURT:  No.

4              MR. DUNN:  I'm not suggesting that at all.

5              THE COURT:  Did they have a permit there?

6              MR. DUNN:  There was no permit there.

7              THE COURT:  And are you suggesting that the

8    Constitution was the only permit that was needed to parade in

9    street with a band and with dancing and --

10             MR. DUNN:  No, your Honor, that's not the issue on

11   East 16th Street.  The issue on East 16th Street is, and it's

12   undisputed, the police sent a large group of people who were in

13   the street -- regardless of what you may think of that -- in

14   the street, into a bustling city block on a summer evening that

15   hundreds of people on it, who had nothing to do with that

16   event.  And they sealed off both ends of the block.  And

17   someone, for instance, like our client, Dinler, who was just

18   completely emblematic of other people, she's just walking down

19   the block.  She tries to get out at each end, she cannot get

20   out.  She ends up essentially having a panic attack and

21   collapsing in the street and is taken to a hospital.  She

22   didn't need a permit to be walking down East 16th Street to go

23   to work.  And the people who were watching that event from the

24   sidewalk didn't need a permit to be watching it.  And the

25   problem with East 16th Street is, whatever you may think about

1    some of the people who went into the street initially, there

2    were a huge number of people who anyone would recognize were

3    completely law-abiding people who just happened to be on a City

4    block on a summer evening.  So if I can, let's turn to the law,

5    because we are obviously going to get to that.  The way we

6    structured this is I'm going to talk about the law with

7    respect -- that covers both locations.  Mr. Spiegel will talk

8    about Fulton Street.  Mr. Moore will talk about East 16th

9    Street.  As you mentioned, you have had a lot of materials

10   thrown at you.  And I recognize that, from prior dealings with

11   you, you will be the most prepared person here in the room --

12           THE COURT:  I don't know that, it's a big room.

13           MR. DUNN:  I know that.  And our goal here is to show

14   you the simple, clear path we have to summary judgment.  And it

15   starts with the recognition, we had damage claims here.

16           The defendants have asserted qualified immunity.  So

17   the ultimate issue you have to decide is whether or not a

18   clearly established right was violated.  And to be clear, the

19   right that we claim was clearly established as law in 2004 was

20   the right for an individual not to be arrested without

21   individual probable cause, regardless of whether or not they

22   were in the vicinity of unlawful activity.

23           And I don't think anyone disputes that right was

24   clearly established at the time.  And in conjunction with that,

25   the City bears the burden, since these were warrantless arrests

1    of proving probable cause.  It's their burden.

2              So then we go back to the premise we started with

3    about a year ago with you.  It's undisputed the City can say

4    nothing about any unlawful activity about any of the

5    plaintiffs. There are court orders to that effect in all of the

6    cases.

7              THE COURT:  Just so we are clear, Judge Francis made,

8    you know, issued an order in which he made it clear that the

9    City was offering no law enforcement witness --

10             MR. DUNN:  No.

11             THE COURT:  -- who can testify to that.

12             But let me just focus on what Judge Francis said.

13             MR. DUNN:  Okay.

14             THE COURT:  But he didn't foreclose the ability to

15   introduce evidence.

16             MR. DUNN:  Well, I have got -- the order in our case,

17   for instance, says:  Defendants have no personal knowledge of

18   plaintiff's actions, this includes any member of the NYPD.

19             THE COURT:  Uh-huh.  But I mean so this is Judge

20   Francis' order from November 28, 2006 in MacNamara, Abdell and

21   Adams to say: Defendants are deemed to have admitted that with

22   respect to each plaintiff in those three cases, they cannot

23   identify any member of the NYPD who has personal knowledge of

24   individual conduct of that plaintiff which served as the basis

25   for that plaintiff's arrest.  This does not preclude the

1   defendants from presenting evidence that a plaintiff was within

2   a group of individuals allegedly engaged in unlawful activity,

3   or from arguing that such evidence is sufficient to demonstrate

4   probable cause.

5           It's that last sentence that I'm not sure exactly what

6   he had in mind.  But I think if I have a hunch, I think it's to

7   talk about a group probable cause as a theory.

8           MR. DUNN:  Yes.

9           THE COURT:  But it might also be about whether or not

10  there is, perhaps, you know, a video that shows a particular

11  person clearly -- clearly engaging in unlawful conduct that

12  would constitute probable cause for that individual.

13          MR. DUNN:  Your Honor, it may be that he allowed that.

14  I know that in our case, and I think it's true in most cases,

15  he ordered that the City had no knowledge about any actions by

16  the individual.  And I grant you, recognizing they can say they

17  were there -- and of course they were there.  But the point is

18  that we are starting from the premise -- and I think for the

19  purposes of summary judgment, it is certainly true that the

20  City doesn't have any information about any individual unlawful

21  activity by any of the plaintiffs.

22          Normally, that would be the end of the discussion.

23  Normally, plaintiff would win.

24          THE COURT:  But they have attached videos.  I have

25  seen people parading on the street, right?  If I conclude they

1   were parading without a permit, that's evidence of unlawful

2   activity, right?

3          MR. DUNN:  That may well be, and if they can identify

4   specific people on specific videos who were doing that, that

5   takes us out of the premise of these motions.

6          As you may recall, the premise of these motions -- and

7   it is certainly true with the plaintiffs in our cases and I

8   believe it is true in most cases, is the City, in fact, through

9   video or anything else, has no ability to identify particular

10  individuals who engaged in unlawful activity.  But more

11  importantly, for any individual plaintiff can't say that that

12  person was doing something unlawful.

13         THE COURT:  All right.  Well, I'll hear what the City

14  has to say about that, because I do think there is a certain

15  amount of interpretation of Judge Francis' order in one or more

16  of the cases that might be worth hearing about.  But you're

17  basically saying, I think, that there is no group probable

18  cause theory that can be proceeded upon.

19         MR. DUNN:  That's right.  They want to proceed on a

20  group probable cause theory.

21         THE COURT:  Which the DC Circuit and now the Eighth

22  Circuit have recognized.  To a point.

23         MR. DUNN:  Well, let's be very careful about that.

24         THE COURT:  To a point.

25         MR. DUNN:  Okay.  To a point.  Okay.

1          First, the Supreme Court has never recognized that.

2     The Second Circuit has never recognized it.  In fact, it

3     rejected it in the one case where it was raised, which is Jones

4     vs. Parmley.  There are the other two cases you mentioned,

5     there's a DC Circuit case Carr, another Circuit case, Bernini,

6     that's what the City hangs its hat on.  And the question is, is

7     what happened here the same thing as what happened there.  And

8     I think, clearly, the answer to that is no.  Carr, and I know

9     that you --

10          THE COURT:  The answer to, what, is no?

11          MR. DUNN:  Whether or not what happened here is the

12     same thing that happened in those two cases.

13          In Carr, as I'm sure you know, we have an actual riot

14     happening.  We have people lighting things on fire, throwing

15     rocks through bank windows, throwing rocks through police

16     cruiser windshields.  There's a police officer affidavit that

17     identifies every single person in the crowd as engaging in

18     unlawful activity.  They were steered into an alley, late at

19     night, that is otherwise secured, and they arrest people.  And

20     they charge them with a rioting offense.

21          Similar situation in Bernini, with one twist that is

22     relevant.  Rioting happening.  They identify a discrete group

23     of people.  They then chased them into a space where there are

24     other people, to be sure.  They then spent a lot of time

25     separating the other people.  They ended up taking 200 people

1   out of that group and they are left with 160 arrestees.

2   Neither of those cases changes the core Fourth Amendment

3   principle that you have to have individualized probable cause

4   for every person who gets arrested.  They just described a

5   unique or very narrow set of circumstances in which you can do

6   that by relying upon information about a group.  And there,

7   which you had, was you have to have.  First, you have to have

8   an assembly-type offense.  Both of those are rioting type

9   offenses.

10          THE COURT:  Do you think it turns on rioting, as

11   opposed to just unlawful parade?

12          MR. DUNN:  Absolutely.  In the sense that in both of

13   those cases, your mere presence and proximity to rioting was an

14   element of the offense.  That's very different than parading

15   without a permit, where you have to show the individual is

16   violating the statute.  Whether they are doing it next to

17   somebody else or not is completely irrelevant.  So what makes

18   those cases work, is the fact that you have an assembly of

19   related offenses.  That is one.

20          Secondly, both of those cases, the Court said, there

21   was evidence to show that every single person in the group was

22   engaged in unlawful activity.  That is the touchstone of the

23   Fourth Amendment.

24          And, third, you had to be sure, at the end of the day,

25   that the people who got arrested, were only the people who were

1    engaged in the unlawful activity.  So, for instance, in Carr

2    you have people in an alley late at night, some of the people

3    who are left.  In Bernini, they had this whole process of

4    pulling people apart.

5         THE COURT:  Right.  But they -- if you look at the

6    numbers in Bernini, it seems like if you to go back to the

7    analogy that has been used before, they have a few dolphins

8    with tuna, right.  And the Court says, well, that doesn't have

9    to be that that can't happen.

10        MR. DUNN:  We are not saying it can't happen, your

11   Honor.  There, they took out 200 people, okay.  The vast

12   majority of people -- the majority of people who were in that

13   location, got taken out, removed, and were not arrested.

14        THE COURT:  More got removed than were arrested.

15        MR. DUNN:  More got removed than got arrested, and

16   there was a sustained effort to remove people who they did not

17   believe were part of the group.

18        THE COURT:  The nature of the sustained effort is not

19   exactly clear in the Eight Circuit cases, it seems to me.  I

20   mean they throw the numbers around, but it's not clear exactly

21   what they did to separate dolphins and tuna.

22        MR. DUNN:  That's fair enough.  But I think what is

23   clear, is that the principle that both those cases still

24   recognize, and they cannot change this because this is Supreme

25   Court law.  You have to, at the end of the day, conclude -- or

1    that a reasonable officer would have concluded that everybody

2    getting arrested had engaged in unlawful conduct.  Even if you

3    are wrong for a few people, you still have to reasonably

4    believe that.

5         And with respect to the two locations, I'm going to

6    turn this over to Mr. Spiegel and Mr. Moore.  But the short of

7    it is, at Fulton Street, whatever you may think about the

8    cohesiveness of the people there -- and I don't think that is a

9    cohesive unit, when you look at the video.  It is our position

10   that no reasonable officer could have concluded -- and you can

11   look at the video -- that everybody walking on that sidewalk

12   had violated the law at East 16th Street and, therefore, they

13   don't come close to qualifying to Bernini, setting aside there

14   is no rioting that has taken place.  We don't think that Carr

15   and Bernini are even eligible here.  But, on the facts, they

16   are very different.  With East 16th Street, whatever you may

17   think about what happened at the beginning of that event and

18   whatever you may think about what some people did on East 16th

19   Street, it is undisputed that the police diverted this whole

20   group of people into a city block that had all kinds of people

21   in it who were just there minding their own business.  And the

22   undisputed evidence of record shows they did very little, and

23   certainly not enough, to assure that the only people getting

24   arrested were people engaged in unlawful activity.  And, not

25   surprisingly, a lot of innocent people got arrested.  You know

1    this is a city block on a summer evening that was full of

2    people.

3            All right, so with that, I'm going to turn it over

4    because the chess clock is running, and I understand the issue

5    about chess clocks.  The one thing I would ask, later on, if

6    you have questions about the fingerprinting claim, I will of

7    course address them.

8            THE COURT:  Are you planning to -- is somebody

9    planning to address that at some point?

10           MR. DUNN:  I will address it when we respond to the

11   City, because I want Mr. Spiegel and Mr. Moore to get up.

12           THE COURT:  Okay.

13           All right, Mr. Spiegel, you are talking about Fulton

14   Street.

15           MR. SPIEGEL:  About Fulton Street.

16           Your Honor, in the Bernini case, the Eighth Circuit

17   said that the touchstone of the Fourth Amendment is

18   reasonableness under the circumstances presented.  And the

19   context, the circumstances presented at Fulton Street, was a

20   peaceful sidewalk protest where arrests were simply

21   unreasonable.  It was unreasonable to believe that the sidewalk

22   was obstructed under New York law.  It was unreasonable to

23   believe that the sidewalk did not contain members of the media,

24   passers by, legal observers.  That everyone, it was

25   unreasonable to think, that everyone there, even if you

1    accepted the City's position that they gave conditions to the

2    marchers, it was unreasonable to believe that everyone on that

3    sidewalk, at the time that the march was stopped and the group

4    was surrounded was, in fact, a marcher.  It was unreasonable to

5    believe that the dispersal order which is depicted on the

6    police videotape number 62, TARU 62, which has that dispersal

7    order as much as it existed in any way.

8          It is a matter of law that you can decide that that

9    dispersal order did not, was not designed to enable the 227

10   people stretching all of the way back to Church street, was not

11   designed for them to hear it, and did not give the people who

12   were trapped on that sidewalk sufficient opportunity to respond

13   to the dispersal order before everyone was arrested.  It was

14   unreasonable to summarily arrest people on that sidewalk

15   without dispersal orders after having granted permission for

16   that march to proceed.  Even if you accept the City's position

17   that Galati reasonably believed that the announcement that he

18   gave amounted to conditions for a march beyond simply saying

19   you cannot obstruct the sidewalk, even if you accept that, even

20   if you accept that it was reasonable to believe that everyone

21   who engaged in the march heard that announcement, even if you

22   accept that it was reasonable to believe that some marchers may

23   have even violated those conditions, it was unreasonable to

24   believe that everyone on the sidewalk when the arrests took

25   place were in fact the people those conditions were addressed

1   to, accepting their terminology.

2          As to the marchers themselves, accepting the fact that

3   the police can set certain types of crowd control conditions

4   and measures, which the City calls conditions, violation is not

5   an obstruction of governmental administration.  And I think

6   that is adequately addressed in the papers submitted by the

7   NYCLU on our motions.  And you cannot arrest everyone because

8   you perceive a few people to have violated some kind of

9   conditions that you have set in order to control the march.

10          Let's look at what happened there from the beginning.

11   The police knew about this protest.  They knew in advance that

12   this march was going to take place.  They knew it was intended

13   to be peaceful, it was called by a pacifist

14   organization.  They knew that they planned to walk on the

15   sidewalk to get as close to Madison Square Garden as they

16   could.  They had to know, once they arrived, that what they

17   were seeing was entirely consistent with what they knew from

18   their intelligence ahead of time.  It was peaceful.  There were

19   no incidents with the police.  There was no violence.  There

20   was no -- there was just nothing, except a gathering of people,

21   and the other people who were there to visit the World Trade

22   Center site.  You see them all on the video.

23          This was a gathering of people to express themselves

24   on issues of war and peace it attracted members of the media.

25   You can hear on the videos the police repeatedly addressing the

1   media.  They were well aware that they were there.  And it was

2   near a tourist attraction where you can see passersby walking

3   by.

4          The police then conferred with one of the organizers,

5   Mr. Hedemann.  Everything about that conversation that is

6   recorded on the videotape is consistent with cooperation with

7   the police to have a peaceful, lawful march on the sidewalk.

8   Once that march started -- and it is -- the critical moments

9   are from the time the march started until it was stopped,

10  because the conditions on the sidewalk, once the march was

11  stopped by Monahan and Galati, certainly could not constitute

12  obstruction --

13         THE COURT:  Did Galati stop it?

14         MR. SPIEGEL:  Galati says that he did.  And he is seen

15  in that video with his hand on the front pole of this TARU 62.

16  He's there with Monahan, and puts his hand up to stop the front

17  pole of the banner.  He claims it was a joint decision with

18  Monahan to stop the march.  The person who speaks on the video

19  is clearly Monahan, the one who seems to be --

20         THE COURT:  Well there's a point on the video where

21  Galati seems to be telling people to move closer to the fence,

22  or they are not going to be able to go forward with the march.

23  But he says that after Monahan has already made an order that

24  people are already getting arrested.

25         MR. SPIEGEL:  He does say that.  And that's very

1   confusing.  He later claimed in a deposition that he had

2   participated in the decision, jointly.

3          What's strange about -- what is unreasonable and --

4   strange and unreasonable about the circumstances, is that the

5   defendants now claim that despite everything they knew about

6   that march when it started, that once people stepped onto the

7   Fulton Street sidewalk, the marchers gave up their intent to

8   get as far as Madison Square Garden, lawfully.  The media gave

9   up their intent to observe what was going on.  And any

10  uninvolved passersby decided to stop being uninvolved and then

11  collectively these people decided to join together to obstruct

12  the sidewalk.  That is an unreasonable conclusion.  There is

13  not a single iota of evidence that supports it.

14         Monahan and Galati had to have known that there were

15  pedestrians and media on that sidewalk.  And the best evidence

16  is the video.  If you look at the videos taken before the march

17  begins.  For example, the Burns video, who is one of the

18  marchers.  He is on the west side of Church Street, amongst the

19  marchers.  And in about a minute and 30 seconds in, he holds

20  his camera up and you can see the other side of Church Street.

21  There are, literally, dozens of people walking on the Fulton

22  Street sidewalk, up and down Church Street and around the

23  corner, on both sides of the Fulton Street sidewalk, before the

24  march begins.  After the march begins, you can hear on that

25  same Burns video Monahan's distinctive voice telling media to

get out of the street, onto the sidewalk.  He, at no point,

says that anything is going on on that sidewalk which

constitutes illegal activity.  There is no linking of arms,

there is no chanting in unison, there is no -- there is no

evidence, whatsoever.  The most that the City says is that they

observe -- Monahan says that he observed pedestrians up the

block, cross from one side of the street to the other.  Which

brings to mind, if I may inject a joke, the chicken crossing

the street.  Who knows, there are a million answers to the

joke, there are a million answers to why people could have

crossed the street up the way, and it certainly does not

constitute evidence that the people who were on the sidewalk

were obstructing.

         So the police had to know, not only were there media

there, because they were talking to them, they could see them.

We have given a number of videos made from the sidewalk by

people who were there as you see the march come across.  So

they were on the sidewalk.  There were pedestrians on that

sidewalk, completely uninvolved.  You see them -- if you look

at the Judd, or Volpe, or Turner videos, you see someone, those

people with their video cameras, on the east side of Church

Street, on the Fulton sidewalk, and you see pedestrians

crossing the crosswalk walking onto the Fulton Street sidewalk.

You have the police talking to Mr. Hedemann on videotape about

their concern that they not obstruct pedestrians.  So they

1    certainly had in mind that there would be pedestrians on that

2    sidewalk when the march was stopped.

3          They, the defendants, do not describe any conduct that

4    would constitute obstructing the sidewalk.  In addition to the

5    fact that you had other people, they do not describe any

6    activity that actually falls within New York law constituting

7    obstruction of the sidewalk.

8          Every single video shows a crowded, typical, New York

9    City sidewalk that pedestrians could pass by on.  There is no

10   indication that it violates the clearly-established law under

11   New York Court of Appeals decisions under Jones vs. Parmley

12   regarding what constitutes obstructing the sidewalk.  There is

13   not an iota of evidence that that sidewalk was ever obstructed

14   by anyone.

15         THE COURT:  Well, one of the ground rules was, one or

16   two abreast before the thing started -- maybe you're going

17   there.  And so -- so that was one of the ground rules.  And

18   don't block intersections, you have to obey traffic lights,

19   correct?

20         MR. SPIEGEL:  So let's assume -- I don't -- I don't

21   know that that exactly -- I don't think that took place, I

22   don't think that is what is shown --

23         THE COURT:  What do you mean that that was what took

24   place, that was one of the conditions.

25         MR. SPIEGEL:  No, I think the police are permitted to

set crowd control conditions.  Can they summarily arrest an

entire group of 227 people because they claim they perceive

someone crossing the sidewalk, the crosswalk improperly?

Because they have set a condition that people walk two by two,

as they walk by a member of the media it looks like three,

let's assume that they are right, that it is three marchers.

Maybe they have probable cause at that point.  I don't think

so --

          THE COURT:  Probable cause --

          MR. SPIEGEL:  -- but the argument would be to arrest

the individual, but not 227 people.  It cannot be the basis for

arresting an entire group of people because they perceive that.

          I think we get into a First Amendment problem when we

are -- which we're not here to address really today, we're here

to address the 4th Amendment problem, about a demonstration in

which you set such conditions.  And then, without fair warning,

think you can start arresting people, anybody, without giving

them some kind of indication that the crowd control conditions

are not being met.

          THE COURT:  Right.  And I'm not sure if you are going

to talk about the Seventh Circuit Vodak case or not, is that

one that you were going to touch on?

          MR. SPIEGEL:  Your Honor, I -- I don't think -- I

think that -- in terms of which aspect?  In terms of the

permission to march?

1           THE COURT:  Well, just in terms of the --

2           MR. SPIEGEL:  I mean, there, you had the police

3    directing people down city streets.  Here, we have people

4    walking on the sidewalk which we don't believe requires a

5    permit.  In any event, the announcement fairly gave people

6    permission to walk.

7           With respect to -- I just don't think that -- that

8    there is any -- the problem we have on Fulton Street is there

9    is no underlying the illegal conduct.  And, then, they can't

10   possibly have believed, reasonably believed that there were not

11   people who were not involved in the march, to the extent that

12   they consider them marchers, to have been some kind of group of

13   people would were not honoring conditions, they say.

14          Was there an issue regarding Vodak that you want --

15          THE COURT:  I think it probably helps your position.

16          MR. SPIEGEL:  I think it does, too, but the march in

17   Vodak, the police gave dispersal orders.  It seemed to me that

18   was the underlying conduct that they found illegal.  And that

19   the people -- that they then arrested a large number of people,

20   and the question was whether or not everybody could have

21   reasonably heard it.  Here, I don't think that the dispersal

22   order really -- it's a sham what Monahan did on the street that

23   day.  That was no dispersal order that anyone could have

24   possibly have responded to, and it's impossible that any group

25   of people, beyond the first few in front of him, could have

```
 1   heard it.

 2            Your Honor, I'm gonna let Mr. Moore address the 16th

 3   Street facts at this time, unless you have any other questions.

 4            THE COURT:  No, I don't, actually, so.

 5            16th Street seemed very, very different than Fulton

 6   Street.

 7            MR. MOORE:  That's fair to say, Judge.

 8            Judge, we represent the class in MacNamara, so we have

 9   plaintiffs in both locations.  I just want to make sure the

10   Court understands we join in the arguments made by Mr. Dunn and

11   Mr. Spiegel.

12            THE COURT:  No, these are divided up just for purposes

13   of today's hearing.

14            MR. MOORE:  I think your comment about Vodak is

15   important, because I think Judge Posner pointed out that, and

16   he says:  No precedent should be necessary to establish the

17   fourth Amendment meant does not permit the police to say to a

18   person, go ahead and march.  And then five minutes later,

19   having revoked the permission for the march without notice to

20   anyone, arrest the person for having marched without police

21   permission.

22            And I think it's -- you could argue that that is

23   exactly what -- that is at least in part what happened at

24   Fulton Street.  So just in terms of responding to your point

25   about Vodak.
```

1          I do want to address --

2          THE COURT:  Maybe not five minutes, but --

3          MR. MOORE:  Actually, it was shorter than five

4   minutes.

5          THE COURT:  Seems to me about 90 seconds.

6          MR. MOORE:  The point that Judge Posner is making in

7   Vodak applies to the full force of these cases.

8          It is true --

9          THE COURT:  No, but the point Mr. Spiegel is making is

10  that there was -- he is suggesting there was no illegal

11  activity at Fulton.  There is clearly some illegal activity on

12  East 16th, right --

13         MR. MOORE:  Well --

14         THE COURT:  You are not suggesting that --

15         MR. MOORE:  That's --

16         THE COURT:  -- anybody can just throw a parade on the

17  middle of a city street in mid day, right?

18         MR. MOORE:  No, I'm not suggesting that.

19         I think 16th Street does present a different set of

20  facts for the Court to consider.

21         I still think that the issue is the same, whether the

22  facts would have been -- whether a reasonably prudent police

23  officer would have concluded, based upon what they saw at the

24  time they decided to arrest this group, that everybody in that

25  group was engaged in unlawful behavior.  And I think if you --

you said you watched the videos, you read the submissions.  I
don't think you can -- any reasonably prudent police officer
could conclude, having gone through that, seen those videos,
having witnessed on what happened on 16th Street, that
everybody being arrested was engaged in unlawful behavior.  And
that's the important point.

Carr and Bernini, to the extent that they have any
applicability in the Second Circuit, carved out a very limited
exception to the Fourth Amendment requirement for
individualized probable cause.

There is, in fact, no principle that I don't think any
Court has ever endorsed of group probable cause.  What Carr and
Bernini say, that under certain unique circumstances, you can
infer from what you are observing that everybody engaged in a
particular activity understands that it is unlawful activity.
And you just can't get that from looking at what happened at
16th Street.

And in the absence of that, in the absence of a
reasonable belief that everybody arrested on that evening on
16th Street was engaged in unlawful activity, you can't sustain
this probable cause theory based on group probable cause that
the defendants urge this Court to do.  This case is simply not
Bernini or Carr.  Those were unique factual situations that the
court dealt with.  And I think if you look at what Judge
Silberman said in the rehearing decision in Carr, he said to

1   caution everybody:  This is not the situation where you have an

2   undifferentiated mass of people who happened to be in proximity

3   to unlawful behavior.  That would not sustain a theory of

4   arresting everybody.  And that's --

5            THE COURT:  Well, what he said, and it's really dicta,

6   but is that Carr does not permit the police to arrest

7   undifferentiated groups of marchers and bystanders, with no

8   effort to separate the two.

9            MR. MOORE:  Right.

10           THE COURT:  Now, there is some evidence, or some

11  evidence that there was an effort to separate the two.  That

12  some officers were sent through the crowd to try to give

13  dispersal orders, and to tell people if they want to get out of

14  here, they better get out now.  Not a lot of detail, not a lot

15  of flesh on those bones.  But there is at least some evidence

16  in the record about that.

17           MR. MOORE:  Let me say two things about that.  First

18  of all, that would have come after Chief Essig had concluded

19  that he was going to arrest everybody on that street, who was

20  on that street who was inside the mesh.  Because he concluded,

21  as he was going -- once he saw this group -- and he says this

22  at his deposition.  He concluded, once he saw the group cross

23  Union Square East into 16th Street, that everybody was gonna be

24  arrested.  So that's why he didn't give any orders to disperse

25  when he got on 16th Street.  He says that in his deposition, he

1    is -- on page 744 -- which is a good reason why depositions

2    should go on for a long time.  But he says:  The people were

3    going to be arrested once they left Union Square and paraded

4    without permit.

5            That's what he says.  And the question was:  So there

6    would have been no reason to give them an order to disperse?

7            Answer:  That is right.

8            So it's curious, I think, that the City now attempts

9    to defend the conduct of the police at 16th Street based upon

10   the effort that Johnson in Cortright made to try to determine

11   whether some people should be asked to be given information

12   that they could leave.  It seems clear to me from having read

13   both those depositions -- and we have provided excerpts to the

14   Court -- that they were really concerned about the business

15   people, and closing the garage door -- there was a big garage

16   on 16th Street.  That there was really no effort to, as there

17   was in Bernini, to determine whether in fact, bystanders, other

18   people who were simply on the sidewalk -- even if you are not a

19   bystander, if you are on a sidewalk not obstructing anything,

20   you have a First Amendment right to watch what is going on even

21   if it is going on on the street.

22           So you have seen the videos.  I mean there are --

23   there are hundreds of people on the sidewalk.  Yes, there are

24   people on the street.  But the fact that the police arrested

25   everybody, does not --

1          THE COURT:  I don't know that -- it's not clear from

2     the video the police arrested everybody.  In fact, it is -- the

3     arresting that's going on is very hard to distinguish whether

4     some people are not arrested who were on the street and

5     watching, or having a cup of coffee.

6          MR. MOORE:  That's my point, Judge.  It's very hard to

7     tell where these people came from.  So no reasonable police

8     officer would have been able to discern that at the time.  You

9     can't tell whether the person you are arresting was simply

10    walking down the street, was a journalist, was a legal

11    observer, was a bystander, was somebody actually engaged in

12    First Amendment expression even if it was on the street, even

13    if it was not a permitted march.  The fact that you can't

14    determine that, is fatal to the City's argument.

15          Notice and an opportunity to disperse which the Barham

16    Court, the Dellums Court, Vodak, all stressed, and even Jones

17    vs. Parmley, is very important.  I mean we would argue that

18    given the First Amendment activity, that you would, before you

19    can arrest for these violations, disorderly conduct, parade

20    without a permit, that you have to give notice.  But even

21    setting that aside, notice was important on the issue of

22    probable cause.  Because it would have given the police some

23    belief that the people who were there after notice and an

24    opportunity to disperse was given were, in fact, engaged in

25    unlawful behavior.

1          Have I reached my 10 minutes?

2          THE COURT:  No, you have a couple of more minutes.

3          MR. MOORE:  Okay.

4          And that simply wasn't the case.  If you look at

5     the -- if you look at the video -- and we provided sort of a

6     time-stamped compilation.  The crowd left Union Square Park at

7     6:58.  That is when the band started marching.  At 7:01, they

8     were diverted onto 16th Street.  At 7:02, the line closes at

9     16th Street by the police so that nobody -- I mean I'm not

10    saying some people didn't get out.  But for all intents and

11    purposes that -- that police put a line across the street,

12    building to building, and not letting people out and not

13    letting people in.  They did the same thing at Irving Place --

14          THE COURT:  Well, the same thing happens in Bernini.

15    Basically, what happened in Bernini, was there was an attempt

16    to discern who had been part of the unit at the intersection

17    and who wasn't.  So it was not an indiscriminate arrest, it was

18    there was an attempt to make some separation.

19          MR. MOORE:  Well there's two things about Bernini.

20    First of all, the conduct here that was happening on 16th

21    Street was nothing close to what was happening at Bernini.

22          THE COURT:  Well, if your loved one was waiting for

23    the ambulance to come, you might feel differently, right?

24          MR. MOORE:  Well, there is no evidence --

25          THE COURT:  Well, my point is that's what the police

1    are charged with, it's making sure that emergency vehicles and

2    others can get through.  And a parade by -- staged by people

3    who didn't care about that -- I guess it depends on whose ox is

4    being gored.  But if you are the one waiting for the ambulance,

5    you would be unhappy about the impromptu parade.

6          So I'm not sure that Bernini or Carr turn on the fact

7    that there were riots, or baseball bats, or torches in one

8    case, and merely a parade with xylophones and drums in the

9    other.

10          MR. MOORE:  Right, not I understand that.  And I think

11   that the point I'm trying to make is the police had a

12   legitimate interest in clearing the street so that people could

13   come by.  And if you look at the videos, at least on Union

14   Square East the traffic was moving within you know, certainly

15   by 7:06 because certainly by 7:10, that's when arrests start.

16   So all of this took place in the course of 12 minutes.  And

17   there is no doubt there -- and we don't take the position that

18   the police didn't have an interest in responding to what was

19   happening.  The question becomes, having responded, having

20   dealt with the crowd control situation, having gotten the

21   people off the street onto the sidewalk -- and it's there in

22   the video.  You see people coming back.  They are coming back

23   on the sidewalks.  And that's where they are arrested, on the

24   sidewalks.  But having done that, then having trapped everybody

25   who was now cleared off the street in the sidewalks and

1   arresting everybody without regard to why they were there or

2   how they got there, is unreasonable under any definition of the

3   Fourth Amendment, that that decision is the one that violates

4   the Fourth Amendment.  Because no reasonable police officer

5   would have, or could have, concluded that everybody who was

6   then trapped between those two orange mesh nets on either side

7   of 16th Street had engaged in unlawful behavior.  And that's

8   why notice and an opportunity to disperse are critical in this

9   context.  And, in fact, as we pointed out in our briefs, that's

10  how the police are trained, that's what Essig said his training

11  was, that you give notice and an opportunity to disperse.  He

12  said he carried a card with the script for what you say to a

13  crowd when they are engaged in that kind of conduct.  And in

14  fact, that is how the defending -- the Brooklyn Bridge arrests.

15  And we provided you with the brief of the City in that case

16  where 700 people marched onto the Brooklyn Bridge, clearly a

17  much more vital artery, traffic artery, than 16th Street

18  between Union Square East and Irving Place.  And they defended

19  that case by saying we did it right; we gave notice, we gave an

20  opportunity to disperse, clearly heard by people.  This

21  situation that the police were presented with at 16th Street

22  just did not give them the right to simply arrest everybody.

23       And so, on that basis, we would urge that the Court

24  grant summary judgment as to 16th Street.

25       Unless you have any other questions, I'll --

1          THE COURT:  No, I'm good.  I'm going to stop the clock
2     for you.
3          MR. MOORE:  I do want to respond at the end to the no
4     summons issue, so I'll wait until that comes up.
5          THE COURT:  Okay, so you folks have about, I think, 19
6     minutes left.   Good.
7          All right, Mr. Farrell, you are going to carry the
8     ball on the first part, right?
9          MR. FARRELL:  Yes, your Honor.
10          My plan is to address the issues, and if there is a
11     question that I think I need some assistance on, I will turn to
12     some of my colleagues at the table.
13          THE COURT:  Okay.
14          MR. FARRELL:  First thing I would say is that, in
15     terms of sending a message, which is what plaintiffs' counsel
16     had asked this Court to do, I think that the message of the RNC
17     was -- the undisputed message was that 800,000 people
18     demonstrated without arrests.  And only 1800 people were
19     arrested.  On a percentage basis, that's less than point
20     2 percent of protestors or demonstrators who were arrested.  So
21     I think that's the message that should be realized.
22          THE COURT:  I'm not sure what I'm supposed to take
23     from that?
24          MR. FARRELL:  Well, I'll --
25          THE COURT:  What's a couple of percent, even if it was

1    wrongful?

2            MR. FARRELL:  I think it's clear that the City was

3    facilitating First Amendment activity when it was lawful,

4    and --

5            THE COURT:  Well, wait.  Wait, wait.  Look, I think

6    that any objective observer could say that, overall, the City

7    did a good job; nothing blew up and people were able to

8    protest.  It was -- it came off okay.  But that's not the

9    issue.  The issue is, from that, I'm to presume that any arrest

10   they did make was an okay one, because they were -- they only

11   arrested 1800 out of 800,000?

12           MR. FARRELL:  No, that's not what I'm asking the

13   Court --

14           THE COURT:  Good.  I didn't think you were.  So but I

15   don't think that's an argument.  That seems to be more designed

16   for press consumption.

17           So let's talk about the issues in this case.  Because

18   I'm not really interested in sending messages, generally.

19   That's for politicians to do.  My interest is just making sure

20   I get the law right, and that I can understand the facts.

21           MR. FARRELL:  All right.  Well, contrary to what

22   plaintiffs have argued here today, the law regarding when the

23   police -- when probable cause exists to arrest a group, was not

24   settled in 2004 during the RNC.  All of the cases Carr,

25   Bernini, Papineau which they refer to as Jones v. Parmley, all

```
 1    were decided after 2004.  That's the first issue.

 2            The second issue is that Carr and Bernini made clear

 3    that when a group is acting as a cohesive unit, it can be

 4    arrested as a unit and that probable cause can exist.

 5            The second thing is that Carr and Bernini made clear

 6    that violence is not a prerequisite to making an arrest of a

 7    group.  Specifically, Carr states in addressing the legal

 8    standard, that groups can be arrested when they are engaged in

 9    violence or obstruction.  That language is explicitly in Carr,

10    it goes back to Washington Mobilization v. Cullinane, which is

11    DC Circuit case.  And the facts in Bernini were -- not only

12    were the individuals there subject to violence, but they also

13    were being charged with unlawful assembly.  And in Minnesota,

14    that statute does not require violence, it only requires,

15    quote:  That the participants so conduct themselves in a

16    disorderly manner as to disturb or threaten the public.

17            So the first three premises that violence is required

18    to make a group arrest is contrary to the established case law

19    in Carr and Bernini --

20            THE COURT:  I agree with you on that, so what are the

21    other two; the other two points you were making?

22            MR. FARRELL:  That you can arrest a cohesive group as

23    a unit --

24            THE COURT:  If you have a reasonable belief that

25    everybody you arrest is part of that unit and is engaged in
```

1    unlawful activity, right?  It can't just be that there is a

2    group here, they are all wearing red shirts and they are

3    engaged in obstructive behavior, so we're taking out the whole

4    block, including everybody who is wearing a blue shirt and a

5    striped shirt, right?

6          MR. FARRELL:  That's not what I am suggesting, your

7    Honor.

8          What I'm suggesting is that the case law, Carr and

9    Bernini, made clear that when the group is acting as cohesive

10   unit and the group as a whole is engaging in either a parade,

11   without a permit, or an obstruction of pedestrian vehicle

12   traffic, that there is probable cause exists to arrest that

13   group or, at a minimum, the officers would be entitled to

14   qualified immunity as the Court found in Bernini.

15         THE COURT:  All right, but here's the situation.

16   Let's use a hypo and come back for actual.

17         So you've got a group determined to obstruct traffic,

18   and conducting impromptu, unpermitted parade on Broadway, right

19   through Times Square.  There is 200 of them and that's what

20   they are doing.  You are not suggesting that you can then just

21   cordon off the block and arrest all 500 people who happen to be

22   on that street because it's 5:00 p.m. on a Thursday in the

23   middle of Times Square.  You are not suggesting that, right?

24         MR. FARRELL:  No.  We're not suggesting that, your

25   Honor.  In fact, the example that your Honor gives, is the

1    cases where the correspondent is not a cohesive unit.  That

2    would be an example --

3            THE COURT:  No, it's a very cohesive unit.

4            MR. FARRELL:  No, it's --

5            THE COURT:  Clearly, cohesive unit is the people who

6    are obstructing traffic.  The issue is whether the police have

7    done enough to make sure they are only arresting the cohesive

8    unit and not everybody else who happens to be in the vicinity.

9            MR. FARRELL:  I agree with you, your Honor.  I think

10   it's a two-step process.  One is I think you need to identify a

11   cohesive unit, that there is a cohesive unit.  And the second

12   step is to ensure that you reasonably believe that the people

13   you place under arrest were part of the cohesive unit and not

14   some other people who were in the vicinity.  I think that is

15   the two-step process that the case law discusses.  And at both

16   locations, at Church and Fulton, and at 16th Street, the City

17   and the individual defendants satisfy those requirements.

18           THE COURT:  How so?  Let's talk about Fulton Street.

19           MR. FARRELL:  All right.  And I just want to state

20   that this is framework that we're discussing about the facts

21   and about the law, is we've moved for probable cause -- there

22   was probable cause existed to grant summary judgment.  Or that

23   there was -- that we are entitled to qualified immunity, which

24   means either the law was not clearly established or that there

25   was arguable probable cause.  So the discussion we are about to

1    have about the facts and the law, I'm going to do in addressing

2    both of our parts of our summary judgment motion.

3              THE COURT:  Okay, that's fine.  But I do think you

4    have to be very careful not to say that because Carr and

5    Bernini had not been written yet, that it was reasonable to

6    believe that if you have a couple of hundred people who you

7    think are violating the law, you get to sweep up 500 because

8    they are nearby.

9              MR. FARRELL:  Again, that's not what I'm suggesting.

10             The question is what were the parameters of when you

11   can make a group arrest, were they clearly established at the

12   time.

13             Before I go into the facts, I would like to address

14   one other point that one of my adversaries made, and that had

15   to do with this issue of, you know, they argue that what was

16   clearly established was that you needed individualized probable

17   cause.  That's not what we are here to discuss and that's not

18   what we are saying.

19             What we believe the qualified immunity test is going

20   to is when you can make an arrest of a group.  Not whether you

21   need individualized probable cause.  Nobody disputes that,

22   quote, you need probable cause to arrest individuals.  The

23   question is, when you have a group setting and you have the

24   practical realities faced by police officers dealing with

25   disorderly groups, large -- large number of people, under what

```
 1   circumstances does the Police Department have probable cause to
 2   make the arrest.  And that is the question that it was not
 3   settled.  And the qualified immunity law clearly states, you
 4   don't deal with generalities -- generalisms, I guess I'll say,
 5   since I can't get the word out -- that you need probable cause
 6   to arrest.  Nobody disputes they need probable cause to arrest.
 7   It's the more specific question and the qualified immunity case
 8   law says the more specific question of under these
 9   circumstances when you have a large disorderly group, when can
10   you make the arrest.  That is the question, not the way it was
11   defined by my adversary.
12          THE COURT:  Wait a minute.  I mean I think the issue
13   is if it was clear to a reasonable officer that we are making
14   an arrest here and we're going to clear this street, but we're
15   gonna have a lot of tuna and we have a lot of dolphins in the
16   same net, but we'll sort that out later when we get them to
17   Pier 57.  You are suggesting that that was a reasonable, and
18   that was a qualified immunity-able position --
19          MR. FARRELL:  No, your Honor.
20          THE COURT:  -- in 2004?
21          MR. FARRELL:  I'm not -- the City's position in this
22   case is not that they swept up a large undifferentiated group
23   and brought them to Pier 57.  The City's position, and I will
24   go through the facts to show you, that at both locations, it
25   perceived a cohesive unit that was engaged in a parade.  If
```

1   there is anything that's cohesive, that is an easily cohesive

2   identifiable unit, that is a parade, that certainly I would

3   think is more identifiable as a cohesive unit, everyone's

4   travelling in the same direction, marching together --

5          THE COURT:  You've got media folks who are aside them,

6   people walking parallel with them because it is an open

7   roadway, or it's a thoroughfare, and you have some people who

8   are just watching.  You are saying you get to arrest all of

9   those folks, too?

10          MR. FARRELL:  What I'm saying is that someone's status

11  as a legal observer as media or something else, if they are

12  engaging in the unlawful conduct, and the police observe that

13  person engaging in it, their status as a media or legal

14  observer doesn't change the analysis.  In fact, in Bernini, the

15  Eighth Circuit specifically said, hey, we know that plaintiffs

16  here claim they were held in the status of legal observer or

17  media or some other title, but that doesn't change the

18  reasonableness of the officers' perception that they were all

19  engaged in unlawful conduct.  That's the explicit language

20  found in Bernini, they say that the title of legal observers

21  and media do not change it.

22          And I will also say at both of these locations, that

23  the police took reasonable steps, once the groups were cordoned

24  off, to make sure that they only had the individuals who they

25  perceived were engaging in unlawful conduct.

1          So I'm going to go into that.  And I would just like

2     to draw the Court's attention, before I do that, to the Carr

3     case when it comes to this issue of the personal knowledge

4     orders that were referenced earlier.  Carr, I'm quoting from

5     Carr, it says:  The officer need not see everyone individually

6     in the crowd.  Police witnesses must only be able to form a

7     reasonable belief that the entire crowd is acting as a unit

8     and, therefore, all members of the crowd violated the law.

9          THE COURT:  Right.

10          MR. FARRELL:  So it's that -- the DC Circuit disagrees

11     with plaintiff counsel's argument --

12          THE COURT:  I'm not sure.  Are you saying, are you

13     disagreeing with that characterization?  I think the issue is

14     whether or not you've got folks at sidewalk cafes that are

15     subject to the same arrest order as the people who are marching

16     in the street and on the sidewalk.

17          MR. FARRELL:  All right.  Well, if plaintiffs are

18     conceding that that's their argument, then I'll move past it,

19     and go to the facts to show why people, it was reasonable for

20     the officers at two locations to believe that they had in fact

21     arrested the unlawful group.

22          All right, so the first question, as we agreed upon,

23     is whether these two groups could be perceived as cohesive

24     units, versus an undifferentiated group.  The undifferentiated

25     group is the type of group that is in the Barham case, DC case

where there were people in a park, outside the park, there had

been a couple of people engaged in unlawful conduct.  They

then, the police observed that unlawful conduct of those

individuals, those individuals then came into the park and the

police then observed the park for an hour after that and

watched other people come and go and intermingle and comingle

with that group.  That is an instance where you have an

undifferentiated group.

At Church and Fulton, the facts that support treating

this as a cohesive unit, were that this was a march organized

by the War Resistance League.  These are all undisputed facts,

that the NYPD discussed the march before it began with the War

Resistance League's –– a person who was organizing it, Ed

Hedemann, who is a plaintiff in these cases.  Hedemann tells

the NYPD, and it's in the videotapes, on the videotapes, that

the group will follow the directives that they had been given,

and that he has designated either marshals or peacekeepers who

will make sure the group does so.

So you have the War Resistance League there.  They

sent out, put a notice out, said:  Hey, come down to Church and

Fulton, we're gonna have an unpermitted march.  Flier said it

was unpermitted, they had no permit for it.  Several hundred

people show up.  This is on Tuesday afternoon at 4:00, during

rush hour.  And, now, the police are there speaking with them.

The police offer the War Resistance League an alternative route

1    up Church Street, because it goes with the flow of traffic.

2    The War Resistance League rejects that offer.  The War

3    Resistance League tells Galati, no, I do not want to go that

4    way.  I want to go up, northbound, on Broadway.  Police say:

5    Hey, if you are going to do that, we can't sanction it, you'll

6    be subject to arrest if you violate the rules.

7            He says:  Fine, we'll take care of it, I have people,

8    we'll follow the rules.

9            Galati tells Hedemann what the rules are.  You have to

10   be single file or double file; you can't cross against the

11   traffic lights; you can't block vehicles or pedestrian traffic;

12   and you can't turn that banner that you plan on having in the

13   front of the march horizontally to block the sidewalk.  He

14   says:  Fine, we agree to that, and we'll make sure that that

15   happens.

16           Then the NYPD makes an announcement to the group.

17   Chief Galati, over the bullhorn, makes an announcement, warns

18   the crowd that these are the three or four things that you need

19   to do and specifically tells them:  Otherwise, you will be

20   subject to arrest.  I must warn you, you will be subject to

21   arrest if you violate these rules.

22           THE COURT:  Right.  But there is some question as to

23   whether everybody heard this.  In fact, on some of the

24   videotapes, you can loudly hear people saying:  Can't hear you,

25   so --

1          MR. FARRELL:  You hear that on some of the videotapes.

2     The question is whether it was reasonable for the NYPD to

3     believe that everybody had heard these warnings.  And, in fact,

4     Chief Galati orders one person to go through the back of the

5     crowd, over a bullhorn, and make the announcements a second

6     time, which happens, and is captured on the videotapes

7     submitted to the Court.

8          In addition, he sends a different officer down the

9     line of the crowd to make oral announcements about the

10    conditions.  The fourth thing that happens is once the crowd

11    starts to cross the street, there is an officer standing there

12    with the bullhorn warning the group that if they violate the

13    law, they are going to be subject to arrest.

14         THE COURT:  No, he didn't say you are all going to be

15    arrested if one of you gets out of line, right?  Nor could he,

16    do you think?  That wouldn't be reasonable, would it?

17         MR. FARRELL:  No, but what this is indicative of is

18    that from the Police Department's viewpoint, that it was

19    reasonable for them to believe the group that had been there to

20    assemble to engage in a march, understood the warnings,

21    understood that if they violated the law that they were going

22    to be subject to an arrest, and that they were gonna proceed

23    under that -- within that framework.

24         THE COURT:  No, but I think to arrest them all, you

25    have to be able to reasonably believe that they all intended to

1    violate the law, right?  If everybody crosses the street with

2    the light, and there is 12 stragglers who cross against the

3    light in violation of, obviously, the local law, those 12 can

4    be arrested.  But you're suggesting you can arrest everybody

5    because of the 12 who crossed against the light?

6              MR. FARRELL:  I'm not saying that.  I'm saying whether

7    it was reasonable for the police officers to view that that

8    march was in violation of the law as a unit.

9              The other thing that they warned them of was that

10    there was no permit for that march.  And they said you do not

11    have a permit for this march, it is an unpermitted march.

12             THE COURT:  Right.  Again, they are on the sidewalk,

13    proceeding two by two.  And so you are saying they needed a

14    permit for that?

15             MR. FARRELL:  Well, that's -- the separate legal part

16    is what you need a permit on the sidewalk.  And we would --

17             THE COURT:  Two by two on the sidewalk, you are saying

18    you still need a permit?

19             MR. FARRELL:  I'm saying that under the Section 10-110

20    of the Administrative Code, if a police officer perceived that

21    that's a parade, a procession, or a race, yes you do.  You do.

22    That's what that statute says.

23             THE COURT:  But police here clearly said you can march

24    by two by two, right?

25             MR. FARRELL:  They said if you -- you have to march

1    single file, or two by two.  So I mean they were making -- in

2    essence, the police were trying to make an effort to say, hey,

3    you want to go, you can try and go, but you are subject to

4    arrest if you don't do these things.  And they told them you

5    don't have a permit, once the group as unit didn't do those

6    things, they were subject to arrest for all the statutes --

7            THE COURT:  All of the people were subject to arrest,

8    once one person --

9            MR. FARRELL:  And the reason is the video --

10           THE COURT:  -- people cross --

11           MR. FARRELL:  If you look at the videotape, from the

12   time that the march steps off, they violate all of the rules.

13   The march starts, the minute they step off the curb to cross

14   Church Street, nobody is single file or two abreast.  You see

15   on the videotape a mass of people proceeding across Church --

16           THE COURT:  I disagree with that, I watched it.  I

17   disagree.  What you do have is a lot of media people walking

18   alongside them.  Your view is the media people were marching as

19   part of the parade, part of the group?

20           MR. FARRELL:  The police officers are not

21   differentiating who is there participating.

22           THE COURT:  Wait a minute.  You just said the first

23   issue is whether or not this is a group that is working

24   collectively, right?  So the media people are taking pictures

25   of people who are walking two by two.  You are saying that the

```
1    police officer then has a reasonable belief that the entire

2    group is violating the law?

3              MR. FARRELL:  If I -- when you say media, if I show up

4    with a camera and I'm participating in the march, I mean,

5    who -- who are we discussing is media?

6              THE COURT:  Press credentials.

7              MR. FARRELL:  Right.  If you have press credentials --

8              THE COURT:  Lou Young, if you want to ask him, he was

9    standing next to people who were walking two by two.  You are

10   saying he was part of the group and, therefore, his violation

11   of the guidelines set by officer -- by Inspector Galati

12   subjected the entire group to an arrest?

13             MR. FARRELL:  No.

14             THE COURT:  No.  Okay.

15             MR. FARRELL:  Press credentialed people were in fact,

16   the testimony shows, Monahan testified, there's no dispute over

17   it -- were let out of the group once it was stopped.

18             THE COURT:  That's a different issue.  I'm talking

19   about the issue as to whether they could engage in acts that

20   would constitute the violation that you think was enough to

21   prompt the arrest of everybody.

22             MR. FARRELL:  I think the Eighth Circuit recognizes

23   that, you know, from -- police officers, they don't -- if the

24   police don't recognize they're media -- or, again, if they are

25   violating the law, participating in unlawful conduct, I don't
```

1    think there is an exception.  But I think the Bernini Court

2    said when the Police Department is looking at a group of -- in

3    Bernini, it was two to four hundred people, depending on what

4    point you wanted to look at it.  The Court said 10 people who

5    are media or legal observers had been arrested as part of that

6    group, does that change the analysis?  And the Court says, no,

7    it does not change the reasonableness of it.

8          In Bernini, what happened, was you had, across from

9    the -- the City of St. Paul, the Police Department was trying

10   to keep this group out from entering the City.  There were a

11   group of 50 people across from them on the sidewalk.  And the

12   Court says -- this is on videotape.  Fifty people across on the

13   sidewalk.  Next to that group, there was approximately 50 more

14   people.  Fifteen people within the center group step out into

15   the street and challenge the police.  They are driven back into

16   the main group.  At that point, the police are outnumbered, so

17   they drive the group west.  As the group heads west, it

18   increases in size to the point where they finally march it a

19   half mile away, and they turn it into a park.  The police then

20   detain everybody in the park, 400 people.  It's undisputed in

21   Bernini -- that there were a hundred people down where the

22   unlawful conduct was observed.  That was with that unlawful

23   conduct that the group was going to be placed under arrest.

24   The group then marched a half mile, went into a park.  Now, the

25   group is up to 400 people.  The police then make an effort to

1    sort through who entered the group during the march westbound

2    and who also was in the park, versus the people that they

3    believed were part of the group that had been across from them

4    down at the main intersection.  They do that sorting process.

5    They then arrest a 160 people; 160 people, they arrest.  The

6    Court says, undisputed fact show when you go to the videotape,

7    there were only a hundred people across from them when they --

8    at the time the unlawful conduct took place.  So in Bernini,

9    they arrested 50 percent more people than were present when the

10   unlawful conduct took place.  And the Court says on those

11   circumstances, because the officer's viewpoint that he couldn't

12   see the depth and size of the crowd, it was still reasonable

13   under those circumstances for the arrest of a 160 people.  And

14   what I am saying to you is, at Church and Fulton, by

15   plaintiff's own admissions, every single one of those people

16   was there to engage in a march.  This was not an instance where

17   you have a hundred of those people saying, hey, you know what,

18   I wasn't there for the march.  We went through all of the

19   testimony, including our declaration, and we have identified

20   only three people out of 221 who claim they were not there to

21   participate in the march.

22        THE COURT:  I don't think that's the issue.

23   Participating in a march is not unlawful, per se.  It's --

24   right?

25        MR. FARRELL:  No, the march turns to be unlawful

1    because --

2              THE COURT:  Because why?

3              MR. FARRELL:  The group, as a unit, did not follow the

4    warnings that the Police Department had given them.

5              THE COURT:  The group, as a unit?  You can hear on the

6    tape some people in the march saying don't block the roadway to

7    other people who are following.  So that clearly, the intent,

8    the collective intent was not to violate the local traffic law.

9              MR. FARRELL:  The intent from the police officer's

10   perspective is what is at issue.  It wasn't reasonable for the

11   police officers to believe, could they infer from the conduct

12   of the group that this group intended on violating the

13   disorderly conduct statute.  I would also say that the parading

14   statute doesn't have an intent requirement.  The parading

15   statute in New York, Section 10-110, when you read it on its

16   face is a strict liability statute.  Since --

17             THE COURT:  Wait.  The police told them they could do

18   this, they told them the ground rules.  You can't just then say

19   I don't really like the way -- I don't like the rules I made,

20   so I'm now going to just stop it, you are all under arrest for

21   illegal parade, can you?

22             MR. FARRELL:  I would agree with you.  If they had

23   said, go ahead march.  That's what happened in Vodak.  You

24   raised Vodak before?

25             THE COURT:  Yes.

1              MR. FARRELL:  There, that was typical parade route.

2     Church and Fulton was not a parade route.  Union Square and

3     16th Street was not a parade route.  There is no such thing as

4     that in New York, Maybe 5th Avenue, perhaps, not there.  In

5     Vodak, it was a typical parade route.  Police said to them

6     nothing.  They said go ahead.  They didn't warn them, they

7     didn't say they had to do anything.  Didn't tell them they

8     would be subject to arrest.  The Court in Vodak said in that

9     instance, that's like entrapment.  That is very different than

10    what happened at Church and Fulton Street.  Because at Church

11    Fulton Streets, they told the group ahead of time, you do not

12    have a permit for this march.

13             Listen, I like to run.  If I showed up with 150 or 300

14    of my people I like to run with, and I want to have a race up

15    5th Avenue and the cops say you have to follow the rules, and I

16    say, okay, I'm going to do all of that, and I know I'm

17    surrounded by 200 other people, I'm basically assuming the risk

18    that if this unit that I'm involved in breaks the law as a

19    group, we take over the roadway, yeah, I am subject to arrest,

20    the cops just told me I was subject to arrest.  I think that is

21    vastly different than the facts that were set forth in Vodak.

22             THE COURT:  So what are the violations, then?  That

23    you are referring to.  So, more than two arrests?  That's what

24    you are saying the evidence reveals?

25             MR. FARRELL:  There were more than two abreast.  The

1    videos show they didn't cross with the traffic light.  There is

2    a -- the video shows they turned the banner to block the

3    sidewalk, they didn't keep it vertically as they said they were

4    going to.  They turned it horizontally.  And they block the

5    entire sidewalk.

6        THE COURT:  The entire sidewalk is blocked because

7    Monahan loses his head, stops the thing, and then doesn't let

8    anybody go forward, while the folks in the back keep moving

9    forward.  That's pretty obvious.  I just think if you are going

10   to insist that it was magnificent police work the whole way, I

11   just think you are going to run up against facts that are

12   difficult to square.  I mean the rest of the cops looked

13   utterly confused as to why Monahan is going nuts.

14       You disagree with that?

15       MR. FARRELL:  What I --

16       THE COURT:  They have gone half a block when he shut

17   the whole thing down.

18       MR. FARRELL:  And you know what the testimony of the

19   marchers were, some of the admissions we got in deposition?

20   Nine plaintiffs admitted at deposition that it would have been

21   difficult for anyone to walk against the flow of the marchers

22   that day.

23       Another plaintiff, Jeffrey --

24       THE COURT:  But, again, if the cops told them they can

25   do this, two abreast, you can't change the rules in mid march,

```
1    can you?

2              MR. FARRELL:  No.  But they were not two abreast.

3    Your Honor, if that videotape showed people processing two

4    abreast in an orderly fashion, I agree with you.  But the video

5    demonstrates they were four, five, six abreast, they were

6    flowing up the entire sidewalk.  That's what the video shows.

7    And the plaintiffs' submissions admit that.

8              Jeffrey Cohen, a plaintiff, testified that he was,

9    quote, swallowed up by the marchers.  He was one of the three

10   out the 220 that said he came into the march.  He wasn't there

11   to participate, he was trying to walk up the sidewalk.  He was

12   swallowed up by the marchers and tried to cross the south side

13   over Fulton Street because he felt claustrophobic.  Another,

14   Katharine Krassan recalls being engulfed, making it difficult

15   to walk on the sidewalk --

16             THE COURT:  Before or after the order to stop the

17   parade and everybody from behind then moved out.

18             MR. FARRELL:  Before, your Honor.

19             THE COURT:  The testimony reflects it was before?

20             MR. FARRELL:  Before.  They said they were swallowed

21   up.  And then when they were trying to work their way out, they

22   couldn't get out, and then they were placed under arrest.

23             Those were admissions cited in our briefs and in our

24   papers.

25             THE COURT:  Well, obviously, the parade was stopped
```

1    before people were put under arrest, right?  The front of the

2    parade, the front of the march was stopped before anybody got

3    arrested at that point.  I mean Chief Monahan basically said

4    stop, stop it right there.  They put bicycles in front of the

5    leaders, and then stopped everybody from moving.  But what

6    happened in the interim was that the folks in the back of the

7    line kept moving forward.  So certainly by that point they were

8    more than two abreast.

9        MR. FARRELL:  If they had all been single file, two

10   abreast, and then they get stopped and that causes them to not

11   be single file, two abreast, I would agree with you.  But the

12   video shows as soon as that group started across the street and

13   on the sidewalk, they were taking over the whole sidewalk and

14   we have plaintiffs' admissions in the video to show that.

15       I would like to move to 16th Street.  I think that,

16   there, it is also undisputed that that group was acting as a

17   cohesive unit.  There was no permit there.  The plaintiffs

18   admitted that they knew it was --

19       THE COURT:  It was a cohesive unit at 16th Street.

20   The issue is did the arrest, and the order to arrest, involve

21   what a reasonable officer would have recognized to be those who

22   were engaged in the collective action and a lot of other

23   bystanders.  And so there are people on the sidewalk, people

24   just walking trying to get to where they are going, and some

25   people just having a drink at a sidewalk cafe.  That's clearly

1    on the video, right?

2              MR. FARRELL:  Yes, but those people were not arrested.

3    There is no plaintiff here in this room, or in any of the

4    papers, out of all of the people that are suing at 16th Street

5    that says I was arrested for sitting at a cafe.  No one.  Not a

6    single person.  So, yes, does the video show there were people

7    on there?  Yes.  But the fact that they are not part of the

8    plaintiff shows that the Police Department's efforts to make

9    sure they only arrested the people that had engaged in the

10   unlawful conduct were successful, at least reasonably

11   successful.  Again, the litmus test here is not that we have to

12   show a criminal conviction beyond a reasonable doubt.  We just

13   have to show a probability of criminality by the people that

14   were placed under arrest.  We're not dealing with criminal

15   conviction.  And your point that, yes, the video shows

16   people --

17             THE COURT:  One of the things that is good about

18   having these, is I get to eventually ask a question or two.  So

19   you just can't run right over me.  You can't do that.

20             MR. FARRELL:  I don't mean to do that, your Honor.

21   I'm just cognizant of the time and the several points I'm

22   trying to make.

23             THE COURT:  All right.  But my questions count against

24   your time, that's just life.

25             So the point I'm trying to make is that there are all

```
 1    these people on the street.  The record seems pretty silent,

 2    actually, as to what efforts were done, as was done in Bernini,

 3    to cull through and segregate those who were part of the

 4    collective action and those weren't.  I don't know why the

 5    record is so silent on that, but it's pretty silent.

 6          Couple of cops were sent through, not clear how long

 7    they were given, not clear what exactly they were directed to

 8    do or what instructions they were giving.  It is kind of --

 9          MR. FARRELL:  I don't -- well, I would disagree with

10    your Honor.  I don't think the record is silent.  I think the

11    record is clear.

12          THE COURT:  Tell me what the record says.

13          MR. FARRELL:  All right.  Well, at 16th Street, police

14    lines were formed at both ends of 16th Street.  The parade

15    comes out of the park, it processes north on Union Square East,

16    turns up to 16th Street, it heads east.  At the point, Essig

17    runs down along the group, runs down 16th Street, gets a couple

18    cops at the far end of that block that are in place, forms a

19    police line, the group keeps marching until it reaches that

20    police line, where it stops.

21          THE COURT:  Right.

22          MR. FARRELL:  At that point, a line that had prevented

23    the group from going, continuing north up on Union Square East,

24    there is about -- you know, cops, fold in behind the group, and

25    seal off 16th Street at Union Square East.
```

1            THE COURT:  Right.

2            MR. FARRELL:  That is depicted on the videotape.

3            THE COURT:  So what is the process designed, as in

4    Bernini, to separate out the bystanders from the collective

5    activists?

6            MR. FARRELL:  Right.

7            Chief Essig dispatches two lieutenants, Johnson and

8    Cortright to identify people who were not part of the group.

9            THE COURT:  What were the criteria they were to use in

10   identifying those people; anybody who was shaven didn't count?

11   Or what?  I don't understand.  What were the criteria?

12           MR. FARRELL:  Well, the criteria weren't identified in

13   Bernini as to what they did.

14           THE COURT:  No, they were not.  That's a flaw of

15   Bernini, that it doesn't give much guidance.  It sort of states

16   conclusorily, well, 200 people were let go, 160 were kept.

17   Here, I don't think I have those numbers at all.  Not clear how

18   many were let go or how many were kept.  And it's certainly not

19   clear what criteria the officers were given to decide who was a

20   dolphin and who was a tuna.

21           MR. FARRELL:  The officers were there, they were

22   trained police officers.  They had witnessed the crowd --

23           THE COURT:  Look, no one has greater respect for

24   police officers than I do.  And I know it is a tough job, and I

25   know these were very difficult circumstances.  But what exactly

1    were those two officers supposed to do to determine who was a

2    parader and who was a bystander.

3         MR. FARRELL:  They were going up and down the block

4    telling people that if they were not part of the group, they

5    should go back into their businesses, go back into their

6    apartments, or they should leave the house.

7         THE COURT:  Leave the house?

8         MR. FARRELL:  The block.

9         Specifically, I believe it was -- I believe it was

10   Captain Johnson.  There was a videotape that was submitted as

11   part of our submissions.  It's Chapter 6 of defendant's

12   videotape submissions at 16th Street.  At minute 7:02 to the

13   end, where a videographer on the street, approaching -- Captain

14   Johnson is coming down there, right in front of the camera.

15   And the person says how can I leave the block, how can I leave

16   the block.

17        On the videotape, Captain Johnson says to him just go

18   down to the end and exit at the end of the block.  Which the

19   videographer then leaves the camera on, proceeds down to the

20   Union Square East end of block where you see on that videotape

21   the line of police officers standing, facing out towards Union

22   Square Park.  They are across this way.  The block is behind

23   them.  They are keeping people out.  His videotape captures

24   them saying, no, you can't come in here.

25        So the first thing that videotape demonstrates police

1    officers were making efforts to keep people from wandering into

2    the block.

3           The second thing it shows, he continues to film -- and

4    you can see people, dozens and dozens of people, leaving the

5    block through the police line.  They are walking right out

6    through the police line, through the line of police officers.

7    Nobody is stopping him.  He videorecords this.  He, then, is

8    standing there.  He, himself, steps through and goes right out

9    through the sidewalk and leaves the block.

10          This is all captured on video.  So you have a

11   videotape which captures the instruction of a police officer

12   saying you want to leave the block you go this way.  So that

13   demonstrates two things; one, that Captain Johnson and

14   Cortright were, in fact, going down the block and trying to

15   sort through who was there committing unlawful conduct and who

16   wasn't; and two, it shows that even if you had been engaged in

17   the unlawful conduct, that you were permitted to leave the

18   block.  Because Captain Johnson says on that videotape, which

19   is -- Captain says, quote:  If you want to break off from the

20   group and go back, he says, you may do so on the sidewalk.

21          So that that's the steps that were taken to make it

22   reasonable that Chief Essig and Inspector Dieckmann believed

23   that the people they had left on that block after those efforts

24   were taken, were the ones who had been engaged in unlawful

25   conduct and were demonstrating an intent to continue to do so.

1    If you look at every video that's been submitted -- and there

2    is dozens of videos -- you don't see anybody on those videos

3    saying, oh, how do I get, out where do I go, oh, I'm stuck on

4    here.

5             THE COURT:  Well there are certainly some people who

6    are saying that, right?

7             MR. FARRELL:  Not on the videos, they're not.  The

8    only person on the video --

9             THE COURT:  Wait.

10            MR. FARRELL:  I'm sorry, I apologize.

11            THE COURT:  We're not limited to what is on the

12   videos, right?  There have to be no disputes of material fact

13   for me to grant your motion.  So there are certainly people who

14   are saying, I tried to get out and I couldn't get out, right?

15            MR. FARRELL:  But under Scott v. Harris, when you have

16   videotape that shows what happened, you have people that said

17   they did that, but the videotape overwhelmingly shows that over

18   the hundreds of people that those videotapes capture, nobody is

19   asking where do I go, and what do I do.  And what those

20   videotapes shows are people dancing, singing, and covering the

21   cameras, whether it's a Taru camera, a police department

22   camera --

23            THE COURT:  Clearly probable cause to arrest a lot of

24   people.  The issue is whether it was reasonable to conclude

25   that everybody on the street at the time of the arrest was part

1    of this unlawful assemblage, this unlawful parade.  And that's

2    the issue.  And so in Bernini and Carr, there are efforts, you

3    know defined or not well defined, about trying to cull through

4    who is a part of the group and who is not a part of the group.

5    And it's less clear to me here what the criteria were.  Some

6    people clearly are able to leave at certain points in the

7    video.  It's not clear exactly -- it's hard to I think discern

8    from the video too, at who what point arrest decisions are

9    being made and how much time people were given to disperse.

10           MR. FARRELL:  If you look at the videos, your Honor,

11   that I just quoted and the ones that were submitted, you see

12   there is ample time where the video captures people walking

13   out, dozens and dozens of people walking through the police

14   lines.  And I think that the effort that was made there is it

15   wasn't a case where the police just said everybody on 16th

16   Street, we're arresting everybody.  They did the same thing

17   that the Court in the Eighth Circuit in Bernini found was

18   reasonable.  They made an effort to discern who was part of the

19   unlawful group and who wasn't.

20           THE COURT:  But what did they do to discern.  That is

21   not -- I keep coming back to this.  So what was the criteria

22   for allowing people to leave or not allowing people to leave?

23           MR. FARRELL:  You have people who are easily

24   identifiable as having part of the march.  Two bands in uniform

25   with instruments that had led the march.  You had people who

1   were carrying a banner; some of them got out and perhaps some

2   of them didn't.  You had people that were in the street, in

3   front of -- when the group came up to 16th Street at the Irving

4   Place, the police line was formed, the group stops, people put

5   bandannas on, they sit down.  The people behind them continued

6   to sing, dance, and chant.  And they start chanting:  Whose

7   streets, our streets; whose streets, our streets.

8           The cops are there observing this.  This is not a case

9   where the cops chased them onto some other block.  They see who

10  it is.  They are there.  They then cordon that group off, after

11  allowing the time for the people that wanted to leave.

12          THE COURT:  How much time was allowed for them to

13  leave?

14          MR. FARRELL:  The testimony by Chief Essig I think is

15  between 10 and 15 minutes before the block was sealed off.

16          And I'll say this, that the -- the --

17          THE COURT:  That's undisputed?  I mean, look --

18          MR. FARRELL:  There is no --

19          THE COURT:  -- there are certainly witnesses that said

20  that they were not afforded, an they did not hear a dispersal

21  order and didn't have sufficient time to get away, right?  You

22  may disagree with whether that is true, but there is certainly

23  people saying that, right?

24          MR. FARRELL:  I think it's undisputed when you look at

25  the videotape.  The videotape shows that the person came up and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

said where can I get out and he says, yeah, go down to the end
of block, walk down the sidewalk and exit, and this guy does it
with his video camera and captures dozens of other people doing
it.  I think this demonstrate there was ample time to proceed
from one side of the block to the other, and exit through the
line of police officers.  I think it is undisputed.  You can
have somebody says, oh, I didn't have enough time, but the
videotape shows that you did have enough time.

            And the last point I would add to this issue is, in
Carr, plaintiffs in that case, in Carr, DC case, moved for a
rehearing.  And on rehearing, the Court said, raised another
issue and said can you arrest people who did not violate the
law.  That was part of what Carr said.  Specifically, in the
first time the District Court said, quote -- Carr says:  To be
sure under the standard of our cases, the police are obliged to
show that the crowd acted unlawfully as a unit.  It is possible
that an entirely innocent person would be mistaken for a
rioter, but the standard is probable cause, not certitude.

            So under the circumstances and the facts that are
undisputed, I think it compels the conclusion that the police
made reasonable efforts to believe that people they placed
under arrest were the ones who were engaged in unlawful conduct
on that block.  And the fact that someone may be, and you don't
have a lot of plaintiffs who claim that.  In fact, most say
they were there and had been walking along as part of the march

1   as part of the march or observing the march.  So you had a

2   crowd of people who all processing together, very small number

3   of people who say, oh, I came from a different way.

4          Mr. Dunn's client, Dinler, no, he said that is the

5   typical plaintiff at that location.  That's not the typical

6   plaintiff at that location.  That's one of the very few

7   plaintiffs who claim they came in from a different direction.

8   I think only two plaintiffs in total, out of several hundred

9   that claim they came in from the eastern side of the block

10  versus the western side of the block.  So that's the standard

11  in Carr.

12         I'm gonna switch over to my other motion.  But I just

13  wanted to say that there is no requirement at law for dispersal

14  order.  Carr makes that clear in these situations, when you

15  don't have -- when you have a group that is acting cohesively,

16  you don't need a dispersal order.  Papineau --

17         THE COURT:  What you need to do is to be reasonable in

18  your belief, as a police officer, that everybody you have

19  arrested is part of the collective unlawful assemblage, right?

20         MR. FARRELL:  That's correct.  And the facts we have

21  articulated, I believe demonstrate that the police officers at

22  these two locations made reasonable efforts to do that.  And

23  that's the probable cause standard.

24         You know, if reasonable officers could disagree or a

25  mistake was made, then these officers are entitled to qualified

1   immunity.  These are very difficult circumstances which the

2   police officers are facing when they are trying to police a

3   large crowd.  The DC Circuit recognizes that.  You have these

4   officers trying to do the right thing.  They give warnings.

5   They try to make decisions about who is in the crowd and who is

6   not.  And it's all captured on videotape.  At both locations

7   there are two high-ranking officers who consult and say, you

8   know what, you know, the facts presented to us show that we

9   believe that there was criminality here.  If there is --

10          THE COURT:  Are you suggesting that Monahan consulted

11   with people before he stopped that march?

12          MR. FARRELL:  I'm saying that it was a joint decision

13   between Chief Galati and Chief Monahan to make the arrest.

14   They either both came to it independently, or they both agreed

15   upon it.  And from the Police Department's -- the law says when

16   it is collective knowledge, the knowledge of one can be assumed

17   by the other when you are going to be making arrests in that

18   way.  And in fact Mr. Spiegel added Chief Galati as a defendant

19   in these cases based upon the fact that he was involved in the

20   decision to make the arrests and in fact Magistrate Judge

21   Francis granted that.

22          So you have two senior officers deciding that probable

23   cause exists.  And what I'm suggesting is the law of qualified

24   immunity -- could it be a mistake here?  Yeah, this could be a

25   mistake.  But that's what qualified immunity is intended to

protect.  Qualified immunity is intended to protect, quote, in
the Supreme Court case, Ashcroft, all but the plainly
incompetent.  And I'm going to end on this section by saying at
those two locations, the steps that the officers made do not
make them plainly incompetent.  They try, they tried to do the
right thing.  You may say, hey, maybe this could be a
disagreement about it, but then that's the case that dictates
for the granting of qualified immunity to these officers.

So I'm going --

THE COURT:  Judicial immunity even covers the
incompetence, which is something that I take solace in every
day.

MR. FARRELL:  So unless your Honor has other
questions, I could go on on this, but I need to utilize my time
and go on to the other motion.

THE COURT:  Yeah, you have 20 minutes.

MR. FARRELL:  So the City has made a motion for
summary judgment on it's two policies.  One was to have people
who are engaging in RNC related unlawful conduct put through
for a custodial arrest or receive a DAT if eligible.  And in
these cases, that has been shortened to be called a no summons
policy, so I'll refer to it as the no summons policy.  The
second part of that was that those people arrested, pursuant to
that policy, would be fingerprinted.

Plaintiffs in these RNC cases have basically agreed

1    and dismissed a lot of their claims either explicitly or they

2    have abandoned them.  That's set out in our reply brief.  We

3    delineate all of those.  What's left are three things.

4    Plaintiffs make a First Amendment challenge to the policy,

5    excluding a retaliation claim, they are not making a

6    retaliation claim against the defendant City only.  Part of

7    what they've said is they are not making any claims against the

8    individuals.  So the City should get summary judgment on those

9    claims, the claims against the individuals should all be

10   dismissed.  The only claims that are left are against the City,

11   and there are only three.  One is a First Amendment challenge,

12   as I have said, the policies, but not retaliation claim.  The

13   second is a claim limited to the MacNamara plaintiffs that the

14   policy violated the Fourth Amendment.

15          The Schiller and Dinler plaintiffs, explicitly say

16   they are not making such a claim for violation of the Fourth

17   Amendment or for those policies, summons and fingerprint

18   policies under the Fourth Amendment.  And I would suggest to

19   the Court that if the plaintiffs' counsel for Schiller and

20   Dinler are not making a claim under the Fourth Amendment for

21   those two things, that the next best thing has no reasonable

22   hope of being successful, otherwise they would have promoted

23   such a claim.

24          THE COURT:  Well, wait.  You're going to say that

25   because they abandoned the claim, and I have to assume that

1   there is no merit to it?

2           MR. FARRELL:  I think that's reasonable.

3           THE COURT:  I'm just farm out all my stuff to

4   Mr. Dunn.  Let me know how it goes.

5           MR. FARRELL:  Having litigated against Mr. Dunn, I

6   know he would not forego a claim if he thought there was a

7   chance of success at it.

8           THE COURT:  So I should assume that the ones he is

9   keeping are pretty good?

10          MR. FARRELL:  No -- those are only ones that have a

11  slight chance of --

12          THE COURT:  All of this laughter is coming out of your

13  time?

14          MR. FARRELL:  The third is a state law claim regarding

15  alleged violation of New York Criminal Procedural Law 160.10.

16  And, again, that's against the City only.

17          THE COURT:  Let's start with that one.  Actually,

18  that's a matter of statutory construction, right?  The language

19  in the fingerprinting statute, that's what we're talking about,

20  right?

21          MR. FARRELL:  Yes.

22          THE COURT:  Pretty explicit, it seems to me.  It says

23  that, basically, an officer for offenses like the ones at issue

24  here can only fingerprint if there are two exceptions, right?

25          MR. FARRELL:  Yes, your Honor.

1          THE COURT:  Let me find it.

2          MR. FARRELL:  Right, it says that you may fingerprint

3     when those things exist.

4          THE COURT:  Well, it says:  In addition, the police

5     officer who makes an arrest for any offense, either with or

6     without a warrant, may take or cause to be taken the

7     fingerprints of the arrested person if such officer, (a), is

8     unable to ascertain such person's identity or,(b), reasonably

9     suspects that the identification given by such person is not

10    accurate or,(c) -- which doesn't really apply here --

11    reasonably suspects that such person is being sought by law

12    enforcement officials for the commission of some other offense.

13    So we're really just talking about 2(a) and 2(b), right?  And

14    those are the conditions that are -- I mean it's either (a) or

15    (b) that are necessary to enable a police officer to take the

16    fingerprints of a person charged with an offense such as this,

17    correct?

18         MR. FARRELL:  Well, on the face of the statute, it

19    doesn't prohibit fingerprinting in other instances, but it does

20    say, it does say what you have read.

21         THE COURT:  So you're suggesting that what it really

22    says is that a police officer may take fingerprints in his or

23    her complete discretion, and by the way we'll list a couple of

24    things that might justify the taking of fingerprints, but by no

25    means is this an exhaustive list?  That's the way judges write,

1    but not the way legislators do.

2              MR. FARRELL:  I'm not sure that the statute is always

3    that clear, what I'm pointing out is that it doesn't say that

4    you can't take it.

5              THE COURT:  All right.  Well, it says that the

6    condition of the officer -- well, it says the officer may take

7    the fingerprints if (a) or (b).  You're suggesting that it

8    means that he may also do it under other circumstances not

9    mentioned here.

10             And do you have any authority for that?

11             MR. FARRELL:  No, just a plain reading of the statute,

12   your Honor.

13             THE COURT:  All right.  So let's talk about (a) and

14   (b) then.  So:  If unable to ascertain such person's identity.

15             I mean, so, what is the evidence for being unable to

16   ascertain such person's identity.  Seems to me both (a) and (b)

17   are really turning on intelligence that was received before the

18   convention that some portion, or some persons who might be

19   there to upset the proceedings or to cause civil unrest in the

20   City, were going to not be bringing identification, or bringing

21   false identification; correct?

22             MR. FARRELL:  Yes, your Honor.

23             THE COURT:  And so you're saying that that

24   intelligence would justify a policy to fingerprint everybody

25   who got arrested during that time frame of the convention?

1          MR. FARRELL:  Well, this only pertains to violations;

2    people arrested for felonies and misdemeanors have to be --

3          THE COURT:  No, I get that.  Just those for

4    violations.

5          MR. FARRELL:  Right.

6          And in response to that, the City had intelligence,

7    which is set out in our papers, which says that people were

8    coming here to engage in unlawful activity, would also be

9    bringing false identification.  And on top of that, as a

10   mechanism, how are you going to allocate police resources and

11   how are you going to handle the possibility of large-scale

12   arrests, it made a decision that everyone was gonna be

13   fingerprinted.  It did that because it believed that there was

14   a high likelihood of people would have false identity.

15         THE COURT:  But wait a minute.  The time it takes to

16   fingerprint somebody is probably longer or equally time

17   consuming as having the officer look at the ID and say that

18   looks like you, this seems like it's legit.  I mean so I don't

19   understand why you can't just -- why this is a decision that is

20   left up to the individual officer who is taking the photo I.D.

21   as opposed to saying nobody is going to be able to show us

22   their photo I.D. because we're fingerprinting everybody.

23         MR. FARRELL:  Well, due to the security interests in

24   the RNC, we submitted a declaration from Brian Jenkins, who

25   supports the conclusion that, in today's society, fraudulent

1    IDs can look as real, as real as real IDs.  And presenting an

2    ID that looks otherwise --

3          THE COURT:  But that's true whether you are at the

4    Republican National Convention or anyplace else, right?

5          MR. FARRELL:  But the difference, there, is that

6    during the Republican National Convention, there were

7    heightened security concerns for all of the reasons that are

8    set forth in our papers.  There was concern that you were going

9    to have people coming here to engage in violent acts, there was

10   the possibility of terrorism during the RNC.  There was also

11   the City wanted to get the best possible prosecution against

12   the people that were involved in the unlawful activity.  And to

13   make sure that you have the right person.  The way -- the best

14   way to try to ensure that you have the person it says who they

15   are is to fingerprint.  And that's set out in --

16         THE COURT:  That's always gonna be true.  But the

17   issue is that the statute limits it to two circumstances, it

18   seems to me.

19         And so the first is whether the police officer is

20   unable to ascertain such person's identity, or reasonably

21   suspects that the identification given is not accurate.  And so

22   it seems like there to was no attempts to do either of these on

23   an individual basis, correct?

24         MR. FARRELL:  We concede that it was not done on an

25   individual basis, your Honor.  Because, as we have set forth,

1    the totality of the circumstances and the security interests

2    that were at stake and the reality of fraudulent

3    identification, and on top of that the fact that the Police

4    Department knew that a lot of people were going to be coming in

5    from out of state, where officers were not going to have

6    familiarity with those types of identifications, drivers

7    licenses, whatever else people may show, there was a whole host

8    of reasons that warranted, under these circumstances, to

9    trigger those two exceptions that there was a reasonable belief

10   that you were not being shown proper identification, which is

11   different than your every day non-RNC situation.

12        THE COURT:  Well, but I mean -- I think everyday

13   situations, people might have incentives to use false

14   identification.  Anybody who finds themselves on the wrong end

15   of a summons or the wrong end of a police officer is going to

16   have some incentive not to necessarily give the correct

17   identification.  And if false identifications are that

18   ubiquitous and easy, seems to me the best thing to do would be

19   to change the statute, but --

20        MR. FARRELL:  Well, your Honor, the ability to get

21   false IDs is very different from when the statute was first

22   written however many years ago.  And, again, the dates are in

23   our papers.  Technology has changed --

24        THE COURT:  That's true.  But is that a basis then for

25   police officers to, or for a police department to just say,

1  well, we are not doing that anymore because technology has

2  changed?

3          MR. FARRELL:  For that event, I believe it is.

4          THE COURT:  Why not just generally, why can't the NYPD

5  say, then, you know what this, statute was written in -- I

6  don't know when it is -- oh, my goodness, 1971.  So -- with

7  some amendments in 2010.  But let's just assume now the Police

8  Department says, oh, this is completely out of date, we're not

9  going to do this, so we're going to adopt new policy that

10 countermands this statute.  They can do that?

11         MR. FARRELL:  We are not saying it's a new policy.

12         THE COURT:  But I'm asking to you indulge me and say

13 if a police department said that, that would be okay according

14 to the statute?

15         MR. FARRELL:  No, I would not say they are rewriting

16 the statute.  I'm saying the reality of that statute, when you

17 reasonably suspect someone doesn't have the proper ID or has a

18 fake ID, in 2012 people can generate ID off a computer that

19 they couldn't do in 1971.  Now, I'm saying they would fit

20 within the exception of that statute.

21         THE COURT:  Well, but it has to be a reasonable

22 belief.

23         MR. FARRELL:  Right.  And the reasonable -- sorry.

24         THE COURT:  So I mean that's the inquiry, is whether

25 there is a reasonable belief.  And it seems to me what you're

1    saying is that, in 2012, and maybe even 2004, that it would be

2    reasonable to believe that everyone has got fake ID and,

3    therefore, the statute no longer applies.

4         MR. FARRELL:  I'm saying the -- I'm not saying the

5    statute doesn't apply, I'm saying it's two parts of it.  One is

6    we have to recognize the reality of how easily accessible

7    fraudulent identification is in today's -- in 2004 and today.

8    And, two, there were special circumstances revolving around the

9    RNC that warranted to make a policy decision, rather than

10   leaving to ad hoc determinations under those circumstances of

11   the RNC when you are faced with possibility of mass arrests and

12   large quantities of people to fit within the parameters of that

13   statute.

14        THE COURT:  But then it turns on whether that policy

15   is reasonable, I guess, right?  You're just saying it has to be

16   reasonable.  Reasonableness is the test.  But policy, in the

17   event of a large event like the RNC is more appropriate than

18   just leaving it up to the individual police officers.

19        MR. FARRELL:  That's what we're saying, your Honor.

20        THE COURT:  Well, let's get to other policy,

21   because --

22        MR. FARRELL:  The other thing I would say, your Honor,

23   is, on the fingerprinting statute, that there also is no

24   private right of action stated for a violation of that statute.

25        THE COURT:  Now, there is some precedent that has

1    allowed a private right of action and damages.  It goes back to

2    1950 or something, right?

3            MR. FARRELL:  I believe so.  I think it may -- I don't

4    really want to use my time discussing those cases.  And if you

5    do, we can have a discussion, I brought one of my colleagues

6    for that.

7            THE COURT:  No, let's just get to the --

8            MR. FARRELL:  Right.  There is no explicit private

9    right of action.  And I would say that the other sections of

10   the criminal procedure law provides for the destruction of

11   those fingerprints.  And that was the remedy that the

12   legislature intended to provide in that event.  Not just on

13   awarding a lot of individual damages claims, but that statute

14   was initially written so you could create fingerprinting data

15   bases for the benefit of the police department.  It wasn't for

16   the benefit of individuals.

17           THE COURT:  Wasn't designed to be punishment, right?

18           MR. FARRELL:  No.  And we are only talking about --

19   this is only the criminal procedural law.  The section, under

20   the Constitution --

21           THE COURT:  I got it.  Move to the next point.

22           MR. FARRELL:  All right, so --

23           THE COURT:  No summons policy.

24           MR. FARRELL:  Yeah, no summons policy.

25           So the first question is whether the no summons policy

```
 1    imposed a direct and substantial burden on First Amendment
 2    activity.  And this was a policy that was not directed at
 3    speech, there is no way around that.  The policy was to only
 4    apply if you were perceived to have broken the law.  And this
 5    goes back to my eight hundred thousand people that
 6    demonstrated.  They all demonstrated without being subject to
 7    the no summons policy.  Because they were not perceived to be
 8    breaking the law, they were not arrested.  So the policy is
 9    clearly just by the size and scope of the demonstrations that
10    took place where the policy didn't apply, shows that the policy
11    was not directed at First Amendment speech, it was directed
12    at --
13              THE COURT:  Let me interrupt.  I mean if somebody is
14    jaywalking on a street in a different part of Manhattan, they
15    are not subject to the no summons policy, right, even during
16    the time period of the convention, correct?
17              MR. FARRELL:  If --
18              THE COURT:  If you were jaywalking on 10th Avenue and,
19    you know, 12 Street where there is nothing going on, presumably
20    you were not subject to the no summons policy, right?
21              MR. FARRELL:  I don't believe jaywalking was one of
22    the concerns that was a threat that were identified.
23              If you were involved in unlawful activity that the
24    intelligence had said was a concern to the City, because it was
25    intended to disrupt, shut down the RNC, shut down the City,
```

block the ability of the City to operate, have emergency

vehicles operate, to have delegates be able to get to the

convention, to and from hotels and other events, that was the

type of conduct that the policies were directed to address.

And it is only to unlawful conduct.  The only time the policies

were triggered is if you were arrested for unlawful conduct.

THE COURT:  But unlawful conduct, I just want to be

clear about this.  There is unlawful conduct and there is

unlawful conduct.  What you just said is this is unlawful

conduct that was believed designed to disrupt the Republican

National Convention.

MR. FARRELL:  Or the City.  It was -- yeah, it was the

types of threats and conduct that the intelligence information

that had been developed said was going to try and shut down the

City, generally, or shutdown the RNC.

THE COURT:  But are you suggesting that somebody who

engaged in that conduct, far removed from the RNC, was going to

be subject to the no summons policy.

MR. FARRELL:  If they were engaged in unlawful conduct

that the police officer believed was of the type that had been

identified --

THE COURT:  Well, maybe -- so what is the type that

has been identified?

MR. FARRELL:  Well, it was -- well, it was generally,

as I had said, conduct intended to disrupt the City, disrupt

1    the RNC.  And that conduct could take place in outer boroughs.

2    Some of these events, some of the possibilities were that this

3    was going to be coordinated conduct.  There were discussions of

4    plans of people who wanted to do this, they were going to

5    create diversions out in outer boroughs to draw police

6    resources out there so they could do things here in Manhattan.

7         There is a whole host of reasons why it is not the

8    proximity or the location of the conduct, but it's the type of

9    conduct, illegal conduct, that the department anticipated.

10   That's what the policy would apply to.

11        THE COURT:  But you're telling me, so you like to run.

12   And so you, in Queens, decided with your buddies to do a little

13   road race.  You're saying you and your friends, during the

14   period of the Republican National Convention would have been

15   subject to the no summons policy, even though you had no

16   interest in disrupting the RNC and no interest in making any

17   kind of political statement, you are saying that you and your

18   buddies would have been subject to the same no summons policy.

19        MR. FARRELL:  No, I think the testimony is clear.

20   Chief Esposito has testified that the policy didn't apply to

21   things that would have been going on anyway, absent the RNC.

22   The concern was the RNC and the undeniable intelligence that

23   there was a mass movement to try and disrupt the City and the

24   RNC during that time.  So if there was a demonstration that was

25   going on, had nothing to do with the RNC and had to do with

1    some, you know, business dispute, the policy didn't apply

2    there.  I mean we have laid that out in the declarations.  It

3    is in Chief Esposito's testimony.  So it's the unlawful conduct

4    that is at issue, and --

5            THE COURT:  So somebody who was protesting the

6    nonunion workers at a building and is engaging in the same

7    activity, they're not subject to the no summons policy, but

8    somebody who is against the War in Iraq would be subject to the

9    no summons policy.

10           MR. FARRELL:  No.

11           THE COURT:  No.

12           MR. FARRELL:  The policy was not content based.

13           THE COURT:  Well, you could say that all you want, but

14   you just said it was people directed towards disrupting the

15   RNC.  So somebody outside of a building protesting, and with a

16   group of people, protesting the nonunion workers who had been

17   brought into that building, that big rat, you know how it's

18   done, they are doing that.  So you are suggesting to me that

19   those folks would not be subject to the no summons policy, but

20   somebody who just, frankly, doesn't care about union workers or

21   nonunion workers, but is really against the War in Iraq and

22   wants to send that message to the Republican National

23   Convention, they would be subject to the no summons policy.

24           MR. FARRELL:  It's not the War in Iraq that triggers

25   the policy.

1          THE COURT:  Well, what is it, it's that they wanted to

2     disrupt the RNC.

3          MR. FARRELL:  And shut down the City.  Yeah, it's

4     unlawful conduct.

5          THE COURT:  Well, they don't want to shut down the

6     whole City, they just want to shut down maybe a couple blocks

7     in front of the RNC, just like the folks in front of the

8     nonunion building want to shut down that block.

9          MR. FARRELL:  No, I disagree, your Honor.

10          I mean the intelligence clearly shows that they want

11     to disrupt the City in its entirety.  The delegates were

12     staying at various hotels throughout the City.  They all were

13     not in a two-block radius at Madison Square Garden.  There were

14     events at those hotels, people going to the theater district,

15     there were dinners --

16          THE COURT:  I get all that.  The whole issue here is

17     almost a silly exercise, but that's what the law requires

18     because of the different levels of scrutiny, right?  So if it's

19     content neutral, it's one level.  And if it is content

20     specific, it's a different level.

21          You're arguing that its content neutral.  And I'm

22     pressing you on that to say that its designed that any activity

23     that is going to disrupt the Republican National Convention

24     gets sort of close to content specific, doesn't it?

25          MR. FARRELL:  No.  The message doesn't matter.  It is

1   not message based.  The content of the speech is irrelevant.

2   It's the act of the unlawful conduct that triggers the policy.

3   The speech doesn't matter --

4        THE COURT:  So if the intent is to mess with the

5   Republicans, it is one thing, but if the intent is to mess with

6   people of other political persuasions, it's less of a big deal?

7        MR. FARRELL:  No one was making judgments about when

8   the policy applies to what.  The message was who they were

9   intended to mess with.  The message was whether they believed

10  those people were here to disrupt the city and shut down the

11  City during the time period of the RNC.

12       THE COURT:  Clearly not specific to whether one is for

13  the war or against the war, whether one is pro life or pro

14  abortion or pro choice, right, it is not that.  Because we had

15  protestors, in fact, who got arrested for being -- criticizing

16  the Republicans for not being pro life enough or conservative

17  enough, right?

18       MR. FARRELL:  Yes, your Honor.

19       THE COURT:  All right.  So you're urging, then,

20  intermediate scrutiny.

21       MR. FARRELL:  I'm urging two things.  Before I even

22  get to immediate scrutiny, I'm saying that because saying that

23  conduct and not speech, that they can't even meet the threshold

24  burden that they have to show that the policy places a direct

25  and substantial burden on First Amendment activity.

1          Assuming arguendo that it does play, that they do meet

2     the threshold burden and show there is direct and substantial

3     burden on First Amendment activity then, yes, intermediate

4     scrutiny should apply, because it's not a content-based policy.

5     It's based upon conduct.

6          THE COURT:  Okay.

7          MR. FARRELL:  So the intermediate scrutiny test has

8     two parts to it; must advance important governmental interests

9     and must not burden more speech -- substantially more speech

10    than necessary.

11         I think that, you know, the part about what the

12    interest that -- the important governmental interests that were

13    advanced, I'm not going to repeat.  Those are all set out in

14    our papers.  Just in summary, the interests that advanced were

15    that policies combatted threats to public safety, they ensured

16    the flow of pedestrian traffic, they were sought to control

17    spiraling criminal conduct, they ensure that the RNC was not

18    shut down --

19         THE COURT:  Is it legitimate to say we just want to

20    make sure that these folks only get to protest once a day,

21    because if we just give them a summons, they will just collect

22    tickets and not be moved or deterred, is that a legitimate

23    interest?

24         MR. FARRELL:  I think there is two things there.

25         One is if you didn't break the law, you could have

1    protested to your hearts desire.  And 800,000 people did do

2    that.  If you broke the law, then there was a legitimate

3    interest in making sure that that conduct didn't continue,

4    because the intelligence information showed that people were

5    coming here with the intent to do that.  And if you issue

6    someone a summons on the street, and they are intending to

7    block traffic or shut things down, that summons is not going to

8    deter them.  We submitted a declaration from Carl Holmberg who

9    has many years of experience up in Washington.  And he confirms

10   all of those, all of those things.  And when you -- and you

11   also have the threat of spiraling disorder.  You know what had

12   happened before the RNC, and this is all set out in Chief --

13   Commissioner Cohen's declaration, there were other cities that

14   had hosted similar large-scale events.  These are undisputed

15   facts; Seattle in 1999, hosted the World Trade Organization --

16            THE COURT:  I know that.

17            MR. FARRELL:  Miami, 2003.

18            THE COURT:  I know that.  Don't tell you me what I

19   know, you are on the clock, in fact, you are over time.

20            MR. FARRELL:  I will try and speed up to the

21   conclusion.

22            I think that the important things that are undisputed

23   that the Court should recognize as undisputed and that the

24   plaintiffs don't dispute, is that Commissioner Cohen provided

25   information about a tripartite threat to the Executive

1     Committee, which included the police commissioner and Chief

2     Esposito.  That three-prong threat involved terrorism, anarchy,

3     and widespread civil disobedience.  The Schiller brief and

4     Macnamara brief both concede that plaintiffs recognize the NYPD

5     had information indicating that New York City faced threats of

6     substantial disorder or worse during the convention.  And

7     further, that it used this information in planning for the

8     convention.  That the Schiller brief three in opposition, and

9     in Macnamara they make a similar admission in their brief on

10    page 1.

11          The threats were informed by information that was

12    collected specifically for the RNC, which is set out in the

13    End-User Reports.  It also was informed by those prior

14    large-scale disorder events.  And, indeed, the Second Circuit

15    has recognized in these RNC cases and their law enforcement

16    privilege decision, they recognized that Commissioner

17    Cohen's --

18          THE COURT:  I remember that.  I remember that one,

19    yes, yes, yes.

20          MR. FARRELL:  They credited Commissioner Cohen's

21    research and analysis of security threats at other large

22    events, including Seattle and Miami.  And they said, they

23    recognized that the NYPD needed a strategy to avoid disorder

24    and violence during the RNC.  The Circuit recognized that based

25    on the End-User Reports that were before them.

1        The policies were in effect for a total of seven days,

2   that they were in effect for seven days and they ended.  This

3   is not a statute that was adopted to last in perpetuity or for

4   other days of the year, it was only during the time period in

5   and around RNC.  That is all the undisputed factual evidence.

6        I talked about what the needs were.  Then the law

7   requires that they fit, the policy be a reasonable fit between

8   the policy and the government interest, and not burden more

9   speech than is reasonably necessary.  The one example we

10  already talked about which is the continuous unlawful activity,

11  is the perfect example of the reasonable fit.  How to get the

12  people, clear the condition, open the street up.  You know,

13  just think about 16th Street where you had all of those people.

14  If you start issuing summons to those people, it was clear that

15  they intended to keep breaking the law.  The testimony in that

16  case was police vehicles couldn't even get close to that

17  location, because the traffic had backed all of the way up.

18  They had to get out of their cars and run down.  The same thing

19  is true for ambulance, fire trucks, if you had emergency

20  response vehicles, you couldn't do any of those things.

21        THE COURT:  Mr. Farrell, I think I have got you 10

22  minutes over what I gave you, so do you want to rap it up?

23        MR. FARRELL:  I'll rap it up.  And I'll save for

24  rebuttal plaintiff's arguments as to why they attack the

25  policies, also set out in our brief.

1              I also say the Macnamara plaintiffs, their argument

2      that there is no Constitutional right to a summons, all you

3      need to do is look at Virginia v. Moore and Atwater, and it's

4      clear there is no Constitutional right to a summons that

5      disposes of their case.  To the extent they are still trying to

6      allege equal protection claim, they have not met the

7      comparative group.  They have not also shown any animus in the

8      record by the Police Department for adopting the policies.

9              And with that, I'll save the time you permit me or my

10     colleagues for rebuttal.

11             THE COURT:  That will be purely at my discretion.

12             MR. FARRELL:  Okay.

13             THE COURT:  Who are we going to hear from here, Mr.

14     Dunn?

15             MR. DUNN:  You can call me Judge Dunn, if you want, so

16     let's --

17             THE COURT:  Doesn't pay much, but I guess --

18             MR. DUNN:  Let's start with the no summons policy.

19             Your Honor, clearly, this was a content-specific

20     policy.  It was not viewpoint specific, it was content

21     specific.

22             If you were involved in expressive activity connected

23     to the convention, you got checked into Pier 57.  If you did

24     not, you did not.  So take your jaywalking example, I will

25     answer the question.  If you had been jaywalking at 10th and

1    12th without anything connected to the RNC, yes, you would have

2    gotten a summons and been on your way.  If you -- did that with

3    an RNC related sign in the Bronx, or in the farthest corner of

4    Queens, you were going to Pier 57.  Everybody who went to Pier

5    57 was a protestor or connected to the protest.

6           Meanwhile, many people who engaged in the exact same

7    conduct during the convention got summonses, including people

8    right in Madison Square Garden who were charged with disorderly

9    conduct and this Quality of Life initiative the department ran,

10   directly across the street from the Garden, they got summonses.

11   This was a protest policy.  And, certainly, on summary

12   judgment, we get that.

13          Second issue is the justifications for the policy.

14   And again, this is --

15          THE COURT:  Well, I mean so you're saying it is

16   content specific, but what Mr. Farrell is saying is that this

17   is not imposition on First Amendment rights, right?

18          MR. DUNN:  He did say that.  And I don't think Mr.

19   Farrell would say that tomorrow the department adopted no

20   summons policies for African-Americans, that was not a race

21   based policy.  Of course this was a speech policy.

22          THE COURT:  That would be equal protection argument?

23   Right.

24          MR. DUNN:  Well, equal protection argument, but there

25   would be no question that would be a race policy.  Just like

this policy was an RNC protest policy.  To be sure, you had to

he be charged with an offense.  But, then, they separated two

groups of people; the people that charged with that offense

while engaging in a protest activity got to go to Pier 57.

Everyone else got to go home.  And I would submit that is as

much as speech based policy as anything.  And given that it's a

speech based policy, it's subject to strict scrutiny.  Even if

it is subject to intermediate scrutiny, and we think it is

subject to strict scrutiny, there is then the question about

what's the reason for the policy, and is it actually narrowly

tailored.  Here, we have big factual dispute.  Mr. Farrell

wants to treat the policy as being based on certain things.

But of course there is a big dispute about that.  You know,

this is a policy that, according to the City, was adopted by

Commissioner Kelly.  Commissioner Kelly is completely absent

from this case.  There is no testimony from him.  There are no

documents about the reasons for the policy.  What the City is

left with is the memory of Chief Esposito, the Chief of the

Department.  And Joe Esposito is a good guy, but he has a

terrible memory.  And when you look at the deposition

transcript -- and we put this in.  He doesn't remember the

particulars of about the policy.  Indeed, he testifies he has

got the wrong date by many months about when the policy was put

into place.  He testifies in his deposition, when specifically

asked, that he has no recollection of the meeting where policy

1    was adopted in the conversation during that meeting.  And he

2    testifies that this was a policy that had been put in place for

3    many prior events.  The fact of the matter is, on summary

4    judgment, when we get all of the facts construed in our favor,

5    what you are left with is a policy that was seemingly adopted

6    without any deliberation very early in the game, that was just

7    a repeat of a policy from before.  It had nothing to do with

8    intelligence, it involved no deliberation that we can tell.

9    And given that there is no basis for suggesting that that

10   policy meets any sort of narrowing test, and any sort of

11   compelling or intermediate scrutiny.

12        THE COURT:  Well am I supposed to check common sense

13   at the door.  You read what Second Circuit said on these

14   things, they seem to be very concerned about law and order,

15   maybe more than I am.  What is the response to that.  I don't

16   need Joe Esposito to remember the specifics of a meeting to

17   know what are the obvious reasons to have a policy like this,

18   right?  Aren't they going to say that?

19        MR. DUNN:  Not on summary judgment, they are not, your

20   Honor.

21        THE COURT:  Depends on the panel.

22        MR. DUNN:  Fair point.  And no one is more of a law

23   enforcement person than you are.

24        THE COURT:  I don't know about that.

25        MR. DUNN:  Well, let's talk about the intelligence.

1       You want the talk about the intelligence, I mean, the City

2       makes a big point of saying the intelligence played a big role

3       in the policy.  But when you look at the facts, at least

4       certainly on summary judgment, and even otherwise, everything

5       suggests otherwise.  As you may recall, we got to within three

6       days of the completion of pretrial discovery in the case,

7       before the City ever mentioned Commissioner Cohen.  And before

8       the City ever mentioned this intelligence gathering operation.

9       And we're year and a half, two years into the case.  And, all

10      of a sudden, Commissioner Cohen, for the first time, shows up.

11      So we have the whole process with the Circuit, as you know, and

12      how long that took, and then we depose Commissioner Cohen, and

13      he says in his deposition I never participated in conversations

14      about the policy, I didn't even know about the policy until

15      after the convention was over, even though he was sitting in

16      all of these meetings with Commissioner Kelly and Joe Esposito.

17            So when I look at those facts, it may suggest that

18      there was common sense that this intelligence was being used

19      for some reason.  And I'm not suggesting for a moment that the

20      City wasn't concerned about the information in the

21      intelligence, wasn't maybe using it in some police setting.

22      But that's a very different question in whether or not it

23      played a specific role in the policy.  And there is no evidence

24      certainly on summary judgment, a tryer of fact, including a

25      jury, could reasonably conclude that the intelligence played no

role in the policy, and they were simply adopting the policy as
it had for many prior events.

So then you are left, even if in you want to suggest
the intelligence played some role, and I'm not going to get
into the details of this.  But then the question would become
what in the intelligence allows the City to single out protests
as the sole source of threat for disorder during the
convention.

And Mr. Farrell might want to say those people walking
along the sidewalk on Fulton Street were the biggest threat
that the City faced, or he may want to say that Georgianna, a
former client of ours, one person standing in front of a Honda
Dealership with a sign, who ended up going to Pier 57, was some
huge threat to the RNC.  But I would submit to you, your
Honor -- we detail this in our briefs -- that when you look at
the intelligence, nobody could conclude, as a matter of law,
that this policy was narrowly tailored to the concerns that is
in the intelligence, such that the City could single out
protestors with a no summons policy, which is what it did.

Very quickly on the fingerprinting, I think you
understand the fingerprinting.  The statute says what it says.
There is undisputed evidence from many plaintiffs, including
all of ours, they had ID, they showed them ID, it was valid ID,
the City does not get to ignore a state statute.  They want to
change it, they can change it.

1          THE COURT:  Well, I guess the argument is that the

2     statute doesn't require an individualized police officer

3     determination, that the policy can be used, instead, where

4     there is a reasonable bases to support the policy, right?  But

5     you're saying that that is unsupportable as a matter of

6     statutory construction?

7          MR. DUNN:  Yes.  You asked Mr. Farrell is there any

8     case law to support that and he said no.

9          THE COURT:  Any case law that goes the other way?

10         MR. DUNN:  I don't think --

11         THE COURT:  Not a lot of case law on this one, right?

12         MR. DUNN:  I don't think it's my burden to show case

13    law that establishes what the statute says on its face.  The

14    statute, on its face, says they have to have a reason to

15    suspect the bona fides of the ID of the person in front of

16    them.

17         THE COURT:  The statute says that a police officer who

18    makes an arrest may take the fingerprints if such police

19    officer is either unable to ascertain the identity, or suspects

20    the identification is not accurate.

21         So you're saying that that means that only the

22    arresting officer is able to make that determination?

23         MR. DUNN:  Well, it doesn't have to be the arresting

24    officer, it has to be the officer that's --

25         THE COURT:  The statute says -- no, no the statute

```
 1   says a police officer who makes an arrest --

 2            MR. DUNN:  Okay.

 3            THE COURT:  -- may take, or cause to be taken.

 4            MR. DUNN:  Recognizing that could involve an officer

 5   who is processing an arrest -- I think that's absolutely right.

 6   The person who is handling the arrestee, by the very terms of

 7   the statute, has to have a reason to question that person's

 8   identification.

 9            THE COURT:  Again, that's not the language of the

10   statute.  Maybe you should have the statute changed.  The

11   statute is limiting it to the arresting officer.

12            MR. DUNN:  I understand that.  But the arresting

13   officer is the person processing the person.  That's what

14   happens.  The arresting officer takes the person -- I am in

15   agreement with you that, yes, the arresting officer has to have

16   that.  What they cannot do, by virtue of information you had

17   months beforehand about other people, we are gonna conclude

18   across the board that every person that presents themselves to

19   us, even if they have a valid drivers license, we don't have to

20   take that into account, and we can assume that we can print

21   them, which is what they did.

22            THE COURT:  And what about whether or not this creates

23   a private right of action, and whether the remedy is damages as

24   opposed to just the fingerprints getting destroyed?

25            MR. DUNN:  As you point out, there are three cases
```

1    where the New York courts do exactly that, namely there were

2    damages for unlawful fingerprinting.  I agree there is not a

3    large body of case law out there, but there are three cases all

4    of which do the exact same thing.  And in those three cases,

5    while you are absolutely right that those are older cases, they

6    are completely consistent with the case law in New York now

7    about implied causes of action.  And, you know, we said set

8    that out in our brief.  But, clearly, this is a statute that

9    was intended to protect people from being improperly

10   fingerprinted.  And recognizing the violations consistent with

11   that.

12           And there is no other remedy.  I mean, yes, you can

13   get your fingerprints sealed if there is a certain outcome in

14   the case, but that's not a remedy for the taking of the

15   fingerprints themselves and the damages associated with that.

16   And we have three courts that have awarded damages to people in

17   New York for exactly that.

18           So the final thing I want to say --

19           I'm sorry, unless you have further questions on the

20   fingerprinting.

21           THE COURT:  No.

22           MR. DUNN:  I want to go back to the false arrest

23   issues, very briefly, in reply to that.

24           I think you're completely clear about what the law is

25   on this.  I don't know if there is any disagreement between the

1  plaintiffs and you.  But one issue I want to emphasize about

2  16th Street, and you were focusing on this, was what's

3  dispositive is, given that the marchers, however you want to

4  describe them, got routed into a city block full of people, the

5  dispositive question is what did the City actually do, or what

6  did Inspector Essig do to separate the people who were perhaps

7  the lawbreakers from everyone else there.

8        And you're right, the record is very sparse on this,

9  the City has put in very little.  But what is there is Essig

10  says he sent Cortright and Johnson down the block, without any

11  amplification, without any clear instructions, to tell people

12  something about leaving the block.

13        THE COURT:  All right.

14        MR. DUNN:  And he says in his deposition, after about

15  five minutes, he then started making arrests.

16        THE COURT:  Right.  So assume all of that to be the

17  case.

18        MR. DUNN:  That's right.  So then the question is, is

19  it reasonable in the circumstances in which he found himself,

20  namely he has to seal off a block full of all kinds of people,

21  some of which may be lawbreakers, many of which may be not, is

22  it reasonable, as a matter of law, for him to conclude, based

23  upon having sent two people down the block without any sound

24  amplification, without any clear instructions, and without an

25  order to people at the lines at either end to let people out,

1  was it reasonable under the circumstances for him to conclude

2  that, five minutes later, that everybody in the block had

3  engaged in unlawful activity and can be arrested.

4          And we submit as a matter of law, that cannot be

5  reasonable and, therefore, we are entitled to summary judgment.

6          THE COURT:  Okay, thank you.

7          MR. SPIEGEL:  Your Honor, I'm going to be very brief

8  on Fulton Street, because it is clear that there is a deep

9  understanding of what happened there on the Court's part.

10         Mr. Moore assisted me with the Vodak reference

11  regarding permission, then having been withdrawn.  I want to

12  look at the three violations that Mr. Farrell relied upon; more

13  than two people abreast, crossing against the traffic light,

14  parentheses, at an intersection at which police officers are

15  guiding people across the street -- which I think obviates that

16  one on its face.  But even accepting that, the final one was

17  that the banner was turned.

18         Incidentally, the two banner carriers, as it turns

19  out, were not arrested.  They actually ended up on the other

20  side of the police lines, so they were not arrested at Fulton

21  Street.  But accepting that those three things took place, it

22  does not support the City's position that that leads to a

23  conclusion that 227 people on that block had banded together to

24  violate the law.  It's as simple as that.

25         The final thing I wanted to address, very briefly, Mr.

1    Farrell said that they did a sorting process after the 227

2    people were surrounded.  And the basis for that sorting process

3    was credentialed media were released which, on its face, is an

4    admission that the basis for releasing people was not their

5    conduct that had been observed beforehand, but was their status

6    as credentialed media.  That's the entire basis of the sorting

7    process.

8            THE COURT:  Well, in fairness, it would not support a

9    conclusion that they are not part of the collective action.  If

10   they are members of the media, they were not participants.

11           MR. SPIEGEL:  But the City takes the position that,

12   no, they saw everyone, regardless of whether or not they were

13   media or not, engaging in the collective action.

14           THE COURT:  I agree there is a tension between several

15   points made by the City, but I'm asking you a different

16   question.

17           So if the City sorted out, by media credential --

18           MR. SPIEGEL:  Is that a sufficient sort?

19           THE COURT:  -- wouldn't that be exactly what is

20   contemplated in something like Bernini?

21           MR. SPIEGEL:  No.  I think that Bernini at least says

22   what we looked at, what we tried to do, was to isolate the

23   group that we believed had committed the unlawful act.  And we

24   separated out people that we didn't think committed an unlawful

25   act.  Whether or not someone is carrying a press credential is

1   not the condition, is not a basis upon which to distinguish

2   whether or not someone had previously been committing an

3   unlawful act.

4            THE COURT:  Yeah, there again, but I think the group

5   probable cause concept turns on membership in the collective

6   and illegal activity; right?

7            MR. SPIEGEL:  Yes.

8            THE COURT:  So the members of the media are not gonna

9   fall into the first category, are they?

10           MR. SPIEGEL:  No.  But many members of the media were

11   there.  And the bases for distinguishing was not whether or not

12   you were actually participating in the illegal activity.  As it

13   turned out, the bases for distinguishing was whether or not you

14   were carrying around a tag after the fact.

15           THE COURT:  Well, again, I think one of the criteria

16   requires there to be membership.  If you have a thousand people

17   and the goal is to stop traffic on Broadway and 42nd Street at

18   that intersection, the goal is to get as many people into the

19   intersection as possible to stop the flow of traffic.  If you

20   are not among the first hundred, maybe you're not in the

21   intersection.  But you are still going to be subject to arrest,

22   I would think, because you are part of the group, you

23   understood what the group was doing, the goal was to violate

24   the law.

25           If you are a press person who is not part of the

1    group, just watching what is going on, if you are violating

2    the -- the local traffic law ordinance, then you could be

3    arrested on your own, but I don't think you are arrested just

4    because you are tagging along with the group.

5         MR. SPIEGEL:  I'm not suggesting that it was not

6    proper to release people who were clearly part of the media,

7    I'm suggesting that the sorting process was not a sufficient

8    one to actually distinguish between the people who they claim

9    were violating the law.

10        THE COURT:  All right.  I get that.

11        MR. MOORE:  Just a couple of responses to the issues

12   raised by Mr. Farrell and by the Court, in some of the

13   questions.

14        They didn't in fact sort it out later.  They didn't

15   take people to Pier 57 and sort it out later as you suggested

16   they might have done.  There was no attempt, at any time,

17   either during the arrest at 16th Street, other than the effort

18   made by Johnson Cortright which we say was not sufficient as a

19   matter of law, anyway.

20        THE COURT:  But look, what Mr. Farrell says is that

21   you have the testimony of those two officers, and then you have

22   video that shows a lot of people walking out of there.  And I

23   mean it's clearly not the situation -- it's very different than

24   Fulton Street, frankly, where the orange fencing goes around

25   that whole group and nobody is getting out at that point.

1      There is a lot of people moving in and out for minutes --

2              MR. MOORE:  Well, the whole --

3              THE COURT:  -- after -- after, you know, they had been

4      told that this is illegal activity, right?

5              MR. MOORE:  Well, they have been -- nobody was told

6      anything, no announcement, no directive, no anything by the

7      police at 16th Street that there was illegal behavior going on;

8      no notice, no warning order to disperse, none of that happened.

9      In fact, all --

10             THE COURT:  Certainly on the video, there is officers

11     telling people that if you want -- if you don't want to get

12     arrested, you'd better get out of here, right?

13             MR. MOORE:  Fair enough.  There are some officers say

14     that.  The question is were the efforts made by NYPD at 16th

15     Street reasonably calculated to advise people who were not

16     engaged in unlawful conduct so as to avoid this group arrest,

17     that they had a right to leave.  And we don't think, under any

18     stretch of the imagination that happened.

19             There is only, Essig, himself, only says there were

20     two officers who went down the street and came back, there was

21     no amplification for what they were saying, they didn't give

22     them any instructions about what to say.  They only spent a few

23     minutes, at most.  There was no directive given to any of the

24     officers at the barricade about whether they could or could not

25     permit people to leave.  In fact, all of the plaintiffs in

1    Macnamara, and if you look at our Rule 56.1 statement, all of

2    them say they went up to the line and asked to be allowed to

3    leave and were denied that, denied permission to leave.  All of

4    them say that.  In fact, not just the Macnamara plaintiffs, but

5    the additional plaintiffs in the other cases say that as well.

6           So and it's undisputed that people did try to leave

7    and were prevented from doing that.  And it's undisputed that

8    people were not permitted to leave, at least -- at least many

9    of the people, and certainly enough to suggest that no

10   reasonable effort was made to really do this sorting process.

11   I don't think you can conclude that any sorting of competent

12   basis was ever done by the police.  Simply sending two officers

13   down the street for a couple of minutes without any

14   direction -- in fact, what they were really doing, if you read

15   Cortright and Johnson's deposition, is that they were focusing

16   on the business owners to tell them to shut their doors and to,

17   you know, shut the garage -- there was a big garage there, you

18   see the garage on the video.  So I just think that there was

19   no -- as you said, the record is very thin with respect to the

20   effort to call out, unlike in Bernini.

21          THE COURT:  I'm not sure the record is so great in

22   Bernini, honestly.  What is there is the number of people who

23   were let go, and I think the amount of time that was used to

24   sort.

25          MR. MOORE:  With respect to the video that Mr. Farrell

1    spoke about, that Mr. Rothman in his brief at footnote four

2    lays out the circumstances of that.  And I would -- that's one

3    of the briefs that was submitted.  And we would, you know,

4    direct the Court so that it's clear that if you really look at

5    the video, that the person who was getting out, individually

6    Bradley Will, who is no longer with us, had simply slipped out

7    when the cops were looking the other way.

8          In fact, he says at the beginning he was down at -- in

9    the video -- Irving Place and was pepper sprayed when he tried

10   to get out there.  So that doesn't suggest that there was any

11   sort of uniform or consistent efforts by the police at this

12   location to cull out the dolphins from the tuna, as you say.

13         With respect to the no summons policy, Judge, let me

14   say something else.  Because, I think before I go to the no

15   summons policy, I think there was a suggestion that the

16   admission that was entered into the record by Judge Francis

17   with respect to the lack of individual personal knowledge about

18   what the plaintiffs did, the City has now had 8 years of this

19   litigation to try to come up with some identification of some

20   specific facts with respect to any of our plaintiffs and they

21   failed to do so, other than with respect to one plaintiff at

22   the library, which is not part of this motion.  So, I would

23   submit to you that they have had sufficient time to do that,

24   they failed to do that, and I don't -- they haven't -- they

25   haven't done, they don't they think they need to do it, or they

1    tried to do it and it's just not there.

2         Finally on the no summons policy, Judge, in addition

3    to the argument made by Mr. Dunn, it's clear to me that this no

4    summons policy runs afoul of the First and Fourteenth

5    Amendment.  And particularly the Fourteenth Amendment

6    because -- and I think it no more graphically demonstrated by

7    the Quality of Life effort which was specifically part of the

8    RNC enforcement effort.  And there were hundreds of people

9    arrested, as Mr. Dunn said, in and around Madison Square

10   Garden.  The Quality of Life effort was directed at RNC venues,

11   and hotels, and the Madison Square Garden; any venues where

12   there were likely to be RNC delegates or RNC business

13   happening.  And those people, there was over 500 officers

14   assigned to this effort as part of the overall law enforcement

15   effort.  They clearly focused on RNC-related events.  Anybody

16   charged with a violation summons-eligible offense, and there

17   were hundreds of them.  And we provide -- we give you the

18   numbers in our brief.  Anybody charged with the summonsable

19   offense was given a summons in those circumstances.  And so I

20   really think it illustrates, to me anyway, that you have a

21   policy if it, in fact, is based on the concern about terrorism,

22   how can you justify a policy that says somebody arrested for

23   having an illegal cart in front of Madison Square Garden, or

24   somebody charged with disorderly conduct in front of Madison

25   Square Garden an, who is not connected to some kind of

1  demonstration or protest activity, does not pose the same kind

2  of threat, potentially, to those these events that were

3  happening in the City at that time, than somebody who is

4  demonstrating.

5         In fact, one could argue that somebody in that

6  context, driving around in an unlicensed van, clearly evident

7  than some of the other people who were given summons, might

8  pose more of a threat.  The fact is that it's a policy that

9  specifically targeted protest activity.  And there is a

10  comparator.  The comparator comes right from their own records,

11  the Quality of Life offensive.  And so we haven't moved for

12  summary judgment on that policy, although I do think that,

13  assuming on 14th Amendment grounds we might be entitled to

14  summary judgment, but I'll leave that up to the Court.

15         In any event, I do thank you for your time and your

16  careful consideration of the issues.  And we respectfully

17  request that the Court grant these motions for summary judgment

18  on behalf of the plaintiffs.

19         THE COURT:  And deny the ones for them, right?

20         MR. MOORE:  Yes, Judge.

21         THE COURT:  All right, Mr. Farrell.

22         MR. FARRELL:  Your Honor, I'll just take those issues

23  in reverse order.

24         On the equal protection claim, the evidence that

25  plaintiffs have put in regarding the Quality of Life, first of

1    all, the Quality of Life team was in effect for a month prior

2    to the RNC.  And that's demonstrated in the -- that's stated

3    explicitly in the exhibit that Mr. Moore attached.  There are

4    three exhibits relating to the Quality of Life.  And when you

5    look at the period of time for which it was in operation, it

6    was for a month prior to the RNC and during the RNC.

7            So there is no way to tell from that exhibit which,

8    when summons were given, whether they were given prior to the

9    RNC, or during the same time as when the policy, no summons

10   policy for the RNC was in effect, that's the first thing.  So

11   that evidence is not competent on that point.

12           The second thing is that they have given no -- there

13   is no evidence on the equal protection claim as to who the

14   proper comparative class would be.  You can't, even if you

15   assumed that their Quality of Life exhibits related only to the

16   same time period as when the RNC no summons policy was in

17   effect, which it doesn't.  But if you assume that, there is no

18   way to tell from just the number of summonses what those people

19   were engaged in, when they got summons or didn't.  You don't

20   know, just on the face of that document, whether that person

21   was engaged in First Amendment activity, or was not engaged in

22   First Amendment activity.  That's a burden that is on

23   plaintiffs on equal protection claim.  So their claim fails

24   because they have not satisfied that component of equal

25   protection.  They have not shown submitted, admissible evidence

1   on who the comparative class should be.

2          The last point on that is there is absolutely no

3   evidence in the record of animus on behalf of the police

4   department.  It is completely devoid of animus.  They have

5   taken -- 2005.  They have taken almost 6 years of deposition

6   testimony.  They deposed the chief of department for nine days

7   over four, five years resulting in 1900 pages of testimony.

8   They have deposed Commissioner Cohen over multiple days

9   resulting in thousands of pages of testimony.  There has been

10  hundreds and hundreds of depositions in this case.  And through

11  that entire time, we're before you today on summary judgment

12  motions, and they have not put before this Court one single

13  piece of evidence that the City had an animus to retaliate or

14  get back at protesters or demonstrators.

15         As to Schiller and Dinler's counsel's point about

16  Commissioner Cohen and the disclosure being made and the timing

17  of that disclosure, that was a technical issue before

18  Magistrate Francis.  The fact of the matter is, Magistrate

19  Francis said you need to put them explicitly in 26A disclosure.

20  But the fact of the matter is, over the years of testimony

21  before that, many people had testified about Commissioner

22  Cohen's role in providing the intelligence information upon

23  which the policies were based.  And Mr. Dunn wanted additional

24  discovery in that matter.  And that was the only basis for

25  allowing the discovery, additional discovery, that we as the

1    City, did not explicitly list Commissioner Cohen as a witness

2    in 26A disclosure.  So this was not a secret about Commissioner

3    Cohen, it was not a last minute attempt by the City to create

4    some evidence to defend the policies.

5         And what goes hand in hand with that is that

6    Commissioner Cohen -- I'm sorry, Chief Esposito, who was

7    deposed both before and after that, through the nine days of

8    deposition over multiple years, he never wavered on what the

9    reasons were for the policy.  They were always the same, he

10   reiterated them time and time again, and that doesn't change.

11   The fact the plaintiffs' counsel points to that Commissioner

12   Cohen doesn't remember the policy, Commissioner Cohen is not a

13   policy --

14             THE COURT:  Commissioner Cohen or Esposito.

15             MR. FARRELL:  Chief Esposito remembered the policy.

16             THE COURT:  Oh --

17             MR. FARRELL:  He was unwavering on the reasons the

18   policy was adopted.  The things that he -- he was not so sure

19   of was who attended what meeting when.  And these are in

20   depositions regarding meetings that took place in 2004.  The

21   depositions are in 2006 and 2010, several years after the

22   activity.  And plaintiff's whole case boils down to, oh, well,

23   the Chief of the Department who has a myriad of

24   responsibilities and duties, who attends thousands of meetings,

25   can't remember exactly who was at a particular meeting.

1          The bottom line is the Chief of the Department has

2      provided the reasons the policies were adopted, never wavered

3      on what those were.  And the fact that Commissioner Cohen

4      doesn't recall the policy, he was not a policymaker.  His role

5      in the department is to collect information and provide it to

6      the policymakers.  He is not a policeman, he spent his time at

7      the CIA gathering intelligence.  So that fact does not -- is

8      immaterial to the reasons why the polices were adopted.

9          And then on whether the policy was content neutral, I

10     would point the Court to the cases that we cite in our brief,

11     Ward and those other cases, and I think on the undisputed facts

12     of this case, that those lead to the conclusion that the policy

13     was content neutral.

14         I have to add one thing that was raised for the first

15     time in reply by plaintiffs' counsel.  One was that Essig and

16     Dieckmann, 16th Street, testified they observed people leaving

17     the block.  So when he asked for facts and when he was

18     responding to that, that was an additional fact that is in the

19     record, on top of the other facts, that makes it reasonable

20     for them to believe that the people they had at the end of that

21     period were the ones who intended to stay there and continued

22     to participate in the unlawful activity.  And then the last

23     thing he said was someone got pepper sprayed, no one got

24     pepper sprayed trying to leave the block.  It was a non

25     sequitur, so I'm not sure what the record of someone being

1   pepper sprayed on 16th Street had to do whether people had an

2   opportunity to leave the block, or whether the people placed

3   under arrest, in fact it was reasonable to believe for the

4   police to believe that those were the ones that had engaged in

5   unlawful conduct.

6           MR. ROTHMAN:  May I address the last statement about

7   the pepper spray, because it relates to this video that's been

8   referenced.  This as my former client, Brad Will.  He brought a

9   suit --

10          THE COURT:  Are you going to let me say "yes" or "no."

11          MR. ROTHMAN:  I thought you would indulge me, but

12   please.

13          THE COURT:  Well, I might.

14          But Mr. Rothman, since the City went over, I have

15   given you more time, I'm going to let Mr. Rothman get the last

16   word.

17          MR. ROTHMAN:  Very briefly, your Honor.

18          Mr. Will was a videographer.  He's seen on the video

19   that is referenced entering the block of 16th Street and going

20   westbound on the northern sidewalk.  When he gets to Irving

21   Place, an officer -- you can see it very clearly on the video.

22   As they are constructing the line, an impermeable line, from

23   building line to building line, takes out a canister of pepper

24   spray, sprays it from hip level, and the pepper spray actually

25   lands on his camera as he was going up to try and talk to the

1    officer.  You hear him say, why did you pepper spray me, why

2    did you pepper spray me, no response.  He then goes into the

3    block, has a conversation with Lieutenant Johnson.  Asked

4    Lieutenant Johnson, can the people go back to the park.

5    Lieutenant Johnson, one of the two Lieutenant that Essig

6    dispatched said, yes, go on the sidewalk.  And they go back

7    towards the park, they can leave.

8         And when Essig was asked in his deposition whether or

9    not Johnson was authorized to say, that Essig said, no, they

10   couldn't leave, because at that point everybody was going to be

11   arrested.  Which illustrates the unreasonableness and a lack of

12   coordination of the police at that scene.

13        And in terms of how he got off the block, you can see

14   very clearly on that video that Mr. Will snuck out of the block

15   as the officers on the Union Square east side were starting to

16   come in to effect the arrest.  It was very crafty of him, very

17   stealthy, I congratulate him on his stealthiness, but it was

18   not indicative as to whether or not the 300 people on that

19   block would have been able to have left at either one of the

20   sides of the block, which had impermeable police lines.  And I

21   will refer you to the reply brief which discusses the video and

22   the footnote.

23        THE COURT:  It's not whether 300 people would have

24   been free to leave, it's whether people not involved in illegal

25   activity and were not part of the group.  So it's whether the

1   dolphins could leave, not whether the tuna could leave, right?

2           MR. ROTHMAN:  Well, and Mr. Moore has discussed very

3   clearly, and Mr. Dunn, as well, that sending two lieutenants

4   without amplification up and down the block for a period of

5   five minutes to have one-on-one conversation with a shifting

6   mass of humanity, many of whom nobody could tell looking at

7   these people whether or not they had marched in the street,

8   whether or not they just were walking down the sidewalk,

9   whether they had come out of a cafe, whether or not they had

10  entered -- like Mr. Dunn's client from the Irving Place side

11  whether on not, like my client Betty Bastidas, and multiple

12  people visible on that video who crossed over after the police

13  had directed the whole group of people onto the block, there is

14  a pulse of people who are seen on the defendant's videos who

15  crossed directly from Union Square Park, because they're

16  curious, because there is a marching band on a street on a

17  beautiful summer evening.  People are drawn by the music, check

18  it out and see what's going on.  They have a First Amendment

19  right to do that, which hasn't been mentioned.  So people, they

20  gravitate it towards this block, lines are thrown up on the

21  block.  There is no remotely reasonable attempt made to tell

22  everybody who was present there, if you don't want to get

23  arrested, you need to go on your way now, because we need to

24  clear this street.  Essig, in fact, says that everyone on that

25  block, other than those few episodic people that Johnson and

1    Cortright happened to go up to and say without any criteria,

2    oh, you can leave, you can leave.  Everybody on that block, the

3    intent was to arrest everybody on that block, Essig said that.

4    And it's clear he didn't communicate appropriately with

5    Johnson, because Johnson gave people instructions that Essig

6    explicitly testified he was not authorized to give.  And

7    Johnson told the people go on the block.  And you can see on

8    the video, Mr. Will in response to Johnson tells the people, go

9    on the sidewalk, and go just on the sidewalk back to the park

10   and you can leave.  And they could not.  Because everybody on

11   that block was going to be arrested.

12        So I would refer you to that video and to the

13   discussion of it in my reply brief.  And I would rely on the

14   statements of my colleagues, as a matter of law, the attempt to

15   notify 300 people, 400 people, on an entire city block, right,

16   it is unreasonable as a matter of law for two people without

17   amplification to mill around and have private conversations and

18   say, you're dolphin, you should leave.

19        THE COURT:  Your view is that had the police cordoned

20   off the entire street, made an announcement that says dolphins

21   are free to leave, show your credentials to the officers at the

22   south end or west end, and then they came through and showed --

23   I don't know what the criteria would be, but the police

24   basically said, yeah, you look like a dolphin, you can go, no,

25   you're a tuna, you have a saxophone in your hand, you're

```
 1    staying, that would have been okay, that would have passed

 2    muster.

 3              MR. ROTHMAN:  What would have passed muster is if they

 4    made an appropriate amplified dispersal order to put people on

 5    notice that they had to leave and gave reasonable opportunity

 6    for people to leave, and if they had some specified

 7    individualized knowledge that such a person was a lawbreaker,

 8    let's say a saxophonist, let's say a particular cop saw a

 9    particular saxophonist who he recognized was marching in the

10    street playing, you know, When The Saints Come Marching In, and

11    that cop recognized that saxophonist, so arrest that

12    saxophonist, don't arrest my client, Betty Bastidas, with

13    United Nations Press passes around her neck, or Thea Rigby, who

14    also had press credentials, or the other four people who

15    Mr. Upton and I represent, who had no indicia that they were

16    involved with any march or parade, because they were not.  They

17    just happened to be in the Union Square area, heard something

18    boisterous going on, wanted to check it out.  They were dressed

19    in regular civilian clothes, Ms. Caspa was on her way to visit

20    her sick aunt, another one just come from shopping.  They were

21    just in the area and went over to check it out.  And so nobody

22    could ever have had a reason to think that they were -- I don't

23    know which one is the bad one, the tuna or dolphin.

24              THE COURT:  The dolphins are good tasting, but high in

25    mercury.
```

1          MR. ROTHMAN:  Nobody could have thought they were

2     tuna.  There was no indication for any reasonable officer to

3     think that they were not a dolphin.  And so there was no remote

4     reason for them to think they had probable cause to arrest the

5     clients that Mr. Upton and I represent, and everybody else who

6     was on that block, unless they had some particularized reason

7     to think that they had broken some particularized law.

8          And Essig admits he had no idea who was or was not on

9     the sidewalk, and who was or was not in the roadway.

10         He admits that.

11         THE COURT:  Thank you.  Stop you now, just because

12    we're exactly the same.

13         MR. ROTHMAN:  Thank you, your Honor.

14         THE COURT:  Each of you got an hour and 16 minutes, so

15    I think -- actually, now, the plaintiffs get 30 seconds more.

16         I'll give you 30 seconds, Mr. Farrell, that's how

17    scrupulous I am.  The court reporter is gonna kill me.

18         MR. FARRELL:  Take my thirty seconds.

19         Mr. Rothman admitted that his clients were there, that

20    they were proceeding with the group as it came down.  It's not

21    what is in their head that is important, it's whether the

22    police officers really believed --

23         THE COURT:  No, I get the standard.

24         MR. FARRELL:  And another thing I would point to is in

25    case in Carr in the Second Circuit case, the Court there

1  recognizes that on the facts of that case, the people that came

2  and were part of the march or perceived to be part of the

3  march, do not have a claim for false arrest.  They said the

4  only people under the facts of that case would be, assuming

5  that they were perceived to be engaging in unlawful activity,

6  that that was shown, would be the people that were in the

7  alleyway, because the group, if you remember, disbursed and ran

8  in an alleyway.  So the cops lost sight of who was there,

9  whereas in our case everybody is located right around the

10 group.  In the alleyway, the Carr case says the only people in

11 Carr who would have a false arrest claim, are the ones who if

12 it was not reasonable that the police then closed off the block

13 and people had gotten in through the line.  It says that you

14 have to read the case very carefully, there's two specific

15 segments in the case that say that.

16      THE COURT:  I don't want to overstate the Eighth

17 Circuit's opinion, it's not binding and pressing on me, it's on

18 point.  And so I have looked at it.  And you have all cited it.

19 But we shouldn't overstate the significance of it.

20      MR. FARRELL:  The Carr case was out of the DC Circuit

21 page 406 and 409, but that points to the fact that there was no

22 case law in the Second Circuit addressing these issues.  The

23 law was not clearly established, and the clients had a minimum

24 of ties to qualified immunity.

25      THE COURT:  It's now 6:10, it's been a long day.  I

1    want to thank all who argued, and all who assisted to prepare

2    them.  And the court reporter who doesn't get a break the

3    entire time.

4         I'll thank the court security officer and -- no

5    applause.  And you should clear out of here in 10 minutes or he

6    is going to summons you.  I don't mean to make light of this,

7    obviously these are very important issues that have great

8    implications for many people.  So it's a source of great regret

9    for me that this is taking so long.  That's the nature of mass

10   arrest cases.  And there are others out there that have taken a

11   long time.

12        I do want to get this moving.  Discovery took forever.

13   And I'm not blaming anybody for that, but we now have to really

14   get this going.  So I am going to reserve for a very short

15   period so I can collect my thoughts, absorb the arguments that

16   have been made, but I want to turn this around quickly.  And

17   then after I rule, I suppose then we'll talk about what's next,

18   because I think depending on how I rule will affect the answer

19   to that question, okay.

20        MR. FARRELL:  I would just like to say while I was

21   speaking I also want to give credit to the entire team that was

22   behind me, while I was the one --

23        THE COURT:  This isn't the Oscars, Mr. Farrell.

24        MR. FARRELL:  I just wanted to give credit to the

25   entire team behind me.  Thank you.

1                THE COURT:  And we're adjourned.

2                (Adjourne)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25